# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT;  :
THE STATE OF DELAWARE;  :
THE STATE OF FLORIDA;  :
THE STATE OF HAWAII;  :
THE STATE OF IDAHO;  :
THE STATE OF IOWA  :
THE STATE OF KANSAS;  :
THE COMMONWEALTH OF  :
    KENTUCKY;  :
THE STATE OF LOUISIANA;  :
THE STATE OF MAINE;  :
THE STATE OF MARYLAND;  :
THE COMMONWEALTH OF  :
    MASSACHUSETTS;  :
THE STATE OF MINNESOTA;  :
THE STATE OF NEVADA;  :
THE STATE OF NEW YORK;  :
THE STATE OF NORTH DAKOTA;  :
THE STATE OF OHIO;  :
THE COMMONWEALTH OF  :
    PENNSYLVANIA;  :
THE COMMONWEALTH OF  :
    VIRGINIA; and  :
THE STATE OF WASHINGTON;  :
                 :   CIVIL ACTION NO.
                 :
                 :   **Public Version**:  3:16 cv 2056 VLB
    v.            :
AUROBINDO PHARMA USA, INC.;  :
CITRON PHARMA, LLC;  :
HERITAGE PHARMACEUTICALS, INC.; :
MAYNE PHARMA (USA), INC.;  :
MYLAN PHARMACEUTICALS, INC.;  :
TEVA PHARMACEUTICALS USA, INC.; :   December 14, 2016

## COMPLAINT

The States of Connecticut, Delaware, Florida, Hawaii, Idaho, Iowa, Kansas, Louisiana,

Maine, Maryland, Minnesota, Nevada, New York, North Dakota, Ohio and Washington and the

Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia (the "Plaintiff States"),

by and through their Attorneys General, bring this action against Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage Pharmaceuticals, Inc., Mayne Pharma (USA), Inc., Mylan Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc., (collectively, the "Defendants") and allege as follows:

## I.     SUMMARY OF THE CASE

1.      In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals.  The information developed through that investigation, which is still ongoing, uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States.  In this initial civil action, the Plaintiff States charge the Defendants with entering into contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the markets for Doxycycline Hyclate Delayed Release ("Doxy DR") and Glyburide in the United States.

2.      Generic pharmaceutical drugs – drugs that are pharmaceutically equivalent in dosage, form, route of administration, strength or concentration and have the same amount of active ingredient as the reference-listed brand name drug – save consumers and our healthcare system tens of billions of dollars annually because they introduce competition into a market where none previously existed.  When a high-priced branded drug comes off patent, generic drugs offer the prospect of lower prices and greater access to healthcare for all consumers in the United States.

3.      Typically, when the first generic manufacturer enters a market, the manufacturer prices its product slightly lower than the brand-name manufacturer.  However, the appearance of

a second generic manufacturer reduces the average generic price to nearly half the brand name price. As additional generic manufacturers market the product, the prices continue to fall, but at a slower rate. For products that attract a large number of generic manufacturers, the average generic price falls to 20% of the branded price and lower.

4.     Generic drugs have long been referred to as one of the few "bargains" in the United States healthcare system and historically health care experts have said that cost savings from the growing number of generic drugs have gone a long way toward keeping the lid on overall increasing health care costs.  This was the way the generic drug market was intended to work, and has generally worked, since the implementation of the Hatch-Waxman Act in 1984.

5.     Over the last several years, however, that price dynamic has changed for a large number of generic drugs.  Prices for dozens of generic drugs have uncharacteristically risen -- some have skyrocketed -- for no apparent reason, sparking outrage from public officials, payers and consumers across the country whose costs have doubled, tripled or in some cases increased up to 1,000% or more.   The growing outrage and public reports of unexplained and suspicious price increases caused the State of Connecticut to commence an investigation in July of 2014, which was followed shortly thereafter by a Congressional inquiry and a reported criminal grand jury investigation by the United States Department of Justice Antitrust Division.

6.     Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.  What the Plaintiff States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug competitors.

7.     Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors.  The Defendants exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements.  The anticompetitive agreements are further refined and coordinated at regular "industry dinners", "girls nights out", lunches, parties, and numerous and frequent telephone calls, emails and text messages.

8.     This anticompetitive conduct -- schemes to fix and maintain prices, allocate markets and otherwise thwart competition – has caused a significant, lasting and ultimately harmful rippling effect in the United States healthcare system, which is still ongoing today.  Moreover, many of these schemes were conceived and directed by executives at the highest levels of many of the Defendant companies.

9.     Although the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time, this Complaint focuses on illegal and anticompetitive conduct with regard to two of those drugs:  Doxy DR and Glyburide.

10.     The principal architect and ringleader of the conspiracies identified herein is Defendant Heritage.  Through its senior-most executives and salespersons, Heritage organized and initiated a wide-ranging series of conspiracies which included numerous generic drug manufacturers, all of whom were knowing and willing participants.  Collectively, Defendants were able to obtain a substantial windfall as a result of these illegal agreements.

11.     The Defendants' anticompetitive schemes have been carried out in two principal ways:  First, to avoid competing with one another and thus eroding the prices for certain generic

drugs, Defendants -- either upon their entry into a given generic market or upon the entry of a new competitor into that market-- communicated with each other to determine and agree on how much market share or which customers each competitor was entitled to. They then effectuated the agreement by either refusing to bid for particular customers or by providing a cover bid that they knew would not be successful. These schemes have the effect of reducing or eliminating competition for a particular drug, and have allowed the Defendants to maintain artificially supra-competitive prices in these markets throughout the United States.

12.     Alternatively, or often in conjunction with those schemes, competitors in a particular market simply communicate -- typically either in person, by telephone, or by text message -- and agree to collectively raise prices for a particular generic drug.

13.     The Defendants knew their conduct was unlawful. Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate. When communications were made in writing, or by text message, some of the Defendants even took overt and calculated steps to destroy evidence of those communications.

14.     As a result of the conspiracies enumerated herein, consumers nationwide paid more for numerous generic pharmaceutical drugs, including specifically Doxy DR and Glyburide, than they otherwise would have in a competitive market, and the Defendants illegally profited as a result.

