**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| THE STATE OF CONNECTICUT; | : | CIVIL ACTION NO. |
| THE STATE OF ALABAMA; | : | 3:16-CV-002056 (VLB) |
| THE STATE OF ARIZONA; | : | |
| THE STATE OF CALIFORNIA; | : | |
| THE STATE OF COLORADO; | : | |
| THE STATE OF DELAWARE; | : | |
| THE STATE OF FLORIDA; | : | |
| THE STATE OF HAWAII; | : | |
| THE STATE OF IDAHO; | : | |
| THE STATE OF ILLINOIS; | : | |
| THE STATE OF INDIANA; | : | |
| THE STATE OF IOWA; | : | |
| THE STATE OF KANSAS; | : | |
| THE COMMONWEALTH OF | : | |
|     KENTUCKY; | : | |
| THE STATE OF LOUISIANA; | : | |
| THE STATE OF MAINE; | : | |
| THE STATE OF MARYLAND; | : | |
| THE COMMONWEALTH OF | : | |
|     MASSACHUSETTS; | : | |
| THE STATE OF MICHIGAN; | : | |
| THE STATE OF MINNESOTA; | : | |
| THE STATE OF MISSISSIPPI; | : | |
| THE STATE OF MONTANA; | : | |
| THE STATE OF NEBRASKA; | : | |
| THE STATE OF NEVADA; | : | |
| THE STATE OF NEW HAMPSHIRE; | : | |
| THE STATE OF NEW JERSEY; | : | |
| THE STATE OF NEW YORK; | : | |
| THE STATE OF NORTH CAROLINA; | : | |
| THE STATE OF NORTH DAKOTA; | : | |
| THE STATE OF OHIO; | : | |
| THE STATE OF OKLAHOMA; | : | |
| THE STATE OF OREGON; | : | |
| THE COMMONWEALTH OF | : | |
|     PENNSYLVANIA; | : | |
| THE STATE OF SOUTH CAROLINA; | : | |
| THE STATE OF TENNESSEE; | : | |
| THE STATE OF UTAH; | : | |
| THE STATE OF VERMONT; | : | |
| THE COMMONWEALTH OF | : | |
|     VIRGINIA; | : | |

THE STATE OF WASHINGTON; and :
THE STATE OF WISCONSIN; :
                                          :
                                          :
                                          :
     v.                                   :
                                          :        **Public Version**
AUROBINDO PHARMA USA, INC.;    :
CITRON PHARMA, LLC;            :
HERITAGE PHARMACEUTICALS, INC.:
MAYNE PHARMA (USA), INC.;      :
MYLAN PHARMACEUTICALS, INC.;   :
TEVA PHARMACEUTICALS USA, INC.:    **March 1, 2017**


<u>**AMENDED COMPLAINT**</u>

The States of Connecticut, Alabama, Arizona, California, Colorado,

Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine,

Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New

Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio,

Oklahoma, Oregon, South Carolina, Tennessee, Utah, Vermont, Washington and

Wisconsin and the Commonwealths of Kentucky, Massachusetts, Pennsylvania

and Virginia (the "States"), by and through their Attorneys General (the "Plaintiff

States"), bring this action against Aurobindo Pharma USA, Inc., Citron Pharma,

LLC, Heritage Pharmaceuticals, Inc., Mayne Pharma (USA), Inc., Mylan

Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc. (collectively, the

"Defendants"), and allege as follows:

I.    <u>**SUMMARY OF THE CASE**</u>

1.    In July 2014, the State of Connecticut initiated a non-public

investigation into suspicious price increases for certain generic pharmaceuticals.

The information developed through that investigation, which is still ongoing,

uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States.  In this initial civil action, the Plaintiff States charge the Defendants with entering into contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the markets for Doxycycline Hyclate Delayed Release ("Doxy DR") and Glyburide in the United States.

2.      Generic pharmaceutical drugs – drugs that are pharmaceutically equivalent in dosage, form, route of administration, strength or concentration and have the same amount of active ingredient as the reference-listed brand name drug – save consumers and our healthcare system tens of billions of dollars annually because they introduce competition into a market where none previously existed.  When a high-priced branded drug comes off patent, generic drugs offer the prospect of lower prices and greater access to healthcare for all consumers in the United States.

3.      Typically, when the first generic manufacturer enters a market, the manufacturer prices its product slightly lower than the brand-name manufacturer. However, the appearance of a second generic manufacturer reduces the average generic price to nearly half the brand name price. As additional generic manufacturers market the product, the prices continue to fall, but at a slower rate. For products that attract a large number of generic manufacturers, the average generic price falls to 20% of the branded price and lower.

4.     Generic drugs have long been referred to as one of the few "bargains" in the United States healthcare system and historically health care experts have said that cost savings from the growing number of generic drugs have gone a long way toward keeping the lid on overall increasing health care costs.  This was the way the generic drug market was intended to work, and has generally worked, since the implementation of the Hatch-Waxman Act in 1984.

5.     Over the last several years, however, that price dynamic has changed for a large number of generic drugs.  Prices for dozens of generic drugs have uncharacteristically risen -- some have skyrocketed -- for no apparent reason, sparking outrage from public officials, payers and consumers across the country whose costs have doubled, tripled or in some cases increased up to 1,000% or more.   The growing outrage and public reports of unexplained and suspicious price increases caused the State of Connecticut to commence an investigation in July of 2014, which was followed shortly thereafter by a Congressional inquiry and a reported criminal grand jury investigation by the United States Department of Justice Antitrust Division.

6.     Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.  What the Plaintiff States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug competitors.

7.      Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors.  The Defendants exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements.  The anticompetitive agreements are further refined and coordinated at regular "industry dinners", "girls nights out", lunches, parties, and numerous and frequent telephone calls, emails and text messages.

8.      This anticompetitive conduct -- schemes to fix and maintain prices, allocate markets and otherwise thwart competition – has caused a significant, lasting and ultimately harmful rippling effect in the United States healthcare system, which is still ongoing today.  Moreover, many of these schemes were conceived and directed by executives at the highest levels of many of the Defendant companies.

9.      Although the Plaintiff States have uncovered wide-ranging conduct implicating numerous different drugs and competitors, which will be acted upon at the appropriate time, this Complaint focuses on illegal and anticompetitive conduct with regard to two of those drugs:  Doxy DR and Glyburide.

10.     The principal architect and ringleader of the conspiracies identified herein is Defendant Heritage.  Through its senior-most executives and salespersons, Heritage organized and initiated a wide-ranging scheme which included numerous generic drug manufacturers, all of whom were knowing and

willing participants.  Collectively, Defendants were able to obtain a substantial windfall as a result of these illegal agreements.

11.     The Defendants' anticompetitive schemes have been carried out in two principal ways:  First, to avoid competing with one another and thus eroding the prices for certain generic drugs, Defendants -- either upon their entry into a given generic market or upon the entry of a new competitor into that market-- communicated with each other to determine and agree on how much market share or which customers each competitor was entitled to.  They then effectuated the agreement by either refusing to bid for particular customers or by providing a cover bid that they knew would not be successful.   These schemes have the effect of reducing or eliminating competition for a particular drug, and have allowed the Defendants to maintain artificially supra-competitive prices in these markets throughout the United States.

12.     Alternatively, or often in conjunction with those schemes, competitors in a particular market simply communicate -- typically either in person, by telephone, or by text message -- and agree to collectively raise prices for a particular generic drug.

13.     The Defendants knew their conduct was unlawful.  Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct.  The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate.  When communications were made

in writing, or by text message, some of the Defendants even took overt and calculated steps to destroy evidence of those communications.

14.     As a result of the conspiracies enumerated herein, consumers nationwide paid more for numerous generic pharmaceutical drugs, including specifically Doxy DR and Glyburide, than they otherwise would have in a competitive market, and the Defendants illegally profited as a result.

15.     The Plaintiff States seek a finding that the Defendants' actions violated federal and state antitrust and consumer protection laws; a permanent injunction preventing the Defendants from continuing their illegal conduct and remedying the anticompetitive effects caused by their illegal conduct; disgorgement of the Defendants' ill-gotten gains; damages on behalf of various state and governmental entities and consumers in various Plaintiff States; civil penalties and other relief as a result of Defendants' violations of law.

II.     <u>JURISDICTION AND VENUE</u>

16.     This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. §§ 1 & 26, and under 28 U.S.C. §§ 1331 and 1337.

17.     In addition to pleading violations of federal law, the Plaintiff States also allege violations of state law, as set forth below, and seek civil penalties, damages and equitable relief under those state laws.  All claims under federal and state law are based on a common nucleus of operative fact, and the entire action commenced by this Amended Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.  This Court has jurisdiction over the non-federal claims under 28 U.S.C. § 1367(a), as well as under principles of

pendent jurisdiction.  Pendent jurisdiction will avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience, and fairness.

18.     This Court may exercise personal jurisdiction over all of the Defendants because all of the Defendants currently transact business in the District of Connecticut.  Specifically, the Defendants market and sell generic pharmaceutical drugs in interstate commerce to consumers nationwide, including in this District, through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs. The acts complained of have and will continue to have substantial effects in this District.

19.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(c).  The Defendants all may be found and transact business within the District of Connecticut.

III.     THE PARTIES

20.     The Attorneys General are the chief legal officers for their respective States.  They are granted authority under federal and state antitrust and consumer protection laws to bring actions to protect the economic well-being of the Plaintiff States and obtain injunctive and other relief from the harm that results from the violations of antitrust and consumer protection laws alleged herein.    All Plaintiff States seek equitable and other relief under federal antitrust laws in their sovereign capacities.  To the extent specified in the state claims asserted in this Amended Complaint, certain Attorneys General of the Plaintiff

States have and here exercise authority to secure relief, including monetary relief, including for governmental entities and consumers in their states who paid or reimbursed for the generic pharmaceutical drugs that are the subject of this Amended Complaint. As specified in Count Three, some states also seek damages for state entities or their consumers under state antitrust law, and some states seek additional relief for violations of state consumer protection laws.

21. Defendant Aurobindo Pharma USA, Inc. ("Aurobindo"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 279 Princeton-Hightstown Road, East Windsor, New Jersey.

22. Defendant Citron Pharma, LLC ("Citron), is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 2 Tower Center Boulevard, Suite 1101, East Brunswick, New Jersey.

23. Defendant Heritage Pharmaceuticals, Inc. ("Heritage"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 12 Christopher Way, Suite 300, Eatontown, New Jersey.

24. Defendant Mayne Pharma (USA), Inc. ("Mayne"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 3301 Benson Drive, Suite 401, Raleigh, North Carolina.

25. Defendant Mylan Pharmaceuticals, Inc. ("Mylan"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania.

26.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania.

27.     Whenever any reference is made in this Complaint to any representation, act or transaction of Defendants, or any agent, employees or representatives thereof, such allegations shall be deemed to mean that such principals, officers, directors, employees, agents or representatives of Defendants, while acting within the scope of their actual or apparent authority, whether they were acting on their own behalf or for their own benefit, did or authorized such representations, acts or transactions on behalf of Defendants, respectively.

IV.     <u>FACTS SUPPORTING THE LEGAL CLAIMS</u>

     **A. The Generic Drug Market**

          <u>The Hatch-Waxman Act</u>

28.     In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, commonly known as the "Hatch-Waxman" Act.  Its intention was to balance two seemingly contradictory interests: encouraging drug innovation, and promoting competition between brand and generic drugs in order to lower drug prices.  To encourage innovation, Hatch-Waxman gave branded drug manufacturers longer periods of market exclusivity for newly-approved products; this increased the financial returns for investment in drug research and development.

29.     To promote price competition, the law established a new regulatory approval pathway for generic products to help ensure that generic drugs became available more quickly following patent expiration.  To gain approval for a new drug, drug manufacturers must submit a new drug application ("NDA") to the United States Food and Drug Administration ("FDA") showing that the new drug is safe and effective for its intended use.  Developing a new drug and obtaining an NDA can take many years and cost tens or hundreds of millions of dollars.

30.     The Hatch-Waxman Act encouraged faster approval for generic versions of brand-name drugs through the use of "abbreviated new drug applications" ("ANDAs").  These applications rely on the safety and efficacy evidence previously submitted by the branded drug manufacturer, permitting generic manufacturers to avoid conducting costly and duplicative clinical trials.

31.     Hatch-Waxman succeeded in both of its goals.  Since the law was passed in 1984, generic drugs have moved from being less than 20% of prescriptions filled in the United States to now representing over 80% of prescriptions filled, and a recent study found that generic medicines saved $193 billion for consumers in 2011 alone.  During the same period, innovation has continued to lead to many new and helpful drugs.

<u>The Importance of Generic Drugs</u>

32.     Like their branded counterparts, generic drugs are used in the diagnosis, cure, mitigation, treatment or prevention of disease and, thus, are integral components in modern healthcare, improving health and quality of life for nearly all people in the United States.  In 2015, sales of generic drugs in the

United States were estimated at $74.5 billion dollars. Today, the generic pharmaceutical industry accounts for approximately 88% of all prescriptions written in the United States.

