# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **THE STATE OF CONNECTICUT, *et al.*,** | \| | **CIVIL ACTION NO.** |
| | \| | **3:16-CV-002056-VLB** |
| **Plaintiffs,** | \| | |
| | \| | |
| **v.** | \| | **Hon. Vanessa L. Bryant** |
| | \| | |
| **AUROBINDO PHARMA USA, INC., *et al.*,** | \| | |
| | \| | |
| **Defendants.** | \| | **May 1, 2017** |

---

**DEFENDANT MAYNE PHARMA INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION UNDER FRCP 12(b)(6) TO DISMISS THE STATE ATTORNEYS GENERAL PLAINTIFFS' AMENDED COMPLAINT, OR IN THE ALTERNATIVE MOTION UNDER FRCP 21 TO SEVER THE DOXYCYCLINE HYCLATE DR CLAIMS FROM THE GLYBURIDE CLAIMS**

---

**[REDACTED PUBLIC VERSION]**

## <u>TABLE OF CONTENTS</u>

Table of Authorities ............................................................................................... iii

Introduction ......................................................................................................... 1

Summary of Plaintiffs' Limited Allegations Against Mayne ....................... 3

Argument ............................................................................................................. 6

I.  THIS COURT SHOULD DISMISS THE COMPLAINT FOR FAILURE
    TO STATE A CLAIM UNDER FRCP 12(b)(6) ......................................... 7

    A.  Standard Of Review .................................................................... 7

    B.  The Law On Conspiracy .............................................................. 9

    C.  Claims Against Mayne Related to Glyburide Should Be
        Dismissed As Mayne Has No Connection to Glyburide ............ 11

    D.  The Complaint Contains No Factual Allegations To Support
        A Claim That Mayne Participated In A Conspiracy Related
        To Doxy DR With Mylan ............................................................. 12

    E.  Allegations Regarding A Conspiracy Between Mayne And
        Heritage Are Insufficient As A Matter Of Law .......................... 14

        i.    Plaintiffs Do Not Allege Direct Evidence Of An
              Agreement Between Mayne And Heritage ....................... 15

        ii.   Plaintiffs Do Not Sufficiently Plead Circumstantial
              Evidence Of A Conspiracy Between Mayne And
              Heritage ......................................................................... 20

II. IN THE ALTERNATIVE, THIS COURT SHOULD SEVER THE
    COMPLAINT'S DOXY DR CLAIMS FROM THE GLYBURIDE
    CLAIMS UNDER FRCP 21 ...................................................................... 25

    A.  Legal Standard ........................................................................... 25

    B.  The Factors Weigh In Favor of Severing the Doxy DR
        Claims from the Glyburide Claims ............................................. 26

Conclusion .......................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                    <u>Page(s)</u>

*Am. Council of Certified Podiatric Physicians and Surgeons v. Am.*
   *Bd. of Podiatric Surgery, Inc.*,
   185 F.3d 606 (6th Cir. 1999) ................................................................. 8

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246 (2d Cir. 1987) ................................................................. 21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................... 7, 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................... *passim*

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) ............................................................ 14, 15

*Concord Assocs., L.P. v. Entm't Properties Trust*,
   2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) .............................................. 7

*Costello v. Home Depot U.S.A., Inc.*,
   888 F. Supp. 2d 258 (D. Conn. 2012) ....................................... 25, 26, 27, 28, 29

*Cox v. Bland*,
   2002 WL 663859 (D. Conn. Mar. 26, 2002) ......................................... 29, 30

*Deskovic v. City of Peekskill*,
   673 F.Supp.2d 154 (S.D.N.Y. 2009) ............................................. 27, 28, 29

*Elektra Entm't Group, Inc. v. Does 1–9*,
   2004 WL 2095581 (S.D.N.Y. Sept. 8, 2004) ...................................... 28, 29

*Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*,
   806 F. Supp. 2d 712 (S.D.N.Y. 2011) ................................................... 30

*Finkelman v. Nat'l Football League*,
   810 F.3d 187 (3d Cir. 2016) ............................................................ 15, 19

*Greystone Cmty. Reinv. Ass'n v. Berean Capital, Inc.*,
   638 F.Supp.2d 278 (D. Conn. 2009) ...................................................... 25

*Hannah v. Wal-Mart Stores*, Inc.,
   2017 WL 68617 (D. Conn. Jan. 6, 2017) ................................................. 30

*Hinds Co. Miss. V. Wachovia Bank, N.A.,*
   620 F. Supp. 2d 499 (S.D.N.Y. 2009) ...................................................... 24

*In re Blech Sec. Litig.,*
   2003 WL 1610775 (S.D.N.Y. March 26, 2003) ...................................... 29

*In re Capacitors Antitrust Litig.,*
   106 F. Supp. 3d 1051 (N.D. Cal. 2015) ................................................... 8

*In re Flat Glass Antitrust Litig.,*
   385 F.3d 350 (3d Cir. 2004) ................................................................... 22

*In re Graphics Processing Units ("GPU") Antitrust Litig.,*
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ....................................... 8, 23, 24

*In re Ins. Brokerage Antitrust Litig.,*
   618 F.3d 300 (3d Cir. 2010) ............................................................... 11,13

*In re K-Dur Antitrust Litig.,*
   2016 WL 755623 (D.N.J. Feb. 25, 2016) ........................................ 11, 13

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.,*
   247 F.R.D. 420 (S.D.N.Y. 2007). ........................................ 25, 27, 28, 30

*In re Processed Egg Prods. Antitrust Litig.,*
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ................................................... 15

*Ingram v. United States,*
   360 U.S. 672 (1959) ............................................................................... 9

*InterVest, Inc. v. Bloomberg, L.P.,*
   340 F.3d 144 (3d Cir. 2003) ................................................................. 16

*Jones v. Howard,*
   2015 WL 4755751 (D. Conn. Aug. 11, 2015) ...................................... 26

*Kotteakos, et al. v. United States,*
   328 U.S. 750 (1946) ........................................................................ 10, 14

*LaFlamme v. Societe Air France,*
   702 F.Supp.2d 136 (E.D.N.Y. 2010) ............................................... 23, 24

*Liberty Mut. Ins. Co. v. Buettel,*
   2015 WL 12990469 (D. Conn. Oct. 7, 2015) .................................... 26, 27

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.,*
   709 F.3d 129 (2d Cir. 2013) ................................................ 14, 15, 20, 21

*Michelman v. Clark-Schwebel Fiber Glass Corp.,*
    534 F.2d 1036 (2d Cir. 1976) ................................................................. 10

*Monsanto Co. v. Spray-Rite Svc. Corp.,*
    465 U.S. 752 (1984) ............................................................................. 20

