UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT, *et al.*, | : | CIVIL ACTION NO. |
| | : | 3:16-CV-002056 (VLB) |
| Plaintiffs, | : | |
| | : | |
| v. | : | Hon. Vanessa L. Bryant |
| | : | |
| AUROBINDO PHARMA USA, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | May 1, 2017 |

<u>**DEFENDANT MYLAN PHARMACEUTICALS INC.'S INDIVIDUAL MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**</u>

**ORAL ARGUMENT REQUESTED**

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 2

LEGAL STANDARD ....................................................................................... 6

ARGUMENT .................................................................................................. 7

I.      PLAINTIFFS FAIL TO ALLEGE MYLAN'S PARTICIPATION IN AN
        UNLAWFUL CONSPIRACY ............................................................... 7

        A.      Plaintiffs Fail to Allege an Agreement between Mylan
                and Herit ................................................................................. 10

        B.      Plaintiffs Fail to Allege an Agreement between Mylan
                and Mayne ............................................................................... 14

        C.      Mylan's Alleged Conduct is Consistent with Independent
                Action ..................................................................................... 15

II.     PLAINTIFFS FAIL TO PLEAD ANTITRUST INJURY ......................... 18

CONCLUSION ............................................................................................. 22

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

Cases:

*Alvord-Polk, Inc. v. F. Schumacher & Co.,*
    37 F.3d 996 (3d Cir. 1994) ........................................................................ 8

*Am. Tobacco Co. v. United States,*
    328 U.S. 781 (1946) ................................................................................... 9

*Apex Oil Co. v. DiMauro,*
    822 F.2d 246 (2d Cir. 1987) ..................................................................... 16

*Ashcroft v. Iqbal,*
    556 U.S. 663 (2009) ............................................................................ 6, 10

*Associated Gen. Contractors v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) ................................................................................. 18

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990) ................................................................................. 18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .........................................................................*passim*

*Bergstrom v. Noah,*
    974 P.2d 520 (Kan. 1999) ........................................................................ 8

*Blair v. Checker Cab Co.,*
    558 N.W.2d 439 (Mich. Ct. App. 1996) ................................................... 8

*Blue Shield of Va. v. McCready,*
    457 U.S. 465 (1982) ................................................................................. 20

*Bridgeport Harbour Place I, LLC v. Ganim,*
    32 A.3d 296 (Conn. 2011) ........................................................................ 7

*Brooke Grp. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) ................................................................................. 16

*Cameron v. New Hanover Mem'l Hosp., Inc.,*
    293 S.E.2d 901 (N.C. 1982) ..................................................................... 8

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
    996 F.2d 537 (2d Cir. 1993) ..................................................................... 14

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.,*
    454 A.2d 367 (Md. Ct. Spec. App. 1983) ................................................................ 8

*Champagne Metals v. Ken-Mac Metals, Inc.,*
    458 F.3d 1073 (10th Cir. 2006) ................................................................ 8

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984) ................................................................ 7

*Ga. Pac. Corp. v. Cook Timber Co.,*
    194 So. 3d 118 (Miss. 2016) ................................................................ 8

*Gatt Commcn's, Inc. v. PMC Assocs., LLC,*
    711 F.3d 68 (2d Cir. 2013) ................................................................ 18

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.,*
    386 F.3d 485 (2d Cir. 2004) ................................................................ 21

*H.L. Moore Drug Exch. v. Eli Lilly and Co.,*
    662 F.2d 935 (2nd Cir. 1981) ................................................................ 8, 11, 13

*Hinds County, Mississippi v. Wachovia Bank N.A.,*
    790 F. Supp. 2d 106 (S.D.N.Y. 2016) ................................................................ 17

*Home Town Muffler, Inc. v. Cole Muffler, Inc.,*
    608 N.Y.S.2d 735 (App. Div. 1994) ................................................................ 8

*In re Aluminum Warehousing Antitrust Litig.,*
    No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) .................. 16

*In re Aluminum Warehousing Antitrust Litig.,*
    833 F.3d 151 (2d Cir. 2016) ................................................................ 20

*In re Elevator Antitrust Litig.,*
    502 F.3d 47 (2d Cir. 2007) ................................................................ 16

*In re Hawaiian & Guamanian Cabbage Antitrust Litig.,*
    647 F. Supp. 2d 1250 (W.D. Wash. 2009) ................................................................ 14

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.,*
    997 F. Supp. 2d 526 (N.D. Tex. 2014) ................................................................ 11, 12

*In re Parcel Tanker Shipping Servs. Antitrust Litig.,*
    541 F. Supp. 2d 487 (D. Conn. 2008) ................................................................ 7

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*In re Text Messaging Antitrust Litig.*,
   46 F. Supp. 3d 788 (N.D. Ill. 2014) ....................................................................... 11

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ................................................................... 18

*In2 Networks, Inc. v. Honeywell Int'l*,
   No. 2:11-cv-6-TC, 2011 WL 4842557 (D. Utah Oct. 12, 2011) ............................. 8

*Indep. Milk Producers Co-op. v. Stoffel*,
   298 N.W.2d 102 (Wis. Ct. App. 1980) .................................................................... 8

*Island Tobacco Co. v. R.J. Reynolds Indus., Inc.*,
   513 F. Supp. 726 (D. Haw. 1981) ............................................................................ 8

*Johnson v. Con-Vey/Keystone, Inc.*,
   814 F. Supp. 931 (D. Or. 1993) ............................................................................... 8

*K. Hefner, Inc. v. Caremark, Inc.*,
   918 P.2d 595 (Idaho 1996) ...................................................................................... 8

*Kenneth E. Curran, Inc. v. Auclair Transp., Inc.*,
   519 A.2d 280 (N.H. 1986) ......................................................................................... 8