15.     The Plaintiff States seek a finding that the Defendants' actions violated federal antitrust law; a permanent injunction preventing the Defendants from continuing their illegal

conduct and remedying the anticompetitive effects caused by their illegal conduct; disgorgement of the Defendants' ill-gotten gains; and other relief as a result of Defendants' violations of law.

## II.   **JURISDICTION AND VENUE**

16.     This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. §§ 1 & 26, and under 28 U.S.C. §§ 1331 and 1337.

17.     All claims enumerated herein are based on a common nucleus of operative fact, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.

18.     This Court may exercise personal jurisdiction over all of the Defendants because all of the Defendants currently transact business in the District of Connecticut.  Specifically, the Defendants market and sell generic pharmaceutical drugs in interstate commerce to consumers nationwide, including in this District, through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs. The acts complained of have and will continue to have substantial effects in this District.

19.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(c).  The Defendants all may be found and transact business within the District of Connecticut.

## III.   **THE PARTIES**

20.     The Attorneys General of the Plaintiff States are the chief legal officers for their respective states and commonwealths.  They are granted authority under federal antitrust law to bring actions in their quasi-sovereign capacities to protect the economic well-being of the States and obtain injunctive and other equitable relief from the harm that results from the violations of antitrust laws alleged herein.  Each of the Plaintiff States and citizens residing therein purchased

or provided reimbursement for the various generic pharmaceutical drugs that are the subject of this Complaint at supra-competitive prices as a result of the Defendants' conduct alleged herein.

21.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6 Wheeling Road, Dayton, New Jersey.

22.     Defendant Citron Pharma, LLC ("Citron), is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 2 Tower Center Boulevard, Suite 1101, East Brunswick, New Jersey.

23.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 12 Christopher Way, Suite 300, Eatontown, New Jersey.

24.     Defendant Mayne Pharma (USA), Inc. ("Mayne"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 3301 Benson Drive, Suite 401, Raleigh, North Carolina.

25.     Defendant Mylan Pharmaceuticals, Inc. ("Mylan"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania.

26.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania.

27.     Whenever any reference is made in this Complaint to any representation, act or transaction of Defendants, or any agent, employees or representatives thereof, such allegations shall be deemed to mean that such principals, officers, directors, employees, agents or

representatives of Defendants, while acting within the scope of their actual or apparent authority, whether they were acting on their own behalf or for their own benefit, did or authorized such representations, acts or transactions on behalf of Defendants, respectively.

## IV.   FACTS SUPPORTING THE LEGAL CLAIMS

### A.  The Generic Drug Market

#### The Hatch-Waxman Act

28.     In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, commonly known as the "Hatch-Waxman" Act.  Its intention was to balance two seemingly contradictory interests: encouraging drug innovation, and promoting competition between brand and generic drugs in order to lower drug prices.  To encourage innovation, Hatch-Waxman gave branded drug manufacturers longer periods of market exclusivity for newly-approved products; this increased the financial returns for investment in drug research and development.

29.     To promote price competition, the law established a new regulatory approval pathway for generic products to help ensure that generic drugs became available more quickly following patent expiration.  To gain approval for a new drug, drug manufacturers must submit a new drug application ("NDA") to the United States Food and Drug Administration ("FDA") showing that the new drug is safe and effective for its intended use.  Developing a new drug and obtaining an NDA can take many years and cost tens or hundreds of millions of dollars.

30.     The Hatch-Waxman Act encouraged faster approval for generic versions of brand-name drugs through the use of "abbreviated new drug applications" ("ANDAs").  These applications rely on the safety and efficacy evidence previously submitted by the branded drug

manufacturer, permitting generic manufacturers to avoid conducting costly and duplicative clinical trials.

31.     Hatch-Waxman succeeded in both of its goals.  Since the law was passed in 1984, generic drugs have moved from being less than 20% of prescriptions filled in the United States to now representing over 80% of prescriptions filled, and a recent study found that generic medicines saved $193 billion for consumers in 2011 alone.  During the same period, innovation has continued to lead to many new and helpful drugs.

### The Importance of Generic Drugs

32.     Like their branded counterparts, generic drugs are used in the diagnosis, cure, mitigation, treatment or prevention of disease and, thus, are integral components in modern healthcare, improving health and quality of life for nearly all people in the United States.  In 2015, sales of generic drugs in the United States were estimated at $74.5 billion dollars.  Today, the generic pharmaceutical industry accounts for approximately 88% of all prescriptions written in the United States.

33.     A branded drug manufacturer that develops an innovative drug can be rewarded with a patent granting a period of exclusive rights to market and sell the drug.  During this period, the manufacturer markets and sells its drug under a brand name, and if demand for the new drug is high, the lack of competition can permit the manufacturer to set its prices high as well.

34.     Once the brand-name drug's exclusivity period ends, other firms who have received FDA approval are permitted to manufacture and sell "generic" drugs that are equivalent to the brand-name drug.  As the makers of generic versions of the brand-name drug begin offering their equivalent products in the market, competition typically leads to dramatic

reductions in price.  Generic versions of brand name drugs are typically priced lower than the brand-name versions from the moment the first generic manufacturer enters the market.  Under most state laws, generic substitution occurs automatically, unless the prescriber indicates on the prescription that the branded drug must be "dispensed as written."

35.     As additional manufacturers enter the market, competition will push the price down much more dramatically.  Often, the price of a generic drug will end up as low as 20% of the branded price or even lower.  For this reason, generic drugs have long been referred to as one of the few "bargains" in the United States healthcare system.  Experts have even stated that the substantial cost savings gained from the growing number of generic drugs have played a major role in keeping the lid on overall increasing health care costs.

36.     The savings offered by generics drugs over their brand-name equivalents can provide tremendous benefits to all consumers and health care payers.  Patients typically see lower out of pocket expenses, while lower costs for payers and insurers can lead to lower premiums for all those who pay for health insurance, and lower costs to government health care programs like Medicare and Medicaid mean greater value for taxpayers.