33. A branded drug manufacturer that develops an innovative drug can be rewarded with a patent granting a period of exclusive rights to market and sell the drug. During this period, the manufacturer markets and sells its drug under a brand name, and if demand for the new drug is high, the lack of competition can permit the manufacturer to set its prices high as well.

34. Once the brand-name drug's exclusivity period ends, other firms who have received FDA approval are permitted to manufacture and sell "generic" drugs that are equivalent to the brand-name drug. As the makers of generic versions of the brand-name drug begin offering their equivalent products in the market, competition typically leads to dramatic reductions in price. Generic versions of brand name drugs are typically priced lower than the brand-name versions from the moment the first generic manufacturer enters the market. Under most state laws, generic substitution occurs automatically, unless the prescriber indicates on the prescription that the branded drug must be "dispensed as written."

35. As additional manufacturers enter the market, competition will push the price down much more dramatically. Often, the price of a generic drug will end up as low as 20% of the branded price or even lower. For this reason, generic drugs have long been referred to as one of the few "bargains" in the United States healthcare system. Experts have even stated that the substantial

cost savings gained from the growing number of generic drugs have played a major role in keeping the lid on overall increasing health care costs.

36.     The savings offered by generics drugs over their brand-name equivalents can provide tremendous benefits to all consumers and health care payers.  Patients typically see lower out of pocket expenses, while lower costs for payers and insurers can lead to lower premiums for all those who pay for health insurance, and lower costs to government health care programs like Medicare and Medicaid mean greater value for taxpayers.

<u>The Players in the Drug Distribution System</u>

37.     The United States prescription drug distribution system includes a multitude of entities that are involved at various stages of the distribution channels through which prescription drugs are delivered to patients.

*<u>Manufacturers/Suppliers</u>*

38.     Drug manufacturers are the source of the prescription drugs in the pharmaceutical supply chain.  As opposed to branded drug manufacturers, generic manufacturers typically do not develop new drug therapies, but instead manufacture generic compounds that compete directly with the original branded version of a drug once the brand product's patent protection has expired. Generic pharmaceuticals can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments and creams.  A manufacturer that wishes to sell a "new drug" in the United States (including generic versions of previously approved drugs) must obtain approval from the

FDA, which reviews many factors, including drug safety, efficacy, raw material suppliers, manufacturing processes, labeling and quality control.

39.     Generic drug manufacturers manage the actual distribution of drugs from manufacturing facilities to drug wholesalers, and in some cases, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans.

40.     Drug manufacturers compete with one another to sell generic pharmaceutical drugs to entities in the distribution chain such as wholesalers and distributors.  Generic drugs are also sold in auctions to different purchasers in the supply chain, e.g., group purchasing organizations and large retail pharmacies and supermarket chains with pharmacies.

41.     The marketing practices of generic drugs often reflect almost no attempt at differentiation from other versions of the same product.  That is because, in essence, a generic drug is a commodity, which means, for the most part, competition is largely dictated based on a manufacturer's ability to provide supply and the price it charges for that specific generic drug.  As a result, generic drug manufacturers usually market the drug under the name of the active ingredient, such that several generic drug producers market the product under the same name.

42.     Drug suppliers can include the manufacturers themselves, or other companies that have agreements to sell or distribute certain generic pharmaceutical drugs manufactured by another company.  The Defendants in this

action are all drug manufacturers/and or suppliers and compete with one another for the sale of generic pharmaceutical drugs to consumers in the United States.

43.     Drugs sold in the United States may be manufactured domestically or abroad, and many manufacturers that produce drugs for the United States market are owned by, or are themselves, foreign companies.  For example, defendant Teva is a subsidiary or affiliate of one of the five largest drug manufacturers in the world, headquartered in Israel.  Generic drugs may be manufactured by the same companies that manufacture brand-name drugs (even in the same factories), or may come from companies that manufacture generics exclusively.  Drug manufacturers typically sell their products through supply agreements negotiated with wholesalers and distributors, group purchasing organizations, pharmacy benefit managers and some large retailers like pharmacy and supermarket chains.

### *Wholesalers/Distributors*

44.     Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers, including pharmacies (retail and mail-order), hospitals, and long-term care and other medical facilities (e.g., community clinics, physician offices and diagnostic labs). Some wholesalers sell to a broad range of potential customers while others specialize in sales of particular products (e.g., biologic products) or sales to particular types of customers (e.g., nursing homes).

45.     Wholesalers and distributors have similar business models, but distributors typically provide more services to their customers.  Some of the

largest wholesalers and distributors of generic drugs include AmerisourceBergen Corporation ("ABC"), Cardinal Health, Inc. ("Cardinal"), H.D. Smith, LLC ("HD Smith"), McKesson Corporation ("McKesson") and Morris & Dickson, LLC ("Morris & Dickson").

### *Group Purchasing Organizations (GPOs)*

46.     Group purchasing organizations ("GPOs") are membership-based entities that negotiate with manufacturers, wholesalers, and distributors on behalf of a large group of purchasers.  GPOs leverage their buying power to obtain better prices and terms for their members, and assist buyers in trade relations and contract management with sellers.  GPOs have formed to serve state and local governments, hospital groups, retail pharmacies, and supermarket chains.  Some of the largest GPOs include Vizient (formerly Novation), Premier, Inc., Intalere (formerly Amerinet), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") and Econdisc Contracting Solutions ("Econdisc").

### *Pharmacy and Supermarket Chains*

47.     Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer/patient.  There are several types of pharmacies, including chain and independent retail pharmacies, pharmacies in supermarkets and other large retail establishments, and mail-order pharmacies. If a retail pharmacy or supermarket chain purchases generic drugs on a large enough scale, manufacturers may agree to contract with them directly.  Such retailers can obtain attractive terms by avoiding the markups or fees collected by wholesalers, distributors, and GPOs.  Retailers large enough to purchase drugs directly from

manufacturers include Rite Aid Corporation ("Rite Aid"), The Walgreen Company ("Walgreens"), Wal-Mart Stores, Inc. ("Walmart"), Target Corporation, and Publix Super Markets, Inc. ("Publix"), among others.

## The Cozy Nature of the Industry and Opportunities for Collusion

48.     The generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.

### *Trade Association and Customer Conferences*

49.     Many customers of the Defendants, including but not limited to (a) large wholesalers or distributors like ABC, Cardinal, HD Smith, McKesson and Morris & Dickson, (b) group purchasing organizations like Premier, Inc., MMCAP and Econdisc, and (c) other large drug purchasers like pharmacy or grocery store chains, hold multi-day conferences throughout the year where many if not most of the generic manufacturers across the United States are invited to attend.

50.     In addition, the Defendants and other generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") and Efficient Collaborative Retail Marketing ("ECRM"), among others.

51.     At these various conferences and trade shows, sales representatives from many generic drug manufacturers, including the Defendants, have opportunities to interact with each other and discuss their respective businesses

and customers.  Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting.  Of particular importance here, generic drug manufacturer representatives who attend these functions, including the Defendants, use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

52.     In short, these trade shows and customer conferences provide generic drug manufacturers, including but not limited to the Defendants, with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

### *Industry Dinners and Private Meetings*

53.     In addition to these frequent conferences and trade shows, sales representatives get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.

54.     A large number of generic drug manufacturers, including several of the Defendants, are headquartered in close proximity to one another in New Jersey or eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.

55.     In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen (13) high-ranking male executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.  An executive from defendant Aurobindo attended this particular dinner.

56.     At these industry dinners, one company is usually responsible for paying for dinner for all of the attendees.  The company that pays the bill is generally determined by alphabetical order.  For example, in a group email conversation among the competitors in December 2013, one of the participants -- a high-ranking executive for one of the participants -- joked ██████████████

████████████████████████  The response: ███████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

57.     Female generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry"  meetings and dinners.  During these GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information.

58.     "Women in the Industry" dinners were typically organized by a female salesperson from defendant Heritage, ███, who resides in the State of Minnesota.  Other participants in those meetings were typically employees of generic drug manufacturers located in Minnesota, or female salespeople residing in the area -- but not exclusively.  For example, in November 2014, a female salesperson from a competitor not identified as a co-conspirator in the Complaint sent ███ a text message asking ████████████████████████████ █████████████████████████████████████ ███ responded: ████████████████████████████████████████ ████████████████████████████████████ ██████████

59.     The September 2014 dinner was also planned around the visit of an out-of-town competitor.  As ███ stated in organizing the dinner:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

60.     Several different GNOs were held in 2015, including:  (1) at the ECRM conference in February (involving defendants Citron and Heritage, among others); (2) in Baltimore in May (involving defendants Citron, Heritage and Teva, among others); and (3) at the NACDS conference in August (involving defendants Citron and Heritage, among others).

## *Information Sharing*

61.     As a result of these various interactions, sales and marketing executives in the generic pharmaceutical drug industry are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity and opportunity often leads to agreements among competitors to allocate a given market so as to avoid competing with one another on price.

62.     Defendants and other generic drug manufacturers routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

63.     Defendants and other generic drug manufacturers also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection  and rebates.  Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

## Generic Drug Price Spikes Since 2013

64.     Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout 2013 and 2014.  According

to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014."

65.    A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices sometimes spiking by 600% to 2,000% in some cases.

66.    More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

### B. The Illegal Schemes

#### Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion

67.    When entering a generic drug market, Heritage and other Defendants routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price.  These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition when in fact none existed.

68.    One specific example of this illegal behavior is set forth below.

#### *Doxy DR*

69.    Doxycycline Hyclate Delayed Release ("Doxy DR"), also known by the brand-name Doryx®, is a tetracycline-class antimicrobial indicated as adjunctive therapy for severe acne.

70.     Heritage entered the market for Doxy DR in or about July, 2013.  The only other generic manufacturer selling Doxy DR at that time was defendant Mylan.

71.     Even before Heritage began selling Doxy DR, representatives of the company began to communicate with Mylan in an effort to divide the market in order to refrain from competing with each other on price.  Because Mylan was the only manufacturer of Doxy DR in the generic market at that time, pricing for the drug was still very profitable.

72.     For example, on May 2, 2013, Jason Malek, Vice President of Commercial Operations at Heritage, asked ███████████████████████ ████████ at Heritage, to set up a call between Malek and the Vice President of Sales at Mylan.  ████ responded that the Vice President of Sales at Mylan had little to do with National Accounts, and he recommended instead that Malek contact ████████████████████████ at Mylan.

73.     Malek promptly connected with ████ through the website LinkedIn. Over the next several weeks, Malek and/or ████ communicated with ████ on at least one occasion.

74.     Similarly, on May 7, 2013, Heritage's President and CEO, Jeffrey Glazer, emailed ████████████████████████ at Mylan.  Glazer stated: ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████ ████ responded with a phone number where he could be reached in England, and the two spoke the next day.

75.     During the course of these communications, Heritage and Mylan executives agreed to allocate market share and refrain from competing with one another for customers in the market for Doxy DR.    The objective was to avoid a price war which would reduce profitability for both companies.  Mylan agreed to "walk away" from at least one large national wholesaler and one large pharmacy chain to allow Heritage to obtain the business and increase its market share.

76.     On the rare occasion that Mylan insisted on competing for business that Heritage believed it was entitled to, Heritage contacted Mylan directly to address the situation.  For example, on November 25, 2013, after Mylan sought to protect its business with one large account, Malek sent an email to █████ asking ████████████████ ██ responded: ████████████████████████████

████████████████████████████████

77.     That same day, Malek also emailed Glazer, saying that ████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Glazer's response made clear the purpose of the agreement with Mylan (maintain high prices) and questioned whether Heritage should take any action that would disrupt that agreement: ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

78.     After evaluating, Heritage decided not to disrupt its agreement with Mylan and risk lowering prices.  Instead, Heritage and Mylan continued to allocate

customers for Doxy DR and maintain unlawfully high prices pursuant to their agreement until at least December 2015.

79.     In February of 2014, a new competitor entered the market selling 150 mg tablets of Doxy DR.    Defendant Mayne (formerly Midlothian Labs) approached Heritage even before it began selling the generic drug, in an attempt to obtain some of Heritage's market share.  For example, on January 7, 2014, ███ ██████████████████████ at Mayne, spoke by phone with ████████████ ██████████████████ at Heritage.

80.     Shortly thereafter, Heritage was solicited by a large wholesaler requesting a bid for Doxy DR.  ███ learned from the wholesaler that Mayne had provided an unsolicited bid for the 150 mg Doxy DR business, which prompted the wholesaler to approach the incumbent supplier, Mylan, to see if Mylan would match the price in order to retain the contract.  This process is a customary practice in the industry and often referred to as a "Right of First Refusal" ("ROFR").  An ROFR is often included as a term in supply contracts between manufacturers and their customers, giving the incumbent manufacturer the right to beat a competitor's price and retain the business.  Because the unsolicited Mayne bid essentially re-opened the bid process, the wholesaler asked Heritage if it would like to bid on the Doxy DR as well.