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc.,*
    998 F.2d 1224 (3d Cir. 1993) ............................................................... 23

*Ross v. Citigroup, Inc.,*
    630 F. App'x 79 (2d Cir. 2015) ............................................................ 22

*Sanchez v. O'Connell,*
    2010 WL 7862797 (D. Conn. Sept. 27, 2010) ...................................... 27

*S.E.C. v. Pignatiello,*
    1998 WL 293988 (S.D.N.Y. June 5, 1998) ........................................... 30

*Starr v. Sony BMG Music Entm't,*
    592 F.3d 314 (2d Cir. 2010) ................................................................. 9

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.,*
    738 F. Supp. 2d 505 (D. Del. 2010) ..................................................... 24

*Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.,*
    346 U.S. 537 (1954) ............................................................................... 7

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue
    Shield,*
    552 F.3d 430 (6th Cir. 2008) ............................................................ 7, 8

*Twombly v. Bell Atl. Corp.,*
    425 F.3d 99 (2d Cir. 2005) ................................................................... 21

*United States v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015) ................................................................. 20

*United States v. Baldridge,*
    559 F.3d 1126 (10th Cir. 2009) ...................................................... 11, 14

*United States v. Chandler,*
    388 F.3d 796 (11th Cir. 2004) ............................................................. 10

*United States v. Kelly,*
    892 F.2d 255 (3d Cir. 1989) ................................................................. 10

*United States v. Kemp,*
    500 F.3d 257 (3d Cir. 2007) ............................................................ 9, 10

***United States v. Swafford*,**
    **512 F.3d 833 (6th Cir. 2008)**............................................................................ **9, 11**

***United States v. Yehling*,**
    **456 F.3d 1236 (10th Cir. 2006)**......................................................................... **9**

## INTRODUCTION

Mayne Pharma Inc. (hereinafter "Mayne") respectfully submits this Court should dismiss the claims against Mayne asserted in the State Attorneys General Amended Complaint (ECF 169) (hereinafter "the Complaint"). In the alternative, Mayne respectfully submits this Court should sever the doxycycline hyclate delayed-release ("Doxy DR") claims from the glyburide claims.

At the heart of their Complaint, the State Attorneys General (collectively, "Plaintiffs") charge the Defendants "with entering into contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the markets for Doxy DR and glyburide in the United States." Compl. ¶ 1. Although the Complaint is insufficient as to all Defendants—as demonstrated in Defendants' Joint Motion to Dismiss—Plaintiffs' claims are particularly deficient as to Mayne.[1]

First, Plaintiffs fail to allege any facts to support a claim that Mayne was involved in an overarching conspiracy related to both Doxy DR and glyburide. Doxy DR and glyburide are entirely distinct and unrelated products used for different purposes to treat different medical issues, and are sold in different markets by different companies at different prices. Mayne has never sought approval from, nor has it ever been approved by, the FDA to sell glyburide. Accordingly, Mayne has never sold glyburide, and has absolutely no involvement in the glyburide market. Compl. ¶ 106. It therefore defies logic that Mayne could be part of a conspiracy to fix prices or rig bids for customers on the sale of

---

[1] Mayne incorporates by reference the arguments of its co-Defendants' in moving to dismiss the Complaint. *See* Defendants' Memorandum In Support Of Joint Motion To Dismiss Plaintiffs' First Amended Complaint.

glyburide; indeed, the Complaint is devoid of any allegations that Mayne had any communications—much less conspired—with any of the non-Doxy DR manufacturers.[2]

Second, Plaintiffs fail to allege any facts to support a claim that Mayne participated in a broad conspiracy related to the sale of Doxy DR. Only three Defendants sell Doxy DR: Mayne, Heritage, and Mylan. Compl. ¶¶ 70, 79. While the Complaint contains conclusory allegations of agreements between Mayne and Heritage and Heritage and Mylan, respectively, the only factual allegation in the Complaint regarding conduct between Mayne and Mylan is that Mayne vigorously competed against Mylan. Compl. ¶ 83. There are no allegations that Mayne knew of, or depended upon, the alleged agreement between Heritage and Mylan. As a result, Plaintiffs' claim that Mayne participated in a broad conspiracy related to the sale of Doxy DR rests on a theory of conspiracy that has been directly rejected by the Supreme Court of the United States.

Third, the factual allegations that relate to a purported conspiracy between Mayne and Heritage are insufficient as a matter of law to comply with the Supreme Court's mandates for alleging an antitrust cause of action. For these reasons, Plaintiffs' claims against Mayne should be dismissed.

In the alternative, Mayne respectfully submits this Court should exercise its discretion and sever the Complaint's Doxy DR claims from the glyburide claims because the respective claims do not arise out of the same transaction or occurrence, nor do they present common questions of fact that can be answered

---

[2] Only Mayne, Heritage Pharmaceuticals, Inc. ("Heritage") and Mylan Pharmaceuticals, Inc. ("Mylan") manufactured Doxy DR. (Compl. ¶¶ 70, 79).

by the same witnesses or the same documentary proof. Severance of the claims would facilitate judicial economy and avoid prejudicing those defendants who are not alleged to have participated in both the Doxy DR and glyburide markets.

### PLAINTIFFS' LIMITED ALLEGATIONS AGAINST MAYNE

Mayne's involvement with the generic drugs identified in the Complaint is limited. Of the generic drugs at issue, Mayne's product offering has been limited to doxycycline hyclate delayed-release—informally known as "Doxy DR." Compl. ¶¶ 69, 70, 79. Only Mayne, Heritage, and Mylan manufactured Doxy DR, and Mayne was the last of the three to enter the Doxy DR market. Compl. ¶ 70, 79. Mayne has no involvement whatsoever with glyburide.

In light of Mayne's limited involvement, Plaintiffs' allegations related to Mayne are notably scarce. Of the Complaint's one hundred and forty substantive allegations, only twenty-four specifically relate to Mayne. Compl. ¶¶ 24, 79-81, 83-91, 93-101, 114, 133. One of the allegations consists of background information. Compl. ¶ 24. Another allegation quotes a ███████ employee surmising that █████████████████████████████████ Compl. ¶ 114. And another allegation claims that a Mayne employee deleted "incriminating text messages" from her cellular telephone, but fails to provide any details on the who, what, where, when, or why to support the assertion that the texts were "incriminating" or that the alleged deletions were done knowingly or purposefully. Compl. ¶ 133.