*LaFlamme v. Société Air France*,
   702 F. Supp. 2d 136 (E.D.N.Y. 2010) ............................................................. 9, 14

*Latino Quimica-Amtex S.A. v. Akzo Nobel Chems. B.V.*,
   No. 03 Civ. 10312 (HBDF), 2005 WL 2207017 (S.D.N.Y. Sept. 8,
   2005) ........................................................................................................................ 20

*Laydon v. Mizuho Bank, Ltd.*,
   No. 12-cv-3419 (GBD), 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014).................... 19

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)................................................................................................. 18

*Mailand v. Burckle*,
   572 P.2d 1142 (Cal. 1978) ........................................................................................ 7

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................................. 13

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2nd Cir. 2013)............................................................................*passim*

iv

## TABLE OF AUTHORITIES

**Page(s)**

*McClure v. Owens Corning Fiberglas Corp.*,
720 N.E.2d 242 (Ill. 1999) ........................................................................... 8

*MYD Marine Distrib., Inc. v. Int'l Paint Ltd.*,
76 So. 3d 42 (Fla. Dist. Ct. App. 2011) ................................................... 7, 8

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd.*,
838 F.3d 421 (3d Cir. 2016) ................................................................. 2, 21

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd.*,
No. 12-3824, 2015 WL 1736957 (E.D. Pa. Apr. 16, 2015) ........................ 20

*Neat Sweep Int'l, Ltd. v. Nat'l Chimney Sweep Guild, Inc.*,
No. HG-333-1, 1996 WL 33468472 (Va. Cir. Ct. Jan. 22, 1996) .............. 8

*Nev. Indep. Serv. Contractors Ass'n v. Pack Expo West*,
No. CVS97-1492-KJD (RJJ), 2002 WL 1162663 (D. Nev. Apr. 8,
2002)............................................................................................................ 8

*Oreck Corp. v. Whirlpool Corp.*,
639 F.2d 75 (2d Cir. 1980) ........................................................................ 11

*Orion's Belt, Inc. v. Kayser-Roth Corp.*,
433 F. Supp. 301 (S.D. Ind. 1977) ............................................................. 8

*People ex rel. Woodard v. Colo. Springs Bd. of Realtors, Inc.*,
692 P.2d 1055 (Colo. 1984) ........................................................................ 7

*Plaquemine Marine, Inc. v. Mercury Marine*,
859 So. 2d 110 (La. Ct. App. 2003) ........................................................... 8

*Re/Max Int'l, Inc. v. Smythe, Cramer Co.*,
265 F. Supp. 2d 882 (N.D. Ohio 2003) ...................................................... 8

*Robb v. Conn. Bd. of Veterinary Med.*,
157 F. Supp. 3d 130 (D. Conn. 2016)..................................................... 9, 10

*Sports & Travel Mktg., Inc. v. Chicago Cutlery Co.*,
811 F. Supp. 1372 (D. Minn. 1993)............................................................. 8

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
803 F.3d 1084 (9th Cir. 2015) .................................................................. 21

*State ex rel. Douglas v. Assoc. Grocers of Neb. Coop., Inc.*,
332 N.W.2d 690 (Neb. 1983).................................................................... 8

v

## TABLE OF AUTHORITIES

Page(s)

*State ex rel. La Sota v. Ariz. Licensed Beverage Ass'n*,
  627 P.2d 666 (Ariz. 1981) ........................................................................................ 7

*State v. Blyth*,
  226 N.W.2d 250 (Iowa 1975) .................................................................................... 8

*State v. Lawn King, Inc.*,
  417 A.2d 1025 (N.J. 1980) ........................................................................................ 8

*Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*,
  738 F. Supp. 2d 505 (D. Del. 2010) ...................................................................... 11

*Taylor v. Philip Morris Inc.*,
  No. 00-cv-203, 2001 WL 1710710 (Me. Super. Ct. May 29, 2001) .......................... 8

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*,
  71 S.W.3d 691 (Tenn. 2002) .................................................................................... 8

*Universal Studios v. Viacom Inc.*,
  705 A.2d 579 (Del. Ch. 1997) .................................................................................. 7

STATUTES:

15 U.S.C. § 1 ................................................................................................................ 7

Hatch-Watchman Act .............................................................................................. 17

Sherman Act ......................................................................................................... 3, 7

N.D. Cent. Code § 51-08.1-02 .................................................................................. 8

## INTRODUCTION

Plaintiffs allege no actual facts connecting Mylan to a purported conspiracy to allocate customers.  As the Supreme Court made clear in *Twombly*, mere threadbare allegations and conclusory statements are not enough.  Plaintiffs must allege actual facts showing that an antitrust conspiracy is "plausible," "as distinct from identical, independent action."  *Bell Atl. Corp. v.  Twombly*, 550 U.S. 544, 549, 556 (2007).  Plaintiffs fail to meet this standard because their conspiracy claim against Mylan is not borne out by the actual facts alleged in the Complaint, most of which have nothing to do with Mylan.  On the contrary, Plaintiffs' factual allegations affirmatively show that Mylan *competed* with other generic drug manufacturers not that it *conspired* with them*.*

When stripped of conclusory language and references to conduct of other Defendants, the Complaint alleges only that Mylan chose not to bid on two potential customers of Doxycycline Hyclate Delayed Release ("Doxy DR") when another manufacturer entered the market.  But Plaintiffs allege no facts indicating that Mylan's alleged decision was the result of an agreement rather than independent business judgment.