### The Players in the Drug Distribution System

37.     The United States prescription drug distribution system includes a multitude of entities that are involved at various stages of the distribution channels through which prescription drugs are delivered to patients.

### *Manufacturers/Suppliers*

38.     Drug manufacturers are the source of the prescription drugs in the pharmaceutical supply chain.  As opposed to branded drug manufacturers, generic manufacturers typically do not develop new drug therapies, but instead manufacture generic compounds that compete

directly with the original branded version of a drug once the brand product's patent protection has expired.  Generic pharmaceuticals can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments and creams.  A manufacturer that wishes to sell a "new drug" in the United States (including generic versions of previously approved drugs) must obtain approval from the FDA, which reviews many factors, including drug safety, efficacy, raw material suppliers, manufacturing processes, labeling and quality control.

39.     Generic drug manufacturers manage the actual distribution of drugs from manufacturing facilities to drug wholesalers, and in some cases, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans.

40.     Drug manufacturers compete with one another to sell generic pharmaceutical drugs to entities in the distribution chain such as wholesalers and distributors.  Generic drugs are also sold in auctions to different purchasers in the supply chain, e.g., group purchasing organizations and large retail pharmacies and supermarket chains with pharmacies.

41.     The marketing practices of generic drugs often reflect almost no attempt at differentiation from other versions of the same product.  That is because, in essence, a generic drug is a commodity, which means, for the most part, competition is largely dictated based on a manufacturer's ability to provide supply and the price it charges for that specific generic drug.  As a result, generic drug manufacturers usually market the drug under the name of the active ingredient, such that several generic drug producers market the product under the same name.

42.     Drug suppliers can include the manufacturers themselves, or other companies that have agreements to sell or distribute certain generic pharmaceutical drugs manufactured by another company.  The Defendants in this action are all drug manufacturers/and or suppliers and

compete with one another for the sale of generic pharmaceutical drugs to consumers in the United States.

43.     Drugs sold in the United States may be manufactured domestically or abroad, and many manufacturers that produce drugs for the United States market are owned by, or are themselves, foreign companies.  For example, defendant Teva is a subsidiary or affiliate of one of the five largest drug manufacturers in the world, headquartered in Israel.  Generic drugs may be manufactured by the same companies that manufacture brand-name drugs (even in the same factories), or may come from companies that manufacture generics exclusively.  Drug manufacturers typically sell their products through supply agreements negotiated with wholesalers and distributors, group purchasing organizations, pharmacy benefit managers and some large retailers like pharmacy and supermarket chains.

### *Wholesalers/Distributors*

44.     Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers, including pharmacies (retail and mail-order), hospitals, and long-term care and other medical facilities (e.g., community clinics, physician offices and diagnostic labs).  Some wholesalers sell to a broad range of potential customers while others specialize in sales of particular products (e.g., biologic products) or sales to particular types of customers (e.g., nursing homes).

45.     Wholesalers and distributors have similar business models, but distributors typically provide more services to their customers.  Some of the largest wholesalers and distributors of generic drugs include AmerisourceBergen Corporation ("ABC"), Cardinal Health, Inc. ("Cardinal"), H.D. Smith, LLC ("HD Smith"), McKesson Corporation ("McKesson") and Morris & Dickson, LLC ("Morris & Dickson").

### *Group Purchasing Organizations (GPOs)*

46.      Group purchasing organizations ("GPOs") are membership-based entities that negotiate with manufacturers, wholesalers, and distributors on behalf of a large group of purchasers.  GPOs leverage their buying power to obtain better prices and terms for their members, and assist buyers in trade relations and contract management with sellers.  GPOs have formed to serve state and local governments, hospital groups, retail pharmacies, and supermarket chains.  Some of the largest GPOs include Vizient (formerly Novation), Premier, Inc., Intalere (formerly Amerinet), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") and Econdisc Contracting Solutions ("Econdisc").

### *Pharmacy and Supermarket Chains*

47.      Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer/patient.  There are several types of pharmacies, including chain and independent retail pharmacies, pharmacies in supermarkets and other large retail establishments, and mail-order pharmacies. If a retail pharmacy or supermarket chain purchases generic drugs on a large enough scale, manufacturers may agree to contract with them directly.  Such retailers can obtain attractive terms by avoiding the markups or fees collected by wholesalers, distributors, and GPOs.  Retailers large enough to purchase drugs directly from manufacturers include Rite Aid Corporation ("Rite Aid"), The Walgreen Company ("Walgreens"), Wal-Mart Stores, Inc. ("Walmart"), Target Corporation, and Publix Super Markets, Inc. ("Publix"), among others.

### The Cozy Nature of the Industry and Opportunities for Collusion

48.     The generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.

### *Trade Association and Customer Conferences*

49.     Many customers of the Defendants, including but not limited to (a) large wholesalers or distributors like ABC, Cardinal, HD Smith, McKesson and Morris & Dickson, (b) group purchasing organizations like Premier, Inc., MMCAP and Econdisc, and (c) other large drug purchasers like pharmacy or grocery store chains, hold multi-day conferences throughout the year where many if not most of the generic manufacturers across the United States are invited to attend.

50.     In addition, the Defendants and other generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") and Efficient Collaborative Retail Marketing ("ECRM"), among others.

51.     At these various conferences and trade shows, sales representatives from many generic drug manufacturers, including the Defendants, have opportunities to interact with each other and discuss their respective businesses and customers.  Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting.  Of particular importance here, generic drug manufacturer representatives who attend these functions, including the

Defendants, use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

52.     In short, these trade shows and customer conferences provide generic drug manufacturers, including but not limited to the Defendants, with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

### *Industry Dinners and Private Meetings*

53.     In addition to these frequent conferences and trade shows, sales representatives get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.

54.     A large number of generic drug manufacturers, including several of the Defendants, are headquartered in close proximity to one another in New Jersey or eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.

55.     In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen (13) high-ranking male executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.  An executive from defendant Aurobindo attended this particular dinner.