81.     In discussing the issue internally, Malek conceded that Heritage had the Doxy DR supply to fulfill the contract, but wanted ████████████  Providing a bid would be perceived as an attack on Mylan's business and may result in retaliation.  ███ agreed, adding that █████████████████████████████

██████████████████████████████████████████████████

██████████████████████

82.     The next day ████ responded to the wholesaler and declined to provide a bid.   The reason ████ gave to the customer for the inability to provide the bid was that Heritage might not have enough supply to fulfill a contract with the wholesaler.   ████'s explanation, however, was a lie, because three days later, she approached a different customer – a pharmacy chain – and asked if Heritage could bid for that company's Doxy DR business, saying ████████████████████ ████████████████████

83.     When Mayne initially entered the Doxy DR market, it avoided bidding on Heritage customers and chose instead to target Mylan, which had roughly 60% of the Doxy DR market.  Mylan, however, consistently protected its business, choosing not to allow Mayne to acquire market share.  In an internal Mayne email discussion on February 21, 2014, after learning from a wholesaler that Mylan had again protected its business with that wholesaler, ████████████████████ ████████████████ at Mayne, gave ████ his understanding of the situation based on his experience in the industry: ████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████

84.     ████ continued to communicate with ████ about Doxy DR.  They spoke by phone on March 13, 2014 and again four days later.  On March 17, 2014, in an email to Malek and others at Heritage entitled ████████████████████████,

█████ recounted their latest conversation, as well as her current understanding with ███ :

█████████████████████████████████████
█████████████████████████████████████
█████████████████████

█████████████████████████████████████
█████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████

█████████████████████████████████████
█████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████

█████████████████████████████████████
█████████████████████████████████████
█████

85.     Malek responded: ████████████████████████

████████  ███  's response was ████████████████████████████

████████

86.     Only two weeks later, however, Heritage learned that Mayne had made an unsolicited bid for Doxy DR to one of Heritage's large nationwide pharmacy accounts.  On March 31, 2014, Malek emailed ████ stating that Mayne

█████████████████████████████████████████████

████  ███  responded: ████████████

87.   The next day, April 1, 2014, ▮ spoke with ▮ Malek and ▮ then exchanged text messages. ▮ told Malek that she ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ Malek responded that Heritage ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

88.   ▮ called ▮ again the next day and they spoke for 12 minutes. Malek then emailed Heritage CEO Jeff Glazer, stating ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

89.   ▮ and ▮ spoke again on April 9, 2014.  She reported the conversation to Malek and ▮ : ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

90.   The next day, ▮ and ▮ exchanged a series of text messages:

(1:14pm) ▮ : ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

(1:16pm) ▮ : ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮

(1:18pm) ██ : ████████████████████████████████████
███████████████████████████████ ███████████

(1:19pm) ██ : █████████████████████████████████

91.     Mayne continued to look for a large account over the next several months, with Mylan and Heritage protecting their business.  Heritage did walk away from one account in May, 2014, however, when Mayne underbid Heritage's price.

92.     During this time period, Heritage continued to honor its agreement with Mylan not to target Mylan's Doxy DR accounts.  For example, on August 29, 2014, Malek sent an internal email to ██ titled ██████  In the email Malek stated ██████████████████████████████████████████████████
██████

93.     In November, 2014, Mayne again put in offers to McKesson's One Stop program and to Econdisc.  On November 21, 2014, ██ sent an email to Malek and others at Heritage, stating ████████████████████████
█████████████████████████  Malek immediately asked ██ to reach out to ██ and discuss the situation.  After exchanging text messages and voice mails with ██, ██ responded: ████████████████████████████████████
████████████████████████████████

94.     ██ and ██ eventually spoke on November 24, 2014.  ██'s notes reflect that when they spoke, she asked ██ what her goals were with respect to Doxy DR.  ██ responded that Mayne was looking for market share; she told ██ that Mayne had to get a ██████████████████████ ██ floated the idea that

Heritage may be willing to walk from Econdisc if Mayne would agree not to price Doxy DR aggressively, and if Mayne would also agree to withdraw its offer to McKesson.

95.    After speaking with ▮▮ , ▮▮ emailed Malek stating ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Within a half hour, after speaking with Malek, ▮▮ made a formal offer to ▮▮ by text message: ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

96.    The next day, November 25, 2014, Malek emailed ▮▮ asking ▮▮ ▮▮▮▮▮▮▮▮ responded ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮ Malek ended the conversation by saying ▮▮▮▮▮▮▮▮ ▮▮

97.    In internal email communications in the weeks following this agreement, Heritage CEO Glazer confirmed that Heritage was ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ and that Heritage ▮▮▮▮ ▮▮▮▮▮▮▮▮ the price for Doxy DR.

98.    ▮▮ and ▮▮ continued to communicate throughout December 2014, by text message, phone and even in person at the American Society of Health-System Pharmacists ("ASHP") conference on December 9, 2014.

99.    When Econdisc put the Doxy DR business out to bid again in January of 2015, Heritage made sure that it bid a higher price than Mayne, fulfilling its end of the agreement by "walking" from Econdisc.  As one Heritage

employee described it in March 2015, ███████████████████████████ at Econdisc in order to allow Mayne the business.

100.    This anticompetitive agreement between Heritage and Mayne continued until at least December, 2015.  For example, in September, 2015, Heritage was approached by a large nationwide pharmacy chain requesting a bid on Doxy DR.  ███, initially excited about the opportunity, confirmed internally that Heritage had the capacity to bid.  Malek cautioned, however, that ██████ ████████████████████████████████████████████████ before providing a response.

101.    After finding out that the incumbent supplier was Mayne, ████ reached out to ████ by text message.  ████ confirmed that Mayne had no supply issues and that the pharmacy chain was simply shopping for a better price.  In accordance with their agreement not to compete with each other and avoid price erosion, Heritage refused to provide a bid.  That same day, ████ sent another text message to ████ reiterating Heritage's intent to abide by the agreement, stating: █████████████████████████ ████ responded: ███████████

102.    As a result of these unlawful agreements, pricing for Doxy DR has been substantially higher than it would have been in a competitive market.

### Agreements to Fix Prices

103.    In addition to reaching agreements with competitors to allocate markets for a number of different generic drugs, Heritage and other Defendants routinely and as part of their regular course of business, sought and obtained

agreements with competitors to fix and raise prices. One specific example of this illegal behavior is set forth below.

### *Glyburide*

104. Glyburide is an oral diabetes medication used to treat Type 2 diabetes. Also known by the brand names DiaBeta® or Micronaise®, it is used to control blood sugar levels.

105. On April 22, 2014, Heritage held a ███████████████ teleconference. Present on the teleconference were members of the Heritage sales team as well as Malek.

106. During the teleconference, Malek identified a large number of different drugs that Heritage targeted for price increases. The list included the generic drug Glyburide. Heritage's competitors in the market for Glyburide at that time were defendants Aurobindo and Teva.

107. In order to accomplish the objective, Malek instructed members of the sales team to immediately reach out to their contacts at each competitor on the list of drugs, and attempt to reach agreement on the price increases. Different Heritage employees were responsible for communicating with different competitors.

108. Malek himself was responsible for communicating with defendant Teva, which was a competitor on several of the drugs on the list, including Glyburide. Malek had a direct relationship with ███, Teva's ████████████ ███████, and was able to successfully communicate with her and reach an agreement to raise prices on Glyburide, among other drugs. In fact, even before

the April 22, 2014 conference call, Malek began communicating with Teva about the price increases. For example, Malek spoke with ██ one week before the call, on April 15, 2014, for approximately 18 minutes.

109. In response to Malek's directive, the rest of the Heritage sales team also started contacting their competition immediately.

110. Over the coming days and weeks, both Malek and Glazer pushed Heritage employees to communicate with their competitors and obtain agreements to raise prices. On April 28, 2014, Malek sent an email to Heritage employee ██, titled ██████, referring to defendant Aurobindo. In the email Malek stated ████████████████████████████████████ ████████████████████

111. The next day, Glazer followed up with an email to ██ titled ████████, stating ████████████████████████ ████████████████ ██ responded saying ████████████████ ████████████████████████████ One day later, Malek followed up with ██ again, asking ████████████

112. On May 8, 2014, Malek sent an email to the Heritage sales team, stating:

████████████████████████████████
████████████████████████████████
████████████████████

113.   On May 9, 2014, Heritage had another teleconference to discuss the contemplated price increases, including for Glyburide.

114.   The following week, ██ met in person and discussed the price increase strategies with a number of different competitors at the MMCAP conference.  During that meeting she was able to personally confirm an agreement with defendant Aurobindo to raise the price of Glyburide.  As she recounted in an email to Malek dated May 15, 2014:



115.   On June 23, 2014, Heritage employees held a ████████████, where they discussed the specific percentage amounts they would seek to increase certain drugs, and the strategies for doing so.  Among those included on the list were Glyburide, which was slated for a 200% increase.

116.   Over the next several weeks, Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices.

117.   On June 25, 2014, for example, ██ texted her friend ██, a ████████████████ at Citron.  ██ wanted to determine whether Citron would be selling Glyburide in the near future:





118.   Shortly after this exchange, ▮ from Citron called ▮ at Heritage, confirming the agreement and informing him that she had been ▮ in on Heritage's plan.  According to ▮'s notes, ▮ told ▮ that Heritage employees should not try to communicate with Citron through email.  She also told ▮ that ▮ should not communicate through ▮, but should instead call ▮, ▮ ▮, if she had sensitive information to convey.

119.  Malek continued to push Heritage employees to discuss the price increases with competitors.  On July 1, 2014, Malek sent an email to the Heritage sales team titled ▮ The email read:

120.   After reaching agreement with competitors Aurobindo, Citron and Teva to raise prices for Glyburide, Heritage began implementing the price increases.  By July 9, 2014, Heritage had been able to successfully increase prices for Glyburide to at least 17 different customers.

121.　　The unlawful agreement resulted in specific price increases to customers who sold Glyburide to customers nationwide.  For example, on July 9, 2014, Teva was contacted by a large national retail chain requesting a bid on Glyburide and another drug, due to the Heritage price increases.  The request was forwarded to █████ with the questions: ████████████████████████ ████████████

122.　　█████ responded by reiterating her understanding of the agreement between Heritage on Teva on the two drugs at issue: ██████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████

123.　　Over the next several weeks, █████ and █████ communicated frequently by phone, text message and in person to discuss Glyburide pricing, bidding strategies, and how Citron might be able to acquire additional market share.

124.　　This anticompetitive agreement to unlawfully increase prices for Glyburide continued until at least December, 2015.

### Consciousness of Guilt – Efforts to Conceal the Schemes

125.　　The Defendants were aware that their conduct was illegal.  They all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made.

126.　　Going back to at least 2012, for example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing.

127.     None of the email accounts maintained by Heritage had any company-imposed document retention policy associated with them.  Heritage executives were aware of this, and utilized the lack of a company retention policy to routinely destroy emails that might disclose their conduct.  Heritage executives were aware that in order to permanently destroy an email, however, the email had to be deleted from more than just the recipient's in box.  For example, on June 27, 2012, Heritage CEO Glazer sent an email to Malek titled ███████ instructing: ████████████████████████████

128.     Glazer continued to remind Malek not to put any evidence of his illegal conduct into writing.  In a text message dated June 26, 2014, Glazer sternly warned Malek about his use of email: ████████████████████████████████████ ███████████

129.     That same day, in an email to the entire sales team at Heritage, Glazer made the point as clearly as possible: ████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████

130.     Other defendants were also aware of the need to avoid putting any evidence of their illegal activity into writing.  For example, in June 2014, shortly after a text message exchange between ████ of Citron and ████ from Heritage wherein the two competitors discussed and agreed to raise the price of Glyburide, ████ from Citron called ████ at Heritage, informing him that she had been ████████ in on Heritage's plan.  According to ████'s notes, ████ told ████ that Heritage employees should not communicate with Citron through email, but

should instead call ███, ██████████████████ at Citron, if they had information to convey.

131.    As Defendants became more aware that they were under state and federal investigation, there was even more urgency to avoid detection.  For example, on June 2, 2015, after it had become public that the Connecticut Attorney General's Office and the United States Department of Justice were investigating the industry, Malek sent ███ a text message stating: ████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████ **Significantly, the email referenced by Malek was not produced to the Connecticut Attorney General's Office in response to its subpoena to Heritage.  Upon information and belief, the referenced email has, along with other relevant documents, been deleted by Heritage.**

132.    Upon information and belief, Glazer, Malek and certain other Heritage employees also deleted all text messages from their company iPhones regarding their illegal communications with competitors.

133.    ███ of defendant Mayne, realizing the illegal nature of the agreements she entered into, also deleted several of the most incriminating text messages from her cell phone between her and ███ before the data on her phone was imaged and produced to the Connecticut Attorney General's Office.

## V.    TRADE AND COMMERCE

134.    At all times relevant to this Amended Complaint, the activities of the Defendants in manufacturing, selling and distributing generic pharmaceutical drugs, including but not limited to Doxy DR and Glyburide, among others, were in the regular, continuous and substantial flow of interstate trade and commerce and have had and continue to have a substantial effect upon interstate commerce.  The Defendants' activities also had and continue to have a substantial effect upon the trade and commerce within each of the States.

## VI.    MARKET EFFECTS

135.    The acts and practices of Defendants have had the purpose or effect, or the tendency or capacity, of unreasonably restraining competition and injuring competition by preventing competition for the generic pharmaceutical drugs identified herein, and have directly resulted in an increase in consumer prices for those drugs.