The remaining allegations focus on Mayne's sales and marketing of Doxy DR. Compl. ¶¶ 79-81, 83-91, 93-101. The Complaint alleges that Mayne—prior to selling 150 mg tablets of Doxy DR—"approached Heritage . . . in an attempt to

obtain some of Heritage's market share." Compl. ¶ 79. Plaintiffs then allege that Mayne made an "unsolicited bid" to a Mylan customer, that Heritage was similarly requested to bid for the business, and that Heritage made an internal decision to decline to do so. Compl. ¶¶ 80-82. The remaining allegations relate to Mayne's attempts to sell Doxy DR during three time periods: February–April 2014; November 2014–January 2015; and September 2015.

<u>February–April 2014 Allegations</u>: The Complaint first alleges that when Mayne entered the Doxy DR market, it avoided bidding on Heritage customers. Compl. ¶ 83. Plaintiffs allege that, over this two-month period, ███████████ ████████████████████ "continued to communicate . . . about Doxy DR," Compl. ¶ 84, but fail to allege any agreement between Mayne and Heritage. Instead, the Complaint (1) cites alleged internal Mayne communications noting that ██████████████████████████████ Compl. ¶ 83; (2) details alleged internal Heritage communications about ██████████████ ██████████████████████████ Compl. ¶¶ 84-89; and (3) alleges that Mayne targeted Doxy DR customers of both of its alleged co-conspirators, Mylan and Heritage. Compl. ¶¶ 80, 83, 86, 89, 91. Plaintiffs provide few details regarding the nature and substance of the alleged communications between ███████████ other than to allege that ██████████████████████ ████████████████████████ Compl. ¶¶ 84, 87, 89, 90. The Complaint makes no allegations that ██████████ exchanged Doxy DR pricing information or agreed on which customers Mayne or Heritage would submit a bid. Compl. ¶¶ 79-91.

4

**November 2014–January 2015 Allegations**: The Complaint next alleges that, in November 2014, Mayne again submitted bids to two Heritage Doxy DR customers, McKesson and Econdisc. Compl. ¶ 93. Plaintiffs allege that, in response to this competitive challenge, Heritage made a "formal offer" to Mayne that if it would "agree not to price Doxy DR aggressively, and if Mayne would also agree to withdraw" its McKesson bid, then Heritage would allow Mayne to win Heritage's Econdisc accounts. Compl. ¶¶ 94-95. The Complaint alleges that ███ ███ discussed Heritage's alleged offer on two occasions, but fails to allege Mayne's response to Heritage's alleged offer. Compl. ¶¶ 95, 98. Plaintiffs allege that in January 2015, Heritage "bid a higher price than Mayne" to Econdisc to "allow Mayne the business," but the Complaint makes no allegation that Mayne (1) agreed to withdraw its McKesson bid, (2) agreed to not price Doxy DR aggressively, or (3) exchanged bid information with Heritage so as to be able to "ma[k]e sure that [Heritage] bid a higher price than Mayne." Compl. ¶¶ 96-100.

**September 2015 Allegations**: Lastly, the Complaint alleges that—in September 2015—Heritage was approached by one of Mayne's customers, a "large nationwide pharmacy chain requesting a bid on Doxy Dr." Compl. ¶ 100. In response, Plaintiffs allege that ███ communicated with ███ through text messages, that ███ confirmed that Mayne had "no supply issues," and that Heritage then "refused to provide a bid." Compl. ¶ 101.

Mayne is noticeably absent from large sections of the Complaint. For instance, Plaintiffs contend that in furtherance of their alleged "schemes," the Defendants "interact and communicate with each other directly and in person, on

a frequent basis" through trade association and customer conferences, and so-called "industry dinners" and "Women in the Industry" private meetings and dinners, at which Plaintiffs allege Defendants "discuss[ed] and share[d] upcoming bids, specific generic drug markets, pricing strategies and pricing terms . . . , among other competitively-sensitive information." Compl. ¶¶ 48-63. While the Complaint alleges specific meetings of several defendants at these events, there is not a single mention of Mayne's attendance. *Id.*

There is no allegation in the Complaint that Mayne met with, or conspired with, any Defendant other than Heritage. The Complaint does not include any facts supporting Mayne's involvement in "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for . . . [Doxy DR] and Glyburide in the United States." Compl. ¶ 1. Most significantly, the Complaint is devoid of any factual allegations even suggesting that Mayne had communications with—let alone coordinated bids with—Mylan. For the reasons set forth below, Plaintiffs' allegations are insufficient to support Mayne's participation in the massive conspiracy alleged in the Complaint.

## ARGUMENT

While Plaintiffs seek to assert "a broad, well-coordinated and long-running" conspiracy across sellers of both Doxy DR and glyburide, Plaintiffs do not allege any facts which connect Mayne to such a vast conspiracy.

I.   **THIS COURT SHOULD DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM UNDER FRCP 12(b)(6)**

   A.  **Standard of Review**

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has failed to show that the pleader is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). That is, allegations that "merely create[] a suspicion" of an antitrust violation fall short of this plausibility standard. *Twombly*, 550 U.S. at 555 (internal quotation and citation omitted). Instead, allegations must go beyond implying the possibility of wrongdoing and instead state "enough factual matter . . . to suggest" that an antitrust violation occurred. *Id.* at 556.

An agreement is the essential element of a Sherman Act § 1 claim. *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954). Indeed, the "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement." *Twombly*, 550 U.S. at 553 (internal citation omitted) (internal punctuation altered). Plaintiffs cannot sustain their burden by making broad allegations against all defendants collectively. Instead, Plaintiffs' claims must provide reasonable notice to a defendant of the claims against it by plausibly suggesting that it "agreed to the conspiracy." *Concord Assocs., L.P. v. Entm't Properties Trust*, 2014 WL 1396524, at *23 (S.D.N.Y. Apr. 9, 2014), aff'd, 817 F.3d 46 (2d Cir. 2016). The complaint must provide information "to some sufficiently specific degree" that a defendant "purposefully joined and participated in the conspiracy." *Id.*; *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430,

436-7 (6th Cir. 2008) (rejecting a pleading under *Twombly* that lacked "specifics as to the role each played in the alleged conspiracy," and only offered "bare allegations without any reference to the 'who, what, where, when, how or why.'"); *In re Graphics Processing Units ("GPU") Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) (holding that "even where some competitors have admitted to meeting to fix prices at or near trade shows and conferences, it is not reasonable to infer that another competitor in attendance at the same meeting had done likewise"); *In re Capacitors Antitrust Litig.,* 106 F. Supp. 3d 1051, 1066 (N.D. Cal. 2015) (a plaintiff "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it").