In addition to failing to allege a plausible conspiracy, Plaintiffs' claims against Mylan should be dismissed because Plaintiffs fail to allege antitrust injury.  It is well-established that to have standing to pursue an antitrust claim, a plaintiff must allege injury that is fairly traceable to defendant's allegedly unlawful conduct.   But Plaintiffs only make the conclusory assertion that "States, governmental entities and consumers" have been forced to pay artificially high

prices.  Plaintiffs fail to allege any facts connecting the limited allegations against Mylan to Doxy DR price increases to *anyone*, much less the thousands of purchasers in 40 different states on whose behalf Plaintiffs purport to bring their claims.

Accordingly, for the reasons set forth below and in Defendants' joint memorandum of law, Mylan respectfully requests that Counts One and Three be dismissed.[1]

## BACKGROUND

Defendant Mylan Pharmaceuticals Inc. ("Mylan") is a global healthcare company focused on making high quality medicines.  Mylan manufactures more than 7,500 products, including among other things, generic drugs.  One such drug is Doxy DR, a generic version of the brand-name drug Doryx® ("Doryx").  Am. Compl., Dkt. No. 168 ("Compl.") ¶¶ 69-70.  Doryx, and its generic counterparts, are tetracycline-class antimicrobial drugs prescribed to treat severe acne.  *Id.* ¶ 69.  Numerous potential substitutes exist for Doryx and Doxy DR, including doxycline hyclate, doxycycline monohydrate, and minocycline hydrochloride.  *See Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 437 (3d Cir. 2016).  Other generic manufacturers of Doxy DR include Defendants Mayne Pharma (USA) Inc. ("Mayne") and Heritage Pharmaceuticals, Inc.

---

[1]     While Mylan believes Plaintiffs' claims should be dismissed, and while the Judicial Panel on Multidistrict Litigation has issued a Conditional Transfer Order ("CTO") transferring this matter to *In re:   Generic Pharmaceuticals Pricing Antitrust Litigation* (MDL 2724) pending in the Eastern District of Pennsylvania, in the event that *both* Mylan's motion to dismiss is denied *and* the CTO is vacated, Mylan supports severance of Plaintiffs' Doxy DR and Glyburide claims for the reasons set forth in Mayne's separately-filed motion to dismiss.

("Heritage").

Plaintiffs are Attorney Generals from states around the country.  As part of an investigation into the rising cost of generic drugs generally, Plaintiffs filed the instant lawsuit in December 2016, *see* Dkt. No. 1, on behalf of "governmental entities and consumers in their states."  Compl. ¶ 20.[2]   Plaintiffs allege, in pertinent part, that Mylan and other generic drug manufacturers conspired to allocate markets for Doxy DR in violation of Section 1 of the Sherman Act and the antitrust and consumer protection laws of various states.[3]   In broad strokes, Plaintiffs allege that Defendants Mylan, Mayne, and Heritage entered into an anticompetitive scheme under which they "communicated with each other to determine and agree on how much market share or which customers each competitor was entitled to."  *Id.* ¶ 11.  Defendants allegedly "effectuated the agreement by either refusing to bid for particular customers or by providing a cover bid that they knew would not be successful."  *Id.*

Despite this broad language, Plaintiffs' factual allegations with respect to Mylan are extraordinarily limited.[4]   Indeed, the only actual facts that Plaintiffs

---

[2]    Plaintiffs filed the First Amended Complaint ("Complaint") on March 1, 2017.  *See* Dkt. No. 168.

[3]    Plaintiffs purport to allege two conspiracies: (1) a conspiracy to allocate markets for Doxy DR among Mylan, Mayne, and Heritage, *see* Compl. ¶¶ 67-102, and (2) a conspiracy to fix prices for Glyburide (a different generic drug prescribed to treat oral diabetes) among Heritage, Teva, Aurobindo, and Citron, *see* Compl. ¶¶ 103-33.  Mylan has never manufactured Glyburide.  Accordingly, Plaintiffs do not, and could not, allege that Mylan was ever involved in this latter conspiracy.

[4]    Plaintiffs make various allegations that are nothing more than legal conclusions – not facts – and therefore are not entitled to a presumption of truth on a motion to dismiss.  *See, e.g.,* Compl.  ¶ 67 (Defendants reached "agreement

Case 3:16-cv-02056-VLB   Document 285-1   Filed 05/01/17   Page 11 of 30

allege are two instances where Mylan purportedly "walk[ed] away" from a potential customer when faced with competition from Heritage, a new entrant. *Id.* ¶ 75.   Some unspecified time before this, Plaintiffs allege, an individual at Heritage "connected with" a Mylan employee through LinkedIn and thereafter communicated "on at least one occasion." *Id.* ¶ 73. Plaintiffs do not allege when they communicated or what the substance of their conversation was about. Around the same time, Plaintiffs allege, a phone call occurred between employees at Mylan and Heritage, in which Heritage allegedly sought to discuss ███████████████████████ *Id.* ¶ 74. There are no other facts alleged in the Complaint regarding the substance of this phone call or the alleged agreement.

Apart from these two instances, Plaintiffs otherwise allege that Mylan "insisted on *competing* for business" from both Heritage and Mayne. *Id.* ¶ 76 (emphasis added); *see also id.* ¶¶ 77-78, 83-84, 87-88, 91. For example, in November 2013, Heritage purportedly contacted Mylan "after Mylan sought to protect its business with one large account." *Id.* ¶ 76. ███████████████

███████████████████████████████████

███████████████████████ ███████████ *Id.* In deciding whether to continue going after Mylan's account, Heritage noted: ███████████████

███████████████████████████████ *Id.* ¶ 77. Heritage allegedly had the same concern in January 2014, when it internally discussed whether to submit a bid against Mylan. *Id.* ¶¶ 80-81. Heritage worried that "[p]roviding a bid

---

to allocate market share"); ¶ 75 (Heritage and Mylan "agreed to allocate market share"); ¶ 78 (Heritage and Mylan "continued to allocate customers").

would be perceived as an attack on Mylan's business and may result in retaliation," i.e., that Mylan would respond with *lower* prices. *Id.* ¶ 81.