56.     At these industry dinners, one company is usually responsible for paying for dinner for all of the attendees.  The company that pays the bill is generally determined by alphabetical order.  For example, in a group email conversation among the competitors in

December 2013, one of the participants -- a high-ranking executive for one of the participants --

joked "████████████████████████" The response: "████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████"

57.     Female generic pharmaceutical sales representatives also get together regularly

for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry"

meetings and dinners.  During these GNOs, meetings and dinners, these representatives meet

with their competitors and discuss competitively sensitive information.

58.     "Women in the Industry" dinners were typically organized by a female

salesperson from defendant Heritage, ███, who resides in the State of Minnesota.  Other

participants in those meetings were typically employees of generic drug manufacturers located in

Minnesota, or female salespeople residing in the area -- but not exclusively.  For example, in

November 2014, a female salesperson from a competitor not identified as a co-conspirator in the

Complaint sent ███ a text message asking "████████████████████████████

████████████████████████" ██ responded: "████████████

████████████████████████████████████████████

████████████████████████████"

59.     The September 2014 dinner was also planned around the visit of an out-of-town

competitor.  As ███ stated in organizing the dinner:

████████████████████████████████████████████

60.     Several different GNOs were held in 2015, including:  (1) at the ECRM conference in February (involving defendants Citron and Heritage, among others); (2) in Baltimore in May (involving defendants Citron, Heritage and Teva, among others); and (3) at the NACDS conference in August (involving defendants Citron, and Heritage, among others).

### *Information Sharing*

61.     As a result of these various interactions, sales and marketing executives in the generic pharmaceutical drug industry are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity and opportunity often leads to agreements among competitors to allocate a given market so as to avoid competing with one another on price.

62.     Defendants and other generic drug manufacturers routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

63.     Defendants and other generic drug manufacturers also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection and rebates.  Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

### *Generic Drug Price Spikes Since 2013*

64.     Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout 2013 and 2014.  According to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014."

65.     A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices sometimes spiking by 600% to 2,000% in some cases.

66.     More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

### B. The Illegal Schemes

### Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion

67.     When entering a generic drug market, Heritage and other Defendants routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price.  These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition when in fact none existed.

68.     One specific example of this illegal behavior is set forth below.

### *Doxy DR*

69.     Doxycycline Hyclate Delayed Release ("Doxy DR"), also known by the brand-name Doryx®, is a tetracycline-class antimicrobial indicated as adjunctive therapy for severe acne.

70.     Heritage entered the market for Doxy DR on July 2, 2013.  The only other generic manufacturer selling Doxy DR at that time was defendant Mylan.

71.     Even before Heritage began selling Doxy DR, representatives of the company began to communicate with Mylan in an effort to divide the market in order to refrain from competing with each other on price.  Because Mylan was the only manufacturer of Doxy DR in the generic market at that time, pricing for the drug was still very profitable.

72.     For example, on May 2, 2013, Jason Malek, Vice President of Commercial Operations at Heritage, asked ███████████████████ at Heritage, to set up a call between Malek and the Vice President of Sales at Mylan.  ████ responded that the Vice President of Sales at Mylan had little to do with National Accounts, and he recommended instead that Malek contact ███████████████████ at Mylan.

73.     Malek promptly connected with ███ through the website LinkedIn.  Over the next several weeks, Malek and ███ communicated with ███ by phone on multiple occasions.

74.     Similarly, on May 7, 2013, Heritage's President and CEO, Jeffrey Glazer, emailed ████████████████ at Mylan.  Glazer stated: ██████████████ ████████████████████████████████████████ █████████████████████████" ███ responded with a phone number where he could be reached in England, and the two spoke the next day.

75.     During the course of these communications, Heritage and Mylan executives agreed to allocate market share and refrain from competing with one another for customers in the market for Doxy DR.  The objective was to avoid a price war which would reduce profitability for both companies.  Mylan agreed to "walk away" from at least one large national wholesaler and one large pharmacy chain to allow Heritage to obtain the business and increase its market share.

76.     On the rare occasion that Mylan insisted on competing for business that Heritage believed it was entitled to, Heritage contacted Mylan directly to address the situation.  For example, on November 25, 2013, after Mylan sought to protect its business with one large account, Malek sent an email to ███ asking "███████████" ███ responded: "███████

███████████████████████████████████████████████"

77.     That same day, Malek also emailed Glazer, saying that "████████████

█████████████████████

████████████████" Glazer's response made clear the purpose of the agreement with Mylan (maintain high prices) and questioned whether Heritage should take any action that would disrupt that agreement:  "████████████████████████

█████████████████████████████

███████████████"

78.     In February of 2014, a new competitor entered the market for the 150mg tablets of Doxy DR.  Defendant Mayne (formerly Midlothian Labs) approached Heritage even before it began selling the generic drug, in an attempt to obtain some of Heritage's market share.  For example, on January 7, 2014, ████████████████ at Mayne, spoke by phone with ███, a ████████████ at Heritage.

79.     Shortly thereafter, Heritage was solicited by a large wholesaler requesting a bid for Doxy DR. ▇▇▇ learned from the wholesaler that Mayne had provided an unsolicited bid for the Doxy DR business, which prompted the wholesaler to approach the incumbent supplier, Mylan, to see if Mylan would match the price in order to retain the contract.  This process is a customary practice in the industry and often referred to as a "Right of First Refusal" ("ROFR").  An ROFR is often included as a term in supply contracts between manufacturers and their customers, giving the incumbent manufacturer the right to beat a competitor's price and retain the business.  Because the unsolicited Mayne bid essentially re-opened the bid process, the wholesaler asked Heritage if it would like to bid on the Doxy DR as well.