136.    By unreasonably and illegally restraining competition for the generic pharmaceutical drugs identified herein, Defendants have deprived the States, governmental entities and consumers of the benefits of competition that the federal antitrust laws are designed to promote, preserve and protect.

137.    As a direct and proximate result of the unlawful conduct alleged above, the States, governmental entities and consumers were not and are not able to purchase, or pay reimbursements for purchases of the generic pharmaceutical drugs identified herein at prices determined by a market unhindered by the impact of Defendants' anticompetitive behavior.  Instead, they

have been and continue to be forced to pay artificially high prices. Consequently, they have suffered substantial injury in their business and property in that, *inter alia*, they have paid more and continue to pay more for the various generic pharmaceutical drugs identified herein than they would have paid in an otherwise competitive market.

138. As a direct and proximate cause of the unlawful conduct alleged above, the general economies of the Plaintiff States have sustained injury and the Plaintiff States are threatened with continuing injury to their business and property unless Defendants are enjoined from continuing their unlawful conduct.

139. Plaintiff States do not have an adequate remedy at law.

140. All conditions precedent necessary to the filing of this action have been fulfilled, waived or excused.

**COUNT ONE (AGAINST DEFENDANTS HERITAGE, MYLAN AND MAYNE) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS FOR THE GENERIC DRUG DOXY DR IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

141.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

142.    Beginning as early as 2013, defendants Heritage, Mylan and Mayne knowingly agreed to allocate and divide the market for the generic drug Doxy DR.

143.    This agreement is facially anticompetitive because it allocates customers for the marketing and sale of the generic drug Doxy DR, artificially raises prices, and limits competition among the Defendants.  This agreement has eliminated price competition in the market for Doxy DR between defendants Heritage, Mylan and Mayne.

144.    These conspiracies substantially affected and still affect interstate commerce.

145.    The agreements constitute unreasonable restraints of trade that violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

146.    As a direct and proximate result of this conspiracy, the States, governmental entities, and consumers have been injured in their business or property because they have had to purchase or reimburse for Doxy DR at supra-competitive prices, and defendants Heritage, Mylan and Mayne have enjoyed ill-gotten gains from the sales of Doxy DR.

**COUNT TWO (AGAINST DEFENDANTS HERITAGE, TEVA, AUROBINDO AND CITRON) – HORIZONTAL CONSPIRACY TO RAISE PRICES FOR THE GENERIC DRUG GLYBURIDE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

147.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

148.    In April of 2014, Heritage devised a scheme whereby it would seek out its competitors and obtain agreements from them to collectively agree to raise prices for a large number of generic drugs.  Among those was the generic drug Glyburide.

149.    Heritage communicated directly with defendants Teva, Aurobindo and Citron, and obtained agreements with Teva, Aurobindo and Citron to raise prices for the generic drug Glyburide in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

150.    Defendants Heritage, Teva, Aurobindo and Citron knowingly became a party to this agreement.  These agreements are facially anticompetitive because they artificially raise prices and limit competition among the Defendants.  These agreements have eliminated price competition in the market for Glyburide between defendants Heritage, Teva, Aurobindo and Citron.

151.    These conspiracies substantially affected and still affect interstate commerce.

152.    The agreements constitute unreasonable restraints of trade that violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

153.    As a direct and proximate result of this conspiracy, the States, governmental entities, and consumers have been injured in their business or

43

property because they have had to purchase or reimburse for Glyburide at supra-competitive prices, and defendants Heritage, Teva, Aurobindo and Citron have enjoyed ill-gotten gains from the sales of Glyburide.

## COUNT THREE (AGAINST ALL DEFENDANTS) – SUPPLEMENTAL STATE LAW CLAIMS

### Connecticut

154.     Plaintiff State of Connecticut repeats and re-alleges each and every preceding allegation as if fully set forth herein.

155.     Defendants' actions as alleged herein violate the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-26 and 35-28, in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of Connecticut and elsewhere.

156.     Defendants' actions as alleged herein have damaged, directly and indirectly, the prosperity, welfare, and general economy of the State of Connecticut and the economic well being of a substantial portion of the People of the State of Connecticut and its citizens and businesses at large.  Plaintiff State of Connecticut seeks recovery of such damages as *parens patriae* on behalf of the State of Connecticut and the People of the State of Connecticut pursuant to Conn. Gen. Stat. § 35-32(c)(2).

157.     Defendants' acts and practices as alleged herein constitute unfair methods of competition in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b.

158.     Plaintiff State of Connecticut seeks injunctive relief pursuant to Conn. Gen. Stat. § 35-34, civil penalties pursuant to Conn. Gen. Stat. § 35-38 for

each and every violation of the Connecticut Antitrust Act, civil penalties pursuant to Conn. Gen. Stat. § 42-110o of $5,000 for each and every willful violation of the Connecticut Unfair Trade Practices Act, an order pursuant to Conn. Gen. Stat. § 42-110m requiring Defendants to submit to an accounting to determine the amount of improper compensation paid to them as a result of the allegations in the Complaint, disgorgement of all revenues, profits and gains achieved in whole or in part through the unfair methods of competition complained of herein, pursuant to Conn. Gen. Stat. § 42-110m, reasonable attorney's fees pursuant to Conn. Gen. Stat. § 42-110m, and such other and further relief as this Court deems just and equitable.

## Alabama

159. Plaintiff State of Alabama repeats and re-alleges each and every preceding allegation as if fully set forth herein.

160. The acts and practices by Defendants constitute unconscionable acts in violation of the Alabama Deceptive Trade Practices Act, Code of Alabama, 1975, § 8-19-5(27) for which the State of Alabama is entitled to relief.

## Arizona

161. Plaintiff State of Arizona repeats and re-alleges each and every preceding allegation as if fully set forth herein.

162. Defendants' actions as alleged herein violate the Arizona State Uniform Antitrust Act, Ariz. Rev. Stat. § 44-1401 *et seq.*

163. Plaintiff State of Arizona brings this action pursuant to A.R.S. §§ 44-1407 and 1408, and seeks relief, including but not limited to injunctive relief, civil

penalties, damages, other equitable relief (including but not limited to disgorgement), fees and costs, and such other relief as this Court deems just and equitable.

164. Defendants' actions as alleged herein constitute unlawful practices as defined in the Arizona Consumer Fraud Act, A.R.S. § 44-1521 *et seq.* Defendants engaged in unfair or deceptive acts or practices in connection with the sale or advertisement of merchandise by, among other things, making misrepresentations and taking steps to conceal their anticompetitive schemes.

165. Defendants' violations of the Arizona Consumer Fraud Act were willful, in that they knew or should have known that their conduct was of the nature prohibited by A.R.S. §44-1522.

166. Plaintiff State of Arizona brings this action pursuant to A.R.S. §§ 44-1528 and 1531, and seeks relief, including but not limited to injunctive relief, restitution, disgorgement and other equitable relief, civil penalties, fees and costs, and such other relief as this Court deems just and equitable.

## California

167. Plaintiff State of California repeats and re-alleges each and every preceding allegation as if fully set forth herein.

168. Defendants' actions alleged herein constitute contracts, combinations or conspiracies in violation of the Cartwright Act, California Business and Professions Code Sections 16720 *et seq.*, in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of California and elsewhere.

169.   In addition, as alleged herein, Defendants engaged, and continue to engage, in unlawful, fraudulent or unfair acts or practices, which constitute unfair competition in violation of California Unfair Competition Law ("UCL"), California Business and Professions Code Sections 17200 *et seq.*

170.   Defendants' actions alleged herein also constitute violations of the California False Advertiing Law ("FAL"), California Business and Professions Code Sections 17500 *et seq.*, in that Defendants made or disseminated, or caused to be made or disseminated, false or misleading statements, and continue to do so with the intent to induce their customers, wholesalers, and consumers to purchase their products at supracompetitive prices when they knew, or by the exercise of reasonable care should have known, that the statements were false or misleading.  Statements in violation of the FAL include, but are not limited to, false or misleading bids and/or offers made by Defendants to their customers and wholesalers as well as false or misleading statements made by Defendants to their customers and wholesalers as to their supply capacity and/or their reasons for bidding or not bidding.

171.   Plaintiff State of California is bringing these state claims as well as the federal claims alleged above in its sovereign capacity only.  In bringing its state claims, Plaintiff State of California is entitled to, among other things, injunctive and equitable relief in the form of disgorgement of Defendants' ill-gotten gains under the Cartwright Act (Cal. Bus. & Prof. Code § 16750, *et seq.*); injunctive, restitution and other equitable relief under the UCL (Cal. Bus. & Prof. Code § 17200, *et seq.*) and under the FAL (Cal. Bus. & Prof. Code § 17500, *et*

*seq.*); civil penalties assessed at $2,500 for each violation of the UCL and penalties assessed at $2,500 for each violation of the FAL (Cal. Bus. & Prof. Code §§ 17206 and 17536), and additional penalties for senior citizens and disabled victims of the violation (Cal. Bus. & Prof. Code § 17206.1 and Cal. Civil Code § 3345); costs of suit, including reasonable attorneys' fees, and such other relief as may be just and equitable (Cal. Bus. & Prof. Code §§ 16750, 16754, and 16754.5).

## Colorado

172.    Plaintiff State of Colorado repeats and re-alleges each and every preceding allegation as if fully set forth herein.

173.    Defendants' actions violate, and Plaintiff State of Colorado is entitled to relief under, the Colorado Antitrust Act of 1992, § 6-4-101, *et seq.*, Colo. Rev. Stat.

174.    Plaintiff State of Colorado seeks equitable relief, the maximum civil penalties allowed by law, attorneys' fees, and costs.

## Delaware

175.    Plaintiff State of Delaware repeats and re-alleges each and every preceding allegation as if fully set forth herein.

176.    The aforementioned practices by defendants Heritage, Mylan and Mayne in Count One of this Complaint are in violation of Section 2103 of the Delaware Antitrust Act, 6 Del. C. § 2101, *et seq.*

177.    The aforementioned practices by defendants Heritage, Teva, Aurobindo and Citron in Count Two of this Complaint are in violation of Section 2103 of the Delaware Antitrust Act, 6 Del. C. § 2101, *et seq.*

178.     Plaintiff State of Delaware through the Attorney General brings this action pursuant to Sections 2105 and 2107, and seeks civil penalties and equitable relief pursuant to Section 2107 of the Delaware Antitrust Act, 6 Del. C. § 2101, *et seq.*

### Florida

179.     The State of Florida repeats and re-alleges each and every preceding allegation as if fully set forth herein.

180.     This is an action that alleges a violation of the Florida Antitrust Act, Section 542.18, Florida Statutes, and the State of Florida is entitled to relief, including, but not limited to, damages, disgorgement, civil penalties, equitable relief, injunctive relief, attorneys' fees and costs resulting from the Defendants' conduct as stated above.

181.     The State of Florida has an assignment from a vendor that purchased pharmaceuticals directly from Defendants.  As a result of that assignment, any claims for violations of federal and/or state antitrust laws that the vendor may have had have been assigned to the State of Florida when the claims relate to purchases by the State of Florida.

182.     Defendants knowingly – that is, voluntarily and intentionally – entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or stabilize the prices charged for pharmaceuticals during the Relevant Period, continuing through the filing of this Complaint.

183.    The State of Florida and its government entities and municipalities, and Florida individual consumers directly and/or indirectly purchased pharmaceuticals within Florida.

184.    The State of Florida and its government entities and municipalities, and Florida individual consumers have been injured and will continue to be injured by paying more for pharmaceuticals purchased directly and/or indirectly from the Defendants and their co-conspirators than they would have paid in the absence of the conspiracy.

185.    As a direct and proximate result of the Defendants' conduct, the State of Florida and its government entities and municipalities, and Florida individual consumers have been harmed and will continue to be harmed by paying supra-competitive prices for pharmaceuticals that they would not had to pay in the absence of the Defendants' conduct as alleged herein.

186.    The sale of pharmaceuticals in the State of Florida involves trade or commerce within the meaning of the Florida Antitrust Act.

187.    Defendants' combination, conspiracy, acts, and practices, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

188.    This is an action that alleges a violation of the Florida Deceptive and Unfair Trade Practices Act, Section 501.201, et seq, Florida Statutes.  The State of Florida seeks all available relief under Section 501.201, et seq, Florida Statutes, including, but not limited to, damages, disgorgement, civil penalties, equitable relief, injunctive relief, attorneys' fees and costs, for all purchases of

pharmaceuticals by the State of Florida and its government entities and municipalities, Florida businesses, and individual consumers.

189.   The sale of pharmaceuticals in Florida to the State of Florida and its government entities and municipalities, Florida businesses, and individual consumers involves trade or commerce within the meaning of the Florida Deceptive and Unfair Trade Practices Act.

190.   Defendants directly and indirectly sold pharmaceuticals to the State of Florida and its government entities and municipalities, Florida businesses, and individual consumers.

191.   The combination, conspiracy, acts, and practices alleged herein constitute unfair methods of competition in violation of the Florida Deceptive and Unfair Trade Practices Act, 501. 201, et seq, Florida Statutes.

192.   Further, Defendants' actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Florida governmental entities, to municipalities in the State of Florida, and to consumers in the State of Florida in violation of Section 501.204, Florida Statutes.