Thus, unilateral conduct by a defendant, "no matter how anticompetitive," cannot give rise to a Sherman Act § 1 violation. *Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 619 (6th Cir. 1999). As a result, the U.S. Supreme Court has made clear that to avoid dismissal, a complaint alleging Sherman Act § 1 violations must plead "enough factual matter . . . to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556; *see also Iqbal*, 556 U.S. at 684.

Moreover, *Twombly* clearly states that an alleged conspiracy predicated on parallel conduct should be dismissed if "common economic experience" or the facts alleged in the complaint show that "independent self-interested conduct" is an "obvious alternative explanation" for defendants' parallel actions. 550 U.S. at

552, 567. Thus, "an allegation of parallel conduct coupled with only a bare assertion of conspiracy is not sufficient to state a Section 1 claim. Instead, allegations of parallel conduct must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322 (2d Cir. 2010) (internal citations omitted). To survive dismissal, a complaint must allege facts supporting a reasonable inference of an agreement—that is, facts suggesting a "meeting of the minds." *Twombly*, 550 U.S. at 557.

### B.  The Law On Conspiracy

Likewise, to support a claim for conspiracy, Plaintiffs are required to establish: "(1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged conspirators were interdependent." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006); *see also Ingram v. United State*s, 360 U.S. 672 (1959) (explaining that knowledge of the objective of the conspiracy is an essential element of conspiracy).

Courts have consistently affirmed the principle that, without demonstrating interdependence amongst alleged co-conspirators, plaintiffs cannot prove that a defendant engaged in a larger conspiratorial scheme. *See, e.g., United States v. Swafford*, 512 F.3d 833, 841-842 (6th Cir. 2008) (holding that a single conspiracy did not exist because the government failed to prove that the defendants were acting in furtherance of a common goal or that there was substantial interdependence among the alleged coconspirators); *United States v. Kemp*, 500

F.3d 257, 288-291 (3d Cir. 2007) (holding that a single conspiracy did not exist because "no spoke depended upon, was aided by or had any interest in the success of the others"); *United States v. Chandler*, 388 F.3d 796, 811-812 (11th Cir. 2004) (holding that a single conspiracy did not exist because "each spoke acted independently and was an end unto itself"). To determine whether allegations related to disparate facts and events can plausibly state a claim of a single, broad unified conspiracy, Plaintiffs must allege sufficient facts to support a showing that: (1) "there was a common goal among the [alleged] conspirators"; (2) the alleged conspirators depended on each other and the "continuous cooperation of the conspirators" to further their common goal; and (3) "the extent to which the participants overlap in the various dealings" that further their common goal. *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989); *see also Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir. 1976) ("The circumstances must be such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.") (internal citations omitted and punctuation altered).

In *Kotteakos v. United States*, 328 U.S. 750 (1946), the Court considered whether a defendant engaged in a large, multi-party conspiracy solely by virtue of his connection with one of the common figures of the conspiracy. The Court sided with the defendant, emphasizing that allegations of a defendant conspiring with *one* player do not demonstrate that the defendant engaged in a larger conspiratorial agreement. *Id.*

Similarly, in *United States v. Baldridge*, 559 F.3d 1126, 1136 (10th Cir. 2009), the court held that "a single conspiracy does not exist solely because many individuals deal with a common central player. What is required is a shared, single criminal objective, not just similar or parallel objectives between similarly situated people." *Id.* (internal quotations and citations omitted). *See also, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction"); *In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *18 (D.N.J. Feb. 25, 2016) ("For a single conspiracy to exist, the parties serving as spokes must have been aware of the existence of other spokes, and each spoke must have done something in furtherance of a single, illegal endeavor.").

## C. Claims Against Mayne Related To Glyburide Should Be Dismissed As Mayne Has No Connection To Glyburide

While addressed generally in Defendants' Joint MTD Complaint (*see* Joint MTD Compl. *passim*), Mayne specifically asserts that it cannot be held liable for any claims related to glyburide or any scheme to inflate prices related to glyburide. Mayne has never made, sold, distributed, or marketed glyburide and, as such, Mayne and the defendants who sold glyburide could not have acted together towards a common objective related to glyburide, or been interdependent on each other to achieve a goal related to glyburide. *See, e.g.*, *Swafford*, 512 F.3d at 841-842 (6th Cir. 2008) (holding that for a conspiracy to exist, coconspirators must be interdependent upon each other and work towards

11

a common goal). Additionally, the Complaint is devoid of any factual allegations that Mayne even knew of—much less had any involvement in—a conspiracy related to glyburide. Because Plaintiffs fail to allege the basic elements of conspiracy between Mayne and the defendants who manufactured glyburide, any and all claims against Mayne related to glyburide should be dismissed. *See Twombly*, 550 U.S. at 557.

### D. The Complaint Contains No Factual Allegations To Support A Claim That Mayne Participated In A Conspiracy Related To Doxy DR With Mylan

Plaintiffs do not allege any facts that suggest a conspiracy between Mayne and Mylan. To the contrary, the only allegations of any conduct between Mayne and Mylan in the Complaint are that (1) Mayne made an "unsolicited bid for the 150 mg Doxy DR business," for which Mylan was the incumbent supplier, and that (2) Mayne "target[ed] Mylan, which had roughly 60% of the Doxy DR market. Compl. ¶ 80, 83.

While the Complaint contains conclusory allegations of agreements related to Doxy DR between Mayne and Heritage, and Heritage and Mylan, respectively, Compl. ¶¶ 75-78, 97-102, the Complaint fails to allege that Mayne knew of any alleged agreement between Heritage and Mylan, or that Mylan knew of any alleged agreement between Heritage and Mayne. The Complaint also fails to allege that Mayne and Mylan depended on each other to achieve some common goal related to Doxy DR. In fact, the allegation that Mayne "target[ed] Mylan" customers and made an "unsolicited bid" for a Doxy DR account for which Mylan was the incumbent supplier demonstrates that Mayne and Mylan were acting

independently to achieve their own legitimate business goals. Compl. ¶ 80, 83. In fact, the Complaint confirms this fact: "Mayne continued to look for a large [Doxy DR] account over the next several months, with Mylan and Heritage protecting their business." Compl. ¶ 91.

Courts have repeatedly refused to find the existence of a single conspiracy in situations like this where the claim is purportedly based on a defendant's connection to a common conspiratorial player absent evidence tying the defendant to the larger conspiracy. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 327 (where various defendants enter into separate agreements with a common defendant, but have no connection with one another, it is considered a rimless wheel conspiracy); *In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *18 ("For a single conspiracy to exist, the parties serving as spokes must have been aware of the existence of other spokes, and each spoke must have done something in furtherance of a single, illegal endeavor.").