Similarly, when Defendant Mayne entered the market for Doxy DR in February 2014, Mylan "consistently protected its business, choosing not to allow Mayne to acquire market share." *Id.* ¶ 83. ███████████████ in March 2014, ███████████ ████████████████████████████████████████████ ██████████████████████████ *Id.* ¶ 84. Circumstances did not change in April 2014. ████████████████████████████████████████ ████████████████████████ ██████████████ █████████████████ *Id.* ¶ 88. As Mayne "continued to look for a large account over the next several months," Mylan responded by "protecting [its] business." *Id.* ¶ 91.

Plaintiffs' only other allegation with respect to Mylan is that in August 2014, Heritage internally discussed █████████████████ ███████████████████ ██████████████ *Id.* ¶ 92. The Complaint does not allege any further facts about ███████████████████████. Plaintiffs do not allege that Heritage ever reached out to Mylan. Nor do Plaintiffs allege that Mylan was ever part of these communications, ████████████████████████████ ███████

Notwithstanding this narrow set of alleged facts, which highlights the aggressive competition between Mylan and other defendants, Plaintiffs contend that "consumers nationwide paid more for numerous generic pharmaceutical drugs, including specifically Doxy DR . . . than they otherwise would have in a competitive market." *Id.* ¶ 14. Among other things, Plaintiffs request "monetary

relief, including for governmental entities and consumers in their states." *Id.* ¶ 20.

## LEGAL STANDARD

To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under this standard, a plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A claim is "plausible" only if a plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557.

In the antitrust context, courts must be particularly rigorous in ensuring that a plaintiff's claims rise to the level of plausibility. As the Supreme Court cautioned: "proceeding to antitrust discovery can be expensive," so "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558-59 (internal quotation marks omitted) (collecting cases and other authorities lamenting the high costs of antitrust discovery). Accordingly, a complaint, like this one, that merely states "labels and conclusions" or tenders "naked assertion[s]," without "further factual enhancement" is insufficient. *Id.* at

6

555, 557. "[A]bsent some factual context suggesting agreement, as distinct from identical, independent action," the Supreme Court has "h[e]ld that such a complaint should be dismissed." *Id.* at 549; *see also In re Parcel Tanker Shipping Servs. Antitrust Litig.,* 541 F. Supp. 2d 487, 492 (D. Conn. 2008) (dismissing conspiracy claim because "[a]lthough the complaint alleges conspiratorial activity, it does not allege facts tending to show how these activities were accomplished" but merely used "labels and conclusions").

## ARGUMENT

## I.  PLAINTIFFS FAIL TO ALLEGE MYLAN'S PARTICIPATION IN AN UNLAWFUL CONSPIRACY.

The "crucial question" in any antitrust conspiracy case is "whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2nd Cir. 2013) (internal quotation marks omitted).  Section 1 of the Sherman Act and equivalent state laws do not prohibit every restraint of trade, but rather "only restraints effected by a contract, combination, or conspiracy." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 775 (1984); 15 U.S.C. § 1 (prohibiting "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce").[5]  Accordingly, to state a claim, Plaintiffs must allege "enough

---

[5]     All but one of the state laws under which Plaintiffs assert antitrust claims require plausible conspiracy allegations to state a claim for an illegal horizontal restraint of trade.  *See State ex rel. La Sota v. Ariz. Licensed Beverage Ass'n*, 627 P.2d 666, 676 (Ariz. 1981); *Mailand v. Burckle*, 572 P.2d 1142, 1148 (Cal. 1978); *People ex rel. Woodard v. Colo. Springs Bd. of Realtors, Inc.*, 692 P.2d 1055, 1062 (Colo. 1984) (en banc); *Bridgeport Harbour Place I, LLC v. Ganim*, 32 A.3d 296, 302 (Conn. 2011); *Universal Studios v. Viacom Inc.*, 705 A.2d 579, 598 (Del. Ch. 1997); *MYD Marine Distrib., Inc. v. Int'l Paint Ltd.*, 76 So. 3d 42, 46–47 (Fla. Dist. Ct.

factual matter (taken as true) to suggest that an agreement was made." *Twombly*,
550 U.S. at 556.

For an agreement to exist, there must be a "'unity of purpose or common
design and understanding, or a meeting of minds in an unlawful arrangement.'"
*H.L. Moore Drug Exch. v. Eli Lilly and Co.*, 662 F.2d 935, 941 (2nd Cir. 1981)