80.     In discussing the issue internally, Malek conceded that Heritage had the Doxy DR supply to fulfill the contract, but wanted "▇▇▇▇▇▇▇"  Providing a bid would be perceived as an attack on Mylan's business and may result in retaliation.  ▇▇▇ agreed, adding that "▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇"

81.     The next day ▇▇▇ responded to the wholesaler and declined to provide a bid.  The reason ▇▇▇ gave to the customer for the inability to provide the bid was that Heritage might not have enough supply to fulfill a contract with the wholesaler.  ▇▇▇'s explanation, however, was a lie, because three days later, she approached a different customer – a pharmacy chain – and asked if Heritage could bid for that company's Doxy DR business, saying "▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇"

82.     When Mayne initially entered the Doxy DR market, it avoided bidding on Heritage customers and chose instead to target Mylan, which had roughly 60% of the Doxy DR market.  Mylan, however, consistently protected its business, choosing not to allow Mayne to

acquire market share.  In an internal Mayne email discussion on February 21, 2014, after

learning from a wholesaler that Mylan had again protected its business with that wholesaler,

██████████████████████████ at Mayne, gave ███ his understanding of the

situation based on his experience in the industry: "█████████████████████████

████████████████████████████████████████████████████

██████████" ███ replied "███████"

    83.    ███ continued to communicate with ███ about Doxy DR.  They spoke by phone

on March 13, 2014 and again four days later.  On March 17, 2014, in an email to Malek and

others at Heritage entitled "███████████████", ███ recounted their latest

conversation, as well as her current understanding with ███:

84.    Malek responded: "████████████████████████████████

████" ████'s response was "████████████████████████████████"

85.    Only two weeks later, however, Heritage learned that Mayne had made an

unsolicited bid for Doxy DR to one of Heritage's large nationwide pharmacy accounts.  On

March 31, 2014, Malek emailed ████ stating that Mayne "████████████████████

██████████████████████" ████ responded: "████████"

86.    The next day, April 1, 2014, ████ spoke with ████ Malek and ████ then

exchanged text messages.  ████ told Malek that she "██████████████████████

██████████████████████████████████████████████████████

██████████████████████████" Malek responded that Heritage "████████

██████████████████████"

87.    ████ called ████ again the next day and they spoke for 12 minutes.  Malek then

emailed Heritage CEO Jeff Glazer, stating "████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████"

88.    ████ and ████ spoke again on April 9, 2014.  She reported the conversation to

Malek and ████: "████████████████████████████████████████

████████████████████████"

89.    The next day, ████ and ████ exchanged a series of text messages:



(1:14pm) ████: "██████████████████████████████████████

██████████████████████████████████"



90.     Mayne continued to look for a large account over the next several months, with Mylan and Heritage protecting their business.  Heritage did walk away from one account in May, 2014, however, when Mayne underbid Heritage's price.

91.     During this time period, Heritage continued to honor its agreement with Mylan not to target Mylan's Doxy DR accounts.  For example, on August 29, 2014, Malek sent an internal email to ▓ titled "▓" In the email Malek stated "▓▓▓"

92.     In November, 2014, Mayne again put in offers to McKesson's One Stop program and to Econdisc.  On November 21, 2014, ▓ sent an email to Malek and others at Heritage, stating "▓" Malek immediately asked ▓ to reach out to ▓ and discuss the situation.  After exchanging text messages and voice mails with ▓, ▓ responded: "▓"

93.     ▓ and ▓ eventually spoke on November 24, 2014.  ▓'s notes reflect that when they spoke, she asked ▓ what her goals were with respect to Doxy DR.  ▓ responded that Mayne was looking for market share; she told ▓ that Mayne had to get a "▓" ▓ floated the idea that Heritage may be willing to walk from Econdisc if

Mayne would agree not to price Doxy DR aggressively, and if Mayne would also agree to withdraw its offer to McKesson.

94.     After speaking with ▮▮, ▮▮ emailed Malek stating "▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮" Within a half hour, after speaking with Malek, ▮▮ made a formal offer to ▮▮ by text message: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮"

95.     The next day, November 25, 2014, Malek emailed ▮▮ asking "▮▮▮▮▮▮▮ ▮▮▮▮▮" ▮▮ responded "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮" Malek ended the conversation by saying "▮▮▮▮▮▮▮▮▮"

96.     In internal email communications in the weeks following this agreement, Heritage CEO Glazer confirmed that Heritage was "▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮" and that Heritage "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" the price for Doxy DR.

97.     ▮▮ and ▮▮ continued to communicate throughout December 2014, by text message and even in person at the American Society of Health-System Pharmacists ("ASHP") conference on December 9, 2014.

98.     When Econdisc put the Doxy DR business out to bid again in January of 2015, Heritage made sure that it bid a higher price than Mayne, fulfilling its agreement by "walking" from Econdisc. As one Heritage employee described it in March 2015, "▮▮▮▮▮▮▮ ▮▮▮▮▮" at Econdisc.

99.     In September, 2015, Heritage was approached by a large nationwide pharmacy chain requesting a bid on Doxy DR. ▮▮, initially excited about the opportunity, confirmed

internally that Heritage had the capacity to bid.  Malek cautioned, however, that "███████

██████████████████████████████████" before providing a response.

100.   After finding out that the incumbent supplier was Mayne, ████ reached out to ████

by text message.  ████ confirmed that Mayne had no supply issues and that the pharmacy chain

was simply shopping for a better price.  In accordance with their agreement not to compete with

each other and avoid price erosion, Heritage refused to provide a bid.

### Agreements to Fix Prices

101.   In addition to reaching agreements with competitors to allocate markets for a

number of different generic drugs, Heritage and other Defendants routinely and as part of their

regular course of business, sought and obtained agreements with competitors to fix and raise

prices.  One specific example of this illegal behavior is set forth below.

### *Glyburide*

102.   Glyburide is an oral diabetes medication used to treat Type 2 diabetes.  Also

known by the brand names DiaBeta® or Micronaise®, it is used to control blood sugar levels.

103.   On April 22, 2014, Heritage held a "███████████████████" teleconference.

Present on the teleconference were members of the Heritage sales team as well as Malek.

104.   During the teleconference, Malek identified a large number of different drugs that

Heritage targeted for price increases.  The list included the generic drug Glyburide.  Heritage's

competitors in the market for Glyburide at that time were defendants Aurobindo and Teva.

105.   In order to accomplish the objective, Malek instructed members of the sales team

to immediately reach out to their contacts at each competitor on the list of drugs, and attempt to

reach agreement on the price increases.   Different Heritage employees were responsible for

communicating with different competitors.