193.   Defendants' unfair methods of competition, combination, conspiracy, acts and practices, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

<u>Hawaii</u>

194.   Plaintiff State of Hawaii repeats and re-alleges each and every preceding allegation as if fully set forth herein.

195.    The aforementioned practices by Defendants violate Chapter 480, Hawaii Revised Statutes, by, among other things, unlawfully restraining trade or commerce, or having the purpose or effect of fixing, controlling or maintaining prices, allocating or dividing customers or markets, fixing or controlling prices or bidding for public or private contracts, or otherwise thwarting genuine competition in generic drug markets.

196.    The aforementioned practices by Defendants were and are unfair or deceptive acts or practices and/or unfair methods of competition in violation of section 480-2, Hawaii Revised Statutes.

197.    Plaintiff State of Hawaii is entitled to injunctive relief pursuant to section 480-15, Hawaii Revised Statutes, civil penalties pursuant to section 480-3.1, Hawaii Revised Statutes, restitution, equitable relief in the form of disgorgement of Defendants' ill-gotten gains, or in the alternative, on behalf of its government agencies, treble damages pursuant to section 480-14, Hawaii Revised Statutes, and as *parens patriae* on behalf of natural persons residing in Hawaii, treble damages, as well as reasonable attorney fees and costs.

## Idaho

198.    Plaintiff State of Idaho repeats and re-alleges each and every preceding allegation as if fully set forth herein.

199.    Defendants' actions as alleged herein violate the Idaho Competition Act, Idaho Code § 48-104, in that they have the purpose and/or the effect of unreasonably restraining Idaho commerce, as that term is defined by Idaho Code § 48-103(1).

200.     For each and every violation alleged herein, Plaintiff State of Idaho, on behalf of itself, its state agencies, and persons residing in Idaho, is entitled to all legal and equitable relief available under the Idaho Competition Act, Idaho Code §§ 48-108, 48-112, including, but not limited to, injunctive relief, actual damages or restitution, civil penalties, disgorgement, expenses, costs, attorneys' fees, and such other and further relief as this Court deems just and equitable.

201.     Defendants' actions constitute per se violations of Idaho Code § 48-104.  Pursuant to Idaho Code § 48-108(2), Plaintiff State of Idaho, as *parens patriae* on behalf of persons residing in Idaho, is entitled to treble damages for the per se violations of Idaho Code § 48-104.

<u>Illinois</u>

202.     Plaintiff State of Illinois repeats and re-alleges each and every preceding allegation as if fully set forth herein.

203.     Defendants' actions as alleged herein violate sections 3(1), 3(2) and 3(3) of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*

204.     Plaintiff State of Illinois, under its antitrust enforcement authority in 740 ILCS 10/7, seeks relief, including but not limited to damages, for Illinois consumers and Illinois state entities that paid for Doxy DR and Glyburide during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct.  Plaintiff State of Illinois also seeks, and is entitled to, injunctive relief, civil penalties, other equitable relief (including but not limited to disgorgement), fees and costs, and any other remedy available for these violations under sections 7(1), 7(2), and 7(4) of the Illinois Antitrust Act.

## Indiana

205.   Plaintiff State of Indiana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

206.   The aforementioned practices are a violation of Chapter Two of the Indiana Antitrust Act, Ind. Code § 24-1-2-1, and the Plaintiff State of Indiana seeks recovery pursuant to I.C. § 24-1-2-5.

207.   The aforementioned practices are a violation of Chapter One of the Indiana Antitrust Act, I.C. § 24-1-1-1, and the Plaintiff State of Indiana seeks recovery pursuant to I.C. § 24-1-1-2.

208.   The aforementioned practices are unfair and/or deceptive acts by a supplier in the context of a consumer transaction in violation of the Indiana Deceptive Consumer Sales Act, I.C. § 24-5-0.5-3.

209.   Plaintiff State of Indiana under its authority in I.C. § 24-1-2-5, I.C. § 24-1-1-2, and I.C. § 24-5-0.5-4 seeks relief, including but not limited to damages, for Indiana consumers and Indiana state entities that paid for Doxy DR and Glyburide during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct.  Plaintiff State of Indiana also seeks, and is entitled to, civil penalties, injunctive relief, other equitable relief (including but not limited to disgorgement), fees and costs and any other remedy available for these violations under the Indiana Antitrust Act and the Indiana Deceptive Consumer Sales Act.

## Iowa

210.    Plaintiff State of Iowa repeats and re-alleges each and every preceding allegation as if fully set forth herein.

211.    The alleged practices by Defendants were in violation of the Iowa Competition Law, Iowa Code Chapter 553.

212.    Iowa seeks an injunction and divestiture of profits resulting from these practices pursuant to Iowa Code § 553.12, and civil penalties pursuant to Iowa Code § 553.13.

213.    Defendants' acts and practices as alleged herein also constitute an unfair practice in violation of the Iowa Consumer Fraud Act, Iowa Code § 714.16(1)(n) and a deception pursuant to Iowa Code section 714.16(1)(f).

214.    Pursuant to Iowa Code § 714.16(7), the State of Iowa seeks disgorgement, restitution, and other equitable relief for these violations.  In addition, pursuant to Iowa Code § 714.16(11), the Attorney General seeks reasonable fees and costs for the investigation and litigation.

## Kansas

215.    Plaintiff State of Kansas repeats and re-alleges each and every preceding allegation as if fully set forth herein.

216.    The aforementioned practices by Defendants were and are in violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101 *et seq.*

217.    The State of Kansas seeks relief on behalf of itself and its agencies and as *parens patriae* on behalf of its residents, pursuant to Kan. Stat. Ann. §§ 50-103 and 50-162.

218. Kansas governmental entities and residents are entitled to money damages regardless of whether they purchased Doxy DR and Glyburide directly or indirectly from Defendants, pursuant to Kan. Stat. Ann. § 50-108(b).

219. The State of Kansas is entitled to injunctive relief, civil penalties, restitution, treble damages, reasonable expenses and investigative fees, reasonable attorney fees and costs, and any other appropriate relief the court so orders, pursuant to Kan. Stat. Ann. §§ 50-103, 50-108, 50-160, and 50-161.

### Kentucky

220. Plaintiff Commonwealth of Kentucky repeats and re-alleges each and every preceding allegation as if fully set forth herein.

221. The aforementioned acts or practices by Defendants violate the Consumer Protection Act, Kentucky Rev. Stat. Ann. 367.110 *et seq.* The violations were willfully done.

222. Plaintiff Commonwealth of Kentucky is entitled to relief under Ky. Rev. Stat. Ann. 367.110 *et seq.*

### Louisiana

223. Plaintiff State of Louisiana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

224. The practices of Defendants described herein are in violation of the Louisiana Monopolies Act, LSA-R.S. 51:121 *et seq.*, and the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et. seq.*

225. Plaintiff State of Louisiana is entitled to injunctive relief and civil penalties under LSA-R.S. 51:1407 as well as damages, disgorgement and any other equitable relief that the court deems proper under LSA-R.S. 51:1408.

## Maine

226. Plaintiff State of Maine repeats and re-alleges each and every preceding allegation as if fully set forth herein.

227. The aforementioned practices by Defendants are in violation of the Maine Monopolies and Profiteering Law, 10 M.R.S. §§ 1101 and 1102, and Plaintiff State of Maine is entitled to relief for these violations under 10 M.R.S. § 1104.

228. The aforementioned practices by Defendants are intentional and in violation of the Maine Unfair Trade Practices Act, 5 M.R.S. § 207, and Plaintiff State of Maine is entitled to relief for those violations under 5 M.R.S. § 209.

## Maryland

229. Plaintiff State of Maryland repeats and re-alleges each and every preceding allegation as if fully set forth herein.

230. The aforementioned practices by Defendants were and are in violation of the Maryland Antitrust Act, Md. Com. Law Code Ann. §§ 11-201 *et seq.*

231. During the relevant period, Doxy DR and Glyburide were in the regular, continuous and substantial flow of intrastate commerce in Maryland. Doxy DR and Glyburide were shipped to pharmacies located in Maryland which sold Doxy DR and Glyburide to persons in Maryland.

232.     During the relevant period Maryland governmental entities and Maryland consumers paid more for Doxy DR and Glyburide than they would have paid but for Defendants' unlawful conduct.

233.     Plaintiff State of Maryland brings this action against Defendants in the following capacities:

  a.  Pursuant to Md. Com. Law Code Ann. § 11-209(a) in its sovereign capacity for injunctive relief, civil penalties, restitution, disgorgement and all other available equitable remedies;

  b.  Pursuant to Md. Com. Law Code Ann. § 11-209(b) to recover three times the amount of damages sustained by Maryland governmental entities.  Maryland governmental entities are entitled to money damages regardless of whether they purchased Doxy DR and Glyburide directly or indirectly from Defendants. Md. Com. Law Code Ann. § 11-209(b)(2);

  c.  Pursuant to Md. Com. Law Code Ann. § 11-209(b)(5) as *parens patriae* on behalf of persons residing in Maryland.  These persons are entitled to three times the amount of money damages sustained regardless of whether they have purchased Doxy DR or Glyburide directly or indirectly from Defendants.  Md. Health-Gen. Code Ann. § 21-1114.

234.     Plaintiff State of Maryland also seeks, pursuant to Md. Com. Law Code Ann. § 11-209(b), reimbursement of reasonable attorney's fees, expert fees and costs.

## Massachusetts

235.    Plaintiff Commonwealth of Massachusetts repeats and re-alleges each and every preceding allegation as if fully set forth herein.

236.    The aforementioned practices by Defendants constitute unfair methods of competition and/or unfair or deceptive acts or practices in trade or commerce in violation of the Massachusetts Consumer Protection Act, M.G.L c. 93A, § 2 *et seq.*

237.    Defendants knew or should have known that their conduct violated the Massachusetts Consumer Protection Act, M.G.L c. 93A, § 2 *et seq.*

238.    Plaintiff Commonwealth of Massachusetts is entitled to relief under M.G.L. c. 93A, § 4, including, without limitation, damages and restitution to Massachusetts consumers and Massachusetts governmental purchasers; civil penalties for each violation committed by the Defendants; injunctive relief and other equitable relief including, without limitation, disgorgement; fees and costs including, without limitation, costs of investigation, litigation, and attorneys' fees; and any other relief available under M.G.L. c. 93A, § 4.

239.    Plaintiff Commonwealth of Massachusetts notified the defendants of this intended action more than five days prior to the commencement of this action and gave the Defendants an opportunity to confer in accordance with M.G. L. c. 93A, § 4.

## Michigan

240.    Plaintiff State of Michigan repeats and re-alleges each and every preceding allegation as if fully set forth herein.

241.    The State of Michigan brings this action both on behalf of itself, its State Agencies, and as *parens patriae* on behalf of natural persons, pursuant to Mich. Comp. Laws §14.28, and §14.101, to enforce public rights and to protect residents and its general economy against violations of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, the Michigan Consumer Protection Act, Mich. Comp. Laws §445.901 *et. seq.*, and the common law of the State of Michigan.

242.    The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, the Michigan Consumer Protection Act, Mich. Comp. Laws §445.901 *et. seq.*, and the common law of the State of Michigan.  As a result of Defendant's unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade and Defendants' conspiracy to restrain trade for the purpose of excluding or avoiding competition, all as more fully described above, the Plaintiff State of Michigan, its agencies, and consumers have suffered and been injured in business and property by reason of having to purchase or reimburse at supra-competitive prices as direct and indirect purchasers and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

243.    Accordingly, Plaintiff State of Michigan on behalf of itself, its agencies, and as *parens patriae* on behalf of its consumers affected by Defendants illegal conduct, is entitled to relief including but not limited to injunctive relief and other equitable relief (including but not limited to disgorgement), civil penalties, damages, costs and attorney fees.

## Minnesota

244.    Plaintiff State of Minnesota repeats and re-alleges each and every preceding allegation as if fully set forth herein.

245.    Defendants' acts as alleged herein violate the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-.66, the Uniform Deceptive Trade Practices Act of 1973, Minn. Stat. §§ 325D.43-.48, Minn. Stat. Ch. 8, and Minnesota common law for unjust enrichment.  Plaintiff State of Minnesota seeks relief, including but not limited to damages, on behalf of itself, its state agencies, and as *parens patriae* on behalf of its consumers.  Plaintiff State of Minnesota is entitled to treble damages under Minn. Stat. § 325D.57.

246.    Plaintiff State of Minnesota is entitled to disgorgement under the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-.66, the Uniform Deceptive Trade Practices Act of 1973, Minn. Stat. §§ 325D.43-.48, Minn. Stat. Ch. 8, and Minnesota common law for unjust enrichment.

247.    Plaintiff State of Minnesota is entitled to costs and reasonable attorneys' fees under Minn. Stat. § 325D.45 and .57.  Plaintiff State of Minnesota is entitled to injunctive relief under Minn. Stat. §§ 325D.45 and .58.

248.    Defendants shall be subject to civil penalties under Minn. Stat. § 325D.56.

## Mississippi

249.    Plaintiff State of Mississippi repeats and re-alleges each and every preceding allegation as if fully set forth herein.