Here, Plaintiffs fail to allege a common goal between Mayne, Heritage, and Mylan. At most, the Complaint alleges unique common goals between Mayne and Heritage, and Heritage and Mylan, respectively, but Plaintiffs fail to allege that Mayne knew of or participated in the latter. Similarly, Plaintiffs fail to allege that the success of Mayne's alleged agreements with Heritage in any way affected or depended upon the success of Heritage's alleged agreements with Mylan. This factual scenario is precisely the type of situation in which courts refuse to find that a party engaged in a single, overarching conspiracy. *See Kotteakos*, 328 U.S. 750 (allegations of a defendant conspiring with one player do not demonstrate

that the defendant engaged in a larger conspiratorial agreement). At most, the Plaintiffs have alleged communications between Mayne and Heritage related to Doxy DR. This is insufficient, by itself, to link Mayne to a broader, single conspiracy with Mylan. *See Baldridge*, 559 F.3d at 1136 ("a single conspiracy does not exist solely because many individuals deal with a common central player. What is required is a shared, single criminal objective, not just similar or parallel objectives between similarly situated people.")   For these reasons, Plaintiffs' allegations are insufficient to state a conspiracy claim between Mayne and Mylan.

### E.  Allegations Regarding A Conspiracy Between Mayne And Heritage Are Insufficient As A Matter Of Law

Plaintiffs' claims of a conspiracy between Mayne and Heritage fail as a matter of law under *Twombly* because there are no factual allegations that plausibly imply collusion.  In Sherman Act Section 1 cases, the "crucial question" is "whether the challenged anticompetitive conduct stems from independent decision or from an agreement."   *Twombly*, 550 U.S. at 553 (citations and internal quotations omitted); *see also Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.,* 709 F.3d 129, 135 (2d Cir. 2013); *see also Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) ("Unilateral action, regardless of motivation, is not a violation of Section 1."). Indeed, because similar business conduct among various competitors may be just as consistent with a conspiracy as with rational, competitive and unilateral business strategy, a plaintiff can survive a motion to dismiss only by identifying and pleading facts that are

"suggestive enough to render a § 1 conspiracy plausible." *Twombly*, 550 U.S. at 556.

Under *Twombly* and its progeny, a plaintiff cannot escape dismissal by alleging similar conduct among the defendants and asking the court to infer that the only explanation is a conspiracy. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016) (explaining plaintiffs in *Twombly* "looked around and saw conduct *consistent* with conspiracy, but [alleged] no facts that indicated more plausibly that a conspiracy actually existed.") (emphasis in original). Instead, the complaint must "delineate[] to some sufficiently specific degree" that each defendant "purposefully joined and participated in the conspiracy." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011). The Complaint falls far short of this standard: Plaintiffs' allegations fail to suggest that the alleged Doxy DR price increases were the product of collusion as opposed to Mayne and Heritage's unilateral decision-making and independent assessments of the market.

### i. Plaintiffs Do Not Allege Direct Evidence of an Agreement Between Mayne and Heritage

To plead a plausible conspiracy, Plaintiffs must allege facts that constitute either direct or circumstantial evidence of a conspiracy. *Burtch*, 662 F.3d at 225. "Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* The "paradigmatic example" of such evidence is a "recorded phone call" featuring an agreement to fix prices. *Mayor and City Council*, 709 F.3d at 136; *see also InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 162-63 (3d Cir. 2003) (providing

examples of direct evidence such as "a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators").  The Complaint here contains nothing of the sort as it relates to an alleged conspiracy between Mayne and Heritage.

Plaintiffs do not identify a single meeting, phone call, document, or text message in which Mayne formed an unlawful agreement with its competitors regarding Doxy DR. Instead, Plaintiffs make a series of allegations of specific, sometimes verbatim, conversations between representatives from Mayne and Heritage—none of which amount to an agreement and many of which actually show that Mayne was competing vigorously for Doxy DR market share—and then make conclusory allegations that the companies reached "agreements." As explained in detail below, none of these allegations amount to direct evidence of a conspiracy between Mayne and Heritage.

The Complaint alleges that in February 2014, before it entered the Doxy DR market, Mayne approached Heritage "in an attempt to obtain some of Heritage's market share." Compl. ¶ 79. Plaintiffs do not allege that Mayne and Heritage allocated market share at this time, and cite as evidence only a January 2014 call between a Mayne employee and a Heritage employee. *Id.* Notably, the Complaint is silent on any details related to this alleged phone conversation, and does not allege that it was in any way improper. *Id.*

The Complaint next alleges that when Mayne initially entered the Doxy DR market in February 2014, "it avoided bidding on Heritage customers and chose instead to target Mylan." Compl. ¶ 83. However, Plaintiffs' very next allegations

present Mayne as competing for customers of both Heritage and Mylan. The Complaint first cites a Mayne ▮▮▮▮▮ declaring—still in February 2014, only a few weeks after allegedly agreeing not to bid on Heritage customers—that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Compl. ¶ 83. The Complaint next cites an ▮▮▮▮▮▮▮ email ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Compl. ¶ 84. And, finally, the Complaint alleges that Mayne—in March 2014, again, after having allegedly agreed not to bid on Heritage customers— "made an unsolicited bid for Doxy DR to one of Heritage's large nationwide pharmacy accounts." Compl. ¶ 86. Stripped of the conclusory allegations that Mayne and Heritage allocated market share and Mayne avoided bidding on Heritage's customers, the Complaint here merely alleges facts consistent with Mayne competing vigorously for market share.

Plaintiffs' allegations continue to follow this same conclusory pattern. The Complaint next alleges a series of communications between a Mayne employee and a Heritage employee. Compl. ¶¶ 87-91. Closely examined, Plaintiffs' allegations detail: (1) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Compl. ¶ 87; (2) ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Compl. ¶ 88; (3) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮, Compl. ¶ 89; (4) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮, Compl. ¶ 90; and (5) Mayne winning a bid from an existing Heritage customer by "underbid[ding] Heritage's price," despite "Heritage protecting their business." Compl. ¶ 91. Plaintiffs allege no agreement

17

to not compete between Heritage and Mayne, but instead list a series of instances where Mayne and Heritage competed against each other for the same business.

The Complaint further alleges that Mayne continued to compete for Heritage's business by submitting "offers to McKesson's One Stop program and to Econdisc" in November 2014. Compl. ¶ 93. Plaintiffs allege that, in response, Heritage employees discussed internally and subsequently offered to Mayne the following: Heritage would "walk from Econdisc if Mayne would agree not to price Doxy DR aggressively, and if Mayne would also agree to withdraw its offer to McKesson." Compl. ¶ 94. Plaintiffs allege that Heritage "fulfill[ed] its end" of this alleged "agreement" by submitting a high bid price to Econdisc in January 2015 "in order to allow Mayne the business." Compl. ¶ 99.