---

App. 2011); *Island Tobacco Co. v. R.J. Reynolds Indus., Inc.*, 513 F. Supp. 726, 738–39 (D. Haw. 1981) (interpreting Hawaii law); *K. Hefner, Inc. v. Caremark, Inc.*, 918 P.2d 595, 598–99 (Idaho 1996); *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 259–60 (Ill. 1999); *Orion's Belt, Inc. v. Kayser-Roth Corp.*, 433 F. Supp. 301, 302–03 (S.D. Ind. 1977) (interpreting Indiana law); *State v. Blyth*, 226 N.W.2d 250, 271 (Iowa 1975); *Bergstrom v. Noah*, 974 P.2d 520, 530–31 (Kan. 1999); *Plaquemine Marine, Inc. v. Mercury Marine*, 859 So. 2d 110, 118 (La. Ct. App. 2003); *Taylor v. Philip Morris Inc.*, No. Civ.A. CV 00-203, 2001 WL 1710710, at *3 (Me. Super. Ct. May 29, 2001); *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 385–86 (Md. Ct. Spec. App. 1983); *Blair v. Checker Cab Co.*, 558 N.W.2d 439, 442 (Mich. Ct. App. 1996); *Sports & Travel Mktg., Inc. v. Chicago Cutlery Co.*, 811 F. Supp. 1372, 1384 & n.18 (D. Minn. 1993) (interpreting Minnesota law); *Ga. Pac. Corp. v. Cook Timber Co.*, 194 So. 3d 118, 123 (Miss. 2016); *State ex rel. Douglas v. Assoc. Grocers of Neb. Coop., Inc.*, 332 N.W.2d 690, 693 (Neb. 1983); *Nev. Indep. Serv. Contractors Ass'n v. Pack Expo West*, No. CVS97-1492-KJD (RJJ), 2002 WL 1162663, at *6 (D. Nev. Apr. 8, 2002) (interpreting Nevada law); *Kenneth E. Curran, Inc. v. Auclair Transp., Inc.*, 519 A.2d 280, 284 (N.H. 1986) (per curiam); *State v. Lawn King, Inc.*, 417 A.2d 1025, 1040 (N.J. 1980); *Home Town Muffler, Inc. v. Cole Muffler, Inc.*, 608 N.Y.S.2d 735, 737 (App. Div. 1994); *Cameron v. New Hanover Mem'l Hosp., Inc.*, 293 S.E.2d 901, 918 (N.C. 1982); N.D. Cent. Code § 51-08.1-02; *Re/Max Int'l, Inc. v. Smythe, Cramer Co.*, 265 F. Supp. 2d 882, 900–03 (N.D. Ohio 2003) (interpreting Ohio law); *Johnson v. Con-Vey/Keystone, Inc.*, 814 F. Supp. 931, 934 (D. Or. 1993) (interpreting Oregon law); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3d Cir. 1994) (interpreting Pennsylvania law); *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703–04 & n.6 (Tenn. 2002); *In2 Networks, Inc. v. Honeywell Int'l*, No. 2:11-cv-6-TC, 2011 WL 4842557, at *6, *8 (D. Utah Oct. 12, 2011) (interpreting Utah law); *Neat Sweep Int'l, Ltd. v. Nat'l Chimney Sweep Guild, Inc.*, No. HG-333-1, 1996 WL 33468472, at *1 (Va. Cir. Ct. Jan. 22, 1996); *Indep. Milk Producers Co-op v. Stoffel*, 298 N.W.2d 102, 107–08 (Wis. Ct. App. 1980).  Oklahoma is the only exception.  But Plaintiffs have failed to plead any "unilateral" acts by Mylan that harmed competition, which would violate the Oklahoma statute in the absence of conspiracy allegation.  *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1091-92 (10th Cir. 2006).  Therefore, the Plaintiffs Oklahoma state antitrust law claim fails as well.

(quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).  Allegations that are equally consistent with "independent action" as conspiracy are insufficient to state an antitrust claim.  *Twombly*, 550 U.S. at 557.

Absent "direct" evidence of a conspiracy, a complaint "may survive dismissal only if an actual agreement 'may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors.'"  *Robb v. Conn. Bd. of Veterinary Med.*, 157 F. Supp. 3d 130, 143 (D. Conn. 2016) (quoting *Mayor and City Council of Baltimore*, 709 F.3d at 136)).  These plus factors include "a high level of interfirm communications," "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators," and "common motive to conspire."  *Mayor and City Council of Baltimore*, 709 F.3d at 136 (internal quotation marks omitted).

Plaintiffs purport to allege a broad scheme involving Mylan, Heritage, and Mayne.  Compl. ¶ 142.  But Plaintiffs' theory is not supported by any of the facts alleged.  As an initial matter, Plaintiffs do not allege any parallel conduct from which a conspiracy could be inferred from "circumstantial evidence," which separates this case from the typical antitrust conspiracy complaint.  *See LaFlamme v. Société Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) (explaining that it is "dubious" to call conduct "parallel" where plaintiffs allege "action by only some defendants and no action by other defendants" or "action by a solitary defendant").  Instead, Plaintiffs apparently intend to bring their claims based on "direct evidence."  But the few facts in the Complaint related to

9

Mylan show that Mylan rarely communicated with Heritage, never communicated with Mayne, and competed aggressively with both.  And Plaintiffs allege no facts showing that Mylan's alleged conduct was against its individual economic self-interest.

A.  <u>Plaintiffs Fail to Allege an Agreement between Mylan and Heritage.</u>

With respect to Heritage, Plaintiffs allege that "Mylan agreed to 'walk away' from at least one large national wholesaler and one large pharmacy chain to allow Heritage to obtain the business and increase its market share."  Compl. ¶ 75.  But there are no facts in the Complaint to support this allegation, and Plaintiffs' conclusory assertions of agreement are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 682; *see also Robb*, 157 F. Supp. 3d at 143 (an antitrust plaintiff must do more than "simply allege that the parties agreed").  While Plaintiffs try to bolster their allegation by claiming that an agreement was made "[d]uring the course of . . . communications" between Mylan and Heritage, Compl. ¶ 75, this too is lacking factual support.  Plaintiffs do not allege any communications between Mylan and Heritage in which they discussed customers, much less any communications from which an agreement not to compete could be inferred.

At most, the factual allegations in the Complaint show that Mylan and Heritage communicated on three occasions.  The first (under a generous reading of the Complaint) occurred when a Heritage executive allegedly "connected" with Mylan via LinkedIn on May 2, 2013.  *Id.* ¶ 73.  The second allegedly occurred sometime "[o]ver the next several weeks" "on at least one occasion."  *See id.* The third communication allegedly occurred on May 8, 2013, when a Mylan

employee responded to a call from Heritage ████████ ████████████

████████████████ *Id.* ¶ 74. Aside from ██████████████████████

████████ Plaintiffs allege no other facts regarding the nature or substance of any of these communications.