106.     Malek himself was responsible for communicating with defendant Teva, which was a competitor on several of the drugs on the list, including Glyburide.  Malek had a direct relationship with ▆▆, Teva's ▆▆▆▆▆▆▆▆▆▆▆▆, and was able to successfully communicate with her and reach an agreement to raise prices on Glyburide, among other drugs.

107.     In response to Malek's directive, the Heritage sales team started contacting their competition immediately.

108.     Over the coming days and weeks, both Malek and Glazer pushed Heritage employees to communicate with their competitors and obtain agreements to raise prices.  On April 28, 2014, Malek sent an email to Heritage employee ▆▆, titled "▆▆▆", referring to defendant Aurobindo.  In the email Malek stated "▆▆▆▆▆▆▆▆▆▆▆▆"

109.     The next day, Glazer followed up with an email to ▆▆ titled "▆▆▆▆", stating "▆▆▆▆▆▆▆▆▆▆▆▆" ▆▆ responded saying "▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆" One day later, Malek followed up with ▆▆ again, asking "▆▆▆▆▆"

110.     On May 8, 2014, Malek sent an email to the Heritage sales team, stating:



111.     On May 9, 2014, Heritage had another teleconference to discuss the contemplated price increases, including for Glyburide.

112.    The following week, ▋ met in person and discussed the price increase strategies with a number of different competitors at the MMCAP conference.  During that meeting she was able to personally confirm an agreement with defendant Aurobindo to raise the price of Glyburide.  As she recounted in an email to Malek dated May 15, 2014:



113.    On June 23, 2014, Heritage employees held a "▋", where they discussed the specific percentage amounts they would seek to increase certain drugs, and the strategies for doing so.  Among those included on the list were Glyburide, which was slated for a 200% increase.

114.    Over the next several weeks, Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices.

115.    On June 25, 2014, for example, ▋ texted her friend ▋, a ▋ ▋ at Citron.  ▋ wanted to determine whether Citron would be selling Glyburide in the near future:





116.   Shortly after this exchange, ▮▮ from Citron called ▮▮ at Heritage, informing him that she had been "▮▮▮" in on Heritage's plan.  According to ▮▮'s notes, ▮▮ told ▮▮ that Heritage employees should not to communicate with Citron through email.  She also told

████ that ████ should not communicate through ████, but should instead call ███, ████████ ████ at Citron, if she had information to convey.

117.   Malek continued to push Heritage employees to discuss the price increases with competitors.  On July 1, 2014, Malek sent an email to the Heritage sale team titled "████████ ████████" The email read:



118.   Over the next several weeks, ████ and ████ communicated frequently by phone, text message and in person to discuss Glyburide pricing, bidding strategies, and how Citron might be able to acquire additional market share.

### Consciousness of Guilt – Efforts to Conceal the Schemes

119.   The Defendants were aware that their conduct was illegal.  They all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made.

120.   Going back to at least 2012, for example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing.

121.   None of the email accounts maintained by Heritage had any company-imposed document retention policy associated with them.  Heritage executives were aware of this, and utilized the lack of a company retention policy to routinely destroy emails that might disclose their conduct.  Heritage executives were aware that in order to permanently destroy an email,

however, the email had to be deleted from more than just the recipient's in box.  For example, on June 27, 2012, Heritage CEO Glazer sent an email to Malek titled "████" instructing:  "████ ████████████"

122.    Glazer continued to remind Malek not to put any evidence of his illegal conduct into writing.  In a text message dated June 26, 2014, Glazer sternly warned Malek about his use of email:  "████████████████████████"

123.    That same day, in an email to the entire sales team at Heritage, Glazer made the point as clearly as possible:  "████████████████████████ ████████████████████████████"

124.    Other defendants were also aware of the need to avoid putting any evidence of their illegal activity into writing.  For example, in June 2014, shortly after a text message exchange between ███ of Citron and ███ from Heritage wherein the two competitors discussed and agreed to raise the price of Glyburide, ███ from Citron called ███ at Heritage, informing him that she had been "████" in on Heritage's plan.  According to ███'s notes, ███ told ███ that Heritage employees should not communicate with Citron through email, but should instead call ███, ████████ at Citron, if they had information to convey.

125.    As Defendants became more aware that they were under state and federal investigation, there was even more urgency to avoid detection.  For example, on June 2, 2015, after it had become public that the Connecticut Attorney General's Office and the United States Department of Justice were investigating the industry, Malek sent ███ a text message stating:  "████████████████████████ ████████████████████████ ████████████" Significantly, the email referenced by Malek was not

produced to the Connecticut Attorney General's Office in response to its subpoena to Heritage. Upon information and belief, the referenced email has, along with other relevant documents, been deleted by Heritage.

126.    Upon information and belief, Glazer, Malek and certain other Heritage employees also deleted all text messages from their company iPhones regarding their illegal communications with competitors.

127.    ███ of defendant Mayne, realizing the illegal nature of the agreements she entered into, also deleted several of the most incriminating text messages from her cell phone between her and ███ before the data on her phone was imaged and produced to the Connecticut Attorney General's Office.

## VI.    TRADE AND COMMERCE

128.    At all times relevant to this Complaint, the activities of the Defendants in manufacturing, selling and distributing generic pharmaceutical drugs, including but not limited to Doxy DR and Glyburide, among others, were in the regular, continuous and substantial flow of interstate trade and commerce and have had and continue to have a substantial effect upon interstate commerce.  The Defendants' activities also had and continue to have a substantial effect upon the trade and commerce within each of the Plaintiff States.

## VII.    MARKET EFFECTS

129.    The acts and practices of Defendants have had the purpose or effect, or the tendency or capacity, of unreasonably restraining competition and injuring competition by preventing competition for the generic pharmaceutical drugs identified herein, and have directly resulted in an increase in consumer prices for those drugs.

130.    By unreasonably and illegally restraining competition for the generic pharmaceutical drugs identified herein, Defendants have deprived the Plaintiff States and their consumers of the benefits of competition that the federal antitrust laws are designed to promote, preserve and protect.