250.    Defendants' acts violate Miss. Code Ann. § 75- 21-1 *et seq.*, and Plaintiff State of Mississippi is entitled to relief under Miss. Code Ann. § 75- 21-1 *et seq.*

251.    Defendants' acts violate the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*, and Plaintiff State of Mississippi is entitled to relief under the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*

252.    Pursuant to Miss. Code Ann. § 75-21-1 *et seq.*, and the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*, Plaintiff State of Mississippi seeks and is entitled to injunctive relief, disgorgement, civil penalties, costs, and any other just and equitable relief which this Court deems appropriate.

<u>Montana</u>

253.    Plaintiff State of Montana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

254.    The aforementioned practices by Defendants violate Montana's Unfair Trade Practices and Consumer Protection Act, Mont Code Ann. §30-14-101 *et seq.*, and Unfair Trade Practices Generally, Mont. Code Ann. §30-14-201 *et seq.*, including §30-14-205(1).

255.    Defendants' unlawful conduct was willful and Plaintiff State of Montana is entitled to all civil relief available under Mont. Code Ann. §30-14-111(4), §30-14-131, §30-14-142(2), and §30-14-222.

## Nebraska

256.    Plaintiff State of Nebraska repeats and re-alleges each and every preceding allegation as if fully set forth herein.

257.    Defendants' actions as alleged herein violate the Unlawful Restraint of Trade Act, Neb. Rev. Stat. § 59-801 *et seq.* and the Consumer Protection Act, Neb. Rev. Stat. § 59-1601 *et seq.* Specifically, Defendants' actions violate Neb. Rev. Stat. §§ 59-801, 59-1602, and 59-1603. These violations have had an impact, directly and indirectly, upon the public interest of the State of Nebraska.

258.    Accordingly, Plaintiff State of Nebraska, on behalf of its state entities and political subdivisions and as *parens patriae* for all citizens within the state, seeks all relief available under the Unlawful Restraint of Trade Act, the Consumer Protection Act, and Neb. Rev. Stat. § 84-212. Plaintiff State of Nebraska is entitled to relief including but not limited to: disgorgement, injunctions, civil penalties, damages, and its costs and attorney's fees pursuant to Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1614, and 84-212.

## Nevada

259.    Plaintiff State of Nevada repeats and re-alleges each and every preceding allegation as if fully set forth herein.

260.    The aforementioned acts and practices by Defendants were, and are, in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*, and specifically the following:

(a) NRS 598.0915(15), a person engages in a deceptive trade practice by knowingly making a false representation in a transaction;

(b) NRS 598.0923(2), a person engages in a deceptive trade practice by failing to disclose a material fact in connection with the sale or lease of goods or services; and

(c) NRS 598.023(3), a person engages in a deceptive trade practice by violating a state or federal statute or regulation relating to the sale or lease of goods or services.

261. The aforementioned acts and practices by Defendants were, and are, also in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.*, and specifically the following:

(a) NRS 598A.060(a), competitors unlawfully restrain trade by engaging in price fixing;

(b) NRS 598A.060(b), competitors unlawfully restrain trade by agreeing to division of markets; and

(c) NRS 598A.060(c), competitors unlawfully restrain trade by agreeing to allocate customers;

262. Accordingly, Plaintiff State of Nevada seeks all relief available under the Nevada Deceptive Trade Practices Act, the Nevada Unfair Trade Practices Act, and common law. Plaintiff State of Nevada is entitled to relief including but not limited to: disgorgement, injunctions, civil penalties, damages, and its costs and attorney's fees pursuant to Nev. Rev. Stat. §§ 598.0963, 598.0973, 598.0999, 598A.170, and 598A.200.

## New Hampshire

263.     Plaintiff State of New Hampshire repeats and re-alleges each and every preceding allegation as if fully set forth herein.

264.     The aforementioned actions, practices and conduct by Defendants violate the New Hampshire Antitrust Provisions, N.H. RSA 356:1, *et seq.*, by, among other things, unlawfully restraining trade or commerce, or having the purpose or effect of fixing, controlling or maintaining prices, allocating or dividing customers or markets, fixing or controlling prices or bidding for public or private contracts, or otherwise thwarting genuine competition in generic drug markets.

265.     The aforementioned actions, practices and conduct by Defendants violate the New Hampshire Consumer Protection Act, N.H. RSA 358-A:1 *et seq.* by using unfair or deceptive methods of competition in the conduct of trade or commerce including, among other things, pricing goods in a manner that tends to harm competition or otherwise thwarting genuine competition in generic drug markets.

266.     These violations artificially inflated prices of generic drugs, substantially affecting the people of New Hampshire and having various impacts within the Plaintiff State.

267.     Some or all of the violations by Defendants were willful and flagrant.

268.     Plaintiff State of New Hampshire seeks all legal and equitable remedies available under the New Hampshire Antitrust Provisions, the New Hampshire Consumer Protection Act, and common law to include, among other

things, restitution, injunctive relief, civil penalties, costs and attorney fees. *See* N.H. RSA 356:4 et seq.; N.H. RSA 358-A:1 *et seq.*

### New Jersey

269.   Plaintiff State of New Jersey repeats and re-alleges each and every preceding allegation as if fully set forth herein.

270.   Defendants' actions as alleged herein violate the New Jersey Antitrust Act, N.J.S.A. 56:9-1 *et seq.*, in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of New Jersey and elsewhere. N.J.S.A. 56:9-3.  Plaintiff State of New Jersey seeks relief including but not limited to, treble damages for New Jersey consumers and state agencies that paid for Doxy DR or Glyburide, injunctive relief, civil penalties and attorneys' fees and investigative costs.   N.J.S.A. 56:9-10, -12.

271.   Defendants' actions as alleged herein violate the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.*, in that Defendants' made misleading statements, omitted material facts and engaged in unconscionable commercial practices in connection with the advertising, offering for sale and sale of Doxy DR and/or Glyburide. N.J.S.A. 56:8-2.  Plaintiff State of New Jersey seeks relief including but not limited to, injunctive relief, civil penalties and attorneys' fees and investigative costs. N.J.S.A. 56:8-8, -11, -13 and -19.

### New York

272.   Plaintiff State of New York repeats and re-alleges each and every preceding allegation as if fully set forth herein.

273.     The aforementioned practices by the Defendants violate New York antitrust law, the Donnelly Act, New York Gen. Bus. Law §§ 340-342c, and constitute both "fraudulent" and "illegal" conduct in violation of New York Executive Law § 63(12).

274.     Plaintiff State of New York seeks relief, including but not limited to damages, for New York consumers and New York state entities that paid for Doxy DR and Glyburide during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct.  Plaintiff State of New York also seeks, and is entitled to, civil penalties, injunctive relief, other equitable relief (including but not limited to disgorgement), and fees and costs.

### North Carolina

275.     Plaintiff State of North Carolina repeats and re-alleges each and every preceding allegation as if fully set forth herein.

276.     Defendants' acts violate North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1 *et seq*.  Plaintiff State of North Carolina is entitled to relief pursuant to N.C. Gen. Stat. § 75-1 *et seq*.

277.     Plaintiff State of North Carolina is entitled to recover its costs and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

### North Dakota

278.     Plaintiff State of North Dakota repeats and re-alleges each and every preceding allegation as if fully set forth herein.

279.     The aforementioned practices by Defendants are in violation of North Dakota's Uniform State Antitrust Act North Dakota Century Code (N.D.C.C.) § 51-

08.1-01 *et seq.*, and Plaintiff State of North Dakota is entitled to relief for these violations under N.D.C.C. § 51-08.1-01 *et seq.*

280.    The aforementioned practices by Defendants constitute unconscionable or deceptive acts or practices in violation of the North Dakota Consumer Fraud Law, N.D.C.C. §51-15-01 *et seq.*, and Plaintiff State of North Dakota is entitled to relief for those violations under N.D.C.C. §51-15-01 *et seq.*

## Ohio

281.    Plaintiff State of Ohio repeats and re-alleges each and every preceding allegation as if fully set forth herein.

282.    The aforementioned practices by Defendants were, and are, a *per se* illegal conspiracy against trade in violation of Ohio Revised Code Section 1331.01 et seq, the common law of Ohio, and void pursuant to Ohio Rev. Code § 1331.06. The State of Ohio, the general economy of Ohio, Ohio entities and individuals in Ohio were harmed as a direct result of Defendants' *per se* illegal conduct. Defendants received ill-gotten gains or proceeds as a direct result of their *per se* illegal conduct.

283.    Plaintiff State of Ohio seeks and is entitled to an injunction, disgorgement and civil forfeiture pursuant to Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq, including Section 1331.03, which requires a forfeiture of $500 per day that each violation was committed or continued, and any other remedy available at law or equity.

**Oklahoma**

284.    Plaintiff State of Oklahoma repeats and re-alleges each and every allegation as if fully set forth herein.

285.    The aforementioned practices by the Defendants are in violation of the Oklahoma Antitrust Reform Act, 79 O.S. § 201 *et seq.*, and Plaintiff State of Oklahoma is entitled to relief under 79 O.S. § 205.

**Oregon**

286.    Plaintiff State of Oregon repeats and re-alleges each and every preceding allegation as if fully set forth herein.

287.    The aforementioned practices by Defendants were, and are, in violation of the Oregon Antitrust Law, Oregon Revised Statutes ("ORS") 646.705, *et seq.* These violations had impacts within the State of Oregon and substantially affected the people of Oregon.

288.    Plaintiff State of Oregon seeks all relief available under the Oregon Antitrust Act, including injunction, civil penalties, equitable relief including but not limited to disgorgement and unjust enrichment, the State of Oregon's costs incurred in bringing this action, plus reasonable attorney fees, expert witness fees, and costs of investigation, and any other remedy available at law for these violations under ORS 646.760, ORS 646.770, ORS 646.775, and ORS 646.780.

**Pennsylvania**

289.    Plaintiff Commonwealth of Pennsylvania repeats and re-alleges each and every preceding allegation as if fully set forth herein.

290.    The aforementioned practices by Defendants violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* ("PUTPCPL") and Pennsylvania antitrust common law.  The Pennsylvania Office of Attorney General has reason to believe that the Defendants have engaged in a method, act or practice declared by 73 P.S. § 201-3 to be unlawful, and that this proceeding would be in the public interest pursuant to 71 P.S. § 201-4.

291.    On behalf of the Commonwealth and its citizens pursuant to 71 P.S. §732-204 (c), Pennsylvania seeks injunctive relief, restoration, disgorgement and attorneys' fees and costs pursuant to 73 P.S. § 201-4 and 4.1 and civil penalties of not exceeding $3,000 for each such willful violation pursuant to 73 P.S. § 201-8 (b).  Pennsylvania also seeks disgorgement, or damages in the alternative, and injunctive relief under antitrust common law.  Pennsylvania also seeks disgorgement under common law for unjust enrichment.

## South Carolina

292.    Plaintiff South Carolina repeats and re-alleges each and every preceding allegation as if fully set forth herein.

293.    South Carolina represents the South Carolina Medicaid Program ("South Carolina Medicaid"), the South Carolina Public Employee Benefit Authority ("South Carolina PEBA"), and as *parens patriae* for the citizens of South Carolina in this action.

294.    The aforementioned practices by Defendants constitute "unfair methods of competition and unfair or deceptive acts or practices" under §39-5-20

of the South Carolina Code of Laws. South Carolina Medicaid and South Carolina PEBA are represented in an individual capacity pursuant to §39-5-140(a). Defendants ' conduct constitutes a "willful or knowing violation of §39-5-20" under §39-5-140(d), and thus South Carolina seeks to recover treble damages under §39-5-140(a) on behalf of South Carolina Medicaid and South Carolina PEBA for all purchases of Doxy DR and Glyburide made by South Carolina Medicaid and South Carolina PEBA during the relevant time period.

295.    South Carolina consumers are represented in a statutory *parens patriae* capacity under §39-5-50 and a common law *parens patriae* capacity. South Carolina consumers are defined as any natural person, corporate entity, or government entity that purchased Doxy DR and Glyburide in South Carolina. Pursuant to §39-5-50(b), South Carolina seeks that this Court restore unto South Carolina consumers any ascertainable loss incurred in making any payments for purchases of Doxy DR and Glyburide. Pursuant to §39-5-50(a), South Carolina seeks injunctive relief to prohibit Defendants from engaging in the conduct described in this complaint.

296.    Defendants' conduct constitutes a willful or knowing violation of §39-5-20 under §39-5-110(c).  South Carolina seeks an award of civil penalties under §39-5-1 IO(a) in the amount up to $5,000.00 per violation in South Carolina.

297.    South Carolina seeks attorneys' fees and costs under §39-5-50(a) and §39- 5-140(a).

## Tennessee

298.   Plaintiff State of Tennessee repeats and re-alleges each and every preceding allegation as if fully set forth herein.

299.   The aforementioned practices by Defendants are in violation of Tennessee's antitrust law, the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.*

300.   Defendants' conduct has affected commerce in Tennessee to a substantial degree, and substantially affected the people of Tennessee.