However, Plaintiffs make no allegations that Mayne "fulfilled its end" of the alleged agreement. The Complaint makes no factual allegation that Mayne actually withdrew its bid to McKesson—Heritage's first condition of the alleged agreement; and the Complaint makes no factual allegation that Mayne agreed "not to price Doxy DR aggressively"—Heritage's second condition of the alleged agreement. And Plaintiffs do not allege that Mayne informed Heritage of the amount of Mayne's bid to enable Heritage to "bid a higher price than Mayne" for the Econdisc bid. In short, Plaintiffs make no factual allegation that Heritage's alleged "offer" was ever effectuated by the companies. As a result, the Complaint fails to allege with any level of specificity that Mayne and Heritage actually reached an agreement. Instead, the Complaint—stripped of the conclusory statements that Plaintiffs inject into the allegations—merely alleges that

18

Heritage's bid to Econdisc was higher than Mayne's. As alleged, Plaintiffs' theory of the conspiracy—that Heritage, an established seller of Doxy DR, simply walked away from business because Mayne, a new market participant, asked it to—is simply implausible and insufficient to support a claim of conspiracy against Mayne. *See Finkelman*, 810 F.3d at 201 (explaining plaintiffs in *Twombly* "looked around and saw conduct *consistent* with conspiracy, but [alleged] no facts that indicated more plausibly that a conspiracy actually existed.") (emphasis in original).  Plaintiffs offer no specific factual allegations that would contradict the presumption that Heritage's higher bid was the result of anything other than Heritage's independent business decisions.

Finally, the Complaint alleges that Heritage refused to provide a Doxy DR bid to a large nationwide pharmacy chain for which Mayne was the incumbent supplier because Mayne and Heritage had an alleged agreement "not to compete with each other and avoid price erosion." Compl. ¶ 100-01. Here, Plaintiffs again fail to allege any specific facts pointing to the formation of an alleged agreement, and instead continue to rely on the conclusory statements in ¶¶ 93-99 as evidence of an alleged ongoing "agreement." Moreover, for this September 2015 allegation, the Complaint merely alleges that Mayne, in response to an inquiry from Heritage, conveyed that it "had no supply issues" and believed that the large nationwide pharmacy chain "was simply shopping for a better price." Compl. ¶ 101. Plaintiffs do not assert that Mayne suggested or even demanded that Heritage refrain from bidding, nor do Plaintiffs provide any specific factual allegations that would contradict the presumption that Heritage's decision not to

bid was the result of anything other than Heritage's independent business decision.

Notably absent throughout the Complaint are specific facts about the alleged "coordination" and alleged "agreements" between Mayne and Heritage. Plaintiffs make no allegation of any counter promise or action on the part of Mayne that benefited Heritage or advanced the alleged conspiracy, nor any allegation of an exchange of price or bid information between Mayne and Heritage used to carry out their alleged "coordination." Accordingly, Plaintiffs fail to plead a conspiracy between Mayne and Heritage through direct evidence.

### ii. Plaintiffs Do Not Sufficiently Plead Circumstantial Evidence of a Conspiracy Between Mayne and Heritage

Without direct evidence of a conspiracy between Mayne and Heritage, Plaintiffs must present "circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme" to price-fix Doxy DR. *Monsanto Co. v. Spray-Rite Svc. Corp.*, 465 U.S. 752, 764 (1984). To "present circumstantial facts supporting the *inference* that a conspiracy existed," *Mayor & City Council*, 709 F.3d at 136, Plaintiffs must first plead "parallel action" by the alleged conspirators. *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015). However, alleged parallel action "is not, by itself, sufficient to prove the existence of a conspiracy," as such action "could be the result of coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* (quoting *Twombly*, 550 U.S. at 556 n.4.). Thus, in relying on circumstantial evidence of an alleged conspiracy, Plaintiffs must also plead "the existence of

20

additional circumstances, often referred to as 'plus factors.'" *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). These "plus factors" may include: "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 114 (2d Cir. 2005) (internal quotations and citations omitted). However, even if Plaintiffs plead these additional "plus factors," these additional facts or circumstances "must still lead to an inference of conspiracy," *Mayor & City Council*, 709 F.3d at 137, as even such factors in a particular case "could lead to an equally plausible inference of mere interdependent behavior, *i.e.*, actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." *Apex Oil Co.*, 822 F.2d at 254.

### 1.  Plaintiffs Fail to Allege Parallel Action

Plaintiffs fail to allege parallel conduct by Mayne and Heritage. Indeed, the closest Plaintiffs come to alleging any sort of parallel action is to generically allege "suspicious price increases" as the stated reason the State of Connecticut began its investigation. Compl. ¶ 5. But Plaintiffs make no specific (or even general) allegations of any "tacit collusion, oligopolistic price coordination, or conscious parallelism"[3] with respect to Mayne.  Instead, Plaintiffs repeatedly allege instances of Mayne "pric[ing] Doxy DR aggressively" in repeated efforts to win market share from its competitors. Compl. ¶¶ 83, 84, 86, 89, 90, 91, 93, 94.

---

[3] *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (U.S. 1993) (internal citations omitted) (internal punctuation altered).

Notably, Plaintiffs' allegations of Mayne's aggressive pricing to ███████ ██████ and obtain more "market share," Compl. ¶ 94, cut against any attempt to allege "instances of parallel business behavior . . . suggest[ive] [of] an agreement." *Twombly*, 550 U.S. at 552. The Complaint is devoid of any allegation that Mayne acted in a parallel manner to Heritage. Thus, Plaintiffs have failed to allege parallel conduct required to support an inference of conspiracy.

### 2. Plaintiffs Fail to Allege Sufficient "Plus Factors" to Create an Inference of Conspiracy

Plaintiffs similarly fail to allege any "plus factors" sufficient to support an inference of conspiracy. A conspiracy claim based on consciously parallel behavior must allege facts showing sufficient "plus factors" to support a plausible claim that the alleged price increases were the result of an unlawful agreement "to ensure that courts punish  concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (internal citations and quotation marks omitted). *Ross v. Citigroup, Inc.*, 630 F. App'x 79, 82 (2d Cir. 2015), as corrected (Nov. 24, 2015) ("These "plus factors" may include (but are not limited to) a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of inter-firm communications.") (citations and quotation marks omitted).