It is impossible to infer a complex conspiracy in which Defendants purportedly agreed to allocate market share and refrain from competing for customers from these limited communications. *See In re Text Messaging Antitrust Litig.*, 46 F. Supp. 3d 788, 806 (N.D. Ill. 2014) (refusing to infer conspiracy from "communications involving defendants that are temporally near some of the pricing changes at issue," but plaintiffs "offer nothing other than speculation about the substance of these talks"). Even a "showing of close relations or frequent meetings," "will not sustain a plaintiff's burden absent evidence which would permit the inference that these close ties led to an illegal agreement." *H.L. Moore Drug Exchange*, 662 F.2d at 941 (*quoting Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980)).

Here, these three communications do not show that Mylan and Heritage communicated frequently. Nor do the alleged communications suggest any "unity of purpose" in how Defendants would approach certain customers or that they were even out of the ordinary. *See Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*, 738 F. Supp. 2d 505, 516 (D. Del. 2010) (refusing to infer conspiracy and granting motion to dismiss where defendants' open "exchange of business information" was "neither remarkable nor actionable"); *see also In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 541 (N.D. Tex.

2014) (refusing to infer conspiracy and granting motion to dismiss, in part because allegations of "private communications" are "ambiguous and overly generalized" and "leave open the distinct possibility that Defendants' behavior was entirely normal and legitimate.") (internal quotation marks and brackets omitted).[6]

The Complaint's other allegations related to Mylan are based on internal discussions at *Heritage*. *See* Compl. ¶¶ 79-81.  "At most," these types of internal conversations do not provide any evidence of communications or agreement with Mylan and, "[a]t most," might "suggest a high level of interfirm *awareness*" at Heritage.  *Mayor and City Council of Baltimore*, 709 F.3d at 139.  (internal communications "do not provide any evidence of *interfirm* communications").  The Second Circuit's decision in *Mayor and City Council of Baltimore* is particularly instructive here.  There, plaintiffs alleged a conspiracy purportedly based on "specific communications between the Defendants."  *Id.*  However, upon closer inspection, the court found that their complaint alleged "only two actual communications *between* competitors."  *Id.*  All the other communications were "*internal* to individual defendants."  *Id.*  The court found these communications insufficient to show a "'high level' of interfirm communications," and given their substance – which, at most, included "two vague references to

---

[6]     Although the Complaint contains allegations about efforts to conceal information, none of these allegations relate to Mylan.  *See* Compl.  ¶ 125-133.

isolated discussions among only three defendants" – insufficient to plausibly allege a conspiracy. *Id.* at 140.[7]

The same is true here.  It is unreasonable to infer a conspiracy from the limited communications alleged between Mylan and Heritage.   And none of Heritage's internal discussions shows a "unity of purpose" or a "meeting of minds" with Mylan.  *H.L. Moore Drug Exchange*, 662 F.2d at 941.  To the contrary, these communications show that Mylan *competed* with Heritage.  Plaintiffs allege that Heritage's internal emails show that "Mylan insisted on competing for business that Heritage believed that it was entitled to."   Compl. ¶ 76.   For example, in an internal email exchange at Heritage, executives allegedly ███████████████████████████████████████   *Id.* ¶ 77.  ████████████

████████████████████████████████████████████████████

███████████████████████████████████████   *Id.*; *see also* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition.").  Heritage apparently expressed the same concern in January 2014 when it was trying to decide *internally* whether to bid against Mylan for another account. *Id.* ¶¶ 80-81.

Although Plaintiffs allege one instance where someone at Heritage allegedly ████████████████████████████   ████████████████

_____

[7]   Even if Plaintiffs had alleged interfirm communications between Mylan and Heritage – which they have not – a high level of interfirm communications is merely a "plus factor" supporting circumstantial evidence of a conspiracy, and thus insufficient without a showing of parallel conduct.   Such a showing is notably absent here. *See supra* 8-9.

████████████████ *id.* ¶ 92, there are no facts indicating that this ever happened or that Heritage's internal email could have had any impact ████████████████

████████████████████████ Accordingly, this internal communication does not support an inference of conspiracy involving Mylan.[8]

   B. Plaintiffs Fail to Allege an Agreement between Mylan and Mayne.

   Similarly, Plaintiffs fail to allege an unlawful agreement between Mylan and Mayne.   Nowhere in the Complaint do Plaintiffs allege that Mylan and Mayne ever communicated, directly or indirectly. *See In re Hawaiian & Guamanian Cabbage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1259 (W.D. Wash. 2009) (refusing to infer conspiracy and dismissing Section 1 claim where "[u]nlike in cases in which antitrust complaints have been deemed sufficient, plaintiffs here do not identify any specific communications or contracts").   Nor do they allege any facts showing that Mylan ever refrained from competing with Mayne for customers.   To the contrary, Plaintiffs allegations show – as they did with Heritage – that Mylan *competed* with Mayne.   For example, when Mayne entered the market for Doxy DR, Plaintiffs allege that "it avoided bidding on Heritage customers and chose

---

[8]      Plaintiffs' generic allegations relating to trade shows and industry dinners fail to nudge their claims "across the line from conceivable to plausible" with respect to Mylan. *Twombly*, 550 U.S. at 570. Plaintiffs do not allege that anyone from Mylan attended *any* of these trade shows or dinners with other Defendants. *See* Compl. ¶¶ 49-60. In any event, the existence of meetings and events that provide no more than a "mere opportunity to conspire" are insufficient to support an inference of a conspiracy. *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993); *see also Twombly*, 550 U.S. at 567 n.12 (rejecting inference of conspiracy based upon participation in an industry trade association); *see also LaFlamme*, 702 F. Supp. 2d at 148 (noting that "membership and participation in a trade association alone does not give rise to a plausible inference of illegal agreement").

instead to target Mylan."  Compl. ¶ 83.  In response, Mylan did not cede any accounts and instead, "consistently protected its business, choosing not to allow Mayne to acquire market share."  *Id.*

Plaintiffs' other factual allegations similarly confirm that there was no agreement between Mylan and Mayne.  During multiple calls between



 Compl. ¶ 84.