131.    As a direct and proximate result of the unlawful conduct alleged above, Plaintiff States and consumers were not and are not able to purchase, or pay reimbursements for purchases of the generic pharmaceutical drugs identified herein at prices determined by a market unhindered by the impact of Defendants' anticompetitive behavior.  Instead, they have been and continue to be forced to pay artificially high prices.  Consequently, they have suffered substantial injury in their business and property in that, *inter alia*, they have paid more and continue to pay more for the various generic pharmaceutical drugs identified herein than they would have paid in an otherwise competitive market.

132.    As a direct and proximate cause of the unlawful conduct alleged above, the general economies of the Plaintiff States have sustained injury and the Plaintiff States are threatened with continuing injury to their business and property unless Defendants are enjoined from continuing their unlawful conduct.

133.    Plaintiff States do not have an adequate remedy at law.

134.    All conditions precedent necessary to the filing of this action have been fulfilled, waived or excused.

## COUNT ONE (AGAINST DEFENDANTS HERITAGE, MYLAN AND MAYNE) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS FOR THE GENERIC DRUG DOXY DR IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

135.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

136.    Beginning as early as 2013, defendants Heritage, Mylan and Mayne knowingly agreed to allocate and divide the market for the generic drug Doxy DR.

137.    This agreement is facially anticompetitive because it allocates customers for the marketing and sale of the generic drug Doxy DR, artificially raises prices, and limits competition among the Defendants.  This agreement has eliminated price competition in the market for Doxy DR between defendants Heritage, Mylan and Mayne.

138.    These conspiracies substantially affected and still affect interstate commerce.

139.    The agreements constitute unreasonable restraints of trade that are per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

140.    As a direct and proximate result of this conspiracy, Plaintiff States and consumers have been injured in their business or property because they have had to purchase or reimburse for Doxy DR at supra-competitive prices, and defendants Heritage, Mylan and Mayne have enjoyed ill-gotten gains from the sales of Doxy DR.

### COUNT TWO (AGAINST DEFENDANTS HERITAGE, TEVA, AUROBINDO AND CITRON) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG GLYBURIDE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

141.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

142.    In April of 2014, Heritage devised a scheme whereby it would seek out its competitors and obtain agreements from them to collectively agree to raise prices for a large number of generic drugs.  Among those was the generic drug Glyburide.

143.    Heritage communicated directly with defendants Teva, Aurobindo and Citron, and obtained agreements with Teva, Aurobindo and Citron to raise prices for the generic drug Glyburide in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

144.    Defendants Heritage, Teva, Aurobindo and Citron knowingly became a party to this agreement.  These agreements are facially anticompetitive because they artificially raise prices and limit competition among the Defendants.  These agreements have eliminated price competition in the market for Glyburide between defendants Heritage, Teva, Aurobindo and Citron.

145.    These conspiracies substantially affected and still affect interstate commerce.

146.    The agreements constitute unreasonable restraints of trade that are per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

147.    As a direct and proximate result of this conspiracy, Plaintiff States and consumers have been injured in their business or property because they have had to purchase or reimburse for Glyburide at supra-competitive prices, and defendants Heritage, Teva, Aurobindo and Citron have enjoyed ill-gotten gains from the sales of Glyburide.

## PRAYER FOR RELIEF

Accordingly, the Plaintiff States request that the Court:

1.  Adjudge and decree that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.  Enjoin and restrain, pursuant to federal law, Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions set forth above;

3.  Award to Plaintiff States disgorgement of the Defendants' ill-gotten gains and any other equitable relief as the Court finds appropriate to redress Defendants' violations of federal law or restore competition;

4.  Award to each Plaintiff State its costs, including reasonable attorneys' fees; and

5.  Order any other relief that this Court deems proper.

## JURY DEMAND

The Plaintiff States demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, on all issues triable as of right by jury.

PLAINTIFF
STATE OF CONNECTICUT
GEORGE JEPSEN
ATTORNEY GENERAL

BY:

Michael E. Cole
Chief, Antitrust Department
W. Joseph Nielsen
Federal Bar No. ct20415
Laura Martella
Assistant Attorneys General
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5040
Fax: (860) 808-5033
Joseph.Nielsen@ct.gov

STATE OF DELAWARE
MATTHEW P. DENN
ATTORNEY GENERAL

Michael A. Undorf
Deputy Attorney General
Delaware Department of Justice
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 577-8924
Fax: (302) 577-6499
Email: Michael.Undorf@state.de.us

FOR PLAINTIFF STATE OF FLORIDA
PAMELA JO BONDI
Attorney General

PATRICIA A. CONNERS
(Florida Bar No. 361275)
Deputy Attorney General
Trish.Conners@myfloridalegal.com
LIZABETH A. BRADY
(Florida Bar No. 457991)
Chief, Multistate Enforcement
Liz.Brady@myfloridalegal.com
TIMOTHY FRASER
(Florida Bar No. 957321)
Assistant Attorney General
Timothy.Fraser@myfloridalegal.com
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
Fax: (850) 488-9134

FOR THE STATE OF HAWAII
DOUGLAS S. CHIN
ATTORNEY GENERAL OF HAWAII

BRYAN C. YEE
RODNEY I. KIMURA
Deputy Attorneys General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii  96813
Tel:  808-586-1180
Fax:  808-586-1205
Bryan.c.yee@hawaii.gov
Rodney.i.kimura@hawaii.gov

FOR PLAINTIFF STATE OF IDAHO
LAWRENCE G. WASDEN
ATTORNEY GENERAL

Brett T. DeLange
John K. Olson (pro hac vice pending)
Deputy Attorneys General
Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho  83720-0010
Telephone: (208) 334-4114
Fax: (208) 334-4151
brett.delange@ag.idaho.gov
john.olson@ag.idaho.gov

Respectfully submitted,

THOMAS J. MILLER
Attorney General of Iowa

Layne M. Lindebak
Assistant Attorney General
Special Litigation Division
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, IA 50319
Tel:  (515) 281-7054
Fax:  (515) 281-4902
Layne.Lindebak@iowa.com


ATTORNEYS FOR THE
STATE OF IOWA

FOR PLAINTIFF STATE OF KANSAS
DEREK SCHMIDT
ATTORNEY GENERAL

Lynette R. Bakker
Assistant Attorney General
Office of the Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 368-8451
Fax: (785) 291-3699
Email: lynette.bakker@ag.ks.gov