301.   On behalf of the State, its agencies, and its citizens, the State of Tennessee seeks all legal and equitable relief available under the Tennessee Trade Practices Act and the common law, including but not limited to injunctive relief, disgorgement, and/or damages for Tennessee consumers and Tennessee state entities that paid for the goods at issue during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct, and such other and further relief as this Court deems just and equitable.

## Utah

302.   Plaintiff State of Utah repeats and re-alleges each and every preceding allegation as if fully set forth herein.

303.   The aforementioned acts by Defendants violate, and Plaintiff State of Utah is entitled to relief under, the Utah Antitrust Act, Utah Code §§ 76-10-3101 through 76-10-3118 (the "Act"), and Utah common law.  Accordingly, Plaintiff State of Utah, by and through the Attorney General of Utah, on behalf of itself, Utah governmental entities, and as *parens patria*e for its natural persons, who

purchased or paid for Doxy DR and/or Glyburide during the relevant time period, is entitled to all available relief under the Act and Utah common law, including, without limitation, damages (including treble damages, where permitted), injunctive relief, including disgorgement, restitution, unjust enrichment, and other equitable monetary relief, civil penalties, and its costs and reasonable attorneys' fees.

Vermont

304.    Plaintiff State of Vermont repeats and re-alleges each and every preceding allegation as if fully set forth herein.

305.    Defendants' actions alleged herein violate the Vermont Consumer Protection Act, 9 V.S.A. § 2453, and the State is entitled to relief for these violations pursuant to 9 V.S.A. §§ 2458, 2461 and 2465.

Virginia

306.    Plaintiff Commonwealth of Virginia repeats and re-alleges each and every preceding allegation as if fully set forth herein.

307.    The aforementioned practices by defendants Heritage, Mylan, and Mayne in Count One of this Complaint are in violation of the Virginia Antitrust Act, Virginia Code Sections 59.1-9.1, *et seq.*

308.    The aforementioned practices by defendants Heritage, Teva, Aurobindo, and Citron in Count Two of this Complaint are in violation of the Virginia Antitrust Act, Virginia Code Sections 59.1-9.1, *et seq.*

309.    Plaintiff Commonwealth of Virginia through the Attorney General brings this action pursuant to Section 59.1-9.15.  Pursuant to Sections 59.1-

9.15(a) and (d), Plaintiff Commonwealth of Virginia seeks disgorgement, restitution, and other equitable relief for these violations. In addition, pursuant to Sections 59.1-9.15(b), the Plaintiff Commonwealth of Virginia seeks reasonable fees and costs for the investigation and litigation.

## Washington

310. Plaintiff State of Washington repeats and re-alleges each and every preceding allegation as if fully set forth herein.

311. The aforementioned practices by Defendants were, and are, in violation of the Washington Consumer Protection Act, Wash. Rev. Code 19.86.020 and .030. These violations had impacts within the State of Washington and substantially affected the people of Washington.

312. Plaintiff State of Washington seeks relief, including but not limited to damages, for Washington consumers and Washington state agencies that paid more for Doxy DR and Glyburide than they would have paid but for the Defendants' unlawful conduct. Plaintiff State of Washington also seeks, and is entitled to, injunctive relief, other equitable relief (including but not limited to disgorgement), civil penalties, and costs and fees under the Consumer Protection Act, Wash Rev. Code 19.86.080 and 19.86.140.

## Wisconsin

313. Plaintiff State of Wisconsin repeats and re-alleges each and every preceding allegation as if fully set forth herein.

314. The aforementioned practices by Defendants are in violation of Wisconsin's Antitrust Act, Wis. Stat. Ch. § 133.03 *et seq.* These violations

substantially affect the people of Wisconsin and have impacts within the State of Wisconsin.

315. Plaintiff State of Wisconsin, under its antitrust enforcement authority in Wis. Stat. Ch. 133, is entitled to all remedies available at law or in equity under Wis. Stat. §§ 133.03, 133.14, 133.16, 133.17, and 133.18.

# PRAYER FOR RELIEF

**Accordingly, the Plaintiff States request that the Court:**

1. **Adjudge and decree that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1;**

2. **Adjudge and decree that the foregoing activities violated each of the State statutes enumerated in this Amended Complaint;**

3. **Enjoin and restrain, pursuant to federal and state law, Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions set forth above;**

4. **Award to Plaintiff States disgorgement of the Defendants' ill-gotten gains and any other equitable relief as the Court finds appropriate to redress Defendants' violations of federal or state antitrust laws and state consumer protection laws or restore competition;**

5. **Award to Plaintiff States damages, including treble damages, to the extent sought pursuant to applicable state laws as enumerated in Count Three of the Amended Complaint;**

6. **Award to each Plaintiff State the maximum civil penalties allowed by law;**

7. Award to each Plaintiff State its costs, including reasonable attorneys' fees; and

8. Order any other relief that this Court deems proper.

## JURY DEMAND

The Plaintiff States demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues triable as of right by jury.

PLAINTIFF
STATE OF CONNECTICUT
GEORGE JEPSEN
ATTORNEY GENERAL

BY:    /s/ W. Joseph Nielsen
Michael E. Cole
Chief, Antitrust Department
Federal Bar No. ct24676
W. Joseph Nielsen
Federal Bar No. ct20415
Laura Martella
Federal Bar No. ct27380
Assistant Attorneys General
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5040
Fax: (860) 808-5033
Joseph.Nielsen@ct.gov

**FOR PLAINTIFF STATE OF ALABAMA**
**STEVEN T. MARSHALL**
**ATTORNEY GENERAL**

**Billington M. Garrett**
**Assistant Attorney General**
**Office of the Attorney General**
**501 Washington Avenue**
**Montgomery, AL 36130**
**Telephone: (334) 242-7300**
**Fax: (334) 242-2433**
**Email: bgarrett@ago.state.al.us**

**FOR PLAINTIFF STATE OF ARIZONA**
**MARK BRNOVICH**
**ATTORNEY GENERAL OF ARIZONA**

**NANCY M. BONNELL**
**(Arizona Bar No. 016382)**
**DANA R. VOGEL**
**(Arizona Bar No. 030748)**
**Assistant Attorneys General**
**Office of the Attorney General**
**Consumer Protection & Advocacy Section**
**1275 West Washington**
**Phoenix, Arizona 85007**
**Telephone:  (602) 542-7728**
**Fax:  (602) 542-9088**
**Nancy.bonnell@azag.gov**
**Dana.vogel@azag.gov**

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA
XAVIER BECERRA
ATTORNEY GENERAL

KATHLEEN FOOTE
Senior Assistant Attorney General

CHERYL JOHNSON (CA SBN 66321)
PAMELA PHAM (CA SBN 235493)
Deputy Attorneys General
300 S. Spring Street, Suite 1700
Los Angeles, CA 90013
Telephone:  (213) 897-2688
Fax:  (213) 897-2801
E-mail:  Cheryl.Johnson@doj.ca.gov;
          Pamela.Pham@doj.ca.gov

**FOR PLAINTIFF STATE OF COLORADO**
**CYNTHIA H. COFFMAN**
**ATTORNEY GENERAL**

**Devin M. Laiho**
**Senior Assistant Attorney General**
**Colorado Department of Law**
**Consumer Protection Section**
**1300 Broadway, Seventh Floor**
**Denver, Colorado 80203**
**Telephone: 720-508-6219**
**Email: Devin.Laiho@coag.gov**

**STATE OF DELAWARE**
**MATTHEW P. DENN**
**ATTORNEY GENERAL**

**Michael A. Undorf**
**Deputy Attorney General**
**Delaware Department of Justice**
**820 N. French St., 5th Floor**
**Wilmington, DE 19801**
**Telephone: (302) 577-8924**
**Fax: (302) 577-6499**
**Email: Michael.Undorf@state.de.us**

**FOR PLAINTIFF STATE OF FLORIDA**
**PAMELA JO BONDI**
**Attorney General**

**PATRICIA A. CONNERS**
**(Florida Bar No. 361275)**
**Deputy Attorney General**
**Trish.Conners@myfloridalegal.com**
**LIZABETH A. BRADY**
**(Florida Bar No. 457991)**
**Chief, Multistate Enforcement**
**Liz.Brady@myfloridalegal.com**
**TIMOTHY FRASER**
**(Florida Bar No. 957321)**
**Assistant Attorney General**
**Timothy.Fraser@myfloridalegal.com**
**Office of the Attorney General**
**State of Florida**
**PL-01, The Capitol**
**Tallahassee, FL 32399-1050**
**Tel: (850) 414-3300**
**Fax: (850) 488-9134**

**FOR THE STATE OF HAWAII**
**DOUGLAS S. CHIN**
**ATTORNEY GENERAL OF HAWAII**

**BRYAN C. YEE**
**RODNEY I. KIMURA**
**Deputy Attorneys General**
**Department of the Attorney General**
**425 Queen Street**
**Honolulu, Hawaii  96813**
**Tel:  808-586-1180**
**Fax:  808-586-1205**
**Bryan.c.yee@hawaii.gov**
**Rodney.i.kimura@hawaii.gov**

**FOR PLAINTIFF STATE OF IDAHO**
**LAWRENCE G. WASDEN**
**ATTORNEY GENERAL**

**Brett T. DeLange**
**John K. Olson**
**Deputy Attorneys General**
**Consumer Protection Division**
**Office of the Attorney General**
**954 W. Jefferson Street, 2nd Floor**
**P.O. Box 83720**
**Boise, Idaho  83720-0010**
**Telephone: (208) 334-4114**
**Fax: (208) 334-4151**
**brett.delange@ag.idaho.gov**
**john.olson@ag.idaho.gov**

**FOR PLAINTIFF STATE OF ILLINOIS**

**LISA MADIGAN**
**Attorney General**

**Robert W. Pratt**
**Antitrust Bureau Chief**
**Office of the Illinois Attorney General**
**100 W. Randolph Street**
**Chicago, IL 60601**
**Tel:  (312) 814-3722**
**Fax:  (312) 814-4902**
**rpratt@atg.state.il.us**

Respectfully submitted,

CURTIS T. HILL
Attorney General of the State of Indiana

AMANDA JANE LEE
Deputy Attorney General

TAMARA WEAVER
Deputy Attorney General

JUSTIN G. HAZLETT
Section Chief, Consumer Protection
Division

302 West Washington St., 5th Floor
IGCS -5th Floor
Indianapolis, IN  46204

Tel: (317) 233-8297
Fax: (317) 233-4393

ATTORNEYS FOR THE
STATE OF INDIANA

Respectfully submitted,

THOMAS J. MILLER
Attorney General of Iowa

Layne M. Lindebak
Assistant Attorney General
Special Litigation Division
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, IA 50319
Tel:  (515) 281-7054
Fax:  (515) 281-4902
Layne.Lindebak@iowa.com


ATTORNEYS FOR THE
STATE OF IOWA

**FOR PLAINTIFF STATE OF KANSAS
DEREK SCHMIDT
ATTORNEY GENERAL**

**Lynette R. Bakker
Assistant Attorney General
Office of the Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 368-8451
Fax: (785) 291-3699
Email: [lynette.bakker@ag.ks.gov](mailto:lynette.bakker@ag.ks.gov)**

**ANDY BESHEAR**
**Attorney General of Kentucky**

**LeeAnne Applegate**
**Charles W. Rowland**
**Assistant Attorneys General**
**Office of the Attorney General of Kentucky**
**1024 Capital Center Drive, Suite 200**
**Frankfort, KY 40601**
**Tel: 502-696-5300**
**Fax: 502-573-8317**
**LeeAnne.Applegate@ky.gov**
**Charlie.Rowland@ky.gov**

ATTORNEYS FOR THE STATE OF KENTUCKY

**FOR PLAINTIFF**
**STATE OF LOUISIANA**
**JEFF LANDRY**
**Attorney General**
**State of Louisiana**

**STACIE L. DEBLIEUX**
**LA Bar # 29142**
**Assistant Attorney General**
**Public Protection Division**
**1885 North Third St.**
**Baton Rouge, LA 70802**
**Tel: (225) 326-6400**
**Fax: (225) 326-6499**
**Email: [deblieuxs@ag.louisiana.gov](mailto:deblieuxs@ag.louisiana.gov)**

Respectfully submitted,

JANET T. MILLS
Attorney General of Maine

Christina Moylan
Assistant Attorney General
Office of the Attorney General of Maine
6 State House Station
Augusta, ME  04333
Tel:  207-626-8838
Fax: 207-624-7730
christina.moylan@maine.gov

ATTORNEYS FOR THE
STATE OF MAINE

**BRIAN E. FROSH**
**MARYLAND ATTORNEY GENERAL**

**Ellen S. Cooper**
**Assistant Attorney General**
**Chief, Antitrust Division**

**John R. Tennis**
**Assistant Attorney General**
**Deputy Chief, Antitrust Division**
**Office of the Attorney General**
**200 St. Paul Place, 19th Floor**
**Baltimore, Maryland 21202**
**Tel. # (410) 576-6470**
**Fax # (410) 576-7830**
**jtennis@oag.state.md.us**