Here, Plaintiffs allege insufficient "plus factors" to support a plausible claim of conspiracy. Plaintiffs generally allege that the generic pharmaceutical industry is "cozy" and has "opportunities for collusion" at trade shows and other

meetings, Compl. ¶¶ 48-66, and that certain defendants were under investigation by the Plaintiff states and the U.S. Department of Justice. Compl. ¶ 5. As explained below, these are insufficient to support an inference of conspiracy.

> a. Allegations related to trade association participation and opportunities to collude are insufficient plus factors.

"Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc.*, 998 F.2d 1224, 1235 (3d Cir. 1993); *accord Twombly*, 550 U.S. at 567 n. 12. Membership in a trade association, attendance at trade association meetings, and participation in trade association activities are presumed legitimate and not a basis from which to infer a conspiracy. *See LaFlamme v. Societe Air France,* 702 F.Supp.2d 136, 149 (E.D.N.Y. 2010); *see also In re GPU Antitrust Litig.*, 527 F. Supp. 2d at 1023. "[A] trade association is not by its nature a 'walking conspiracy.'"

Plaintiffs' allegations as to Mayne's role in trade associations, customer conferences, industry dinners and private meetings are limited to one clause in one sentence, which merely notes that a ███████ employee met a ████ employee at a trade show. Compl. ¶ 98. Plaintiffs do not allege that Mayne participated in any trade show, customer conference, industry dinner, or private meeting at which the alleged information sharing took place. Accordingly, Plaintiffs' attempt to rely on insinuation and conclusory allegations to manufacture a "plus factor" here fails.

> b. Government Investigations are also not a plus factor.

As to government investigations, the Complaint only generally alleges that

defendants are the subject of state and federal investigations, but fails to allege that Mayne specifically is under any type of investigation. Compl. ¶¶ 5, 131. Significantly, no allegations are made concerning the filing of any indictments, plea agreements, or other government charges against Mayne. In short, Plaintiffs cannot create an inference of a Doxy DR conspiracy involving Mayne by simply using generic government action as a basis for their claims. Courts assign little to no weight to such allegations. *See, e.g.*, *LaFlamme,* 702 F.Supp.2d at 154 ("vague allegations regarding pending investigations based on interviews with unidentified individuals and a subpoena . . . are not probative of the Sherman Act Section 1 violations . . . because neither mere participation in an investigatory interview nor the receipt of a subpoena is necessarily probative of conspiracy") (citing *In re GPU Antitrust Litig.*, 527 F. Supp. at 1024). In short, citing alleged ongoing government investigations into unnamed defendants does not enhance the plausibility of Plaintiff's claim and do not warrant subjecting Defendants to the burdens of antitrust discovery. *See Hinds Co. Miss. V. Wachovia Bank, N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) ("The various investigations, inquiries, and subpoenas do not make the [complaint's] allegations plausible for the purpose of deciding a motion to dismiss . . . ."). Failure to ascribe any weight to such allegations makes sense because "proof of the mere occurrence of the DOJ's investigation is equally consistent with Defendants' innocence." *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010).

In sum, Plaintiffs fail to allege any commonly-plead "plus factors" that would sufficiently support a claim of parallel conduct on the part of the alleged

conspirators.

## II.   IN THE ALTERNATIVE, THIS COURT SHOULD SEVER THE COMPLAINT'S DOXY DR CLAIMS FROM THE GLYBURIDE CLAIMS UNDER FRCP 21

### A.  Legal Standard

FRCP 21 provides that a court "may sever any claim against a party."  FED. R. CIV. P. 21.  The decision to sever a claim "is committed to the sound discretion of the trial court." *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263 (D. Conn. 2012). When deciding a motion to sever, courts consider the following factors: "(1) [whether] the claims arise out of the same transaction or occurrence; (2) [whether] the claims present some common question of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) [whether] prejudice would be avoided; and (5) [whether] different witnesses and documentary proof are required for the separate claims." *Id.* (citing *Greystone Cmty. Reinv. Ass'n v. Berean Capital, Inc.*, 638 F.Supp.2d 278, 293 (D. Conn. 2009)). To find grounds for severance of claims, a court need to find "only one of these conditions," and "[a]bove all, the court must consider [the] 'principles of fundamental fairness and judicial efficiency.'" *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 247 F.R.D. 420, 424 (S.D.N.Y. 2007).

### B.  The Factors Weigh in Favor of Severing the Doxy DR Claims from the Glyburide Claims

#### i.  Same Transaction or Occurrence & Common Question of Law or Fact

The first two severance factors consider whether Defendants have been improperly joined under FRCP 20. Under FRCP 20(a), defendants may be joined in one action only if two criteria are met: (1) the claims "aris[e] out of the same

transaction, occurrence, or series of transactions and occurrences;" and (2) "any question of law or fact common to all defendants will arise in the action." *Jones v. Howard*, 2015 WL 4755751, at *4 (D. Conn. Aug. 11, 2015). "[B]oth requirements of Rule 20(a) must be met" to permit joinder. *Liberty Mut. Ins. Co. v. Buettel*, 2015 WL 12990469, at *1 (D. Conn. Oct. 7, 2015). While determination of what constitutes the "same transaction or occurrence" is made on a "case by case basis," courts "have drawn guidance from the use of the same term" in Rule 13, finding that whether claims arise out of the same transaction depend upon (1) "the logical relationship between the claims," and (2) whether the "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Jones*, 2015 WL 4755751, at *4 n.1 (internal citations and quotation marks omitted); *see also Costello*, 888 F. Supp. 2d at 263-64.

Here, the Complaint "contains claims that arise out of entirely distinct factual scenarios." *Jones*, 2015 WL 4755751, at *4. With respect to the Doxy DR claims, the Plaintiffs allege that Mylan, Heritage, and Mayne made "effort[s] to reach agreement to allocate market share, maintain high prices and/or avoid competing on price." Compl. ¶ 67. But with respect to their glyburide claims, the Plaintiffs allege that Heritage, Aurobindo, Citron, and Teva "sought and obtained agreements with competitors to fix and raise prices." Compl. ¶ 103. For each of the alleged conspiracies in the Complaint, the "primary actors in each claim are different and there are no common questions of fact." *Jones*, 2015 WL 4755751, at *4. While both conspiracy claims relate to the sale and marketing of generic

26

drugs[4] and are brought under the same series of antitrust laws, each conspiracy claim is limited to alleged acts specific to a single generic drug, a specific time period, and specific defendants, each of which is separate and distinct from the other. "Where, as here, plaintiffs' claims under the same statutory framework arise from different circumstances and would require separate analyses, they are not logically related." *Costello*, 888 F. Supp. 2d at 264 (rejecting the argument that the same *type* of transaction or occurrence satisfies Rule 20); *see also Liberty Mut.*, 2015 WL 12990469, at *1 (finding no logical relationship between the claims where the "allegations establish distinct actors and [distinct] factual circumstances"); *see also Sanchez v. O'Connell*, 2010 WL 7862797, at *2 (D. Conn. Sept. 27, 2010) (severing multiple plaintiffs' claims against the same police officer because the alleged acts occurred at "different times and under different circumstances.") Accordingly, the first and second factors weigh in favor of severing Plaintiffs' Doxy DR and glyburide claims.