*Id.* ¶¶ 87-88.

*Id.* ¶¶ 88, 91. [9]  In addition to showing that Mylan competed with Mayne, these allegations underscore the absence of any facts showing that Mylan ever communicated with Mayne, much less reached an agreement to conspire for purposes of the antitrust laws.  As such, the Complaint asserts *no* allegations, and certainly no plausible allegations, that Mylan entered into any type of anticompetitive agreement with Mayne.

### C. Mylan's Alleged Conduct is Consistent with Independent Action.

Not only do the facts alleged in the Complaint suggest that Mylan was *competing* with both Mayne and Heritage, Mylan's alleged conduct is equally consistent with "independent action" and Mylan's own self-interest.  *Twombly,*

---

[9]    Similarly, Plaintiffs' quotation of an internal Mayne email purportedly stating that                              Compl. ¶ 83, is consistent with Mylan acting in its own economic self-interest to decide which customers are worth pursuing when faced with new entrants and cannot support a conspiracy claim.

550 U.S. at 549; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (per curiam) (no conspiracy where there is "a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market") (quoting *Twombly*, 550 U.S. at 554); *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510, *32-33 (S.D.N.Y. Aug. 29, 2014) (refusing to infer conspiracy and granting motion to dismiss where facts suggest defendants acted "entirely consistent with their self-interest"). Plaintiffs fail to allege any facts showing that the two customers in question would have been profitable to Mylan, that Mylan received any benefit from Heritage for supposedly giving up these two customers, or that Mylan's alleged decision made no sense absent an agreement. On the contrary, Mylan's conduct is consistent with "actions taken by market actors who are aware of and anticipate similar actions taken by competitors." *Mayor and City Council of Baltimore*, 709 F.3d at 137, 139 (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987)); *see also Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).

Indeed, the conspiracy theory alleged here is similar to that alleged in *Twombly*, which was soundly rejected by the Supreme Court*.* There, plaintiffs alleged that a conspiracy could be inferred from the defendants' decisions not to compete across their respective service areas, notwithstanding "especially attractive business opportunities in surrounding markets." 550 U.S. at 567 (internal quotation marks omitted). The Court found this set of facts "not suggestive of conspiracy." *Id.* Instead, "a natural explanation for the

noncompetition" was that defendants "were sitting tight, expecting their [competitors] to do the same." *Id.* at 568. As the Court explained, all of the defendants had reason to "see their best interests in keeping their old turf," independent of any agreement with one another. *Id.*[10]

As in *Twombly*, it is just as likely that Mylan saw its best interest in "sitting tight, expecting [its competitors] to do the same." *Id.* at 567; *see also id.* at 569 ("[F]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets.") (internal quotation marks omitted). As Plaintiffs explain in the Complaint, the Hatch-Watchman Act creates a regulatory scheme in which generic entry is encouraged. As more generic manufacturers enter the market, "competition will push the price down much more dramatically." Compl. ¶ 35. Just as Plaintiffs understand these market dynamics, so too do generic manufacturers, who, knowing that new entrants will inevitably capture market share, have an independent and unilateral interest in not competing for every customer to prevent prices from shrinking "dramatically." As a result, Plaintiffs' allegations are consistent with "a natural and independent desire to avoid a turf

---

[10]    The Southern District of New York rejected a similar theory in *Hinds County, Mississippi v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106 (S.D.N.Y. 2016). There, plaintiffs alleged a market allocation scheme for municipal derivatives and claimed that a conspiracy could be inferred from the substantial difference between the winning and losing bids. *Id.* at 112, 116. For example, in one instance, the losing bid was eighty basis points below the winning bid. *Id.* The court rejected this theory, explaining that this fact, "standing alone, does not support an inference that [defendants] engaged in collusive activity." *Id.*; *see also id.* at 118-20. Citing *Twombly*, the court noted that plaintiffs had failed to allege facts showing "such intentionally low bids were the result of any specific communications or collusion." *Id.* at 119.

17

war and preserve . . . profits." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 375 (S.D.N.Y. 2016) (internal quotation marks omitted); *see also Twombly*, 550 U.S. at 568.

Accordingly, Plaintiffs have failed to allege a conspiracy involving Mylan and Counts One and Three should be dismissed.