ANDY BESHEAR
Attorney General of Kentucky

LeeAnne Applegate
Charles W. Rowland
Assistant Attorneys General
Office of the Attorney General of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel: 502-696-5300
Fax: 502-573-8317
LeeAnne.Applegate@ky.gov
Charlie.Rowland@ky.gov

ATTORNEYS FOR THE STATE OF KENTUCKY

FOR PLAINTIFF
STATE OF LOUISIANA
JEFF LANDRY
Attorney General
State of Louisiana

STACIE L. DEBLIEUX
LA Bar # 29142
Assistant Attorney General
Public Protection Division
1885 North Third St.
Baton Rouge, LA 70802
Tel: (225) 326-6400
Fax: (225) 326-6499
Email: deblieuxs@ag.louisiana.gov

Respectfully submitted,

JANET T. MILLS
Attorney General of Maine

Christina Moylan
Assistant Attorney General
Office of the Attorney General of Maine
6 State House Station
Augusta, ME  04333
Tel:  207-626-8838
Fax: 207-624-7730
christina.moylan@maine.gov

ATTORNEYS FOR THE
STATE OF MAINE

BRIAN E. FROSH
MARYLAND ATTORNEY GENERAL

Ellen S. Cooper
Assistant Attorney General
Chief, Antitrust Division

John R. Tennis
Assistant Attorney General
Deputy Chief, Antitrust Division
Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, Maryland 21202
Tel. # (410) 576-6470
Fax # (410) 576-7830

Attorneys for the State of Maryland

FOR PLAINTIFF COMMONWEALTH
OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

William T. Matlack (MA BBO No. 552109)
Assistant Attorney General
Chief, Antitrust Division
Carol E. Head (MA BBO No. 652170)
Matthew M. Lyons (MA BBO No. 657685)
Michael MacKenzie (MA BBO No. 683305)
Assistant Attorneys General
Antitrust Division
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 722-0184 (fax)
William.Matlack@state.ma.us
Carol.Head@state.ma.us
Matthew.Lyons@state.ma.us
Michael.Mackenzie@state.ma.us

FOR PLAINTIFF
STATE OF MINNESOTA
LORI SWANSON
ATTORNEY GENERAL

JAMES CANADAY
Deputy Attorney General

JUSTIN ERICKSON
Assistant Attorney General

ROBERT CARY
Assistant Attorney General
Office of the Minnesota Attorney General
Suite 1400
445 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 757-1022
Fax: (651) 296-9663
Email: robert.cary@ag.state.mn.us

Respectfully submitted,

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

MANISHA SHETH
Executive Deputy Attorney General for
Economic Justice

BEAU BUFFIER
Chief, Antitrust Bureau

ELINOR R. HOFFMAN
Deputy Chief, Antitrust Bureau

ROBERT L. HUBBARD
LINDA GARGIULO
Assistant Attorneys General

120 Broadway, 26th Floor
New York, New York 10271-0332
Tel: (212) 416-8267
Fax: (212) 416-6015

ATTORNEYS FOR THE
STATE OF NEW YORK

FOR PLAINTIFF STATE OF NEVADA

ADAM PAUL LAXALT
Nevada Attorney General

Lucas J. Tucker
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
10791 W. Twain Ave., Suite 100
Las Vegas, Nevada 89135
Nevada Bar No. 10252
ltucker@ag.nv.gov

STATE OF NORTH DAKOTA
Wayne Stenehjem
Attorney General

Parrell D. Grossman, ND ID 04684
Assistant Attorney General
Director, Consumer Protection &
Antitrust Division
Office of Attorney General
Gateway Professional Center
1050 E Interstate Ave, Ste 200
Bismarck, ND  58503--5574
Telephone (701) 328-5570
Facsimile (701) 328-5568
pgrossman@nd.gov

*Attorneys for the State of North Dakota*

COMMONWEALTH OF
PENNSYLVANIA
Office of the Attorney General

BRUCE R. BEEMER
ATTORNEY GENERAL

James A. Donahue, III
Acting Chief of Staff
Executive Deputy Attorney General
Public Protection Division
PA 42624

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
PA 69164

Joseph S. Betsko
Senior Deputy Attorney General
Antitrust Section
PA 82620

Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA  17120
Telephone: (717) 787-4530
Fax: (717) 787-1190
Email: twertz@attorneygeneral.gov
jbetsko@attorneygeneral.gov

ATTORNEYS FOR THE
COMMONWEALTH
OF PENNSYLVANIA

Respectfully submitted,

R. MICHAEL DEWINE
Attorney General of Ohio

Jennifer Pratt
Chief, Antitrust Section
Beth A. Finnerty
Assistant Section Chief, Antitrust Section
Edward J. Olszewski
Senior Assistant Attorney General
Office of the Ohio Attorney General
Antitrust Section
150 E. Gay St., 22nd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0269
edward.olszewski@ohioattorneygeneral.gov

ATTORNEYS FOR THE
STATE OF OHIO

Respectfully submitted,

MARK R. HERRING
Attorney General of Virginia

Cynthia E. Hudson
Chief Deputy Attorney General

Rhodes B. Ritenour
Deputy Attorney General

Richard S. Schweiker, Jr.
Senior Assistant Attorney General and Chief
Consumer Protection Section

Sarah Oxenham Allen
Senior Assistant Attorney General

Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, VA  23219
Tel:  804-692-0485
Fax: 804-786-0122
thenry@oag.state.va.us


ATTORNEYS FOR THE
COMMONWEALTH OF VIRGINIA

ROBERT W. FERGUSON
Attorney General of Washington State

JONATHAN A. MARK
Senior Assistant Attorney General
Antitrust Division Chief

Michael Hemker
Assistant Attorney General
Erica Koscher, Assistant Attorney General
Office of the Attorney General of
Washington State
Assistant Attorneys General
800 5th Ave, Ste. 2000
Seattle, WA 98104-3188
(206) 464-7744

Attorneys for Plaintiff State of Washington