**Attorneys for the State of Maryland**

**FOR PLAINTIFF COMMONWEALTH
OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL**

**William T. Matlack (MA BBO No. 552109)
Assistant Attorney General
Chief, Antitrust Division
Carol E. Head (MA BBO No. 652170)
Matthew M. Lyons (MA BBO No. 657685)
Michael MacKenzie (MA BBO No. 683305)
Assistant Attorneys General
Antitrust Division
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 722-0184 (fax)
William.Matlack@state.ma.us
Carol.Head@state.ma.us
Matthew.Lyons@state.ma.us
Michael.Mackenzie@state.ma.us**

**FOR PLAINTIFF**
**STATE OF MICHIGAN**
**BILL SCHUETTE**
**ATTORNEY GENERAL**

**DJ Pascoe**
**Assistant Attorney General**
**First Assistant, Corporate Oversight**
**Michigan Department of Attorney General**
**G. Mennen Williams Building, 6th Floor**
**525 W. Ottawa Street**
**Lansing, Michigan 48933**
**pascoed1@michigan.gov**
**Telephone:  (517) 373-1160**
**Fax:  (517) 335-6755**

**FOR PLAINTIFF**
**STATE OF MINNESOTA**
**LORI SWANSON**
**ATTORNEY GENERAL**

**JAMES CANADAY**
**Deputy Attorney General**

**JUSTIN ERICKSON**
**Assistant Attorney General**

**ROBERT CARY**
**Assistant Attorney General**
**Office of the Minnesota Attorney General**
**Suite 1400**
**445 Minnesota Street**
**St. Paul, MN 55101**
**Telephone: (651) 757-1022**
**Fax: (651) 296-9663**
**Email: robert.cary@ag.state.mn.us**

**FOR PLAINTIFF STATE OF MISSISSIPPI**

**JIM HOOD, ATTORNEY GENERAL**
**STATE OF MISSISSIPPI**

**By: Crystal Utley Secoy, MSBN 102132**
**Special Assistant Attorney General**

**Consumer Protection Division**
**Office of the Attorney General**
**Post Office Box 22947**
**Jackson, Mississippi  39225**
**Telephone:  601-359-4213**
**Fax: 601-359-4231**
**Email:  cutle@ago.state.ms.us**

**STATE OF MONTANA**
**TIMOTHY C. FOX**
**Attorney General**


**MARK MATTIOLI**
**Chief, Consumer Protection**
**CHUCK MUNSON**
**Assistant Attorney General**

**MONTANA DEPARTMENT OF JUSTICE**
**OFFICE OF CONSUMER PROTECTION**
**555 Fuller Avenue**
**P.O. Box 200151**
**Helena, MT 59620-0151**
**(406) 444-4500**
**FAX:  (406) 442-1894**
**cmunson@mt.gov**

**FOR PLAINTIFF**
**STATE OF NEBRASKA,**
**ex rel. DOUGLAS J. PETERSON,**
**ATTORNEY GENERAL**

**Collin Kessner**
**Assistant Attorney General**
**Nebraska Attorney General's Office**
**2115 State Capitol**
**Lincoln, NE  68509**
**Tel: 402-471-3833**
**Fax: 402-471-4725**
**collin.kessner@nebraska.gov**

**FOR PLAINTIFF STATE OF NEVADA**

**ADAM PAUL LAXALT**
**Nevada Attorney General**

**Lucas J. Tucker**
**Senior Deputy Attorney General**
**Office of the Nevada Attorney General**
**Bureau of Consumer Protection**
**10791 W. Twain Ave., Suite 100**
**Las Vegas, Nevada 89135**
**Nevada Bar No. 10252**
**ltucker@ag.nv.gov**

**FOR THE PLAINTIFF**
**STATE OF NEW HAMPSHIRE**
**By its attorney,**
**Joseph A. Foster**
**Attorney General of New Hampshire**

**Jennifer L.  Foley, NH Bar #10519**
**Assistant Attorney General**
**Consumer Protection and Antitrust Bureau**
**NH Department of Justice**
**33 Capitol Street**
**Concord, NH  03301**
**(603) 271-7987**
**Jennifer.Foley@doj.nh.gov**

**Brooksley C. Belanger, NH Bar #17097**
**Assistant Attorney General**
**Medicaid Fraud Control Unit**
**33 Capitol Street**
**Concord, NH  03301-6397**
**(603) 271-1246**
**brooksley.belanger@doj.nh.gov**

**CHRISTOPHER S. PORRINO**
**Attorney General of New Jersey**

**Russell M. Smith, Jr.**
**Jodie E. Van Wert**
**Deputy Attorneys General**
**State of New Jersey**
**Office of the Attorney General**
**Division of Law**
**124 Halsey Street – 5th Floor**
**P.O. Box 45029**
**Newark, New Jersey 07101**
**Tel: (973) 877-1280**
**Fax: (973) 648-4887**
**Russell.Smith@dol.lps.state.nj.us**
**Jodie.VanWert@dol.lps.state.nj.us**

**ATTORNEYS FOR THE**
**STATE OF NEW JERSEY**

Respectfully submitted,

**ERIC T. SCHNEIDERMAN**
**Attorney General of the State of New York**

**MANISHA SHETH**
**Executive Deputy Attorney General for**
**Economic Justice**

**BEAU BUFFIER**
**Chief, Antitrust Bureau**

**ELINOR R. HOFFMAN**
**Deputy Chief, Antitrust Bureau**

**ROBERT L. HUBBARD**
**LINDA GARGIULO**
**Assistant Attorneys General**

**120 Broadway, 26th Floor**
**New York, New York 10271-0332**
**Tel: (212) 416-8267**
**Fax: (212) 416-6015**

**ATTORNEYS FOR THE**
**STATE OF NEW YORK**

FOR PLAINTIFF
STATE OF NORTH CAROLINA

Respectfully submitted,

JOSH STEIN
Attorney General of North Carolina

Kimberley A. D'Arruda
Special Deputy Attorney General
North Carolina Dept. of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC  27603
Telephone: (919) 716-6013
Fax: (919) 716-6050
Email: kdarruda@ncdoj.gov

**STATE OF NORTH DAKOTA**
**Wayne Stenehjem**
**Attorney General**

**Parrell D. Grossman, ND ID 04684**
**Assistant Attorney General**
**Director, Consumer Protection &**
**Antitrust Division**
**Office of Attorney General**
**Gateway Professional Center**
**1050 E Interstate Ave, Ste 200**
**Bismarck, ND  58503--5574**
**Telephone (701) 328-5570**
**Facsimile (701) 328-5568**
**pgrossman@nd.gov**

***Attorneys for the State of North Dakota***

Respectfully submitted,

R. MICHAEL DEWINE
Attorney General of Ohio

Jennifer Pratt
Chief, Antitrust Section
Beth A. Finnerty
Assistant Section Chief, Antitrust Section
Edward J. Olszewski
Senior Assistant Attorney General
Office of the Ohio Attorney General
Antitrust Section
150 E. Gay St., 22nd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0269
edward.olszewski@ohioattorneygeneral.gov

ATTORNEYS FOR THE
STATE OF OHIO

**FOR PLAINTIFF STATE OF OKLAHOMA**

**E. SCOTT PRUITT**
**ATTORNEY GENERAL**

**Rachel Irwin, OBA #31598**
**Assistant Attorney General**
**Office of the Oklahoma Attorney General**
**313 N.E. 21st Street**
**Oklahoma City, OK 73105**
**Telephone: (405) 522-1014**
**Fax: (405) 522-0085**
**Email: Rachel.Irwin@oag.ok.gov**

**STATE OF OREGON**

**ELLEN F. ROSENBLUM**
**ATTORNEY GENERAL**

**TIM D. NORD, OSB 882800**
**Special Counsel**
**Civil Enforcement Division**
**Oregon Department of Justice**
**1162 Court Street NE**
**Salem, OR 97301-4096**
**Tel: (503) 934-4400**
**Fax: (503) 373-7067**
**tim.d.nord@doj.state.or.us**

**KATHERINE A. CAMPBELL,**
**OSB 071044**
**Assistant Attorney General**
**Civil Enforcement Division**
**Oregon Department of Justice**
**100 SW Market Street**
**Portland, OR 97201**
**Tel: (971) 673-1880**
**Fax: (971) 673-1884**
**katherine.campbell@doj.state.or.us**

**COMMONWEALTH OF
PENNSYLVANIA
Office of the Attorney General**

**JOSH SHAPIRO
ATTORNEY GENERAL**

**Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section**

**Joseph S. Betsko
Senior Deputy Attorney General
Antitrust Section**

**Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: 717-787-4530
Fax: 717-787-1190
twertz@attorneygeneral.gov
jbetsko@attorneygeneral.gov**

**ATTORNEYS FOR THE
COMMONWEALTH
OF PENNSYLVANIA**

**ALAN WILSON**
**Attorney General for the**
**State of South Carolina**
**Federal ID No. 10457**
**Email: awilson@scag.gov**

**ROBERT BOLCHOZ**
**Chief Deputy Attorney General**
**Federal ID No. 6959**
**Email: rbolchoz@scag.gov**

**ROBERT D. COOK**
**Solicitor General**
**Federal ID No. 285**
**Email: bcook@scag.gov**

**C. HAVIRD JONES, JR.**
**Senior Assistant Deputy Attorney General**
**Federal ID No. 2227**
**Email: sjones@scag.gov**

**CLARK KIRKLAND, JR.**
**Assistant Attorney General**
**Federal ID No. 12410**
**Email: ckirklandjr@scag.gov**

**OFFICE OF THE ATTORNEY GENERAL**
**1000 Assembly Street**
**Rembert C. Dennis Building**
**Post Office Box 11549**
**Columbia, South Carolina 29211-1549**
**Phone: 803.734.3970**

**Attorneys for Alan Wilson, in his official capacity as Attorney General of the State of South Carolina.**

**FOR PLAINTIFF STATE OF TENNESSEE**

**HERBERT H. SLATERY III**
**Attorney General and Reporter of**
**Tennessee**

**CYNTHIA E. KINSER**
**Deputy Attorney General**

**BRANT HARRELL**
**Senior Counsel**

**DAVID MCDOWELL**
**Assistant Attorney General**

**Office of the Attorney General and Reporter**
**P.O. Box 20207**
**Nashville, TN 37202**
**Tel: (615) 741-8722**
**Cynthia.Kinser@ag.tn.gov**
**Brant.Harrell@ag.tn.gov**
**David.McDowell@ag.tn.gov**


**ATTORNEYS FOR THE**
**STATE OF TENNESSEE**

**FOR PLAINTIFF STATE OF UTAH**

**SEAN D. REYES**
**UTAH ATTORNEY GENERAL**
**350 North State Street, #230**
**P.O. Box 142320**
**Salt Lake City, UT 84114-2320**

**David Sonnenreich**
**Deputy Attorney General**

**Ronald J. Ockey**
**Assistant Attorney General**
**Chief, Antitrust Section**

**Edward Vasquez**
**Assistant Attorney General**

**Office of the Attorney General of Utah**
**Tax, Financial Services and Antitrust**
**Division**
**160 East 300 South, 5th Floor**
**P.O. Box 140874**
**Salt Lake City, UT 84114-0874**
**Tel: 801-366-0375**
**Fax: 801-366-0378**
**dsonnenreich@utah.gov**
**rockey@utah.gov**
**evasquez@utah.gov**

**ATTORNEYS FOR THE**
**STATE OF UTAH**

**FOR PLAINTIFF STATE OF VERMONT**
**THOMAS J. DONOVAN, JR.**
**ATTORNEY GENERAL**

**Jill S. Abrams**
**Assistant Attorney General**
**109 State Street**
**Montpelier, Vermont 05609**
**Telephone: (802) 828-1106**
**Fax: (802) 828-2154**
**Email: [Jill.Abrams@vermont.gov](mailto:Jill.Abrams@vermont.gov)**

Respectfully submitted,

**MARK R. HERRING**
**Attorney General of Virginia**

**Cynthia E. Hudson**
**Chief Deputy Attorney General**

**Rhodes B. Ritenour**
**Deputy Attorney General**

**Richard S. Schweiker, Jr.**
**Senior Assistant Attorney General and**
**Chief, Consumer Protection Section**

**Sarah Oxenham Allen**
**Senior Assistant Attorney General**

**Tyler T. Henry**
**Assistant Attorney General**
**Office of the Attorney General of Virginia**
**202 North 9th Street**
**Richmond, VA  23219**
**Tel:  804-692-0485**
**Fax: 804-786-0122**
**thenry@oag.state.va.us**

**ATTORNEYS FOR THE**
**COMMONWEALTH OF VIRGINIA**

**ROBERT W. FERGUSON**
**Attorney General of Washington State**

**JONATHAN A. MARK**
**Senior Assistant Attorney General**
**Antitrust Division Chief**

**Michael Hemker**
**Assistant Attorney General**
**Erica Koscher, Assistant Attorney General**
**Office of the Attorney General of**
**Washington State**
**Assistant Attorneys General**
**800 5th Ave, Ste. 2000**
**Seattle, WA 98104-3188**
**(206) 464-7744**

**Attorneys for Plaintiff State of Washington**

Respectfully submitted,

BRAD D. SCHIMEL
Wisconsin Attorney General

GWENDOLYN J. COOLEY
Assistant Attorney General
State Bar #1053856

Attorneys for the State of Wisconsin

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 261-5810
(608) 266-2250 (Fax)
cooleygj@doj.state.wi.us