### ii.  Judicial Economy and Overlap of Evidence

The third severance factor considers whether "separate trials will require *substantial* overlap of witnesses and documentary proof." *Costello*, 888 F. Supp. 2d at 264-65 (emphasis in original) (quoting *Deskovic v. City of Peekskill*, 673 F.Supp.2d 154, 171 (S.D.N.Y. 2009). Courts have found that when there are substantial factual differences among the parties' claims, keeping the claims

---

[4] This fact alone is insufficient to prevent severance of the claims. *See, e.g., In re MTBE Prod. Liab. Litig.*, 247 F.R.D. at 425 (noting that because "*all* the complaints" in the MTBE MDL arose "out of a similar, although not identical, series of occurrence," the "first two factors to be considered are at most neutral under these circumstances in determining whether the claims should be served.")

together "would not serve the goal of efficiency" since there would be "little to no shared testimony [nor] documentary evidence." *Id.* at 265.

Here, there are "substantial factual differences" between the Doxy DR claims and the glyburide claims. *Compare* Compl. ¶¶ 67-101 *with* Compl. ¶¶ 104-24. Doxy DR and glyburide are entirely distinct and unrelated products, and are sold in different markets by different companies at different prices. The only Defendant that sells both Doxy DR and glyburide is Heritage, but the allegations of Heritage's involvement in a conspiracy related to Doxy DR are completely distinct from the allegations of Heritage's involvement in a conspiracy related to glyburide.   As a result, discovery and evidence related to the Doxy DR and glyburide claims would not be shared, and the lack of judicial economy in keeping these claims together weighs in favor of severing the Doxy DR and glyburide claims.   *Costello*, 888 F. Supp. 2d at 265; *see also In re MTBE Prod. Liab. Litig.*, 247 F.R.D. at 425 ("judicial resources will not be preserved" given the lack of overlapping evidence.)

   iii. Avoiding Prejudice

The fourth severance factor considers whether "all Defendants could be prejudiced by a joint trial." *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 171 (S.D.N.Y. 2009). A joint trial that involves "separate witnesses, different evidence, and different legal theories and defenses" could likely "lead to confusion of the jury." *Elektra Entm't Group, Inc. v. Does 1–9*, 2004 WL 2095581, at *7 (S.D.N.Y. Sept. 8, 2004); see also *Costello*, 888 F. Supp. 2d at 265. In addition, in cases with "many different defendants" and with "significant differences" between Plaintiffs'

various claims against these different defendants, "there is a risk that trying all of Plaintiff[s'] claims in a single trial could lead to 'guilt by association and spillover prejudice.'" *Deskovic*, 673 F. Supp. 2d at 171 (quoting *In re Blech Sec. Litig.*, 2003 WL 1610775, at *14 (S.D.N.Y. March 26, 2003).

As noted above, the Complaint's respective Doxy DR and glyburide claims are significantly different. To prove their case, Plaintiffs will have to rely on separate witnesses for each claim and different evidence for each claim. Likewise, given that the Doxy DR claim alleges market allocation practices and the glyburide claim alleges price-fixing practices, Defendants will rely on different legal defenses for each claim. Perhaps most importantly, conducting a joint trial of two separate and distinct conspiracies that share only a single common participant runs the heightened risk of prejudicing defendants like Mayne, whose alleged participation in only one of the conspiracies is notably limited. *See In re Blech Sec. Litig.*, 2003 WL 1610775, at *14 ("When many defendants are tried together in a complex case and they have significantly different levels of culpability, the risk of prejudice is heightened.") Accordingly, this factor weighs in favor of severing Plaintiffs' Doxy DR and glyburide claims.

### iv. Different Witnesses and Documentary Proof

Closely aligned with the first and second severance factors, the fifth severance factor considers whether the "same witnesses and documentary proof would be utilized in adjudicating both" claims sought to be severed. *Cox v. Bland*, 2002 WL 663859, at *6 (D. Conn. Mar. 26, 2002). Again, of the six defendants named in the Complaint, only Heritage is alleged to have participated in both

conspiracies. Compl. *passim*. Because the "the two sets of claims . . . in this case [do not] arise out of the same transaction or occurrence," they consequently "involve different witnesses and documentary proof." *Hannah v. Wal-Mart Stores, Inc.*, 2017 WL 68617, at *4 (D. Conn. Jan. 6, 2017). *See, e.g., S.E.C. v. Pignatiello*, 1998 WL 293988, at *4 (S.D.N.Y. June 5, 1998) (granting severance where "two [alleged] schemes appear[ed] to require the testimony of different witnesses and different documentary proof," despite the fact that both schemes were organized by a single individual). Accordingly, this factor weighs in favor of severing Plaintiffs' Doxy DR and glyburide claims.

### v. The Relevant Factors Favor Severance

"Courts may order a Rule 21 severance when it will serve the ends of justice and further the prompt and efficient disposition of litigation." *Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*, 806 F. Supp. 2d 712, 720 (S.D.N.Y. 2011). After considering the five severance factors above, a court need find "the presence of only one of these conditions" for severance to be appropriate. *In re MTBE Prod. Liab. Litig.*, 247 F.R.D. at 424. In this case, as argued above, all five factors weigh in favor of severing the Complaint's Doxy DR claims from its glyburide claims.

### <u>CONCLUSION</u>

For the reasons set forth above, the Court should dismiss the State Attorneys General Plaintiffs' claims against Mayne, or—in the alternative—should sever the Doxy DR claims from the glyburide claims.

Respectfully Submitted,

Dated:  May 1, 2017                                    */s/ Michael Martinez*


Michael Martinez (*pro hac vice*)
Steven Kowal (*pro hac vice*)
Lauren Norris Donahue (*pro hac vice*)
Brian J. Smith (*pro hac vice*)
K&L Gates LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Tel: (312) 372-1121
Fax: (312) 827-8000
steven.kowal@klgates.com
michael.martinez@klgates.com
lauren.donahue@klgates.com
brian.j.smith@klgates.com

Sean R. Higgins (ct28279)
K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
Tel: (617) 261-3100
Fax: (617) 261-3175
sean.higgins@klgates.com

*Counsel for Defendant Mayne Pharma Inc.*