## II. PLAINTIFFS FAIL TO PLEAD ANTITRUST INJURY.

Plaintiffs' claims against Mylan should be dismissed for the additional reason that they fail to allege any facts indicating that Mylan's alleged conduct proximately caused harm to any individual State, the general economies of any State, or the citizens of any State.[11] *See* Compl. ¶¶ 135-138.  The law is clear that an antitrust plaintiff cannot recover "merely by showing injury causally linked to an illegal presence in the market." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (internal quotation marks omitted).  Instead, Plaintiffs must allege injury that "flows from that which makes [or might make] defendants' acts unlawful." *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (internal quotation marks omitted); *see also Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983)

---

[11]   As discussed in Defendants' joint motion to dismiss, Dismissal of Plaintiffs' antitrust claims for lack of antitrust standing also disposes of Plaintiffs' consumer protection claims.  Moreover, for the reasons stated herein, Plaintiffs' allegations are also insufficient to satisfy Article III standing, which requires Plaintiffs to show that their alleged injury is "fairly traceable" to Mylan's conduct. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

(plaintiff must show "chain of causation between [plaintiff's] injury and the alleged restraint in the market").[12]

While Plaintiffs claim they made "reimbursements for purchases" of generic pharmaceuticals generally, Compl. ¶ 137, they do not allege actual facts showing that they, or any particular customers they purport to represent, purchased Doxy DR directly or indirectly. Nor do Plaintiffs allege any facts regarding how they purportedly suffered harm as a result of paying reimbursements or how Mylan allegedly caused that harm, *Twombly*, 550 U.S. at 555 (2007) ("The pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action.") (alterations and internal quotation marks omitted).

More dispositive, however, is the fact that Plaintiffs' factual allegations are insufficient to show that any conduct attributable to Mylan could have caused the alleged harm. *See Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD), 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014) (no antitrust injury alleged where plaintiffs' factual allegations were insufficient to "demonstrate an adequate connection between the alleged misconduct and the effect") (internal quotation marks omitted). At most, Plaintiffs allege that Mylan decided not to compete for two potential customers of Doxy DR. Plaintiffs do not allege that they or anyone they purport to represent purchased Doxy DR from either of these two customers. Plaintiffs have not pled the requisite proximate causation because there are no

---

[12]     As discussed in Defendants' joint motion to dismiss, every state antitrust law under which Plaintiffs bring suit also requires a showing of antitrust injury or proximate causation.

facts alleged connecting these two potential Mylan customers to the harm allegedly suffered by consumers spanning 40 states that the Plaintiffs purportedly represent.  *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 162 (2d Cir. 2016) (affirming dismissal of complaint and explaining that antitrust injury "requires that the anticompetitive conduct proximately cause the antitrust injury") (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477-78 (1982)); *see also Latino Quimica-Amtex S.A. v. Akzo Nobel Chems. B.V.*, No. 03 Civ. 10312 (HBDF), 2005 WL 2207017, at *9 (S.D.N.Y. Sept. 8, 2005) (dismissing complaint where plaintiff alleged "causal relationship" in only "general terms").

Nor do Plaintiffs allege in anything more than the most bare, conclusory terms that this alleged conduct caused price increases for Doxy DR. While Plaintiffs assert that the price of generic drugs has increased, there are no facts alleged in the Complaint showing that prices have increased for Doxy DR specifically based on the alleged conduct.  Such allegations would make no sense in any event because at least one court has held that numerous substitutes for Doxy DR exist.  In *Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd.*, the district court rejected a single product market limited to branded and generic Doryx after finding "consensus among dermatologists that all oral tetracyclines treat acne with similar effectiveness and so are interchangeable for that purpose." No. 12-3824, 2015 WL 1736957, at *9, *11 (E.D. Pa. Apr. 16, 2015). The Third Circuit agreed on appeal, confirming that "the relevant market consisted of Doryx and other oral tetracyclines prescribed to treat acne," including doxycycline hyclate, doxycycline monohydrate, and minocycline hydrochloride.

20

*Mylan Pharm., Inc.*, 838 F.3d at 437.  In antitrust terms, this means that the alleged conspiracy not to compete for sales of Doxy DR is unlikely to raise prices because customers could simply turn to the brand or other generic alternatives.[13] *See Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (explaining generally that "the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level").  Put simply, it is implausible that a conspiracy limited to Mylan, Heritage, and Mayne, manufacturers of doxycycline hyclate, would result in higher prices when there are multiple alternatives, including doxycycline monohydrate, minocycline hydrochloride, and brand-name Doryx, for which Plaintiffs allege no role in the alleged conspiracy.

Without any allegations addressing this economic reality, Plaintiffs cannot demonstrate that their vague, overly broad claims of injury as a result of "generic pharmaceutical" price increases were proximately caused by any unlawful conduct by Mylan.   Accordingly, Plaintiffs have failed to allege sufficient facts to show that Plaintiffs suffered antitrust injury as a result of the alleged conspiracy and their antitrust claims should be dismissed.

---

[13]    By way of analogy, if three gas stations existed in a one-mile radius, it would not make economic sense for two of the three to collude because customers could simply turn to the third gas station to avoid any price increases. *See, e.g.*, *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1090 (9th Cir. 2015) (conspiracy made "little economic sense" where, among other reasons, the potential payoff was unlikely to be significant because "other manufacturers compete in this market").

## CONCLUSION

For the foregoing reasons and those provided in Defendants' Memorandum in Support of Joint Motion to Dismiss Plaintiffs' First Amended Complaint, Mylan respectfully requests that the Court dismiss Counts One and Three in their entirety against Mylan.

Respectfully submitted,

DATED: May 1, 2017

/s/ *Kim E. Rinehart*
WIGGIN AND DANA
One Century Tower
265 Church Street
New Haven, Connecticut 06508
krinehart@wiggin.com

J. Robert Robertson
Adam K. Levin
Benjamin F. Holt
Justin W. Bernick
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
Tel:    (202) 637-5600
Fax:    (202) 637-5910
adam.levin@hoganlovells.com
benjamin.holt@hoganlovells.com
justin.bernick@hoganlovells.com

Mitchell E. Zamoff
HOGAN LOVELLS US LLP
80 South Eighth Street
Suite 1225
Minneapolis, MN 55402
Tel:    (612) 402-3000
Fax:    (612) 402-3001
mitch.zamoff@hoganlovells.com

*Attorneys for Defendant Mylan
Pharmaceuticals Inc.*

23