**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **STATE OF CONNECTICUT,** *et al.*, | : | **CIVIL ACTION NO.** |
| | : | **3:16-CV-002056 (VLB)** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **Hon. Vanessa L. Bryant** |
| **AUROBINDO PHARMA USA, INC.,** | : | |
| *et al.*, | : | |
| | : | |
| | : | |
| **Defendants.** | : | **May 22, 2017** |

**PLAINTIFF STATES' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED
COMPLAINT (DOC. #282)**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ................................................................................... 1

ARGUMENT ........................................................................................ 3

I.      THE STATES HAVE SUFFICIENTLY ALLEGED
FEDERAL ANTITRUST CLAIMS. ................................................. 3

      A.    The States Plausibly Allege Ongoing or Threatened Injury. ... 3

      B.    Disgorgement Is Available to Remedy a Sherman Act
Violation, Especially Where the Public Interest is at Stake. ........... 7

      C.    The States Have Standing to Bring a Claim for
Injunctive Relief under Federal Law. ................................................. 15

      D.    The States Have Sufficiently Pled Antitrust Injury. ....................... 19

II.    THE STATES' STATE LAW CLAIMS DO NOT FAIL
EVEN IF THEIR FEDERAL LAW CLAIMS FAIL. ......................................... 25

III.   THE STATES HAVE SUFFICIENTLY ALLEGED
STATE LAW ANTITRUST CLAIMS. ............................................................ 29

      A.    Any State Seeking Damages on Behalf of their
Citizens Is Authorized to Do So. .................................................. 30

      B.    Any State that Brings a State Law Claim on Behalf of
Indirect Purchasers Is Authorized to Do So. .................................. 36

            1.    The States May Bring Indirect Purchaser Claims
under State Law. ..................................................................... 36

            2.    The States May Bring State Law Disgorgement Claims. ..... 40

      C.    New York Has Standing to Sue on Behalf
of Government Entities. ................................................................ 43

      D.    The States Have Sufficiently Alleged a Nexus to Intrastate
Commerce as Required by their Respective State Laws,
and State Antitrust and Consumer Protection Laws Are Not
Unconstitutional under the Dormant Commerce Clause. ............. 44

i

**TABLE OF CONTENTS - CONTINUED**

Page

      1.    The Amended Complaint Sufficiently Alleges a Nexus to Intrastate Commerce for State Law Antitrust Claims. ......... 45

      2.    The States' Antitrust and Consumer Protection Laws Are Not Unconstitutional under the Dormant Commerce Clause. .................................................... 55

IV.    THE STATES HAVE SUFFICIENTLY PLED THEIR CONSUMER PROTECTION CLAIMS CONSISTENT WITH THE REQUIREMENTS OF EACH STATE. ........................................................................... 57

    A.    Kentucky and South Carolina Are Entitled to Monetary Relief. ............................................................... 60

    B.    Any State Required to Allege Deceptive Conduct Has Done So. ..................................................................... 62

    C.    The States Have Sufficiently Pled Unfair or Unconscionable Conduct or Unfair Methods of Competition under their Respective State Laws. ............................................... 73

    D.    Indiana, Maine, and Michigan Possess Statutory Authority to Challenge the Conduct Alleged in the Amended Complaint under their State Consumer Protection Laws. ........................ 88

    E.    New Hampshire Has Sufficiently Alleged Intrastate Nexus and North Carolina Is Not Required to Plead Substantial Effects. .......................................................................... 91

    F.    Vermont Does Not Assert a State Consumer Protection Law Claim. ................................................................................. 94

    G.    Indirect Purchasers Have Standing under Florida and Louisiana Consumer Protection Laws. ........................................... 95

V.    CONCLUSION ........................................................................ 96

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Ackre v. Chapman & Chapman, P.C.,
   2010 ND 167 (N.D. 2010) .......................................................................... 69

Alexander v. New Jersey Power & Light Co.,
   122 A.2d 339 (N.J. 1956) ........................................................................... 33

Alfred L. Snapp & Son v. Puerto Rico,
   458 U.S. 592 (1982) ............................................................................ 16, 17

Am. Booksellers Found. v. Dean,
   342 F.3d 96 (2d Cir. 2003) .......................................................................... 56

Am. Rockwool, Inc. v. Owens-Corning Fiberglass Corp.,
   640 F. Supp. 1411 (E.D.N.C. 1986) ..................................................... 87, 94

Angeles Cellular Tel. Co.,
   20 Cal. 4th 163, 180-81 (1999) .................................................................. 27

Aryeh v. Canon Bus. Solutions, Inc.,
   55 Cal. 4th 1185 (Cal. 2013) ...................................................................... 80

Ash v. Cont'l Ins. Co.,
   932 A.2d 877 (Pa. 2007) ............................................................................ 70

Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,
   489 U.S. 519 (1983) ................................................................................... 22

Automatic Cigarette Sales, Inc. v. Wilson,
   No. CV 960071766, 1997 WL 35809 (Conn. Super. Ct. 1997) ................ 75

Bardin v. DaimlerChrysler Corp.,
   136 Cal. App. 4th 1255 (2006) ................................................................... 80

Bd. of Comm'rs of Howard Cty. v. Kokomo City Plan Comm'n,
   263 Ind. 282 (1975) ................................................................................... 31

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007) ................................................................................... 19

Berghausen v. Microsoft,
   765 N.E.2d 592 (Ind. Ct. App. 2002) ......................................................... 89

## TABLE OF AUTHORITIES - CONTINUED

**Page(s)**

**Bostick Oil. Co. v. Michelin Tire Corp., Com. Div.,**
  **702 F.2d 1207 (4th Cir. 1983)** ................................................................. 27

**Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,**
  **441 U.S. 1 (1979)** ............................................................................................ 4

**Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,**
  **429 U.S. 477 (1977)** ..................................................................................... 19

**Bunker's Glass Co. v. Pilkington PLC,**
  **75 P.3d 99 (Ariz. 2003)** .............................................................................. 39

**Buradus v. Gen. Cement Products Co.,**
  **52 A.2d 205 (Pa. 1947)** ............................................................................... 70

**Burch v. Goodyear Tire & Rubber Co.,**
  **554 F.2d 633 (4th Cir. 1977)** ...................................................................... 16

**California v. ARC America Corp.,**
  **490 U.S. 93 (1989)** ........................................................... 37, 40, 41, 56

**California v. Frito Lay,**
  **474 F.2d 774 (9th Cir. 1973)** ..................................................................... 30

**California v. Infineon Techs. AG,**
  **2008 WL 4225459 (N.D. Cal. Sept. 11, 2008)** ....................................... 95

**California v. Infineon Techs. AG,**
  **531 F. Supp. 2d 1124 (N.D. Cal. 2007)** ................................... 30, 36, 54

**Californians for Disability Rights v. Mervyn's, LLC,**
  **39 Cal. 4th 223 (2006)** ................................................................................ 66

**Camacho v. Auto Club of S. Cal.,**
  **142 Cal. App. 4th 1394 (2006)** .................................................................. 75

**Cardigan Mt. Sch. v. NH Ins. Co.,**
  **787 F.3d 82 (1st Cir. 2015)** ........................................................................ 93

**Carell v. Shubert Org., Inc.,**
  **104 F. Supp. 2d 236 (S.D.N.Y. 2000)** ...................................................... 24

**Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,**
  **20 Cal. 4th 163 (1999)** .......................................................................... 77, 80**

# TABLE OF AUTHORITIES - CONTINUED

**Page(s)**

**Cheramie Servs., Inc. v. Shell Deepwater Prod. Inc.,**
35 So.3d 1053 (La. Apr. 23, 2010) ............................................................. 96

**Chern v. Bank of Am.,**
15 Cal. 3d 866 (1976).................................................................................. 66

**Cheshire v. Coca-Cola Bottling Affiliated, Inc.,**
758 F. Supp. 1098 (D.S.C. 1990)........................................................... 77, 88

**Ciardi v. Hoffman-La Roche, Ltd.,**
762 N.E.2d 303 (Mass. 2002) ........................................................ 75, 77, 84

**Collins v. Main Line Bd. of Realtors,**
304 A.2d 493 (Pa. 1973) ............................................................................. 26

**Com. ex rel Corbett v. Peoples Benefit Serv., Inc.,**
923 A.2d 1230 (Pa. Commw. Ct. 2007)....................................................... 72

**Com. ex rel. Creamer v. Monumental Props., Inc.,**
329 A.2d 812 (Pa. 1974) ............................................................................. 70

**Com. ex rel. Zimmerman v. Nickel,**
26 Pa. D & C 3d. 115 (Pa. Com. Pl. 1983) ............................................ 72, 73

**Com. v. Percudani,**
825 A.2d 743 (Pa. Commw. Ct. 2003)......................................................... 73

**Com. v. Percudani,**
844 A.2d 35 (Pa. Commw. Ct. 2004)........................................................... 71

**Comes v. Microsoft Corp.,**
646 N.W.2d 440 (Iowa 2002) ............................................................... 28, 39

**Commonwealth of Ky. v. Marathon Petroleum Co. LP,**
191 F. Supp. 3d 694 (W.D. Ky. 2016)...................................................... 75, 77

**Commonwealth v. ABAC Pest Control, Inc.,**
621 S.W.2d 705 (Ky. App. Ct. 1981) ........................................................... 61

**Connecticut v. Am. Elec. Power Co., Inc.,**
582 F.3d 309 (2d Cir. 2009)................................................................... 18, 19

**Consolidated Ice Mfg. Co. v. Medford,**
18 Pa. D. 293 (Phila. 1908).......................................................................... 34

## TABLE OF AUTHORITIES - CONTINUED

**Page(s)**

**Daugherty v. Am. Honda Motor Co.,**
  **144 Cal. App. 4th 824 (2006)** .................................................. **75**

**Day v. AT&T Corp.,**
  **63 Cal. App. 4th 325 (1998)** ................................................... **66**

**Delaney v. Bank of Am. Corp.,**
  **766 F.3d 163 (2d Cir. 2014)** .................................................. **29**

**Donovan v. Dig. Equip. Corp.,**
  **883 F. Supp. 775 (D. N.H. 1994)** ........................................... **27**

**Elkins v. Microsoft Corp.,**
  **817 A.2d 9 (Vt. 2002)** .................................................. **26, 94**

**Environamics Corp. v. Ferguson Enters.,**
  **No. Civ. 00-579-JD, 2001 WL 1134727 (D.N.H. Sept. 24, 2001)** ............ **92**

**Evans v. Utah,**
  **963 P.2d 177 (Utah 1998)** .................................................. **26**

**F. Hoffman-La Roche Ltd. v. Empagran S.A.,**
  **542 U.S. 155 (2004)** ..................................................... **6, 14**

**F. Ray Moore Oil Co. v. State,**
  **341 S.E.2d 371 (N.C. Ct. App. 1986)** ....................................... **34**

**Farmers Ins. Exch. v. Superior Court,**
  **2 Cal. 4th 377 (1992)** ...................................................... **79**

**Fido's Fences, Inc. v. Canine Fence Co.,**
  **672 F. Supp. 2d 303 (E.D.N.Y. 2009)** ....................................... **45**

**Fletcher v. Sec. Pac. Nat'l Bank,**
  **23 Cal. 3d 442 (1979)** ...................................................... **66**

**Flood v. Kuhn,**
  **407 U.S. 258 (1972)** ........................................................ **56**

**Formula One Licensing, B.V. v. Purple Interactive Ltd.,**
  **No. C 00-2222 MMC, 2001 WL 34792530 (N.D. Ca. Feb 6, 2001)** ............ **60**

**Free v. Abbott Labs. Inc.,**
  **176 F.3d 298, 299 (5th Cir. 1999)** .......................................... **40**

## TABLE OF AUTHORITIES - CONTINUED

**Page(s)**

**Freeman Indus., LLC v. Eastman Chem. Co.,**
  172 S.W.3d 512 (Tenn. 2005) .................................................................... 53

**FTC v. Bronson Partners, LLC,**
  654 F.3d 359 (2d Cir. 2011) ...................................................................... 11

**FTC v. Cement Inst.,**
  333 U.S. 683 (1948) .................................................................................. 70

**FTC v. Cephalon, Inc.,**
  100 F. Supp. 3d 433 (E.D. Pa. 2015) .................................................... 12, 13

**FTC v. Com. Planet, Inc.,**
  815 F.3d 593 (9th Cir. 2016) .................................................................... 11

**FTC v. Communidyne, Inc.,**
  No. 93 C 6043, 1993 WL 558754 (N.D. Ill. Dec. 3, 1993) ......................... 59

**FTC v. Consumer Health Benefits Ass'n,**
  No. 10-CV-3551-ILG-RLM, 2012 WL 1890242 (E.D.N.Y. May 23, 2012) ................ 69

**FTC v. Ind. Fed. of Dentists,**
  476 U.S. 447 (1986) .............................................................................. 72, 89

**FTC v. Med. Billers Network, Inc.,**
  543 F. Supp. 2d 283 (S.D.N.Y. 2008) ....................................................... 59

**FTC v. Motion Picture Adver. Serv. Co.,**
  344 U.S. 392 (1953) .................................................................................. 76

**FTC v. Mylan Labs., Inc.,**
  62 F. Supp. 2d 25 (D.D.C. 1999) ......................................................... 12, 13

**FTC v. Mylan Labs., Inc.,**
  99 F. Supp. 2d 1 (D.D.C. 1999) .......................................................... 32, 43

**FTC v. Nat'l Lead Co.,**
  352 U.S. 419 (1957) .................................................................................. 74

**FTC v. Sperry and Hutchinson Co.,**
  405 U.S. 233 (1972) ....................................................................... 72, 73, 81

**Garrett Day LLC v. Int'l Paper Co.,**
  No. 3:15-cv-36, 2017 WL 633467 (S.D. Ohio Feb. 15, 2017) ................... 38

## TABLE OF AUTHORITIES - CONTINUED

**Page(s)**

Gatt Commc'ns Inc. v. PMC Assoc., LLC,
   711 F.3d 68 (2d Cir. 2013) ................................................................. 20, 21

Georgia v. Pa. R.R. Co.,
   324 U.S. 439, 447-48 (1945) ............................................................... 16, 17

Globe & Rutgers Fire Ins. Co., v. Firemen's Fund Ins. Co.,
   97 Miss. 148 (Miss. 1910) ....................................................................... 50

Govereau v. Wellish,
   No. 2:12-CV-00805-KJD-VCF, 2012 WL 5215098 (D. Nev. Oct. 19, 2012) ............. 68

Group Health Plans v. Philip Morris, Inc.,
   621 N.W.2d 2 (Minn. 2001) ....................................................................... 67

Hair Excitement, Inc. v. L'Oreal U.S.A., Inc.,
   965 A.2d 1032 (N.H. 2009) ....................................................................... 84

Hanover Shoe, Inc. v. United Shoe Mach. Corp.,
   392 U.S. 481 (1968) ................................................................................. 10

Harvey v. Blockbuster,
   384 F. Supp. 2d 749 (D.N.J. 2005) ............................................................. 32

Hawaii v. Standard Oil Co. of Cal.,
   405 U.S. 251 (1972) ...................................................................... 8, 16, 18

Heath v. Cornelius,
   511 S.W.2d 683 (Tenn. 1974) .................................................................... 36

Hicks v. PGA Tour,
   165 F. Supp. 3d 898 (N.D. Cal. 2016) ......................................................... 60

Hood v. BASF Corp.,
   No. 56863, 2006 WL 308378 (Miss. Ch. Ct. Jan. 17, 2006) ........................ 49, 50, 76

Hyde v. Abbot Labs. Inc.,
   473 S.E.2d 680 (N.C. Ct. App. 1996) ........................................................... 26

Illinois Brick Co. v. Illinois,
   431 U.S. 720 (1977) ....................................................................... *passim*

Indirect Purchaser Plaintiffs v. Toshiba Corp.,
   No. 16-16427 (9th Cir. Aug. 12, 2016) …...……………..…..……………….…..14

## TABLE OF AUTHORITIES - CONTINUED

**Page(s)**

*In re Aggrenox Antitrust Litig.,*
   94 F. Supp. 3d 224 (D. Conn. 2015) ....................................................... 58

*In re Aggrenox Antitrust Litig.,*
   No. 3:14:-md-2516, 2016 WL 4204478 (D. Conn. Aug 9, 2016) ................ 58, 59, 95

*In re Aluminum Warehousing Antitrust Litig.,*
   833 F.3d 151 (2d Cir. 2016).................................................................. 58, 59

*In re Antibiotic Antitrust Actions,*
   333 F. Supp. 278 (S.D.N.Y. 1971) ............................................................ 31

*In re Auto. Parts Antitrust Litig.,*
   No. 12-md-02311, 2014 WL 2993753 (E.D. Mich. July 3, 2014) ............................. 52

*In re Cardizem CD Antitrust Litig.,*
   391 F.3d 812, 818 (6th Cir. 2004)........................................................ 35, 36

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.,*
   No. 1:14-md-2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015)................... 53, 94

*In re Cathode Ray Tube ("CRT") Antitrust Litig.,*
   No. C-07-5944 JST, 2016 WL 3648478 (N.D. Cal. July 7, 2016) ............................ 14

*In re Chocolate Confectionary Antitrust Litig.,*
   602 F. Supp. 2d 538 (M.D. Pa. 2009) ............................................. 50, 51, 54

*In re Chocolate Confectionary Antitrust Litig.,*
   749 F.Supp.2d 224 (M.D. Pa. Sept. 21, 2010) ........................................... 92

*In re Cipro Cases I & II,*
   61 Cal. 4th 116 (2015) ..................................................................... 27, 80

*In re D.C.,*
   679 A.2d 634 (N.J. 1995) .................................................................... 32, 33

*In re DDAVP Direct Purchaser Antitrust Litig.,*
   585 F.3d 677 (2d Cir. 2009)................................................................... 21

*In re DDAVP Indirect Purchaser Antitrust Litig. v. Ferring Pharms. Inc.,*
   903 F. Supp. 2d 198 (S.D.N.Y. Oct. 17, 2012) ..................................... 53, 92

*In re Dig. Music Antitrust Litig.,*
   812 F.Supp.2d 390 (S.D.N.Y. 2011) ............................................. 52, 68, 95

## TABLE OF AUTHORITIES - CONTINUED

**Page(s)**

In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.,
   No. 12-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013) .......................................... 91, 92

In re Fricker,
   115 B.R. 809 (Bankr. E.D. Pa. 1990) ........................................................................ 71

In re K-Dur Antitrust Litig.,
   338 F. Supp. 2d 517 (D.N.J. 2004) ........................................................................ 4, 6

In re Lidoderm Antitrust Litig.,
   103 F. Supp. 3d 1155 (N.D. Cal. 2015) ...................................................................... 94

In re Lorazepam & Clorazepate Antitrust Litig.,
   205 F.R.D. 369 (D.D.C. 2002) ....................................................................... 31, 34, 35

In re Magnesium Oxide Antitrust Litig.,
   No. 10-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ............................................ 51

In re Milbourne,
   108 B.R. 522 (Bankr. E.D. Pa. 1989) ........................................................................ 72

In re New Motor Vehicles Canadian Exp. Antitrust Litig.,
   350 F. Supp. 2d 160 (D. Me. 2004) ................................................................*passim*

In re Opana ER Antitrust Litig.,
   162 F. Supp. 3d 704 (N.D. Ill.2016) ........................................................................ 58

In re Optical Disk Drive Antitrust Litig.,
   MDL No. 2143, 2014 WL 1379197 (N.D. Cal. Apr. 8, 2014) .................................... 38

In re Packaged Ice Antitrust Litig.,
   779 F. Supp. 2d 642 (E.D. Mich. 2011) ................................................................. 5, 6

In re Packaged Seafood Prods. Antitrust Litig.,
   No. 15-md-2670, 2017 WL 1010329, --- F. Supp. 3d --- (S.D. Cal. Mar. 14, 2017) . 94

In re Plavix Indirect Purchaser Antitrust Litig.,
   No. 1:06-cv-226, 2011 WL 335034 (S.D. Ohio Jan 31, 2011) .................................. 60

In re Propranolol Antitrust Litig.,
   16-CV-09901, 2017 WL 1287515, --- F. Supp. 3d --- (S.D.N.Y. April 6, 2017) ........ 22

In re Refrigerant Compressors Antitrust Litig.,
   No. 2:09-md-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) .......................... 93

## <u>TABLE OF AUTHORITIES - CONTINUED</u>

<u>Page(s)</u>

In re Smith,
  866 F.2d 576 (3d. Cir. 1989) .................................................................. 72

In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,
  No. 14-md-02503-DJC, 2015 WL 5458570 (D. Mass. Aug. 16, 2015) .................... 52

In re Static Random Access Memory (SRAM) Antitrust Litig.,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) .............................................. 62, 71

In re TFT-LCD (Flat Panel) Antitrust Litig.,
  MDL No. 1827, 2014 WL 4652145 (N.D. Cal. Sept. 18, 2014) ............... 12, 13, 14, 95

In re Tobacco II Cases,
  46 Cal. 4th 298 (2009) ...................................................................... 66

In re Vitamins Antitrust Litig.,
  No. Misc. 99-197 (TFH), 2000 WL 1475705 (D.D.C. May 9, 2000) ........................ 95

In re Warfarin Sodium Antitrust Litig.,
  214 F.3d 395 (3d Cir. 2000) ...................................................... 4, 22, 23

Johnson v. Microsoft Corp.,
  834 N.E.2d 791 (Ohio 2005) ................................................................ 42

Jorgenson v. Agway, Inc.,
  2001 ND 104 (N.D. 2001) .................................................................. 69

Kasky v. Nike, Inc.,
  20 Cal. 4th 939 (2002) ...................................................................... 66

Keasbey & Mattison Co. v. FTC,
  159 F.2d 940 (6th Cir. 1947) .............................................................. 74

Klein v. Chevron U.S.A.,
  202 Cal. App. 4th 1342 (2012) ............................................................ 75

Kugler v. Koscot Interplanetary, Inc.,
  293 A.2d 682 (N.J. Super. Ct. Ch. Div. 1972) ........................................ 86

Kugler v. Romain,
  279 A.2d 640 (N.J. 1971) .................................................................. 85

L.C. Williams Oil Co. v. Exxon Corp.,
  625 F. Supp. 477 (M.D.N.C. 1985) ........................................................ 87

## TABLE OF AUTHORITIES - CONTINUED

**Page(s)**

**LaChance v. U.S. Smokeless Tobacco Co.,**
931 A.2d 571 (N.H. 2007) .................................................................. 77, 84

**Lemelledo v. Beneficial Mgmt. Corp. of Am.,**
696 A.2d 546 (N.J. 1997) ........................................................................ 85

**Leon v. Rite Aid Corp.,**
774 A.2d 674 (N.J. Super Ct. App. Div. 2001) ........................................ 86

**List v. Burley Tobacco Growers' Co-op Ass'n,**
151 N.E. 471 (Ohio 1926) ................................................................... 42, 43

**Lorix v. Crompton Corp.,**
736 N.W.2d 619 (Minn. 2007) ................................................................. 26

**Mack v. Bristol-Myers Squibb Co.,**
673 So. 2d 100 (Fla. Dist. Ct. App. 1996) ......................................... 75, 95

**Major v. Microsoft Corp.,**
60 P.3d 511 (Okla. Civ. App. 2002) ........................................................ 38

**Marco Island Cable, Inc. v. Comcast Cablevision of S., Inc.,**
2006 WL 1814333 (M.D. Fla. July 3, 2006) ............................................. 75

**Merck & Co. Inc. v. Lyon,**
941 F. Supp. 1443 (M.D.N.C. 1996) ........................................................ 93

**Metts v. Murphy,**
363 F.3d 8 (1st Cir. 2004) ....................................................................... 93

**Meyers v. Bayer AG,**
735 N.W.2d 448 (Wisc. 2007) ................................................................. 54

**Mfrs. Life Ins. Co. v. Super. Ct.,**
10 Cal. 4th 257 (1995) ......................................................................... 79, 80

**Milford Lumber Co. v. RCb Realty,**
780 A.2d 1259 (N.H. 2001) .......................................................... 76, 83, 84

**Miller v. Am. Family Publishers,**
663 A.2d 643 (N.J. Super. Ct. Ch. Div. 1995) ........................................ 85

**Mississippi C.R. Co., v. Knight,**
138 Miss. 621 (1925) ............................................................................... 49

## TABLE OF AUTHORITIES - CONTINUED

Page(s)

**Missouri ex rel. Koster v. Harris,**
    847 F.3d 646 (9th Cir. 2017)........................................................................ 18

**Moniz v. Bayer Corp.,**
    484 F. Supp. 2d 228 (D. Mass. 2007)........................................................... 75

**Morris Run Coal Co. v. Barclay Coal Co.,**
    68 Pa. 173 (1871) ......................................................................................... 34

**Morrison v. Viacom, Inc.,**
    78 Cal. Rptr. 2d 133 (1998) ......................................................................... 25

**Mr. Frank, Inc. v. Waste Mgmt., Inc.,**
    591 F. Supp. 859 (N.D. Ill. 1984) ................................................................ 46

**Nat'l Soc. of Prof'l Engineers v. United States,**
    435 U.S. 679 (1978) ....................................................................................... 6

**New York v. Feldman,**
    210 F. Supp. 2d 294 (S.D.N.Y. 2002) .......................................................... 33

**Nicosia v. Amazon.com, Inc.,**
    834 F.3d 220 (2d Cir. 2016) .......................................................................... 6

**On Children's Television, Inc. v. Gen. Foods Corp.,**
    35 Cal. 3d 197 (1983).................................................................................. 80

**Pace Elec., Inc. v. Canon Computer Sys., Inc.,**
    213 F.3d 118 (3d Cir. 2000)......................................................................... 20

**Payne v. United Cal. Bank,**
    23 Cal. App. 3d 850 (1972)......................................................................... 66

**Peery v. Hansen,**
    120 Ariz. 266 (App. 1978)...................................................................... 64, 65

**People ex rel. Babbitt v. Green Acres Trust,**
    618 P.2d 1086 (Ariz. Ct. App. 1980) .......................................................... 65

**People v. Orange Cnty. Charitable Servs.,**
    73 Cal. App. 4th 1054 (1999) ...................................................................... 66

**People v. Rattenni,**
    613 N.E.2d 155 (N.Y. 1993) ........................................................................ 52

## TABLE OF AUTHORITIES - CONTINUED

Page(s)

People v. Super. Ct. of L.A.,
   9 Cal. 3d 283, 286 (1973) ........................................................................ 7

Plowman v. Bagnal,
   316 S.C. 283 (1994) .............................................................................. 76

Porter v. Warner Holding Co.,
   328 U.S. 395 (1946) ......................................................................... 13, 14

Purdue Pharma L.P. v. Kentucky,
   704 F.3d 208 (2d Cir. 2013) .................................................................. 18

Raad v. Wal–Mart Stores, Inc.,
   13 F. Supp. 2d 1003 (D. Neb. 1998) ..................................................... 83

Riehle v. Bank of Am., N.A.,
   No. CV-13-00251-OHX-NVW, 2013 WL 1694442 (D. Ariz. Apr. 18, 2013) ............. 65

Roberts Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co.,
   91 Hawaii 225 (1999) ............................................................................ 77

Rohrer v. Knudson,
   203 P.3d 759 (Mont. 2009) .............................................................. 76, 82

Roncari Dev. Co. v. GMG Enters., Inc.,
   45 Conn. Supp. 408 (Conn. Super. Ct. 1997) ....................................... 75

Schwartz v. Laundry & Linen Supply Drivers' Union, Local 187,
   339 Pa. 353 (1940) ................................................................................ 34

SEC v. First City Fin. Corp.,
   890 F.2d 1215 (D.C. Cir. 1989) ............................................................. 11

SEC v. Pentagon Cap. Mgmt.,
   725 F.3d 279 (2d Cir. 2013) ............................................................. 11, 12

SEC v. Whittemore,
   691 F. Supp. 2d 198 (D.D.C. 2010) ...................................................... 11

SEC v. Wyly,
   71 F. Supp. 3d 399 (S.D.N.Y. 2014) ..................................................... 11

Seldon v. Home Loan Servs., Inc.,
   647 F. Supp. 2d 451 (E.D. Pa. 2009) .................................................... 71

## <u>TABLE OF AUTHORITIES - CONTINUED</u>

<u>Page(s)</u>

**Sell it Social, LLC v. Acumen Brands, Inc.,**
   No. 14 Civ. 3491 (RMB), 2015 WL1345927 (S.D.N.Y. Mar. 20, 2015) ..................... 23

**Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,**
   742 F.2d 786 (3d Cir. 1984) ..................................................................................... 86

**Shea v. First Federal Savings and Loan Ass'n of New Haven,**
   439 A.2d 997 (Conn. 1981) ...................................................................................... 28

**Sheet Metal Worker Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,**
   737 F. Supp. 2d 380 (E.D. Pa. 2010) ....................................................................... 53

**Skeer v. EMK Motors, Inc.,**
   455 A.2d 508 (N.J. Super. Ct. App. Div. 1982) ......................................................... 85

**Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,**
   No. 2:03-CV-30, Dkt. 323 (E.D. Tenn. Mar. 11, 2005) .............................................. 35

**SmithKline Beecham Corp. v. Apotex Corp.,**
   383 F. Supp. 2d 686 (E.D. Pa. 2004) ....................................................................... 19

**Sperry v. Crompton Corp.,**
   863 N.E.2d 1012 (N.Y. 2007) ................................................................................... 26

**SPGGC LLC v. Blumenthal,**
   505 F.3d 183 (2d Cir. 2007) ..................................................................................... 56

**Standard Oil Co. of Ky. v. State,**
   107 Miss. 377 (1914) ............................................................................................... 49

**State by Humphrey v. Philip Morris Inc.,**
   551 N.W.2d 490 (Minn. 1996) .................................................................................. 67

**State ex rel Hood State of Miss. v. BASF Corp.,**
   No. 56863, 2006 WL 308378 (Miss. Ch. Ct. Jan. 17, 2006) .............................. 49, 76

**State ex rel. Corbin v. Tolleson,**
   773 P.2d 490 (Ariz. Ct. App. 1989) .......................................................................... 65

**State ex rel. Dann v. Am. Int'l Group, Inc.,**
   C.P. No. CV-07-633857 (Cuyahoga Cty. Ct. Comm. Pl. June 30, 2008) ................ 43

**State ex rel. Inman v. Brock,**
   622 S.W.2d 36 (Tenn. 1981) .............................................................................. 35, 36

## TABLE OF AUTHORITIES - CONTINUED

Page(s)

**State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.,**
694 N.W.2d 518 (Ia. 2005) ........................................................................ 74

**State ex rel. Miller v. Vertrue, Inc.,**
834 N.W.2d 12 (Ia. 2013) .................................................................. 81, 82

**State ex rel. Moore v. Molpus,**
578 So.2d 624 (Miss. 1991) ..................................................................... 49

**State ex rel. Spaeth v. Eddy Furniture Co.,**
386 N.W.2d 901 (N.D. 1986) ............................................................. 69, 70

**State ex rel. Stenberg v. Consumer's Choice Foods, Inc.,**
276 Neb. 481 (2008) ................................................................................ 83

**State ex rel. Wilson v. Ortho-McNeil-Janssen Pharma., Inc.,**
777 S.E.2d 176 (S.C. 2015) ..................................................................... 87

**State of Cal. ex rel. Van de Kamp v. Texaco, Inc.,**
46 Cal. 3d 1147 (1988) ............................................................................ 27

**State v Heath,**
806 S.W.2d 535 (Tenn. Ct. App. 1990) .............................................. 35, 36

**State v. Black,**
100 Wash. 2d 793 (1984) ................................................................... 76, 77

**State v. Directory Pub. Serv., Inc.,**
No. C1-95-1470, 1996 WL 12674 (Minn. Ct. App. Jan. 16, 1996) ........... 67

**State v. Liberty Mut. Holding Co.,**
No. X09CV064023087, 2009 WL 943094 (Conn. Super. Ct. 2009) ............ 37, 38, 42

**State v. Marsh & McLennan Cos.,**
286 Conn. 454 (Conn. 2008) ............................................................. 41, 42

**State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v.**
**Qwest Commc'ns Intern., Inc.,**
904 A.2d 775 (N.J. App. Div. 2006) .......................................................... 86

**Sullivan v. DB Inv., Inc.,**
667 F.3d 273, 313 (3d Cir. 2011) ............................................................. 10

**Takiguchi v. MRI Int'l, Inc.,**
47 F. Supp. 3d 1100 (D. Nev. 2014) ......................................................... 69

## TABLE OF AUTHORITIES - CONTINUED

**Page(s)**

**Tri-State Rubbish v. Waste Mgmt., Inc.,**
875 F. Supp. 8, 14 (D. Me. 1994).................................................................. 28

**Tungate v. MacLean-Stevens Studios, Inc.,**
714 A.2d 792 (Me. 1998).................................................................. 90, 91

**Turner v. Shared Towers VA, LLC,**
107 A.3d 1236 (N.H. 2014) .................................................................. 83

**U.S. ex rel Zissler v. Regents of the Univ. of Minn.,**
992 F. Supp. 1097 (D. Minn. 1998) .................................................................. 11

**U.S. v St. Regis Paper Co.,**
285 F.2d 607 (2d Cir. 1960).................................................................. 90

**United States v. KeySpan Corp.,**
763 F. Supp. 2d 633 (S.D.N.Y. 2011) .................................................... 12, 13, 14, 15

**United States v. Morgan Stanley,**
881 F. Supp. 2d 563 (S.D.N.Y. 2012) .................................................. 11, 12, 13

**United States v. Philip Morris USA, Inc.,**
396 F.3d 1190 (D.C. Cir. 2005).................................................................. 15

**United States v. W. T. Grant Co.,**
345 U.S. 629 (1953) .................................................................. 5

**Watts v. Medicis Pharm. Corp.,**
365 P.3d 944 (Ariz. 2016).................................................................. 64

**Weinberg v. Sun Co., Inc.,**
777 A.2d 442 (Pa. 2001) .................................................................. 71

**Westfield Group v. Campisi,**
No. 2:02-cv-997, 2006 WL 328415 (W.D. Pa. 2006) ................................ 72

**Westport Taxi Serv. v. Westport Transit Dist.,**
664 A.2d 719 (Conn. 1995) .................................................................. 28

**Wisconsin v. Mitchell,**
508 U.S. 476 (1993) .................................................................. 77

**XF Enters., Inc. v. BASF Corp.,**
47 Pa. D. & C. 4th 147 (2000).................................................................. 34

## TABLE OF AUTHORITIES - CONTINUED

Page(s)

### STATUTES

Clayton Act ........................................................................................*passim*

Sherman Act .......................................................................................*passim*

Ala. Code §8-19-5(27) ....................................................................... 79

A.R.S. § 41-192(A)(6) ........................................................................ 30

A.R.S. § 44-1408(A) ........................................................................... 30

Cal. Bus. & Prof. Code § 17200 ....................................................... 79

Cal. Bus. & Prof. Code § 17500 ....................................................... 65, 66

Colo. Rev. Stat. 6-4-103(5) ............................................................... 45

Conn. Gen. Stat. § 35-30 .................................................................. 45

Conn. Gen. Stat. § 35-32 .................................................................. 7, 41

Fl. Stat. § 501.204(2) ........................................................................ 75

Haw. Rev. Stat. § 480-2(a) ............................................................... 74, 75

Haw. Rev. Stat. § 480-4 .................................................................... 46

Haw. Rev.Stat. § 480-3 ..................................................................... 75

Illinois Antitrust Act, 740 ILCS 10/1 ............................................... 46

Ind. Code § 24-1-1-2 ........................................................................ 32

Ind. Code § 24-1-2-5 ........................................................................ 31

Ind. Code § 24-5-0.5-3(a) ................................................................. 81, 89

Iowa Code § 714.16 .......................................................................... 74, 81

Iowa Code § 553.2 ............................................................................ 28

Kan. Stat. Ann. 50-163(d)(5) ............................................................ 28

## TABLE OF AUTHORITIES - CONTINUED

Page(s)

Ky. Rev. Stat. Ann. § 367.200 ....................................................................... 61

Ky. Rev. Stat. Ann. § 367.990 ....................................................................... 61

Ky. Rev. Stat. Ann. § 367.190 ................................................................... 7, 75

LAC 16:III Chapter 5, § 501 ........................................................................ 75

10 M.R.S. § 1101 ........................................................................................ 28

Mass. Gen. Laws c. 93A, § 2(a) .................................................................. 74

Mich Comp Laws § 445.910 ............................................................ 75, 76, 90, 91

Mich. Comp. Laws § 445.771 ....................................................................... 47

Mich. Comp. Laws § 445.903 ....................................................................... 91

Minn. Stat. § 325D.44 ................................................................................. 67

Miss. Code § 75-24-3(c) .............................................................................. 76

Miss. Code § 75-24-5 .................................................................................. 76

Miss. Code § 75-21-1 .................................................................................. 48

Miss. Code § 75-24-9 ................................................................................... 7

Miss. Code § 79-4-15.01 .............................................................................. 50

Mont. Code Ann. § 30-14-101 ...................................................................... 82

Mont. Code Ann. § 30-14-103 ................................................................. 74, 82

Mont. Code Ann. § 30-14-201 ...................................................................... 82

Mont. Code Ann. § 30-14-205 ...................................................................... 82

Neb. Rev. Stat. § 59-1602 ....................................................................... 76, 83

Neb. Rev. Stat. § 59-829 .............................................................................. 76

Nev. Rev. Stat. § 598.0953 .......................................................................... 68

**TABLE OF AUTHORITIES - CONTINUED**

Page(s)

**Nev. Rev. Stat. § 598A.010** ........................................................................... 50

**Nev. Rev. Stat. § 598A.060** ........................................................................... 51

**NH RSA 356:11** ............................................................................................... 84

**NH RSA 356:2** ................................................................................................. 51

**NH RSA 356:4** ................................................................................................. 51

**NH RSA 358-A:13** ........................................................................................... 76

**NH RSA 358-A:2** .......................................................................... 74, 76, 83, 91

**N.J. Stat. Ann. 52:17A-4** ............................................................................... 32

**N.J. Stat. Ann. 56:8-1** ................................................................................... 84

**N.J. Stat. Ann. 56:8-2** ................................................................................... 84

**N.J. Stat. Ann. 56:9-1** ................................................................................... 32

**N.J. Stat. Ann. 56:9-12(b)** ............................................................................ 33

**N.J. Stat. Ann. 56:9-18** ................................................................................. 33

**N.J. Stat. Ann. 56:9-6** ................................................................................... 32

**N.Y. Exec. Law § 63(12)** ................................................................................ 33

**N.Y. Exec. Law § 63.1** ................................................................................... 44

**N.Y. Gen. Bus. § 340** ..................................................................................... 52

**N.Y. Gen. Bus. Law § 342** ................................................................. 7, 43, 44

**N.C.G.S. § 75-1.1** ............................................................................. 86, 87, 94

**N.C.G.S. § 75-1** ................................................................................ 53, 74, 87, 94

**N.C.G.S. § 75-15** ............................................................................................. 34

**N.C.G.S. § 75-16** ............................................................................................. 34

## TABLE OF AUTHORITIES - CONTINUED

Page(s)

N.D.C.C. § 51-15-02...................................................................... 69, 70

N.D.C.C. § 51-08.1......................................................................... 70

79 Okla. Stat. 205.......................................................................... 38

Oregon Revised Statutes 646.715(2) ............................................. 46

71 P.S. § 732-204 (c) ...................................................................... 34

73 P.S. § 201-2 (4) .......................................................................... 71

73 P.S. § 201-4 ............................................................................... 71

73 P.S. § 201-9.2 ............................................................................ 71

S.C. Code § 39-5-10........................................................................ 87

S.C. Code § 39-5-110...................................................................... 61

S.C. Code § 39-5-140...................................................................... 61

S.C. Code § 39-5-20........................................................................ 87

S.C. Code § 39-5-50........................................................................ 61

Tenn. Code Ann. § 47-25-101 ................................................... 35, 53

Tenn. Code Ann. § 8-6-109 ....................................................... 35, 36

9 V.S.A. § 2453................................................................................ 94

9 V.S.A. § 2465(b) ........................................................................... 94

## OTHER AUTHORITIES

Einer Elhauge, Disgorgement as an Antitrust Remedy,
   76 Antitrust L.J. 79 (2009) ..................................................... 12

Black's Law Dictionary (10th ed. 2014) ......................................... 79

## TABLE OF AUTHORITIES - CONTINUED

**Page(s)**

**RULES**

**Fed.R.Civ.P. 9(b)**.................................................................................*passim*

**Local Rule 7(a)(1)** .............................................................................*passim*

## INTRODUCTION

As one part of an on-going investigation of widespread anticompetitive activity in the generic drug industry, the Attorneys General of forty (40) states (the "States") initiated this suit against six generic drug manufacturers, asserting claims under federal antitrust laws and state antitrust and consumer protection laws.[1]  The Amended Complaint focuses on two drugs—Doxycycline Hyclate Delayed Release ("Doxy DR") and Glyburide—and is the result of a nearly three-year antitrust investigation by the State of Connecticut.[2]  This litigation commenced shortly after two high-level executives at Defendant Heritage Pharmaceuticals, Inc., Jason Malek, the former president, and Jeffrey Glazer, the former chairman and chief executive officer, entered into plea agreements with the U.S. Department of Justice after being charged with two counts of criminal violations of the Sherman Antitrust Act.

As chief legal officers, the Attorneys General represent the States in their sovereign capacities to enforce both state and federal law.  This sovereign enforcement action has been brought to advance the public interest and address anticompetitive activity in the generic drug industry that has led to higher prices

---

[1] The States include the States of Connecticut, Alabama, Arizona, California, Colorado, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, Tennessee, Utah, Vermont, Washington and Wisconsin and the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, by and through their respective attorneys general.

[2] For a description of the factual allegations of the Amended Complaint, the States direct the Court to their companion brief, the States' Joint Consolidated Opposition to the Motions to Dismiss of Defendants Mylan, Mayne, Aurobindo, and Teva ("Consolidated Opp."), filed simultaneously with this opposition.

for consumers and state governments.  As sovereigns, the States seek injunctive and equitable relief, including disgorgement, in an effort to remedy and deter future illegal conduct.  Some States also seek civil penalties and other unique remedies under their respective state laws.  And other States seek damages on behalf of governmental purchasers and/or damages on behalf of consumers in their state.

In their Memorandum in Support of Joint Motion to Dismiss the States' First Amended Complaint (Dkt. #282-1) ("Joint Mem."), Defendants challenge the States' ability to obtain injunctive and monetary relief under federal antitrust law and the States' standing to bring federal claims under the Sherman Act.  (Joint Mem. at 4-13.)  Each of these arguments fails under well-established law.  Simply put, there is nothing novel or unprecedented about State Attorneys General bringing an enforcement action under federal law where companies engage in price-fixing, agreements to allocate markets and other anticompetitive activity. The State Attorneys General are well within their powers to bring this action, and have sufficiently alleged their federal claims.

Defendants also attack the States' state law antitrust and consumer protection claims.  (Joint Mem. at 13-32.)  Collectively, Defendants' approach may best be described as cursory, conclusory, shotgun and, in many cases, devoid of any actual developed argument.  In many instances, it is difficult to discern what Defendants are actually arguing.  For this reason, the States draw the Court's attention to the requirements of Local Rule 7(a)(1), which permits the Court "to deny a motion or portion thereof that is not adequately briefed."

Moreover, Defendants' arguments simply miss their mark.  Defendants repeatedly misstate, misconstrue or flatly ignore applicable state law. Defendants also make broad pronouncements directed at no particular State about why the "Plaintiffs'" claims fail, ignoring that the forty States' various laws differ in many ways.  Each State Attorney General has brought carefully considered state law claims based on his or her expertise in this area, and each State has supported its claims with sufficient allegations.  The States have tried, as concisely as possible, to address the scores of specific and general arguments raised against each State and, where appropriate, elaborate on the specific requirements of a State's particular laws.  The bottom line, however, is that Defendants present no cogent argument to dismiss any of the States' state antitrust or consumer protection claims for failure to state a claim.

Defendants' motion to dismiss should be denied.

## ARGUMENT

## I.     THE STATES HAVE SUFFICIENTLY ALLEGED FEDERAL ANTITRUST CLAIMS.

### A.     The States Plausibly Allege Ongoing or Threatened Injury.

Defendants rest their argument that injunctive relief is unavailable to the States on the slim reed that the Amended Complaint states that their conspiracies "continued until at least December, 2015" (Am. Compl. ¶¶ 100, 124), and there are "no factual allegations plausibly showing a 'threatened' future injury."  (Joint Mem. at 5.)  Defendants both misread the Amended Complaint and misunderstand the law.

Injunctive relief is a common and appropriate remedy in price-fixing litigation.  See Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 7 n.10 (1979) (quoting Columbia Broad. Sys., Inc. v. Am. Soc. of Composers, Authors and Publishers, 562 F.2d 130, 140 (2d Cir. 1977)).  As a starting point, "injunctive relief under section 16 only requires a threat of loss."  In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 399 (3d Cir. 2000) (citing Cargill, Inc. v. Monfort of Col., Inc., 479 U.S. 104, 109–11 (1986)).  The States allege facts sufficient to support the claim that the threat of loss from Defendants' market allocation and price-fixing is ongoing and that the States are entitled to injunctive relief.  Therefore, their request for injunctive relief should be allowed to progress past the pleading stage.  See In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 550 (D.N.J. 2004) (stating that courts are "loathe at [the pleading] stage in the proceeding to curtail [their] broad equity powers to fashion the most complete relief possible").

The States allege that the conspiracies continued through *at least* December 2015, and that Doxy DR and Glyburide continue to be sold.  The Amended Complaint contains numerous allegations demonstrating that Defendants continue, even now, to have opportunities to collude concerning the sale of these drugs.  The States allege that Defendants interact frequently (Am. Compl. ¶ 48) by attending multiday conferences held by customers (Id. ¶ 49) and various trade shows throughout the year (Id. ¶ 50), which include social events and secluded activities that provide the opportunity to meet with competitors.  (Id. ¶ 51.)  Manufacturers use these events to discuss bids, markets, pricing

strategies and terms, and other competitively sensitive information. (<u>Id.</u>)  Many generic drug executives also attend industry dinners (<u>Id.</u> ¶¶ 55-56) and other social events, such as "Girls Night Out" (<u>Id.</u> ¶ 57.) and "Women in the Industry" dinners.  (<u>Id.</u> ¶ 58.)  The States allege that the Defendants and other generic manufacturers routinely communicate about bids and pricing strategy. (<u>Id.</u> ¶¶ 61-63.)  Such allegations have been found sufficient for claims for injunctive relief to survive a motion to dismiss.  <u>See</u> <u>In re Packaged Ice Antitrust Litig.</u>, 779 F. Supp. 2d 642, 668-69 (E.D. Mich. 2011) (holding that allegations of "conduct continuing at least until March 6, 2008, the exact dates being unknown to plaintiffs" and "describ[ing] Defendants' ongoing opportunities to conspire" as "sufficient at the pleading stage to permit [plaintiffs'] claim for injunctive relief to go forward").

However, even if Defendants' claim that unlawful coordination has ended, voluntary cessation of illegal conduct does not deprive the court of the power to grant injunctive relief.  <u>United States v. W. T. Grant Co.</u>, 345 U.S. 629, 633 (1953).  As an initial matter, courts do not assume that a defendant's illegal conduct has ended based solely on a defendant's word:  "'When defendants are shown to have settled into a continuing practice or entered into a conspiracy violative of antitrust laws, courts will not assume that it has been abandoned without clear proof.'"  <u>Id.</u> at 632, n.5 (quoting <u>United States v. Oregon State Med. Soc'y</u>, 343 U.S. 326, 333 (1952)).  Defendants here have not come forward with any proof, let alone "clear proof" that they have abandoned the illegal conduct alleged in the Amended Complaint.  <u>See</u> <u>In re Packaged Ice Antitrust Litig.</u>, 779 F. Supp. 2d at 668-69 (holding that defendants had not met their "burden of establishing that the

alleged harm will not be repeated" when denying their motion to dismiss).  Even if Defendants had demonstrated that their illegal conduct has ended, a plaintiff may rely on past conduct where it is demonstrable that plaintiff is "likely to be harmed again in the future in a similar way."  <u>Nicosia v. Amazon.com, Inc.</u>, 834 F.3d 220, 239 (2d Cir. 2016).  The repetition of Defendants' past conduct across at least six different companies and over several years makes injunctive relief an important remedy in this litigation to prevent such conduct by Defendants in the future.

Finally, injunctive relief may be granted to "address the effects of [past] violations that persist."  <u>In re K-Dur Antitrust Litig.</u>, 338 F. Supp. 2d at 550.[3]  The States have alleged harm, springing from Defendants' conduct, that persists to the present day.  The Amended Complaint clearly alleges that the "States, governmental entities and consumers … have been and continue to be forced to pay artificially high prices" due to the Defendants' unlawful market allocation and price-fixing.  (Am. Compl. ¶ 137.)  Moreover, in this public interest action involving only government plaintiffs as enforcing agents, the Court's equitable powers are broader and more flexible than in any private controversy, as are the equitable remedies available to the enforcers.  See <u>F. Hoffman-La Roche Ltd. v. Empagran S.A.</u>, 542 U.S. 155, 170 (2004).

---

[3] <u>See also</u> <u>Nat'l Soc. of Prof'l Engineers v. United States</u>, 435 U.S. 679, 697 (1978) ("Having found the [defendant] guilty of a violation of the Sherman Act, the District Court was empowered to fashion appropriate restraints on the [defendant's] future activities both to avoid a recurrence of the violation and to eliminate its consequences." (citation omitted)).

An injunction is a proper and necessary remedy in this matter, and the States' request for injunctive relief should not be dismissed.[4]

### B. Disgorgement Is Available to Remedy a Sherman Act Violation, Especially Where the Public Interest is at Stake.

The States' only collective claim for monetary relief under federal antitrust law is an equitable claim for "disgorgement of the Defendants' ill-gotten gains" under federal antitrust law in order "to redress the Defendants' violations of

---

[4] Defendants challenge the States' ability to seek injunctive relief under their individual state laws by making only a cursory reference to arguments relating to federal law.  (See Joint Mem. at 24 ("Relatedly, to the extent Plaintiffs seek injunctive relief under any consumer protection statutes, those claims fail because they have not demonstrated any threat of future injury. See supra Part I.A.").)  This one-sentence conclusory statement contains no developed argument and the Court need not consider it.  See Local Rule 7(a)(1).  In any event, the argument fails as it relates to state law claims because, as discussed in the context of the federal law injunctive claim, the States have demonstrated a threat of future injury.  In addition, many States need not prove that the conduct is ongoing to obtain an injunction under their state laws. See, e.g., Conn. Gen. Stat. § 35-32(a) (the Attorney General, acting in the name of the state or as parens patriae, can seek a temporary or permanent injunction "for any violation of the provisions of this chapter"); Cal. Bus & Prof. Code 16754.5 (in Attorney General actions, "the court may, in addition to granting such prohibitory injunctions and other restraints as it may deem expedient to deter the defendant from, and insure against, his committing a future violation of this chapter, grant such mandatory injunctions as may be reasonably necessary to restore and preserve fair competition in the trade or commerce affected by the violation"); People v. Super. Ct. of L.A., 9 Cal. 3d 283, 286 (1973) (under California's Unfair Competition Law, "a court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties restoring if necessary the status quo ante as nearly as may be achieved."); Ky. Rev. Stat. Ann. 367.190 ("whenever [the Attorney General] has reason to believe that any person is using, has used or is about to use any method, act or practice…"); Miss. Code Ann. Section 75-24-9 ("[w]henever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice prohibited by Section 75-24-5, and that proceedings would be in the public interest, he may bring an action in the name of the state against such person to restrain by temporary or permanent injunction the use of such method, act or practice."); N.Y. Gen. Bus. Law § 342 (permitting the Attorney General to sue "to restrain and prevent" an antitrust violation).  Thus, injunctions serve to not only deal with future violations, but to restore competition from past violations.

7

federal [antitrust law] or restore competition."  (Am. Compl. Prayer for Relief ¶¶ 1, 3 and 4; Am. Compl. ¶ 16.)  Defendants argue that this disgorgement claim is really a damage claim that violates <u>Illinois Brick</u>'s prohibition on indirect-purchaser recovery of monetary relief as well as <u>Standard Oil</u>'s prohibition of suits by states "to recover for estimated damage to general economies."  (<u>See</u> Joint Mem. at 5-9 (citing <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977) and <u>Hawaii v. Standard Oil Co. of Cal.</u>, 405 U.S. 251 (1972)).)  The argument ignores the limits of the actual pleadings and is predicated on damage claims that were never asserted under federal law.

*First*, Defendants baldly assert that the States' disgorgement claim is somehow ancillary to some sort of claim for pass-on damages, restitution, unjust enrichment, or loss to general economies.  (<u>See</u> Joint Motion at 6-9.)  But the Amended Complaint makes no such allegations, and the Defendants' brief points to none.  In fact, the States seek no monetary relief claim under federal law other than by equitable disgorgement (with Florida the one exception).[5]  (<u>See</u> Am. Compl. ¶¶ 141-46 (Count One Against Defendants Heritage, Mylan and Mayne for Violation of Section 1 of the Sherman Act), ¶¶ 147-53 (Count Two Against Defendants Heritage, Teva, Aurobindo and Citron for Violation of Section 1 of the Sherman Act); Am. Compl. Prayer for Relief ¶ 1 (adjudge and decree that

---

[5] The State of Florida does have a direct-purchaser claim based on "an assignment from a vendor that purchased pharmaceuticals directly from Defendants."  (Am. Compl. ¶ 181.)  But direct purchaser claims are unaffected by the prohibitions in <u>Illinois Brick</u> and <u>Standard Oil</u>, on which Defendants rely in requesting dismissal of the States' disgorgement claim.  (<u>See</u> Joint Mem. at 5-9.)  As such, Defendants cannot rely on Florida's direct purchaser claim to attack the sufficiency of the States' disgorgement claim under federal antitrust law.

8

Defendants violated Section 1 of the Sherman Act), ¶ 3 (injunctive relief claim for Sherman Act violations), ¶ 4 (disgorgement claim for Sherman Act violations).

While Paragraph 138 of the Amended Complaint asserts that the States' general economies have sustained injury, it is not a claim for recovery of damages to general economies, but, rather, simply support for standing for the States' injunctive relief request.[6]  Thus, Paragraph 138 recites: "As a direct and proximate cause of the unlawful conduct alleged above, the general economies of the Plaintiff States have sustained injury and the Plaintiff States are threatened with continuing injury to their business and property unless Defendants are enjoined from continuing their unlawful conduct."  On its face, Paragraph 138 undisputedly makes no claim for "'disgorgement for purported injuries to their general economies.'"  (Joint Mem. at 8.)

Likewise, Defendants' naked characterization of the States' federal disgorgement claim as an indirect-purchaser claim for damages, restitution, or unjust enrichment is belied by the pleadings and has no legal citations or support.  While the States have pled claims for equitable disgorgement, damages, restitution, unjust enrichment, and/or loss to general economies under their respective state laws (Am. Compl. ¶¶ 17, 154-315), the state law claims do not transform or alter the States' federal claim for disgorgement and equitable relief.  Rather, the federal disgorgement claim is alleged specifically as an adjunct to the claim for injunctive relief pursuant to Section 16 of the Clayton Act.  (Am. Compl.

---

[6] This contrasts with the clear assertion of a right to recover for damages to the general economy asserted by Connecticut under Connecticut state antitrust law.  (Am. Compl. ¶ 156.)

Prayer for Relief ¶¶ 1, 3 and 4; Am. Compl. ¶ 16 (asserting subject matter jurisdiction under federal injunctive relief statute), ¶ 138 (asserting standing for injunctive relief), ¶ 139 (asserting that "Plaintiffs do not have an adequate remedy at law), ¶¶ 141-53 (asserting violations of Section 1 of the Sherman Act requiring equitable redress).)  In fact, Defendants acknowledge that the States assert subject matter jurisdiction over this action under 15 U.S.C. § 26, which authorizes claims for injunctive relief.  (Joint Mem. 6 n.2.)[7]

*Second*, Defendants' attempt to somehow invoke <u>Illinois Brick</u> is totally unavailing.  <u>Illinois Brick</u> is essentially a rule of evidence that precludes only the use of pass-on proof of damages in federal antitrust claims, and has no application to any equitable claim for disgorgement under federal antitrust law. <u>See</u> <u>Sullivan v. DB Inv., Inc.</u>, 667 F.3d 273, 313 (3d Cir. 2011).  In <u>Illinois Brick</u>, the Supreme Court extended the ban on "defensive" use of pass-on proof of damages enunciated in <u>Hanover Shoe, Inc. v. United Shoe Mach. Corp.</u>, 392 U.S. 481 (1968), to also prohibit the "offensive" use of pass-on evidence to establish the fact of damage component of antitrust liability.  <u>Illinois Brick</u>, 431 U.S. at 728-36.  Thus, after <u>Illinois Brick</u>, downstream customers generally may not show antitrust injury with proof that an illegal overcharge was passed on to them by an intermediary purchaser, and defendants cannot defend an antitrust claim with evidence that the plaintiff passed on an illegal overcharge to others.

---

[7] Because the States have not asserted damages under federal law as an indirect purchaser, the cases cited by Defendants (Joint Mem. at 6-9) involving the dismissal of a claim for the recovery of pass-on damages, restitution, or unjust enrichment under federal antitrust laws are inapposite.

By its very nature, a disgorgement claim does not implicate any <u>Illinois</u> <u>Brick</u> issue of proof of pass-on damages along the distribution chain, because disgorgement does not rely on proof of the amount of damages passed on to or by the plaintiff.  Because "'[t]he primary purpose of disgorgement is not to compensate [victims],' but rather to divest the wrongdoer of the proceeds of their misconduct," the disgorgement amount is keyed to "net revenues rather than to alleged consumer harm."  <u>United States v. Morgan Stanley</u>, 881 F. Supp. 2d 563, 568 (S.D.N.Y. 2012) (quoting <u>SEC v. Cavanagh</u>, 445 F.3d 105, 117 (2d Cir. 2006)); <u>see also</u> <u>SEC v. Whittemore</u>, 691 F. Supp. 2d 198, 204 (D.D.C. 2010) (quoting <u>SEC v. Tome</u>, 883 F.2d 1086, 1096 (2d Cir. 1987) ("The paramount purpose of … ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing.")); <u>FTC v. Bronson Partners, LLC</u>, 654 F.3d 359, 368-370 (2d Cir. 2011) (disgorgement of profits divests a wrongdoer of ill-gotten gains to ensure the wrongdoer will not profit from their wrongdoing and to deter similar conduct); <u>SEC v. First City Fin. Corp.</u>, 890 F.2d 1215, 1230 (D.C. Cir. 1989) (same); <u>SEC v. Wyly</u>, 71 F. Supp. 3d 399, 419-20 (S.D.N.Y. 2014) (same); <u>U.S. ex rel Zissler v. Regents of the Univ. of Minn.</u>, 992 F. Supp. 1097, 1112-13 (D. Minn. 1998) (citing <u>Interstate Cigar Co. v. United States</u>, 928 F.2d 221, 223 (7th Cir. 1991)) (same); <u>FTC v. Com. Planet, Inc.</u>, 815 F.3d 593, 601 (9th Cir. 2016) (citations omitted) ("Defendants … are liable for the unjust gains the defendants <u>collectively</u> received, even if that amount exceeds (as it usually will) what any one defendant pocketed form the unlawful scheme."); <u>SEC v. Pentagon Cap. Mgmt.</u>, 725 F.3d

279, 288 (2d Cir. 2013) (permitting disgorgement of the combined profits of all defendants, from any single defendant).

　　In recent years, courts have consistently recognized the availability of disgorgement to enforcers in public interest cases brought under federal antitrust law, and specifically rejected arguments that disgorgement constitutes an implicit or explicit "end-run" around any <u>Illinois Brick</u> precept.  <u>See, e.g.</u>, <u>United States v. KeySpan Corp.</u>, 763 F. Supp. 2d 633, 639-41 (S.D.N.Y. 2011); <u>In re TFT-LCD (Flat Panel) Antitrust Litig.</u>, MDL No. 1827, 2011 WL 2790179, at \*\*3-4 (N.D. Cal. July 12, 2011); <u>Morgan Stanley</u>, 881 F. Supp. 2d at 568; <u>FTC v. Cephalon, Inc.</u>, 100 F. Supp. 3d 433, 437-38 (E.D. Pa. 2015).[8]  "In fact, there appears to be little disagreement among commentators about the propriety of disgorgement as an antitrust remedy."  <u>KeySpan Corp.</u>, 763 F. Supp. 2d at 642 (citing Phillip E. Areeda et al., Antitrust Law ¶ 325a (3d ed. 2007) ("[E]quity relief may include, where appropriate, the disgorgement of improperly obtained gains."); Einer Elhauge, <u>Disgorgement as an Antitrust Remedy</u>, 76 Antitrust L.J. 79, 79 (2009) ("One's first reaction might well be that perhaps the rare usage reflects some underlying insecurity about whether disgorgement really is a permissible antitrust remedy. But there is surprisingly little doubt that equitable antitrust remedies include requiring violators to disgorge any illegally obtained profits.")).

　　Defendants hitch their argument that disgorgement is not an available remedy to the 1999 district court opinion in <u>FTC v. Mylan Labs., Inc.</u>, 62 F. Supp. 2d 25, 41-42 (D.D.C. 1999).  <u>Mylan</u> has no binding authority here and is an outlier

---

[8] **Accordingly, <u>Illinois Brick</u> and its line of cases, as cited in the Defendants' Joint Memorandum at 6-8, are inapposite here.**

decision.  Most importantly, in holding disgorgement was not an available remedy

for a Sherman Act violation, the court ignored the Supreme Court's statutory

construction framework in <u>Porter v. Warner Holding Co.</u>, 328 U.S. 395 (1946).

Instead, after mischaracterizing disgorgement as duplicative damage recovery,

<u>Mylan</u> relied on <u>Illinois Brick</u>'s broad and inapposite warning against duplicative

recovery.  <u>See</u> 62 F. Supp. 2d at 41-42.  <u>Mylan</u> also erroneously failed to give

sufficient deference to the traditional broad scope of the court's equitable

powers, and narrowly construed Section 16 of the Clayton Act to permit only

forward-looking remedies while wrongly denying the forward-looking nature of

disgorgement.  <u>Id.</u> at 41.

But since <u>Mylan</u>, courts have consistently adopted the <u>Porter</u> framework

and found disgorgement to be a proper equitable remedy under federal antitrust

law.  <u>See</u> <u>KeySpan Corp.</u>, 763 F. Supp. 2d at 639-41 (applied <u>Porter</u> and found no

preclusion of the government's disgorgement claims under federal antitrust law);

<u>see also</u> <u>Morgan Stanley</u>, 881 F. Supp. 2d at 565-68; <u>Cephalon, Inc.</u>, 100 F. Supp.

3d at 438-39 (same); <u>In re TFT-LCD (Flat Panel) Antitrust Litig.</u>, 2011 WL 2790179,

at **3-4 (adopting <u>KeySpan</u>'s application of <u>Porter</u> and concluding "that

disgorgement is available to Oregon").

In <u>Porter</u>, the United States Supreme Court held that where a statutory

scheme provides for compensatory legal damages under one provision and

specific equitable relief under another, the full range of possible traditional

equitable relief is available unless expressly precluded by the legislation itself.

328 U.S. 398-99.  Additionally, where the public interest is involved, the equitable

13

powers of a district court are even broader and more flexible than when only a private controversy is at stake.  Id. at 398.

Moreover, when a government plaintiff is involved, broader relief is available to the government as an enforcing agent than to a private plaintiff.  "A Government plaintiff, unlike a private plaintiff, must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm.  And a Government plaintiff has legal authority broad enough to allow it to carry out this mission."  F. Hoffman-La Roche Ltd, 542 U.S. at 170.  Indeed, one of the cases cited by the Defendants specifically noted that the claims for disgorgement in KeySpan and In re TFT-LCD (Flat Panel) Antitrust Litig. were permissible "because they were brought by the Government instead of private party."  In re Cathode Ray Tube ("CRT") Antitrust Litig., No. C-07-5944 JST, 2016 WL 3648478, at *13 n.26 (N.D. Cal. July 7, 2016), appeal filed sub nom., Indirect Purchaser Plaintiffs v. Toshiba Corp., No. 16-16427 (9th Cir. Aug. 12, 2016).

Applying the Porter analysis, the KeySpan court concluded that disgorgement was not expressly precluded by the remedy statute, and further that it was an especially appropriate antitrust remedy because "[a]ntitrust law is both forward-and backward-looking."  763 F. Supp. 2d at 641 (emphasis in the original) (citing Int'l Boxing Club of N.Y., Inc. v. United States, 358 U.S. 242, 252 (1959) ("The decree should (1) put an end to the combination or conspiracy when that is itself the violation; (2) deprive the antitrust defendants of the benefits of their conspiracy; and (3) break up or render impotent the monopoly power which

violates the Act (quotations omitted)").  By subjecting market manipulators to the prospect of disgorgement in addition to other remedies, <u>KeySpan</u> recognized the remedy as "an important marker for enforcement agencies and [] regulators alike" that properly tilted incentives against wrongful restraints on proper marketplace competition.  <u>Id.</u> at 642.[9]

Disgorgement is therefore an available remedy under federal antitrust law and the contrary argument asserted by Defendants is not legally sound.

C.   <u>The States Have Standing to Bring a Claim for Injunctive Relief under Federal Law.</u>

The States seek injunctive relief under Section 16 of the Clayton Act (Am. Compl. ¶ 16) pursuant to their well-recognized *parens patriae* authority to seek injunctive relief to remedy antitrust harm.  Contrary to Defendants' claims, the States' allegations that the prosperity and welfare of their general economies are affected by Defendants' wide-ranging conspiracies are more than adequate to provide standing to bring a claim for injunctive relief under Section 16.

As an initial matter, Defendants' arguments regarding duplicative recovery and federal *parens patriae* damage claims under Section 4C of the Clayton Act, 15 U.S.C. § 15c (Joint Mem. at 9-11), are inapposite, as the States are not seeking

---

[9] Defendants cite <u>United States v. Philip Morris USA, Inc.</u>, 396 F.3d 1190 (D.C. Cir. 2005) to limit the reach of disgorgement, which the case characterized as a backward-looking remedy.  (Joint Mem. at 7-8.)  But <u>Philip Morris</u> was specifically rejected by the <u>KeySpan</u> court on several grounds, the most pertinent being that <u>Philip Morris</u> was a RICO case and not an antitrust case and since RICO's language is much narrower in scope than antitrust law, which "is both forward-and backward-looking" while RICO law is not.  Therefore, <u>Philip Morris</u> cannot dictate the remedies available in antitrust matters.  <u>KeySpan</u>, 763 F. Supp. 2d at 641.

damages for the natural persons residing in their States through their federal statutory *parens patriae* authority.  (See Am. Compl. ¶ 20, Prayer for Relief ¶¶ 1-8.)

Courts have long found that Section 16 of the Clayton Act authorizes state attorneys general to bring claims for injunctive relief to remedy antitrust harm to their general economies.  Georgia v. Pa. R.R. Co., 324 U.S. 439, 447-48 (1945); see Standard Oil Co., 405 U.S. at 260-61 (restating the *parens patriae* rights to injunctive relief under Section 16, but refusing to extend *parens patriae* to claims under Section 4 of the Clayton Act for damages to the state's general economy).  In a rare example of a party contesting that authority, the Fourth Circuit held that a state attorney general acting pursuant to his/her *parens patriae* authority has standing to bring a claim for injunctive relief to address injury to the state's general economy.  Burch v. Goodyear Tire & Rubber Co., 554 F.2d 633, 634-35 (4th Cir. 1977) (Maryland had standing to assert *parens patriae* claim seeking injunctive relief where the state alleged harm to general economy).

Similarly, the Supreme Court's *parens patriae* analysis in Alfred L. Snapp & Son v. Puerto Rico, 458 U.S. 592 (1982), supports the States' standing here.  The Snapp Court held that for Article III *parens patriae* standing the state must articulate an interest apart from the interest of a particular private party, "*i.e.*, the State must be more than a nominal party.  The State must express a quasi-sovereign interest … in the health and well-being—both physical and economic— of its residents in general.  Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system."  Id. at 607.

In evaluating whether a state has *parens patriae* authority, a court may consider "whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers;" and whether the challenged conduct affects, either directly or indirectly, a "sufficiently substantial segment of the population."  Id.  The Supreme Court has not, however, specified percentages of the population that the challenged behavior must adversely affect.  Id.

Quoting Georgia v. Penn. R.R. Co., the Snapp Court stated, "[t]rade barriers may cause a blight no less serious than the spread of noxious gas over the land or the deposit of sewage in the streams.  They may affect the prosperity and welfare of a State as profoundly as any diversion of the waters from the rivers[.]"  Snapp, at 606 (quoting 324 U.S. at 450-51).

Here, the "noxious gas" alleged to harm the States' general economies is Defendants' broad-ranging price-fixing and market allocation agreements.  The alleged conduct increases consumer prices and deprives governmental entities and consumers of the ability to purchase or pay reimbursements for purchases of the generic drugs identified in the Amended Complaint at prices determined by a market unhindered by the Defendants' anticompetitive behavior.  (Am. Compl. ¶¶ 135-38.)  Such conduct harms the States' economies as much as the "sewage in the streams" by directly impacting the economic health and well-being of the States' citizens and economies.

As such, the States' claims here fit within the Supreme Court's repeated acknowledgment of the "right of a State to sue as *parens patriae* to prevent or repair harm to its 'quasi-sovereign' interests."  Standard Oil, 405 U.S. at 258.

Defendants' reliance on Missouri ex rel. Koster v. Harris is misplaced.  847 F.3d 646 (9th Cir. 2017), petition for cert. filed sub nom., Missouri ex rel. Hawley v. Becerra, No. 16-1015 (Feb. 21, 2017).  There, a complaint that only "alleged the importance of the California market to egg farmers in the Plaintiff States and the difficult choice that egg farmers face in deciding whether to comply with the Shell Egg Laws[,]" was not sufficient to assert Article III standing.  Id. at 652 (emphasis added).  The Ninth Circuit was not persuaded that the states in question asserted standing because their egg farmers could seek complete relief on their own and no general public hazard was involved.  Id. at 652-53.  The Ninth Circuit also noted it was not alleged that consumers would necessarily pay higher prices and considered this lack of alleged harm to consumers in its holding.  Id. at 653 ("the complaint alleges the prices will go up or down").  In contrast, here, the States have alleged harm to their citizens and their economies.

Defendants' reliance on Purdue Pharma L.P. v. Kentucky is also misplaced.  704 F.3d 208 (2d Cir. 2013).  The court in Purdue specifically recognized that a state may assert *parens patriae* standing by articulating a quasi-sovereign interest "such as an 'interest in the health and well-being—both physical and economic—of its residents in general.'"  Id. at 215 (quoting Alfred L. Snapp & Son, 458 U.S. at 600).  Here, the States have articulated just such an interest.  (Am. Compl. ¶¶ 135-138.)  Defendants' reliance on Connecticut v. Am. Elec. Power

18

Co., Inc. is similarly misguided.  582 F.3d 309 (2d Cir. 2009).  In that case, the court recognized that interest in the physical and economic health and well-being were "classic examples of a state's quasi-sovereign interest."  Id. at 338.

Section 16 of the Clayton Act grants the States the right to seek injunctive relief, and Defendants' argument to the contrary should be rejected.

D.     The States Have Sufficiently Pled Antitrust Injury.

Arguing that the States have not properly alleged antitrust injury, Defendants claim that the Amended Complaint lacks allegations of facts that each Defendant's conduct caused price increases or other harm to each of the States. But Defendants' arguments are vague, undeveloped and misconstrue the law concerning antitrust injury.  To survive a motion to dismiss, a complaint need only include factual allegations that render the plaintiffs' entitlement to relief plausible.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).  The "existence of antitrust injury is not typically resolved through motions to dismiss," and if plaintiffs allege that an antitrust injury has been suffered, the complaint should not be dismissed.  SmithKline Beecham Corp. v. Apotex Corp., 383 F. Supp. 2d 686, 695 (E.D. Pa. 2004) (citations omitted).  The States have easily met that requirement by alleging facts showing per se antitrust violations (horizontal price-fixing and market allocation) that caused them to pay higher prices for Defendants' products.

"Antitrust Injury" is "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  "In applying the antitrust injury requirement, the Supreme Court has inquired

19

whether the injury alleged by the plaintiff 'resembles any of the potential dangers' which led the Court to label the defendants' alleged conduct violative of the antitrust laws in the first instance." <u>Pace Elec., Inc. v. Canon Computer Sys., Inc.</u>, 213 F.3d 118, 120 (3d Cir. 2000) (quoting <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 336 (1990)).

The States have alleged *per se* antitrust violations that caused them to pay higher prices for Defendants' products and, as importantly, caused harm to competition in the generic drug market.

The Second Circuit set forth a three-part analysis for determining whether a plaintiff has sufficiently alleged antitrust injury in <u>Gatt Commc'ns Inc. v. PMC Assoc., LLC</u>, 711 F.3d 68 (2d Cir. 2013). First, the defendant's anticompetitive practice must be identified. Second, the plaintiff must identify its actual injury. Finally, the court compares the effect of the anticompetitive practice to the actual injury that is alleged. To establish antitrust injury, the plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful." <u>Id.</u> at 76 (quoting <u>Daniel v. Am. Bd. Emergency Med.</u>, 428 F.3d 408, 438 (2d Cir. 2005)).

In applying the three-part process described in <u>Gatt</u> to the States' claims, there is no doubt of an antitrust injury. First, Defendants joined together in various combinations to carry out *per se* violations of the antitrust law. As set forth in greater detail in Sections I.A and I.C of the States' Consolidated Opposition to Certain Defendants' Motions to Dismiss, Heritage conspired with Mylan and Mayne to allocate customers in the Doxy DR market, resulting in

"substantially higher" pricing than would have existed in a competitive market. (Am. Compl. ¶ 102.)  With respect to the Glyburide market, Heritage, Citron, Aurobindo and Teva agreed to fix and raise the price of the drug.  (Am. Compl. ¶¶ 149-50; see also Consolidated Opp. at Sections I.B and I.D.)

Second, the States allege that they paid higher prices as purchasers of Doxy DR and Glyburide and that competition was harmed in the markets for those generic drugs.  (Am. Compl. ¶¶ 135-38, 146, 153.)  Third, "artificially raise[d] prices and limit[ed] competition" are exactly the types of harm the antitrust laws were intended to prevent.  See Gatt, 711 F.3d at 77 (stating that plaintiffs, former co-conspirators of defendants, did not have standing as opposed to customers of conspirators, "who [were] victimized by price-fixing schemes").

Defendants' main argument is that the States have not sufficiently shown how conduct by the Defendants caused the nationwide price increases alleged in the Amended Complaint.  But none of the cases cited by Defendants require that kind of specificity to show an antitrust injury.  It is enough, as the States have done, to plausibly demonstrate anticompetitive conduct by Defendants resulting in harm to competition in the market where Defendants and Plaintiffs participate. The States need only to allege in the Amended Complaint that consumers paid higher prices and that the higher prices are "inextricably intertwined" with the Defendants' conduct.  In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009) (purchasers' claim of higher prices due to defendants' anticompetitive conduct stated antitrust injury).

Defendants argue that finding their anticompetitive acts "caused an anticompetitive effect would require a showing that price increases were passed down uniformly through various entities along the supply chain to end consumers across 40 different states."  (Joint Mem. at 12.)  This exact argument was rejected by the appellate court in In re Warfarin Sodium Antitrust Litig.  In Warfarin, the users of the prescription drug Coumadin, generically known as warfarin sodium, brought an action against the drug's manufacturer for attempted monopolization by excluding a generic version from the market.  214 F.3d at 396-97.  The defendant manufacturer argued, and the district court agreed, that the end users of the drug did not suffer an antitrust injury because plaintiffs' ability to trace their overpayment to the alleged anticompetitive conduct traversed several somewhat vaguely defined links due to their position on the distribution chain and the role of third-party payors.  Id. at 399 (discussing district court's application of Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 489 U.S. 519, 540 (1983)).[10]

The Third Circuit reversed the district court's dismissal, holding:

---

[10]Defendants also cite Associated General Contractors for support of their argument that the States' antitrust injury is part of a "speculative causal chain." (Joint Mem. at 12.)  That argument was recently considered, and rejected, by Judge Rakoff in the Southern District of New York with regard to the drug Propranolol:  "Here, the chain of distribution in the pharmaceutical industry is short, direct, and well understood: manufacturers sell to wholesalers, which in turn sell to the pharmacies from which the End-Payors' buy the drug. . . .  Price increases can be directly traced throughout this distribution chain."  In re Propranolol Antitrust Litig., --- F. Supp. 3d ---, 2017 WL 1287515, *9, 16-CV-09901 (S.D.N.Y. April 6, 2017) (Rakoff, J.) (citing In re Asacol Antitrust Litig., 2017 WL 53695, *3 (D. Mass. Jan. 4, 2017) (chain of distribution passes "from Defendants [manufacturers], to wholesalers, to pharmacies, and then to end payors"); In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., 64 F. Supp. 3d 665, 698 (E.D. Pa. 2014)).

> **[W]e find that Coumadin consumers clearly suffered antitrust injury. Coumadin purchasers were the target of [the manufacturer's] antitrust violation.  Regardless of the existence of the various links of middlemen, if there were no ultimate consumer of Coumadin, prices charged for the drug by [the manufacturer] to distributors, pharmacies, etc. would be irrelevant.  The excess amount paid by Coumadin users not only is 'inextricably intertwined' with the injury [the manufacturer] aimed to inflict, the overcharge was the aim of [the manufacturer's] preclusive conduct.  <u>It is difficult to imagine a more formidable demonstration of antitrust injury.</u>**

<u>Id.</u> at 401 (emphasis added).  The same logic applies with equal force to the "formidable demonstration" here:  States both purchase drugs and reimburse the cost of drugs used by the ultimate consumers and therefore have suffered injury – in the form of higher prices and reduced competition – from Defendants' anticompetitive conduct.

Defendants cite general language from two cases for their contention that simply pleading that consumers nationwide paid higher prices for the product at issue is insufficient.[11]  (<u>See</u> Joint Mem. at 12.)  However, neither case involves facts similar to those pled here.  In <u>Sell it Social, LLC v. Acumen Brands, Inc.</u>, plaintiff, an online retailer of country western clothing, sued another online retailer of country western clothing for defamation and attempted monopolization

---

[11] Defendants cite Paragraph 11 of the Amended Complaint to support their contention that "Defendants' alleged conduct involves alleged refusals to bid on a small number of customers."  (Joint Mem. at 11.)  However, Paragraph 11 says no such thing.  It states that Defendants would determine the market share each entrant into a new generic market was entitled to and then effectuate this scheme by "refusing to bid for particular customers or by providing a cover bid that they knew would not be successful.  These schemes have the effect of reducing or eliminating competition for a particular drug, and have allowed the Defendants to maintain artificially supra-competitive prices in these markets throughout the United States."  (Am. Compl. ¶ 11.)  Regardless of how Defendants construe the Amended Complaint's allegations, their arguments relating to antitrust injury still fail.

when defendant told vendors it would refuse to deal with them if they did business with plaintiff and made allegedly false claims about plaintiff.  No. 14 Civ. 3491 (RMB), 2015 WL1345927 at *1 (S.D.N.Y. Mar. 20, 2015).  The court found that plaintiff failed to allege antitrust injury because plaintiff did not allege any facts supporting how this attempt to limit plaintiff's access to vendors would lead to higher prices in the market, as opposed to merely harming the plaintiff, a competitor.  Id. at **4-5.

Similarly, Carell v. Shubert Org., Inc., 104 F. Supp. 2d 236 (S.D.N.Y. 2000) is a copyright case in which plaintiff alleged as antitrust injury that plaintiff could not market its product successfully because defendants refused to license the product.  The court dismissed the antitrust count because plaintiff failed to plead a relevant product market and because only conclusory allegations of facts were alleged.  Id. at 263-67.  The cases cited by Defendants are not relevant to the States' factual allegations of the *per se* price-fixing and market allocation schemes.

Defendants' arguments that the States do not plead facts sufficient to show antitrust injury are without merit.  The States have alleged *per se* violations of the antitrust laws.  The States have sufficiently pled that they participate as purchasers of Defendants' products in the generic drug market and that they (and their citizens) paid higher prices as a result of Defendants' anticompetitive practices.  In addition, as explained in Section I.C, the Defendants' conduct has harmed the States' general economies.  The Amended Complaint should not be dismissed for failure to adequately plead antitrust injury.

## II. THE STATES' STATE LAW CLAIMS DO NOT FAIL EVEN IF THEIR FEDERAL LAW CLAIMS FAIL.

Defendants make the conclusory statement that because "state antitrust law generally follows federal antitrust law" and "every state antitrust law either follows federal law or uses it as a guide," the States' state antitrust claims must fail if their federal antitrust claims are dismissed.  (Joint Mem. at 13-14 & n.4.)  In support of this claim, Defendants rely only on a string cite of statutes and a few cases without any discussion of the significance of these legal authorities.  (Id. at n.4.)  This does not rise to the level of argument.  See Local Rule 7(a)(1).  Moreover, the authorities cited by Defendants do not support this blanket statement.  For example, Defendants cite, Morrison v. Viacom, Inc., 78 Cal. Rptr. 2d 133, 137 n.2 (1998), which, contrary to Defendants' assertion, clearly observes that "the Sherman Act is not … directly probative on interpretation of [California Law, although] judicial interpretations of the Sherman Act are … often helpful" in interpreting state antitrust laws.  (citations omitted).  This case, as well as Defendants' other citations, does not support the claim that Defendants attempt to advance.

Simply put, not every State's antitrust law is interpreted in lockstep with the Sherman Act; many state laws are interpreted more broadly or differently.  To give just a few examples (and without conceding that any of the citations identified in Defendants' long string cite support their position), Wisconsin's statute is clear: "It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition."  Wis. Stat. § 133.01.  Likewise, the Utah Supreme Court has stated,

25

"[w]e are guided by the widely accepted principle that antitrust laws should be construed broadly and exemptions should be considered narrowly so as to give effect to their purposes."  <u>Evans v. Utah</u>, 963 P.2d 177, 185 (Utah 1998).

North Carolina's Court of Appeals has held that "we are not required to construe our antitrust statute in harmony with the federal antitrust laws …"  <u>Hyde v. Abbot Labs. Inc.</u>, 473 S.E.2d 680, 686 (N.C. Ct. App. 1996).  Vermont's Supreme Court likewise held that Vermont state law need not follow federal antitrust law. <u>See</u> <u>Elkins v. Microsoft Corp.</u>, 817 A.2d 9 (Vt. 2002).  The Pennsylvania Supreme Court also applies Pennsylvania restraint of trade common law without being bound by the federal Sherman Act.  <u>Collins v. Main Line Bd. of Realtors</u>, 304 A.2d 493, 496-97 (Pa. 1973).

Though New York's Donnelly Act is generally construed in light of federal antitrust case law, New York's highest court has recognized that it is "well settled" that New York courts will interpret the Donnelly Act differently "where State policy, difference in the statutory language or the legislative history justify such a result."  <u>Sperry v. Crompton Corp.</u>, 863 N.E.2d 1012, 1018 (N.Y. 2007) (quoting <u>Anheuser Busch, Inc. v. Abrams</u>, 520 N.E. 2d 535, 539 (N.Y. 1988)). Likewise, Minnesota "is not required … to abide by federal antitrust standing limitations."  <u>Lorix v. Crompton Corp.</u>, 736 N.W.2d 619, 626 (Minn. 2007). Minnesota antitrust law "contains an expansive grant of standing" that more than encompasses damages suffered by "an end user of a consumer good whose price was inflated by anticompetitive conduct earlier in the chain of manufacture."  <u>Id.</u> at 627, 631.

Similarly, California's Supreme Court has repeatedly recognized that the Sherman Act has a different scope, history, and interpretation than the Cartwright Act and Unfair Competition Law.  See, e.g., Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180-81 (1999); In re Cipro Cases I & II, 61 Cal. 4th 116, 142 (2015).  California law does not require that its antitrust and consumer protection laws be harmonized with the federal Sherman Act.  See, e.g., State of Cal. ex rel. Van de Kamp v. Texaco, Inc., 46 Cal. 3d 1147, 1166 (1988).

The Fourth Circuit highlighted the differences between the Sherman Act and South Carolina's state law: "there is no requirement in the Unfair Trade Practices Act of a contract, combination or conspiracy as there is under § 1 of the Sherman Act."  Bostick Oil. Co. v. Michelin Tire Corp., Com. Div., 702 F.2d 1207, 1220 (4th Cir. 1983) (the Act "states only that 'the courts will be guided by the interpretations given' to the [FTC Act], which neither revokes pre-existing South Carolina definitions of unfair or deceptive trade practices, nor binds the Act to the scope of the federal law") (emphasis in original).  New Hampshire law is similar. NH RSA 356:14 ("the courts may be guided" by federal antitrust law); see Donovan v. Dig. Equip. Corp., 883 F. Supp. 775, 785 (D. N.H. 1994) (determining that New Hampshire's "statutory language is permissive and, thus, the court is entitled to diverge from federal antitrust law when considering a state antitrust claim.").

Kansas's harmonization statute specifically dictates that the Kansas Restraint of Trade Act will not be construed to prohibit "any action or proceeding brought by the attorney general pursuant to authority provided in the [Act], or any

other power or duty of the attorney general provided in such act."  Kan. Stat. Ann. 50-163(d)(5).  Thus, any argument that its alignment with the Sherman Act negates Kansas's state law claims is wrong.  Iowa's Supreme Court has held that Iowa's antitrust harmonization statute is not necessarily consistent with federal law, indicating that "[w]e do not find that Iowa Code §553.2 requires Iowa courts to interpret the Iowa Competition Law the same way federal courts have interpreted federal law.  In fact, the harmonization statute specifically states the provision 'shall not be made in such a way as to constitute a delegation of state authority to the federal government.'"  Comes v. Microsoft Corp., 646 N.W.2d 440, 446 (Iowa 2002).  And while Maine's antitrust act parallels the Sherman Act, the state analog has not been deemed to foreclose liability under state law in the event the federal law provides no relief.  10 M.R.S. § 1101, *et seq.*; Tri-State Rubbish v. Waste Mgmt., Inc., 875 F. Supp. 8, 14 (D. Me. 1994) (plaintiff "offered no argument" that the same result should not obtain).

Connecticut's law is also merely "aided by reference to judicial opinions interpreting the federal antitrust statutes.  Accordingly, we follow federal precedent when we interpret the act unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently."  Westport Taxi Serv. v. Westport Transit Dist., 664 A.2d 719, 728 (Conn. 1995) (citations omitted). The Connecticut Antitrust Act is not identical to the Sherman Act, and is substantially more specific.  See Shea v. First Federal Savings and Loan Ass'n of New Haven, 439 A.2d 997, 1006-07 (Conn. 1981).

The Court should reject the Defendants' blanket claim that all state law antitrust claims should be dismissed if the States' federal law claims fail.

Defendants also argue, incorrectly, that if the States' federal clams are dismissed, "there is no basis for the Court to assert jurisdiction over the state-law claims." (Joint Mem. at 15.)  In fact, the law does provide such a basis: "a district court does not abuse its discretion where the 'values of judicial economy, convenience, fairness, and comity' support the exercise" of supplemental jurisdiction.  See Delaney v. Bank of Am. Corp., 766 F.3d 163, 170 (2d Cir. 2014) (quoting Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)).  Defendants' motion to dismiss on these grounds should be rejected.

III.    THE STATES HAVE SUFFICIENTLY ALLEGED STATE LAW ANTITRUST CLAIMS.

Continuing the strategy of arguing "everything including the kitchen sink," Defendants attack the claims asserted by certain States[12] under state antitrust laws.  Defendants argue that various state law antitrust claims are barred because, they contend: (1) some States lack statutory authority to bring certain claims; (2) some States are subject to the Illinois Brick doctrine; (3) some States cannot sue on behalf of certain government entities; and/or (4) some States have run afoul of the dormant commerce clause by not alleging an effect on intrastate commerce.  All of Defendants' arguments fail.

---

[12] These States are: Arizona, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Indiana, Louisiana, Maine, Michigan, Mississippi, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Virginia and Wisconsin.  (Joint. Mem. at 15-21.)

Here, the State Attorneys General, as law enforcement officers, have properly pled state antitrust claims for damages, injunctive relief and/or penalties under their various statutory and common law powers.  In arguing otherwise, Defendants either mischaracterize the state law claims that the States are asserting or misstate (or ignore) the state law on which those claims are based.  And many times, Defendants do both.

### A.  Any State Seeking Damages on Behalf of their Citizens Is Authorized to Do So.

The States that seek damages on behalf of their citizens, whether called *parens patriae* or otherwise, have authority to do so through both statute and common law.

Defendants incorrectly argue that ten States do not have the authority to seek damages on behalf of citizens.  (Joint Mem. at 15-17.)  Defendants mischaracterize the claims of three of these states[13] and, for the remaining seven,[14] ignore both statutory and case law providing that each of these States does have authority to bring such claims.

Defendants rely on dicta from a Ninth Circuit case, <u>California v. Frito Lay</u>, 474 F.2d 774 (9th Cir. 1973), and a California district court decision, <u>California v. Infineon Techs. AG</u>, 531 F. Supp. 2d 1124, 1164 (N.D. Cal. 2007), neither of which are binding on this Court, to claim that *parens patriae* authority can only be

---

[13] Defendants incorrectly assert that Arizona, North Dakota, and Wisconsin seek damages on behalf of their citizens as *parens patriae.*  They do not.  As such, the states deny the Defendants' analysis of their respective laws as inapposite.  Pursuant to A.R.S. § 44-1408(A), Arizona does assert a damages claim for its state agencies, as authorized by A.R.S. § 41-192(A)(6).

[14] Defendants identify Indiana, Maine, New Jersey, New York, North Carolina, Pennsylvania, and Tennessee. (Joint Mem. at 16.)

granted by *specific* statutory authority.  No other appellate court has adopted the position espoused by Defendants, and many courts have held otherwise.  <u>See, e.g.</u>, <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, 205 F.R.D. 369, 386-87 (D.D.C. 2002) (explaining that in some instances states have express statutory authority while other states "have had state and/or federal courts interpret statutory provisions to effectively grant *parens patriae* authority or have determined that their attorney general has such authority under state common law"); <u>In re Antibiotic Antitrust Actions</u>, 333 F. Supp. 278, 280 (S.D.N.Y. 1971) ("It is difficult to imagine a better representative of retail consumers within a state than the state's Attorney General.  Historically the common law powers of the attorney general include the right and duty to take actions necessary to the maintenance of the general welfare and his presence in these actions is but a modern day application of that right and duty.").

Each of the remaining seven states identified by Defendants has the requisite *parens patriae* or similar authority under state law.

*Indiana*:  Under Indiana law, "a state may act as *parens patriae* on behalf of its citizens."  <u>Bd. of Comm'rs of Howard Cty. v. Kokomo City Plan Comm'n</u>, 263 Ind. 282, 295 (1975).  Under Indiana Code § 24-1-2-5, "It shall be the duty of the attorney general . . .  to institute appropriate proceedings to prevent and restrain violations of the provisions of this chapter or any other statute or the common law relating to the subject matter of this chapter and to prosecute any person or persons guilty of having violated any of the penal provisions thereof."  <u>See also</u>

Ind. Code § 24-1-1-2 ("It is hereby made the duty of the attorney general of the state to enforce this section by due process of law.").

*Maine*: Under Maine's antitrust law, "the powers of the Maine Attorney General are sufficiently broad to encompass a *parens patriae* action on behalf of indirect purchasers."  FTC v. Mylan Labs., Inc., 99 F. Supp. 2d 1, 7 (D.D.C. 1999) (citing Lund ex rel. Wilbur v. Pratt, 308 A.2d 554, 558 (Me. 1973)).

*New Jersey*: The Attorney General of New Jersey "has long been vested with the responsibility of protecting the public interest and enforcing public duties by instituting appropriate civil actions in court."   In re D.C., 679 A.2d 634, 644 (N.J. 1995).  Pursuant to N.J. Stat. Ann. 52:17A-4, the Attorney General of New Jersey has the powers and duties to represent the State of New Jersey in all proceedings brought for the State; interpret all State statutes; attend to all legal matters in which the State has any interests or rights; and enforce all State laws.  The Attorney General of New Jersey, acting under the State's *parens patriae* authority, may represent New Jersey consumers as a whole, see Harvey v. Blockbuster, 384 F. Supp. 2d 749, 753-54 (D.N.J. 2005), and is empowered to "[e]nforce the provisions of the Constitution and *all other laws of the State* [of New Jersey]," N.J. Stat. Ann. 52:17A-4(h) (emphasis added), including the New Jersey Antitrust Act, N.J. Stat. Ann. 56:9-1 *et seq.* ("NJATA").  See also N.J. Stat. Ann. 56:9-6 ("The Attorney General shall investigate suspected violations of, and institute such proceedings as are hereinafter provided for violation of the provisions of [the NJATA]").

The NJATA expressly authorizes the Attorney General to file suit to recover damages on behalf of its "political subdivisions and public agencies."  <u>N.J. Stat. Ann.</u> 56:9-12(b).  The right to seek damages on behalf of individuals, as *parens patriae*, is established by New Jersey case law.  <u>See generally,</u> <u>In re D.C.</u>, 679 A.2d 634; <u>Alexander v. New Jersey Power & Light Co.</u>, 122 A.2d 339, 343 (N.J. 1956).  Additionally, under <u>N.J. Stat. Ann.</u> 56:9-18, the NJATA must "be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, uniformity in the laws of those states which enact it."  The Sherman Act specifically provides that "[a]ny attorney general of a State may bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State."  15 U.S.C. § 15c(a)(1). To achieve harmony between the Sherman Act and the NJATA, the Attorney General must be permitted to proceed "as *parens patriae* on behalf of natural persons residing" in New Jersey.

*New York*:  New York law also provides that the New York Attorney General can seek monetary relief for injured New Yorkers.  In a footnote, Defendants cite various provisions of New York antitrust law to argue that the Attorney General does not have this authority.  (Joint Mem. at 16 n.10.)  But Defendants ignore the New York statute cited in New York's supplemental state law claim (Am. Compl. ¶¶ 273-74), —N.Y. Exec. Law § 63(12)—that provides for such authority in many contexts, including in antitrust cases.  <u>E.g.</u>, <u>New York v. Feldman</u>, 210 F. Supp. 2d 294, 299-300, 302-03 (S.D.N.Y. 2002).

_North Carolina_:  The North Carolina Attorney General has statutory authority to bring actions "in the name of the State on relation of the Attorney General."  N.C.G.S. § 75-15. This language constitutes "express statutory authority" to represent consumers in a _parens patriae_ fashion.  See In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. at 386.  Here, the North Carolina Attorney General seeks damages on behalf of the agencies injured by Defendants' anticompetitive behavior under N.C.G.S. § 75-16. "There is no reason why the State as a consumer cannot take advantage of G.S. 75-16 if it is the victim of an unfair or deceptive trade practice."  F. Ray Moore Oil Co. v. State, 341 S.E.2d 371, 374 (N.C. Ct. App. 1986).

_Pennsylvania_:  The Commonwealth of Pennsylvania is also authorized to proceed as _parens patriae_ by statute for antitrust claims.  See In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. at 407.  "The Attorney General shall represent the Commonwealth and its citizens in any action brought for violation of the antitrust laws of the United States and the Commonwealth."  71 P.S. § 732-204 (c).[15]

---

[15] Restraints of trade are actionable under Pennsylvania common law. Schwartz v. Laundry & Linen Supply Drivers' Union, Local 187, 339 Pa. 353, 14 A.2d 438 (1940).  The Pennsylvania Supreme Court considers antitrust conduct such as price-fixing and, more generally, combinations in restraint of trade to be indictable.  Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. 173, 186-87 (1871). Price-fixing in restraint of trade can also result in the imposition of fines and costs.  Consolidated Ice Mfg. Co. v. Medford, 18 Pa. D. 293 (Phila. 1908). Consolidated Ice provides the legal basis for an award of damages under Pennsylvania antitrust common law that restraints of trade were penalized and gave rise to actionable wrong.  See XF Enters., Inc. v. BASF Corp., 47 Pa. D. & C. 4th 147, 150 (2000).  Accordingly, antitrust conduct is actionable for damages under Pennsylvania common law.

*Tennessee*:  Defendants also mischaracterize Tennessee law to assert that the Tennessee Attorney General lacks *parens patriae* authority to enforce the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101, *et seq.*  Defendants rely on an unpublished trial court decision from 1980 (which has not been followed by any appellate court) and a trial court opinion which misstated Tennessee's position on the issue and was later corrected, see Smith Wholesale Co. v. R.J. Reynolds Tobacco Co., No. 2:03-CV-30, Dkt. 323 (E.D. Tenn. Mar. 11, 2005) (amending opinion to clarify that Tennessee's Attorney General did not concede he lacked authority to bring a *parens* claim) (attached as Exhibit A).  (Joint Mem. at 17 n.14.)

Other courts, including the Sixth Circuit Court of Appeals, have held that the Tennessee Attorney General has *parens patriae* authority as to its citizens' antitrust claims for damages as part of his broad general powers to litigate on the public's behalf, which originated under common law and are codified at Tenn. Code Ann. § 8-6-109 (describing duties of Attorney General, declaring authority "to utilize and refer to the common law in cases in which the state is a party").  The Sixth Circuit Court of Appeals agreed that objections to the Attorney General's *parens patriae* authority lacked merit.  In re Cardizem CD Antitrust Litig., 391 F.3d 812, 818 (6th Cir. 2004); see also In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. at 386 (state of Tennessee had *parens patriae* authority to represent consumers to litigate and settle antitrust claims) (citing Tenn. Code Ann. § 8-6-109, State ex rel. Inman v. Brock, 622 S.W.2d 36, 42 (Tenn. 1981) and State v Heath, 806 S.W.2d 535, 537 (Tenn. Ct. App. 1990)).  Because Cardizem

35

issued from the federal court of appeals most familiar with Tennessee law, its

conclusion that Tennessee's Attorney General is authorized to bring and settle

*parens* claims is instructive.[16]  <u>See</u> 391 F.3d at 818.

Thus, any State that has alleged a claim on behalf of its citizens is

authorized to do so, and Defendants' motion to dismiss on this basis should be

denied.

B. <u>Any State that Brings a State Law Claim on Behalf of Indirect Purchasers Is Authorized to Do So.</u>

1. The States May Bring Indirect Purchaser Claims under State Law.

It is well established that States cannot bring <u>*federal*</u> antitrust claims for

damages on behalf of indirect purchasers.  Citing this basic principle of antitrust

law, Defendants baldly and incorrectly argue that no state brings claims on behalf

---

[16] **In** <u>Infineon Technologies AG</u>, the Northern District of California rejected Tennessee's *parens patriae* claims in error.  531 F. Supp. 2d at 1170-71.  That court's holding contravenes the clear intent of the Tennessee Supreme Court. Tennessee's Supreme Court and state appellate courts have consistently taken an expansive view of the Attorney General's duty and authority to litigate, even where that authority is not explicitly enumerated by statute.  <u>See</u> <u>Brock</u>, 622 S.W.2d at 42 (rejecting challenge to Attorney General's authority to represent defendants in quo warranto action, holding that Tenn. Code Ann. § 8-6-109, "which describes the attorney general's duty to try cases…" is "very broad in both its specific language and intent"), citing with approval <u>Heath v. Cornelius</u>, 511 S.W.2d 683 (Tenn. 1974) ("A broad discretion is vested in this officer in determining what matters may, or may not, be of interest to the people generally. We must recognize the fact that the office of Attorney General is ancient in its origin in history, and it is generally held by the states of the Union that the Attorney General has a wide range of powers at common law. These are in addition to his statutory powers.").  The Tennessee Attorney General "has all common law powers of office, except insofar as they are restricted by statute, and the attorney general's duties are so numerous that the legislature does not attempt to identify each by statute."  <u>State v. Heath</u>, 806 S.W.2d at 537.  "As the chief law enforcement officer of the state, the attorney general may exercise such authority as the public interest may require and may file suits necessary for the enforcement of state laws and public protection."  <u>Id.</u>

of direct purchasers and that ten states[17] are barred from bringing damages claims under *state* antitrust law on behalf of indirect purchasers.

As a threshold matter, in making their argument, Defendants ignore the United States Supreme Court case, <u>California v. ARC America Corp.</u>, 490 U.S. 93 (1989).  In <u>ARC America</u>, the Supreme Court held that states barred by the <u>Illinois Brick</u> doctrine were allowed to maintain an action in federal court alleging a violation of state antitrust laws that allowed for indirect purchaser suits.  <u>Id.</u> at 102-03.  In <u>Arc America</u>, the states had brought suit in federal court seeking treble damages under Section 4 of the Clayton Act for an alleged nationwide conspiracy to fix prices of cement in violation of Section 1 of the Sherman Act.  The <u>Arc America</u> Court recognized that these states did not have a claim under federal law for damages as indirect purchasers, but held that <u>Illinois Brick</u> did not preclude them from maintaining indirect purchasers claims under their state antitrust laws. <u>Id.</u> at 102-03.

Therefore, a state's authority to bring indirect purchaser claims is a matter of state law.  Defendants mischaracterize the claims asserted by some States and, for other States, misstate that State's law.

Colorado, Connecticut,[18] Delaware, New Jersey, Ohio, Oklahoma[19] and Virginia are not asserting claims on behalf of indirect purchasers.  Any

---

[17] Defendants identify the following States:  Colorado, Connecticut, Delaware, Florida, Indiana, Louisiana, New Jersey, Ohio, Oklahoma and Virginia. (Joint Mem. at 18-19.)

[18] Connecticut is seeking general economy damages under Conn. Gen. Stat. § 35-32(c)(2) (<u>see</u> Am. Compl. ¶ 156), however, <u>Illinois Brick</u> does not apply to such claims.  <u>See State v. Liberty Mut. Holding Co.</u>, No. X09CV064023087, 2009 WL 943094, at *10-11 (Conn. Super. Ct. 2009) (<u>Illinois Brick</u> does not apply to the

arguments regarding those state laws is inapplicable and should be ignored as irrelevant.

As for the other States identified by Defendants, their state antitrust law claims are properly pled:

_Florida_:  As to Florida law, Florida has not asserted a damages claim on behalf of indirect purchasers under the Florida Antitrust Act ("FAA").  Florida does, however, bring <u>direct</u> purchaser claims under both the FAA and federal law. (Am. Compl. ¶ 181.)[20]  Consistent with well-established law, Florida also brings indirect purchaser claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  (<u>See</u> <u>infra</u> at IV.G (Florida).)

_Indiana_:  As Defendants acknowledge in their brief (Joint Mem. at 18 n.20), the Indiana Antitrust Act explicitly provides for indirect damages on behalf of the State and its political subdivisions.  Ind. Code §§ 24-1-1-5.1, 24-1-2-5.1, 24-1-2-7.

---

State when it is bringing a sovereign enforcement action or a general economy _parens patriae_ claim because the State is not acting as a purchaser – direct or indirect).

[19] Oklahoma does not specifically assert a claim for damages for indirect purchasers.  Rather, Oklahoma only states it is entitled to relief under the Oklahoma Antitrust Reform Act, 79 Okla. Stat 205 ("OARA").  While Defendants are correct in their assertion that a claim for damages for indirect purchasers is barred in Oklahoma pursuant to <u>Major v. Microsoft Corp.</u>, 60 P.3d 511, 513, (Okla. Civ. App. 2002), Oklahoma is entitled to other relief under the OARA, including "injunctive or other equitable relief." 79 Okla. Stat. 205(A)(1).  The Oklahoma Attorney General interprets "other equitable relief" to include disgorgement.

[20] Florida alleges that it has an assignment of antitrust claims from a vendor who purchased directly from Defendants and that Florida was harmed as a direct and proximate result of Defendants' conduct.  (_Id._ ¶¶ 181, 185.)  These factual allegations are sufficient at the pleading stage.  <u>See, e.g.</u>, <u>In re Optical Disk Drive Antitrust Litig.</u>, MDL No. 2143, 2014 WL 1379197, at *4 (N.D. Cal. Apr. 8, 2014) ("legal sufficiency" of assignments "present questions not readily adjudicatable on a motion to dismiss"); <u>Garrett Day LLC v. Int'l Paper Co.</u>, No. 3:15-cv-36, 2017 WL 633467, at *4 (S.D. Ohio Feb. 15, 2017) (factual questions concerning assignments are "explored during discovery").

Indiana seeks exactly these damages for these entities.  Indiana does not,

however, seek indirect purchaser damages for individuals.

_Louisiana_:  No Louisiana appellate court has directly addressed the

standing of indirect purchasers under the Louisiana Monopolies Act.  Louisiana's

antitrust laws date back to the 1890s and have historically provided broad

standing to all injured purchasers for nearly eighty years before Illinois Brick was

decided.  Though the U.S. Supreme Court decided to narrow federal standing to

only "direct purchasers" for a host of purely policy reasons, nothing in

Louisiana's law changed.  Indeed, the Monopolies Act plainly states that "[a]ny

person who is injured … may sue in any court of competent jurisdiction and shall

recover threefold damages sustained by him," La. R.S. 51:137.  Louisiana law

requires that when a law is clear and unambiguous and its application does not

lead to absurd consequences, the law shall be applied as written and no further

interpretation may be made in search of the intent of the legislature.  La. C.C. art.

9.  It is inappropriate to read some further requirement – such as direct purchaser

status – into the plain language of the Monopolies Act.[21]

---

[21] Applying these principles, courts have granted indirect purchasers
standing to recover damages under state antitrust laws.  See Comes, 646 N.W.2d
at 445 ("[W]e do not regard our legislature's failure to explicitly authorize indirect
purchasers to maintain a suit for antitrust violations as an expression of its
agreement with Illinois Brick. … Given the clear, broad language of the state
antitrust law, we conclude the Iowa Competition Law creates a cause of action for
all consumers, regardless of one's technical status as a direct or indirect
purchaser.") (citations omitted).  Similarly, the Arizona Supreme Court explained
that nothing in the plain language of the Arizona statute prohibits indirect
purchasers from bringing suit.  Bunker's Glass Co. v. Pilkington PLC, 75 P.3d 99,
102 (Ariz. 2003). The Louisiana's Monopolies Act likewise contains no language
that would expressly deny standing to indirect purchasers.

39

The Defendants rely on Free v. Abbott Labs. Inc., which, when faced with having "to fathom Louisiana's unsettled antitrust law" on this issue, determined that Louisiana would likely not allow indirect purchaser actions for damages. 176 F.3d 298, 299 (5th Cir. 1999). However, this decision is not binding on this Court, and the Fifth Circuit, inappropriately, did not evaluate Louisiana's antitrust laws through Louisiana's own rules of statutory interpretation. Instead, it assumed that Louisiana would follow federal law and apply Illinois Brick, despite the fact that federal interpretations of antitrust laws "should be persuasive" but are "not controlling." Id. at 299 (citing Louisiana Power and Light Co. v. United Gas Pipe Line Co., 493 So.2d 1149, 1158 (La.1986)). The Free Court ignored the U.S. Supreme Court's holding in ARC America and did exactly what that Court held was unacceptable by permitting Illinois Brick to define what a state was allowed to do under its own antitrust laws, ignoring the basic principles of statutory interpretation for Louisiana laws and providing absolutely no factual analysis of the asserted claims. This decision should not be followed here.

2.     The States May Bring State Law Disgorgement Claims.

In a footnote, Defendants also make the blanket statement, without citation, that the States cannot seek disgorgement under state law. (Joint Mem. at 19 n.26.) And then, citing one district court case discussing state law claims brought by private class plaintiffs, Defendants baldly claim that state attorneys general in states that are not Illinois Brick repealer states cannot seek certain equitable remedies. To the extent that Defendants seek to bar States from seeking disgorgement or other equitable remedies under state law, Defendants' conclusory statements contain no developed argument and the Court need not

40

consider them.  <u>See</u> Local Rule 7(a)(1).  In any event, Defendants again overlook both the Supreme Court decision in <u>ARC America</u>, holding that <u>Illinois Brick</u> does not address the preemption of state antitrust laws, and that the State Attorneys General are law enforcement officers and not private plaintiffs.

Moreover, Defendants' efforts to cabin the court's authority to fashion the equitable remedy of disgorgement does not depend on the exact nature of the damage caused, to the economy generally or individuals specifically, because the nature of the remedy itself is designed to prevent the party that violates antitrust law from profiting from that conduct.

With respect to Michigan, Ohio and Connecticut, Defendants additionally state that Michigan and Ohio's disgorgement claims under state law fail because those States follow federal antitrust law, and that Connecticut's claims fail because they have not plausibly alleged "that Defendants caused economy-wide harm."  (Joint Mem. at 19 n.26.)

*<u>Connecticut</u>*:  Connecticut has adequately pled its claim for harm to the State's general economy.  Under Connecticut General Statute § 35-32(c)(2), the Attorney General "may bring an action in the name of the state as . . . *parens patriae* with respect to damages to the general economy of the state . . .."  <u>See also</u> <u>State v. Marsh & McLennan Cos.</u>, 286 Conn. 454, 472 (Conn. 2008) (holding that Section 35-32(c)(2) "confers standing upon the state to pursue a *parens patriae* claim for antitrust damages to its general economy").  Here, Connecticut alleges that Defendants' conduct "damaged, directly and indirectly, the prosperity, welfare, and general economy of the State of Connecticut and the

economic well-being of a substantial portion of the People of the State of Connecticut and its citizens and businesses at large."  (Am. Compl. ¶ 156; <u>see also</u> ¶ 138 ("the general economies of the Plaintiff States have sustained injury and the Plaintiff States are threatened with continuing injury to their business and property unless Defendants are enjoined from continuing their unlawful conduct.").)  This is sufficient to state a claim for general economy damages under Section 35-32(c)(2).  <u>See, e.g.</u>, <u>Marsh & McLennan Cos</u>, 286 Conn. at 476 ("antitrust plaintiffs need not prove damages with exactitude at any stage, much less in the pleadings") (internal quotation marks and citation omitted); <u>see also</u> <u>State v. Liberty Mut. Holding Co.</u>, No. X09CV064023087, 2009 WL 943094, at *3 (Conn. Super. Ct. Mar. 20, 2009) (denying motion to strike general economy claim where state "alleged damage to the state's general economy and harm to the Connecticut citizenry from the alleged conspiracy.")

<u>*Michigan*</u>: Michigan law generally follows federal interpretations of federal antitrust law and federal law recognizes disgorgement as an appropriate antitrust remedy.  (<u>See</u> Section I.B, <u>supra</u>.)  Additionally, the Michigan Antitrust Act specifically authorizes the Attorney General to seek "appropriate injunctive or other equitable relief."  MCL 445.777.  Thus, Michigan law contemplates that the Attorney General may seek disgorgement as an appropriate measure of relief.

<u>*Ohio*</u>: Ohio's state antitrust law generally follows federal interpretations of federal antitrust law.  <u>Johnson v. Microsoft Corp.</u>,  834 N.E.2d 791, 794 (Ohio 2005).  However, Ohio's highest court recognizes that "Ohio law is in much broader and stronger terms than the federal enactment."  <u>List v. Burley Tobacco</u>

Growers' Co-op Ass'n, 151 N.E. 471, 474 (Ohio 1926).  The Ohio Attorney General is empowered by R.C. 109.81 and 1331.01, *et seq.* to obtain equitable remedies, even on behalf of indirect purchasers of the affected product who have no ability to recover damages.  FTC v. Mylan Labs., Inc., 99 F. Supp. 2d 1 (D.D.C. 1999). Disgorgement is an equitable remedy the Ohio Attorney General is entitled to seek pursuant to R.C. 109.81 and 1331.11.  State ex rel. Dann v. Am. Int'l Group, Inc., C.P. No. CV-07-633857, 2008 WL 4107117 (Cuyahoga Cty. Ct. Comm. Pl. June 30, 2008).

In short, States have alleged such state law claims as their state laws authorize, and Defendants' arguments to the contrary should be rejected.

C.      **New York Has Standing to Sue on Behalf of Government Entities.**

Defendants broadly assert that "Plaintiffs" may only seek relief on behalf of governmental entities where they are authorized to do so, but then only identify two (Colorado[22] and New York)—of the forty State Attorneys General in this case—who they claim do not have such authority.  (Underline Joint Mem. at 19-20.) Defendants' arguments, yet again, miss their mark.

Defendants argue that the New York Attorney General cannot assert damages on behalf of the state without the request of the state, citing N.Y. Gen. Bus. Law § 342-b.  (Joint Mem. at 19-20, n.28.)  But that section and the case cited by Defendants relates to public authorities and political subdivisions, not the state itself, and New York does not assert claims for New York public authorities or political subdivisions.  New York asserts the claims of the state under the

_____

[22] Colorado is not asserting any claims on behalf of any entities other than the State of Colorado, by and through its Attorney General.

Donnelly Act, including the damage claims of the state.  The New York Attorney General has the authority to represent the state and assert those damage claims under the comprehensive authority given to the Attorney General specified in N.Y. Exec. Law § 63.1 ("The attorney-general shall: 1. Prosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, but this section shall not apply to any of the military department bureaus or military offices of the state.").  This comprehensive authority is an example of authority that is unaffected by section 342-b, as illustrated by that section's introductory clause: "In addition to existing statutory authority to bring such actions on behalf of the state and public authorities."

### D. The States Have Sufficiently Alleged a Nexus to Intrastate Commerce as Required by their Respective State Laws, and State Antitrust and Consumer Protection Laws Are Not Unconstitutional under the Dormant Commerce Clause.

In their last effort to dismiss the States' state law antitrust claims, Defendants make two remarkable claims: (1) that thirteen states[23] have failed "to allege actual facts showing that Defendants' conduct substantially affected intrastate commerce" and (2) that the remaining state law claims "are unconstitutional under the Dormant Commerce Clause."  (Joint Mem. at 20-21.) Neither argument withstands serious scrutiny.

---

[23] The Defendants identify: Colorado, Connecticut, Hawaii, Illinois, Michigan, Mississippi, Nevada, New Hampshire, New York, North Carolina, Oregon, Tennessee and Wisconsin.  (Joint. Mem. at 20.)

1.   **The Amended Complaint Sufficiently Alleges a Nexus to Intrastate Commerce for State Law Antitrust Claims.**

Defendants argue that thirteen states' antitrust claims fail because they do not allege that Defendants' conduct substantially affected intrastate commerce. The only legal authority Defendants cite in support of dismissing these states' claims is a footnote with a string cite to various state statutes and cases interpreting state law.  The footnote is devoid of any discussion or argument as to why these cited authorities support dismissal.  (Joint Mem. at 20 n.29.) Because such arguments are not sufficiently developed, the Court need not consider them.  See Local Rule 7(a)(1).

Defendants' claim fails as to Colorado, Connecticut, Hawaii, Illinois, and Oregon,[24] because there is no requirement under those states' antitrust laws that Plaintiffs plead a substantial effect on intrastate commerce.

---

[24] Colorado does not require that "intrastate" commerce be alleged.  Colo. Rev. Stat. 6-4-103(5) defines "trade or commerce" as "any and all economic activity carried on wholly or partially in this state…" (emphasis added). Paragraph 134 of the Amended Complaint sufficiently alleges that Defendants' conduct impacted trade and commerce in Colorado: "The Defendants' activities also had and continue to have a substantial effect upon trade and commerce within each of the States."

Conn. Gen. Stat. § 35-30 "applies to every contract, combination, or conspiracy in restraint of any part of trade or commerce . . . when any part thereof was entered into or effectuated in whole or in part in this state."  Id. § 35-25(c) ("'Trade or commerce' means intrastate as well as interstate commerce.").  The case cited by Defendants, Fido's Fences, Inc. v. Canine Fence Co., 672 F. Supp. 2d 303, 313 (E.D.N.Y. 2009), is inapposite.  In Fido's Fences, the District Court dismissed plaintiff's claims because there was no connection between plaintiff's business and the state of Connecticut.  The District Court said nothing about the necessity of alleging facts about intrastate commerce to state a claim under the CT Act.

Hawaii antitrust laws, Haw. Rev. Stat. chapter 480, do not require allegations regarding a substantial effect upon the trade and commerce within the State of Hawaii.  Moreover, the Amended Complaint contains allegations

Moreover, to the extent that state law requires allegations regarding an impact on commerce within the relevant state, such allegations are more than adequately pled.  The comprehensive factual allegations, incorporated by reference in each State's claims, plausibly allow the following inferences:  The generic pharmaceutical industry is a dominant and integral part of lowering health care costs nationwide, including within each state.  (E.g., Am. Compl. ¶¶ 2-4, 29-40.)  Defendants, as generic drug manufacturers, rely on the complex

---

sufficient to apprise Defendants of the nationwide impact of their conduct, and the concomitant impact on intrastate commerce within the states (see, e.g., ¶¶ 6-13), and the State of Hawaii is part of the nation.  Hawaii's counterpart to Section 1 of the Sherman Act, Haw. Rev. Stat. § 480-4, expressly limits its applicability of the statute to trade or commerce within Hawaii.  This express limitation and the fact that Hawaii's claim is unambiguously represented to be a state law claim causing damage to the State of Hawaii reduces the need for further elaboration in the Amended Complaint.

The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, also contains no requirement to plead substantial "intrastate commerce" effects for a price-fixing cases such as this. The case cited by defendants, Mr. Frank, Inc. v. Waste Mgmt., Inc., 591 F. Supp. 859, 869 (N.D. Ill. 1984), interprets only the monopolization sub-section of the Illinois Antitrust Act--the Section 2 analogue.  Even in that monopolization context, the court denied the motion to dismiss, concluding that "[p]rice increases in a market which encompasses part of Illinois are a sufficiently substantial effect on Illinois commerce for [plaintiff] to seek relief under the Illinois Antitrust Act." Id.  Here, of course, plaintiffs allege price increases nationwide, which by definition includes all of Illinois.  (Am. Compl. ¶ 14.)

Citing no authority apart from the statute itself, Defendants mistakenly argue that Oregon Revised Statutes 646.715(2) limits the application of the Oregon Antitrust Law to intrastate commerce.  The section Defendants cite, however, does precisely the opposite, stating: "It is the legislative purpose that [the Oregon Antitrust Law] apply to intrastate trade or commerce, and to interstate trade or commerce involving an actual or threatened injury to a person or property located in this state."  Indeed, the statutory section Defendants cite was amended in 2001 to make the interstate application of the law express and unmistakable.  As such, Defendants' argument—that Oregon's state law claim should fail if the Amended Complaint is found to allege no effect on Oregon intrastate commerce—is careless, lacks any basis in the statutory text, and should therefore be disregarded.

industry distribution chain to sell their products and reach patients in every state nationwide.  (E.g., Am. Compl. ¶¶ 38-43, 121, 134.)  This distribution chain includes purchasers such as states and governmental entities; entities that operate as purchasing agents for state government payers throughout the nation; and national companies that commonly operate as purchasers within each state.  (E.g., Am. Compl. ¶¶ 20, 36-47, 136-38.)  The allegations show widespread conspiracies with long-lasting effects (e.g., Am. Compl. ¶¶ 1-18), and the two drugs at issue were pharmaceuticals purchased within each state.  (E.g., Am. Compl. ¶¶ 1, 9, 69, 104.)  As a result of these conspiracies, "consumers nationwide paid more for numerous generic pharmaceutical drugs, including specifically Doxy DR and Glyburide, than they otherwise would have in a competitive market. . . ." (E.g., Am. Compl. ¶ 14.)

As to the specific state laws cited by Defendants, the States respond as follows:

*Michigan*:  Michigan law does not require the State to plead "substantial affects" on intrastate commerce to state a claim.  Defendants' reference to Mich. Comp. Laws § 445.771 sub(b) and sub(c) do not show that Michigan's allegations of impact on intrastate commerce are wanting.  The statute simply defines the "relevant market" as the "geographical area of actual or potential competition in a line of trade or commerce, all or any part of which is within this state."  And "trade or commerce" similarly, simply means the producing or providing of goods, commodities, services, etc.  In this case, the States allege that the illegal agreements affected the provision of the drugs at issue, and it is equally clear

47

that the States have alleged that these illegal agreements had, or at a minimum had the potential to have, competitive impact.  (Am. Compl. ¶¶ 135, 136.)  Thus, Defendants' argument based on the language of the Michigan statute are unavailing.

*Mississippi*:  The Mississippi Antitrust Act ("MAA") applies to illegal agreements to restrain trade, fix prices or output, hinder competition, or otherwise unite interests at any point in the manufacturing, sale, and pricing of a commodity that occurs in both interstate commerce and intrastate commerce and are inimical to public welfare.  The Act decisively states that "any corporation, domestic or foreign, . . . who… create[s or] become[s] a member of [any] trust or combine as hereinabove defined shall be deemed… guilty of a conspiracy… and subject to the penalties hereinafter provided."  Miss. Code Ann. § 75-21-1 (1972) (emphasis added).  Since the statutory language is unambiguous, a plain meaning should apply, and the statute accordingly governs the Defendants' conspiracy.

Despite the historic and clear statutory authority of a State to regulate commerce, Defendants argue that the State may only regulate intrastate commerce.  In 1991, the Mississippi Supreme Court recognized that the Defendants' argument had been judicially overruled by the  U.S. Supreme Court in 1942, which overruled the intrastate/interstate dichotomy allowing Congress to regulate small local, intrastate activities that have an aggregate effect on

48

interstate commerce.  <u>State ex rel. Moore v. Molpus</u>, 578 So.2d 624, 635 (Miss. 1991) (citing <u>Wickard v. Filburn</u>, 317 U.S. 111 (1942)).[25]

In <u>Standard Oil Co. of Ky. v. State</u>, multiple entities constructed an interstate monopoly that eliminated competition and monopolized the trade in petroleum "throughout the United States and its territories . . ."  107 Miss. 377, 469 (1914).  In holding that these foreign companies and their national monopoly were subject to the MAA, the Supreme Court reasoned that although the petroleum at issue was manufactured in another state and was imported into Mississippi, Defendants conduct constituted intrastate commerce and was "governed by the state's laws" because "an article which is one of interstate commerce by reason of the fact that it is the subject of a sale by a citizen of one state to a citizen of another, and it being transported from the one state to the other, loses its character as such when the transportation has been completed and it is mingled with and becomes a part of the general mass of property in the state."  <u>Id.</u> at 470 (citing <u>Leisey v. Hardin</u>, 135 U.S. 100 (1890)).  Under this reasoning, any trust or combination that exists in both interstate and intrastate commerce may be governed by both the federal and state antitrust acts.  <u>See also</u> <u>Hood v. BASF Corp.</u>, No. 56863, 2006 WL 308378, at *5 (Miss. Ch. Ct. Jan. 17, 2006) ("Once the vitamins' transportation had been completed and reached the

---

[25] In the alternative, if the present court finds merit in the Defendants' argument despite the applicable statutory language and current case law, it is important to note that whether an activity occurs in interstate or intrastate commerce is a question of fact.  <u>Mississippi C.R. Co., v. Knight</u>, 138 Miss. 621 (1925).

State of Mississippi, their final destination, the vitamins were under the jurisdiction of Mississippi's laws.")

Aside from the lack of legal merit, Defendant Mylan has already admitted that it is conducting intrastate business by having an agent registered with the Mississippi Secretary of State and regularly filing annual reports with the Mississippi Secretary of State.[26]  This admission is not the only evidence of intrastate commerce.   As discussed <u>infra</u>, the actual sale and marketing of the relevant pharmaceuticals were in intrastate commerce.  When individual parties form a conspiracy, the parties are liable for all actions of the conspiracy.[27]

*Nevada*:  The Nevada Unfair Trade Practices Act's ("NUTPA's") prohibition against unlawful conspiracies conducted "in this State" does not require that Defendants conduct substantial activities within Nevada; it simply provides a remedy against an interstate conspiracy that produces harm in Nevada.  <u>See</u> Nev. Rev. Stat. §§ 598A.010, *et seq.*; <u>In re Chocolate Confectionary Antitrust Litig.</u>, 602 F. Supp. 2d 538, 581 (M.D. Pa. 2009) ("[NUTPA] creates a remedy against an

---

[26] **The Mississippi Code Section 79-4-15.01 states that "a foreign corporation may not transact business in this state until it obtains a certificate of authority from the Secretary of State."  The section also states that a foreign corporation does not need an agent if it is "transacting business in interstate commerce."  <u>Id.</u>  Thus, under Federal Rule of Evidence 801, Defendant Mylan has made an admission of party opponent that it conducts intrastate commerce by obtaining a registered agent in the State of Mississippi.  Mylan's registered agent is listed on the Secretary of State's website, <u>https://corp.sos.ms.gov</u>, and Mylan's 2016 annual filing can be found at: <u>https://corp.sos.ms.gov/corpconv/portal/c/ExecuteWorkflow.aspx?workflowid=g12dbd558-fa5d-49a1-a869-ad8b9db198db&FilingId=ca4b0734-ee40-4f10-8d8b-e814411b601a</u>.**

[27] <u>**Globe & Rutgers Fire Ins. Co., v. Firemen's Fund Ins. Co.**</u>**, 97 Miss. 148 (Miss. 1910).**

interstate conspiracy that produces harm in Nevada," such as when "defendants engaged in a national price-fixing conspiracy that resulted in price increases in Nevada and elsewhere.").  And the Amended Complaint has alleged such a conspiracy that produced harm nationwide, including in Nevada.  (E.g., Am. Compl. ¶ 14.)  Thus, Defendants' citation to Nev. Rev. Stat. §598A.060 offers them no comfort.

_New Hampshire_:  New Hampshire antitrust law proscribes a broad range of conspiratorial conduct among competitors in "any" part of trade or commerce, including fixing prices and bid-rigging conduct in "any" private or public contract.   NH RSA  356:2, I; see RSA 356:1 (defining "[t]rade or commerce" without a state specific constriction).[28]  NH RSA 356:2 does not prescribe an intrastate nexus.  See In re Magnesium Oxide Antitrust Litig., No. 10-5943, 2011 WL 5008090, at *8 n.10 (D.N.J. Oct. 20, 2011) (unpublished) (recognizing New Hampshire antitrust law has "no discernable requirement of in-state conduct or effect, or residency").  The sole federal case cited by defendants as "interpreting New Hampshire law" relates to state consumer protection law.  (See Joint Mem. at 20, n.29.)  In short, the court should reject the Defendants' empty proposition. See Local Rule 7(a)(1).

Even if an intrastate nexus were required, the factual allegations in the Amended Complaint give rise to a plausible inference of a sufficient intrastate

---

[28]  The State of New Hampshire has authority to seek relief as a sovereign, as _parens patriae,_ and as an injured party, including for direct and indirect purchasing.  NH RSA 356:4-a, :4-b, :4-c.  Allegations of injury are not required for the State Attorney General to prevail in this antitrust law enforcement action seeking, among other things, injunctive relief, disgorgement, and civil penalties.

nexus.  Several federal courts have ruled that allegations showing a plausible inference that competitors' conspiratorial conduct caused artificially inflated pricing of goods in states nationwide sufficed to allege material intrastate nexus between the proscribed conduct and a particular state.  See, e.g., In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-md-02503-DJC, 2015 WL 5458570, at *16 (D. Mass. Aug. 16, 2015); In re Auto. Parts Antitrust Litig., No. 12-md-02311, 2014 WL 2993753, at **14-17 (E.D. Mich. July 3, 2014); In re Dig. Music Antitrust Litig., 812 F. Supp. 2d 390, 407-08 (S.D.N.Y. 2011) (citing cases).  The court should rule similarly here -- especially given the far reach of the generics distribution chain into each state and among a swath of government and commercial purchasers, as explained supra.

*New York*:  Defendants baselessly argue that New York needs to and has not alleged that Defendants' conduct "substantially affected intrastate commerce."  (Joint Mem. at 20, n.29.)  The only citation to New York law that Defendants provide is to N.Y. Gen. Bus. § 340.  That section applies to conduct "in this state."  That section does not apply to "intrastate" conduct or conduct "only" or "substantially" within New York.  New York is not aware of any case that limits the reach of section 340 to intrastate commerce (substantially or otherwise) and is aware of many cases that apply section 340 to conduct in New York regardless of whether that conduct is also in interstate commerce.  E.g., People v. Rattenni, 613 N.E.2d 155 (N.Y. 1993) (Connecticut-New York border used in a per se illegal geographic market allocation).  As conceded by Defendants,

New York alleges conduct in New York in paragraph 134 of the Amended Complaint.

*North Carolina*:  Under North Carolina law, N.C.G.S. § 75-1 prohibits anticompetitive conduct "in restraint of trade or commerce in the State of North Carolina." This provision does not, contrary to Defendants' assertion, mandate that the anticompetitive conduct have a substantial effect on intrastate commerce.  The statute only requires that part of the violation take place in the State.  See In re Cast Iron Soil Pipe & Fittings Antitrust Litig., No. 1:14-md-2508, 2015 WL 5166014, at *25 (E.D. Tenn. June 24, 2015).  Allegations that goods are brought into the State for sale therein are sufficient to state a cause of action.  In re DDAVP Indirect Purchaser Antitrust Litig. v. Ferring Pharms. Inc., 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012); Sheet Metal Worker Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F. Supp. 2d 380, 400 (E.D. Pa. 2010).  The Amended Complaint makes these allegations.  Even assuming, *arguendo*, that substantial effects on intrastate commerce must be alleged, the complaint is rife with allegations concerning the impact Defendants' anticompetitive conduct had on the prices of generic drugs in North Carolina.

*Tennessee*:  Under Tennessee law, to determine whether a case falls within the scope of the Tennessee Trade Practices Act (Tenn. Code Ann. § 47–25–101), courts must decide whether the alleged anticompetitive conduct affects Tennessee trade or commerce "to a substantial degree." Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 523-24 (Tenn. 2005).  The determination of whether an effect is substantial is pragmatic, turning upon the particular facts of

the case, id. at 523, and thus is generally not suitable to decide on a motion to dismiss.  Further, the anticompetitive conduct need not even affect market prices to substantially affect intrastate commerce.  Id. at 523-24 (internal citations omitted).  Courts have found the requisite substantial effect on intrastate commerce from allegations that conspiracies had nationwide effects, and/or effects in Tennessee.  Compare In re New Motor Vehicles Canadian Exp. Antitrust Litig., 350 F. Supp. 2d 160, 173 (D. Me. 2004) ("retail prices throughout the country (thus including Tennessee) are higher" as a result of challenged conduct; nationwide impact "necessarily implicates substantial effects on commerce within Tennessee") and In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d at 581–82 (price-fixing by defendants elevated the cost of chocolate products in Tennessee and nationwide) with Infineon Techs. AG, 531 F. Supp. 2d at 1159–60 (complaint was "completely devoid of any mention of Tennessee commerce").  Tennessee adequately pled such allegations in the Amended Complaint.  (See, e.g., Am. Compl. ¶¶ 14, 300.)

*Wisconsin*:  As for Wisconsin, Defendants fail to note the latest precedent for filing an action under Wisconsin law.  "A plaintiff filing an action under Wisconsin's Antitrust Act must allege price fixing … that 'substantially affects the people of Wisconsin and has impacts in this state.'"  Meyers v. Bayer AG, 735 N.W.2d 448, 451 (Wisc. 2007).  Wisconsin has satisfied this pleading requirement. (See Am. Compl. ¶ 314.)

In sum, Defendants' motion to dismiss these state law claims for failing to allege "actual facts" that Defendants' conduct "substantially affected" intrastate

commerce should be denied.  For each State identified by Defendants, its respective State Attorney General has pled what is required under state law.

> 2.   The States' Antitrust and Consumer Protection Laws Are Not Unconstitutional under the Dormant Commerce Clause.

Defendants argue, almost in passing, that to the extent state antitrust and consumer protection acts do not require a connection to intrastate commerce, they are unconstitutional under the Dormant Commerce Clause, (Joint Mem. at 20-21 & 31, n.36), wholly ignoring that the States and their Attorneys General have a long history of enforcement in these areas.  Defendants' suggestion, essentially made in two sentences, that this well-established authority is contrary to the United States Constitution is unsupported by both fact and law.

All States have alleged that the actions of the Defendants have affected the price of drugs in their States.  No State has asserted a claim without including an allegation that the actions of Defendants have had an effect on commerce in their state.  More importantly, as discussed in the previous section above, the allegations in the Amended Complaint make it clear that intrastate commerce, as well as interstate commerce, are affected.  For example, the drug manufacturers sell to entities in the States which then resell to pharmacy benefit managers, health plans, pharmacies, patients, or health care providers within the state. Most of the final transactions are intrastate.

The Dormant Commerce Clause is not implicated in this case.  The Supreme Court has specifically recognized that state antitrust acts are <u>not</u> preempted by the Sherman Act, <u>California v. ARC America Corp.</u>, 490 U.S. 93 (1989), directly contradicting Defendants' argument (made in a parenthetical

based upon <u>Flood v. Kuhn</u>, 407 U.S. 258 (1972)) that interstate transactions must be governed by federal, not state, antitrust law.[29]  To the contrary, the Supreme Court stated, "[g]iven the long history of state common-law and statutory remedies against monopolies and unfair business practices, it is plain that this is an area traditionally regulated by the States." <u>ARC Am.</u>, 490 U.S. at 101 (citations omitted).

A state law burdens interstate commerce when it "'has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction.'" <u>Am. Booksellers Found. v. Dean</u>, 342 F.3d 96, 102 (2d Cir. 2003) (quoting <u>Brown & Williamson Tobacco Corp. v. Pataki</u>, 320 F.3d 200, 208–09 (2d Cir. 2003)).  While Defendants suggest that the state statutes at issue in this action impermissibly directly regulate or discriminate against interstate commerce, the statutes at issue are nothing more than common state antitrust and consumer protection statutes which the States have always had the power to enact and enforce.  None target out-of-state business, favor in-state business, or require out-of-state business to conduct business in a certain way.  Defendants have not cited a single case striking down a state antitrust law, a general consumer protection law or any law remotely analogous under the Dormant Commerce Clause.  <u>See</u> <u>SPGGC LLC v. Blumenthal</u>, 505 F.3d 183, 194 (2d Cir. 2007) (stating that courts should hesitate to use the Commerce Clause to invalidate laws in areas traditionally subject to state regulation).  Defendants'

---

[29] <u>Flood</u> concerned baseball, which, as the Court noted, is "an exception and an anomaly" with regard to antitrust law.  407 U.S. at 283.  The Court carefully stated that its comments on state law were "[a]s applied to organized baseball …" <u>Id.</u> at 284-85.  Thus, the case is inapposite to the claims asserted here.

motion to dismiss state law claims as violative of the Dormant Commerce Clause should be denied.

## IV.  THE STATES HAVE SUFFICIENTLY PLED THEIR CONSUMER PROTECTION CLAIMS CONSISTENT WITH THE REQUIREMENTS OF EACH STATE.

Here again, Defendants take a shotgun approach towards attacking the consumer protection claims brought by a subset of States[30] by baldly asserting that these claims have been inadequately pled.  (See Joint Mem. at 21-24.) Contrary to Defendants' broad pronouncements, each State Attorney General asserting a consumer protection claim has brought carefully considered consumer protection claims based on his or her expertise in this area, and each State has supported its claims with sufficient allegations.  By contrast, in seeking dismissal, Defendants have done little more than flatly argue that "all" States' claims fail.  Where Defendants have identified specific arguments as to particular States, those States provide responses below.

The general, broad-brush statements made by Defendants include that (1) all States' consumer protection claims fail for insufficient pleading; (2) all States fail to plead their consumer protection claims with the specificity required by Rule 9(b); and (3) the States cannot "bootstrap antitrust claims with consumer protection claims."  (See Joint Mem. at 21-24.)  On each score, Defendants' simplistic and conclusory statements miss their mark.

---

[30] Defendants identify the following States:  Alabama, Arizona, California, Connecticut, Florida, Hawaii, Indiana, Iowa, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Carolina, North Dakota, Pennsylvania, South Carolina, Vermont and Washington.

The cases cited by Defendants in support of the claim that the States, writ large, have insufficiently pled consumer protection claims simply do not apply. In those cases, private plaintiffs alleged state law violations by "list[ing] a couple of dozen state statutes" or "listed claims under many state laws" or making "the bald assertion that [the conduct] violates dozens of non-antitrust laws." (See Joint Mem. at 22 (quoting In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 163 (2d Cir. 2016); In re Aggrenox Antitrust Litig., 94 F.Supp.3d 224, 255 (D. Conn. 2015); In re Opana ER Antitrust Litig., 162 F. Supp. 3d 704, 725-26 (N.D. Ill. 2016)).) These cases are not applicable where plaintiffs have made particularized allegations and sufficiently pled the elements of each consumer protection law under which relief is sought. Here, the State Attorneys General do not merely list state laws; they have put forth scores of carefully pled allegations in support of their claims.

Defendants also cite In re Aggrenox Antitrust Litig., No. 3:14:-md-2516, 2016 WL 4204478 (D. Conn. Aug. 9, 2016), for the broad proposition that "[i]f such allegations [of anticompetitive conduct] were sufficient to state a consumer protection law claim, there would be no need for separate antitrust laws." (Joint Mem. at 22-23.) The Aggrenox opinion does not stand for such a broad proposition. Rather, in dicta, the court makes the unremarkable observation that it is up to each state to interpret its laws. See 2016 WL 4204478 at *7. The court does hold that under Illinois law it would be redundant to assert an Illinois consumer protection claim where the antitrust law clearly applies and therefore

dismisses the Illinois consumer protection claim.  See id. (discussion), at *10
(dismissal).[31]

Accordingly, Defendants have provided no basis to dismiss these state law
claims wholesale for insufficient pleading.

Defendants also broadly argue that the States "fail to set forth the required
elements of their consumer protection claims or plead facts sufficient to establish
that those elements have been met, much less with the specificity required by
Rule 9(b) …" (Joint Mem. at 22.)  Such a sweeping argument ignores the
specificity the States have provided in their Amended Complaint, and moreover
also ignores that consumer protection statutes do not all require allegations of
fraud, and thus do not need to be alleged with specificity pursuant to Rule 9(b).
To the extent such a broad argument on Rule 9(b) requires a response, several
federal district court cases have held that actions brought by the FTC for
violations of the FTC Act, upon which many state consumer protection statutes
are based, see discussion infra, are not subject to Rule 9(b) because the elements
required to establish a traditional fraud claim are not required in FTC Act cases.
See, e.g., FTC v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 314-15 (S.D.N.Y.
2008) (recognizing that Rule 9(b) does not apply to Section 5 claims); FTC v.
Communidyne, Inc., No. 93 C 6043, 1993 WL 558754, at *2 (N.D. Ill. Dec. 3, 1993)
("A claim under section 5(a) of the FTC Act is not a claim of fraud or mistake, so
Rule 9(b) does not apply.").  Even assuming arguendo that the Rule 9(b)

---

[31] This is consistent with the Illinois Attorney General's pleading of
antitrust claims, and not consumer protection claims, in the present case.

requirements did apply, for the reasons discussed in the individual State sections, all such pleading requirements have been met.

Finally, Defendants argue that "even if Plaintiffs could bootstrap their antitrust claims with consumer protection claims" the consumer protection claims should be dismissed if the underlying antitrust claims prove insufficient. (Joint Mem. at 23.)  As an initial matter, as discussed above and in the States' Consolidation Opposition to dismissal, the States' antitrust claims have been more than sufficiently pled.  Further, Defendants ignore that each state law has specific pleading requirements, and a one-size-fits all argument like this cannot apply to the particularized claims of each consumer protection violation alleged here.  To support their position, Defendants cite certain cases brought by private plaintiffs who failed in pleading certain consumer protection claims.  See In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 163 (2d Cir. 2016); Formula One Licensing, B.V. v. Purple Interactive Ltd., No. C 00-2222 MMC, 2001 WL 34792530 (N.D. Ca. Feb 6, 2001), at *4; Hicks v. PGA Tour, 165 F. Supp. 3d 898, 911 (N.D. Cal. 2016); In re Plavix Indirect Purchaser Antitrust Litig., No. 1:06-cv-226, 2011 WL 335034, at *5 (S.D. Ohio Jan 31, 2011).  None of these cases stands for the broad proposition that a consumer protection claim cannot exist separately from an antitrust claim and, as demonstrated below, the relevant States have properly pled their consumer protection law claims.

A.    Kentucky and South Carolina Are Entitled to Monetary Relief.

Defendants argue that Kentucky and South Carolina are limited to injunctive relief.  (Joint Mem. at 24.)  But the law in each state clearly establishes that the Attorney General may seek monetary relief for violations of each State's

60

consumer protection law.  The Kentucky Attorney General is entitled to seek civil penalties for the Commonwealth (Ky. Rev. Stat. Ann. § 367.990) and restitution on behalf of harmed consumers.  Ky. Rev. Stat. Ann. § 367.200 (Attorney General may seek "orders or judgments . . . to restore to any person in interest any moneys . . . which may have been paid out as a result of any practice declared unlawful by KRS 367.130 to 367.300."); see also Commonwealth v. ABAC Pest Control, Inc., 621 S.W.2d 705, 706 (Ky. App. Ct. 1981) ("the legislature, in enacting KRS 367.200, intended to vest the Attorney General with the authority to seek restitution on behalf of defrauded consumers.").  Similarly, under South Carolina law, the Attorney General is empowered to seek restitution, civil penalties, and actual damages on behalf of state agencies that have been harmed by the conduct at issue.  See, e.g., S.C. Code § 39-5-50 (Attorney General may seek "additional orders or judgments as may be necessary to restore to any person who has suffered any ascertainable loss . . ., any moneys or property, real or personal, which may have been acquired by means of any practice declared to be unlawful in this article . . ."); S.C. Code § 39-5-110 (Attorney General may seek a civil penalty not to exceed $5,000 for each willful violation); S.C. Code § 39-5-140 (state agencies that are being represented by the Attorney General may recover actual damages—which are trebled for willful violations—as well as attorneys' fees and costs.)

Further, to the extent that the Court entertains Defendants' undeveloped one-sentence blanket statement that no state can seek injunctive relief claims under their consumer protection laws because the States have not demonstrated

any threat of future injury (<u>see</u> Joint Mem. at 24), it should be rejected for the reasons discussed <u>supra</u> in Section I.A.

**B.      Any State Required to Allege Deceptive Conduct Has Done So.**

Defendants argue that six States' consumer protection claims[32] require "allegations of deceptive or misleading conduct directed at consumers."  (Joint Mem. at 24-25.)  All of the relevant pleading requirements have been satisfied through the allegations in the Amended Complaint.  Arizona, California, and Pennsylvania do not have the requirements argued by Defendants, and Minnesota, Nevada, and North Dakota meet their respective state law pleading requirements.  Defendants also argue that "claims under most of these statutes must be pled with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure." (<u>Id.</u> at 25.)  Claims brought by the Attorneys General of Arizona, California, and Pennsylvania are not required to be pled in accordance with Rule 9(b).  To the extent that the other three states require Rule 9(b) particularity, those requirements have been met for each of Minnesota, Nevada, and North Dakota for the reasons discussed below.[33]

---

[32] Defendants identify the following States:  Arizona, California, Minnesota, Nevada, North Dakota and Pennsylvania.  (Joint Mem. at 24.)

[33] Defendants cite <u>In re Static Random Access Memory (SRAM) Antitrust Litig.</u>, 580 F. Supp. 2d 896, 909 (N.D. Cal. 2008), and <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 350 F. Supp. 2d at 200-01, for the overbroad proposition that "courts routinely dismiss consumer protection claims that require a pleading of deceptive conduct when a plaintiff merely attempts to allege anticompetitive conduct." (Joint Mem. at pp. 25-26.)  These cases – both private class actions – are inapposite.  <u>In re SRAM Antitrust Litigation</u> makes no mention of the laws of Arizona, Minnesota, Nevada, and North Dakota and only mentions California in the context of choice of law, not the adequacy of consumer protection allegations.

Based on the actual pleading requirements for each state claim, the Amended Complaint contains more than sufficient allegations to survive dismissal.  (See, e.g., Am. Compl. ¶¶ 6-14, 42, 48-133, 137, 170.)  Included are allegations that Defendants artificially maintained high prices (¶¶ 67, 137), created the appearance of competition (¶ 67), provided false statements to wholesalers when declining to provide competitive bids (¶ 82), refused to provide bids to protect and maintain price increases (¶¶ 11, 121-22), and misrepresented true market price (¶ 137).

In general, the Amended Complaint alleges that the Doxy DR Defendants deceived their wholesaler customers by providing false and misleading statements regarding their inability to undercut one another's prices and to bid on competing accounts.  It also alleges that the Glyburide Defendants engaged in deceptive conduct, communicated with one another to ensure that their prices were well in excess of what they would otherwise charge and refused to bid for contracts when wholesalers sought new suppliers to counter those price increases.  These allegations are more than sufficient for each of the States above to meet their respective consumer protection state law standards.

---

In In re New Motor Vehicles Canadian Export Antitrust Litig., the court did dismiss the consumer protection claims of the Arizona, Minnesota, North Dakota, and Pennsylvania classes, but did so on the basis that there were no allegations of fraud or deception.  Id. at 178 (Arizona), 190 (Minnesota), 198 (North Dakota), 200-201 (Pennsylvania).  As discussed below, in the present case all of the pleading requirements have been met.  The applicability of the Pennsylvania law analysis in these decisions is addressed in the Pennsylvania-specific section below.

Furthermore, allegations concerning the Defendants' fraudulent concealment of the false or misleading nature of their statements concerning the fairness of their bids or price offers, or statements concerning their supply capacity or reasons for bidding or not bidding, have been pled with the required specificity.[34]  They include dates of specific meetings, and dates, participants and content of specific communications, all of which were incorporated into the States' consumer protection claims.  These allegations easily meet the legal standards described below.

*Arizona*:  Defendants incorrectly assert that Arizona law requires a plaintiff to allege that the deceptive or misleading conduct was directed at consumers and cites a case that does not support this argument.  In Watts v. Medicis Pharm. Corp., 365 P.3d 944, 953 (Ariz. 2016), the court held that the Arizona Consumer Fraud Act ("ACFA") does not require a direct merchant-consumer transaction.  Id. Additionally, the language in footnote 30 (Joint Mem. at 25), regarding the required showing of proximate injury resulting from the misrepresentation applies to private causes of action, not actions brought by the Attorney General. To support an enforcement action under the ACFA, the Attorney General is simply required to allege a false promise or misrepresentation made in connection with the sale or advertisement of merchandise.  Peery v. Hansen, 120 Ariz. 266, 585 P.2d 574 (App. 1978).  In contrast, a plaintiff in a private ACFA action, such as in Watts, must additionally allege his or her injury or damages.

---

[34] Those heightened allegations are set forth, among other places, at paragraphs 125-133.

Defendants also incorrectly assert that the FRCP 9(b) requires the State of Arizona to plead ACFA violations with particularity.  "The elements of a claim for relief under the Consumer Fraud Act are not necessarily identical to the elements of a common law fraud action.  A violation of the Act is more easily shown." Peery, 585 P. 2d at 577.

Finally, the case cited by Defendants, Riehle v. Bank of Am., N.A., No. CV-13-00251-OHX-NVW, 2013 WL 1694442, at *3 (D. Ariz. Apr. 18, 2013), addresses actions brought by private parties, not enforcement actions brought by the Attorney General.  The Arizona Attorney General is not required to allege knowledge of or intent to deceive, actual deception, damages or reliance.  People ex rel. Babbitt v. Green Acres Trust, 618 P.2d 1086, 1094 (Ariz. Ct. App. 1980); State ex rel. Corbin v. Tolleson, 773 P.2d 490, 504 (Ariz. Ct. App. 1989).

*California*:  As a preliminary matter, Defendants wrongly argue that California's false advertising claims should be dismissed on the basis that they "are just repackaged [federal] antitrust claims."  (Joint Motion at pp. 21-24.)  But California's False Advertising Law ("FAL"), Business and Professions Code section 17500, *et seq.*, does not require any predicate violation of federal law, and indeed, California's FAL claims do not allege that any such violation constitutes a claim under the FAL.  (Am. Compl. ¶ 170.)  As such, the FAL claims cannot be dismissed as "repackaged antitrust claims."  Furthermore, contrary to Defendants' assertion, California's FAL also does not require "allegations of deceptive or misleading conduct directed at consumers" nor does it require that those allegations be "pleaded with particularity in accordance with Rule 9(b) of

the Federal Rules of Civil Procedure."  (Joint Mem. at 24-25.)  Rather, the FAL requires only general allegations of a statement made in connection with the sale or disposition of goods or services, which is known or should be known to be untrue or misleading.  Cal. Bus. & Prof. Code § 17500.  Significantly, neither the pleading nor proof of the traditional elements of fraud is required in public enforcement actions brought under Section 17500; rather, only a tendency or likelihood to deceive or confuse arising from the statement need be alleged.  <u>In re Tobacco II Cases</u>, 46 Cal. 4th 298, 313-14 (2009); <u>Californians for Disability Rights v. Mervyn's, LLC</u>, 39 Cal. 4th 223, 227 (2006); <u>Kasky v. Nike</u>, Inc., 20 Cal. 4th 939, 951 (2002); <u>Fletcher v. Sec. Pac. Nat'l Bank</u>, 23 Cal. 3d 442, 451 (1979); <u>Chern v. Bank of Am.</u>, 15 Cal. 3d 866, 875 (1976); <u>Payne v. United Cal. Bank</u>, 23 Cal. App. 3d 850, 855 (1972); <u>People v. Orange Cnty. Charitable Servs.</u>, 73 Cal. App. 4th 1054, 1076 (1999); <u>Day v. AT&T Corp.</u>, 63 Cal. App. 4th 325, 332 (1998).  In fact, California has pled the required elements of its Section 17500 claims with particularity well beyond that legally required.  As stated above, paragraphs 6-14, 42, 48-124, 125-133, 137 and 170 of the Amended Complaint specifically allege that such tendency or likelihood to deceive or confuse arose from Defendants' fraudulent concealment of the false or misleading nature of their statements concerning the fairness of their bids or price offers, or statements concerning their supply capacity or reasons for bidding or not bidding.

   *Minnesota*:  Minnesota's consumer protection laws "reflect a clear legislative policy encouraging aggressive prosecution of statutory violations" and "are generally very broadly construed to enhance consumer protection."

<u>State by Humphrey v. Philip Morris Inc.</u>, 551 N.W.2d 490, 495-96 (Minn. 1996).[35]

Any person that makes "false or misleading statements of fact concerning the

reasons for, existence of, or amounts of price reductions" violates Minnesota's

Deceptive Trade Practices Act ("MDTPA").  Minn. Stat. § 325D.44, subd. 1(11).

Likewise, any similar conduct that "creates a likelihood of confusion or of

misunderstanding" is also considered a deceptive trade practice.  Minn. Stat. §

325D.44, subd. 1(13).  It is not necessary for the State to prove actual confusion

or misunderstanding.  <u>Id.</u>, subd. 2.  Rather, the State need only prove that the

conduct has the tendency or capacity to deceive.  <u>See</u> <u>State v. Directory Pub.</u>

<u>Serv., Inc.</u>, No. C1-95-1470, 1996 WL 12674, at *5 (Minn. Ct. App. Jan. 16, 1996).

    *Nevada*:  Defendants pose three arguments to dismiss the Nevada

Deceptive Trade Practices Act ("NDTPA") claims, namely that such claims: (i)

require allegations of deceptive or misleading conduct directed at consumers, (ii)

are merely repackaged antitrust claims, and (iii) were not plead with particularity

according to Fed.R.Civ.P. 9(b). (Joint Mem. at 26.)   Addressing the first argument,

---

    **[35]** **Defendants also appear to contend that Minnesota's MDPTA claim should be dismissed because it is nothing more than a repackaging of its antitrust claims.  (Joint Mem. at 21-23.)  Minnesota law clearly contemplates that an entity's wrongful conduct may subject itself to liability under multiple statutory schemes.  Minnesota's consumer protection and antitrust statutes contain "specific authorizations" for suit and each creates a separate cause of action. <u>See</u> <u>Philip Morris Inc.</u>, 551 N.W.2d at 495. These provisions "reflect a clear legislative policy encouraging aggressive prosecution of statutory violations." <u>Id.</u>  The fact that Defendants' conduct was so brazenly unlawful as to be both per se anticompetitive and deceptive does not exempt it from liability under the MDPTA, particularly when, as discussed above, the facts pled more than establish conduct that has a tendency to deceive or mislead others.  <u>See</u> <u>Group Health Plans v. Philip Morris, Inc.</u>, 621 N.W.2d 2, 11 (Minn. 2001) (stating that consumer protection statutes should not be narrowed in scope when the "legislature has spoken in unequivocally broad terms").**

the Amended Complaint alleges that Defendants' conduct was both directed at consumers (Am. Compl. ¶¶ 14, 42, 135-137) and brazenly deceptive, not merely anticompetitive.  (Am. Compl. ¶¶ 80-82, 100-101.)  Further, the precedent cited for Defendants' first argument is irrelevant and merely clarifies boundaries of NDTPA's application to a private claim for unpaid wages.  See Govereau v. Wellish, No. 2:12-CV-00805-KJD-VCF, 2012 WL 5215098, at *2 (D. Nev. Oct. 19, 2012) (court rejected plaintiff's argument that a claim for unpaid wages established NDTPA liability because her job was to assist with sale or lease of goods or services). The NDTPA was not intended to protect employees.  In contrast, all Defendants in the present case sold goods in the marketplace.

Addressing the second claim, Defendants' "repackaging" argument also fails due to NDTPA's similarity to the Federal Trade Commission Act ("FTCA"). Nev. Rev. Stat. § 598.0953 characterizes deceptive trade practices as also being unfair and injurious to competition and competitors, thereby creating a nexus between NUTPA and NDTPA.  That nexus makes the NDTPA akin to Section 5 of the FTCA, which also prohibits both unfair and deceptive conduct.  Just as violations of federal antitrust law also constitute FTCA claims, Plaintiffs' allegations support both federal antitrust and NDTPA claims.  See In re Dig. Music Antitrust Litig., 812 F. Supp. 2d 390, 411 (S.D.N.Y. 2011) (citing ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 48 (4th Cir. 1983)) (allegations sufficient to state a federal antitrust claim also sufficed to state a claim under North Carolina's consumer law, which also covered unfair conduct).

Finally, all allegations in paragraphs 1-140 of the Amended Complaint were incorporated into the NDPTA claims.  (Am. Compl. ¶ 259.)  To the extent Fed. R. Civ. P. 9(b) applies to the NDTPA claims, that standard has been met.[36]

*North Dakota*:  Pursuant to North Dakota Century Code (N.D.C.C.) § 51-15-02, the North Dakota "Consumer Fraud Law," the "act, use, or employment" of "any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby," is unlawful. The North Dakota Supreme Court has held that it is "generally recognized that consumer protection statutes are remedial in nature, must be liberally construed in favor of protecting consumers" and need only be proved by a preponderance of the evidence. State ex rel. Spaeth v. Eddy Furniture Co., 386 N.W.2d 901, 903 (N.D. 1986). Consumer fraud is a cause of action which, although it contains the word fraud, is separate and distinct from common law fraud.  Id. (quoting Dunlap v. Jimmy GMC of Tucson, Inc., 666 P.2d 83, 88-89 (Ariz. Ct. App. 1983)).  N.D.C.C. chapter 51-15 is not limited to consumer transactions. Jorgenson v. Agway, Inc., 2001 ND 104 ¶ 8, 627 N.W.2D 391 (N.D. 2001); see also Ackre v. Chapman & Chapman, P.C., 2010 ND 167, ¶ 20, 788 N.W.2d 344 (N.D. 2010).

---

[36] The States' allegations would satisfy the pleading standards discussed in Takiguchi v. MRI Int'l, Inc., 47 F. Supp. 3d 1100, 1111 (D. Nev. 2014). But deceptive trade claims asserted under the FTCA generally are not subject to Fed. R. Civ. P. 9(b). FTC v. Consumer Health Benefits Ass'n, No. 10-CV-3551-ILG-RLM, 2012 WL 1890242, at *7 (E.D.N.Y. May 23, 2012).  Because the NDTPA is akin to the FTCA, the NDTPA claims should likewise not be subject to Fed. R. Civ. P. 9(b).

N.D.C.C. §51-15-02 also prohibits "unconscionable" acts or practices. N.D.C.C. §51-15-02 was amended in 2015 to include as unlawful conduct any "act or practice, … which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition."  Defendants' motion to dismiss does not address this part of the North Dakota Consumer Fraud Law claim, and that claim should not be dismissed.

North Dakota courts have neither addressed nor ruled that the same or related conduct cannot result in violations of both the Consumer Fraud Law, N.D.C.C. ch. 51-15, and the Uniform State Antitrust Act, N.D.C.C. ch. 51-08.1.  It is likely that North Dakota courts would look to persuasive federal court decisions which state that to the extent that the same conduct may violate both the antitrust laws and the FTC Act, the laws are designed to provide cumulative remedies.  See FTC v. Cement Inst., 333 U.S. 683, 694–695 (1948).

*Pennsylvania*:  Pennsylvania has sufficiently alleged both unfair and deceptive conduct.  The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL") catchall was designed to cover all unfair and deceptive acts or practices in the conduct of trade or commerce.  Com. ex rel. Creamer v. Monumental Props., Inc., 329 A.2d 812, 826-27 (Pa. 1974); Ash v. Cont'l Ins. Co., 932 A.2d 877, 881-82 (Pa. 2007).  "In general, the construction placed upon a statute by the courts becomes a part of the act, from the very beginning."  Buradus v. Gen. Cement Products Co., 52 A.2d 205, 208 (Pa. 1947).  The PUTPCPL

is to be liberally construed.  <u>Monumental Props.</u>, 329 A.2d at 816-17.  In construing the PUTPCPL, courts may look to the decisions under the FTCA for guidance and interpretation.  <u>Id,</u> at 818.  The PUTPCPL is also akin to Section 5 of the FTCA.

The Defendants cite <u>In re Static Random Access Memory (SRAM) Antitrust Litig.</u>, 580 F.Supp.2d 896, 909 (N.D. Cal. 2008), to argue that the PUTPCPL requires an allegation of deception *in connection with a consumer transaction*. The Defendants ignore that the Commonwealth brought its state law claims pursuant to 73 P.S. § 201-4, which provides the Pennsylvania Attorney General broad standing to combat unfair trade practices unlike private plaintiffs pursuant to 73 P.S. § 201-9.2.  <u>Weinberg v. Sun Co., Inc.</u>, 777 A.2d 442, 443-46 (Pa. 2001). Pennsylvania courts have clearly held that any such consumer transaction nexus is *not* required under a PUTPCPL Section 4 enforcement action.  <u>Com. v. Percudani</u>, 844 A.2d 35, 48 (Pa. Commw. Ct. 2004); 73 P.S. § 201-4; <u>compare</u> 73 P.S. § 201-9.2.  The PUTPCPL broadly applies to unfair trade practices, irrespective of a consumer transaction.  <u>In re Fricker</u>, 115 B.R. 809, 818-19 (Bankr. E.D. Pa. 1990).

The Defendants cite <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 350 F. Supp. 2d at 200-01, to argue that the PUTPCPL requires an allegation of fraud or deception under the catchall in 73 P.S. § 201-2 (4)(xxi).  An allegation of unfair or deceptive conduct under the PUTPCPL need not be pled with particularity under Fed. R. Civ. P. 9(b).  <u>Seldon v. Home Loan Servs., Inc.</u>, 647 F. Supp. 2d 451, 469 (E.D. Pa. 2009).  While deceptive conduct is alleged in the

71

Amended Complaint (as discussed <u>supra</u>), the Commonwealth is not required to

allege fraud or actual deception; but rather, a tendency or a capacity to deceive.

<u>Com. ex rel Corbett v. Peoples Benefit Serv., Inc.</u>, 923 A.2d 1230, 1236 (Pa.

Commw. Ct. 2007).  Moreover, the Commonwealth is not required to show an

intention to deceive; but rather, that the acts or practices are capable of being

interpreted in a misleading way.  <u>Id.</u>  More to the point, an act or practice need not

be deceptive to be declared "unfair."  <u>Westfield Group v. Campisi</u>, No. 2:02-cv-

997, 2006 WL 328415, at *18 (W.D. Pa. 2006); <u>Com. ex rel. Zimmerman v. Nickel</u>, 26

Pa. D & C 3d. 115, 120-21 (Pa. Com. Pl. 1983).

      Determining what is unfair involves a variety of factors, including whether

the act or practice offends public policy as established by statute or common law

and whether it causes substantial harm to consumers (or competitors or other

businesses). <u>Id.</u> (citing <u>FTC v. Sperry and Hutchinson Co.</u>, 405 U.S. 233, 244-45 n.

5 (1972) (establishing standard of unfairness)).  As applied, violating

Pennsylvania's antitrust common law or the federal Sherman Act is an unfair act

or practice.  <u>See</u> <u>FTC v. Ind. Fed. of Dentists</u>, 476 U.S. 447, 454 (1986) (federal

Sherman Act violations are also an unfair act or practice under § 5 of the FTC Act

per the standard of unfairness).  Defendants' motion to dismiss does not address

this part of the PUTPCPL claim, and that claim should not be dismissed.

      The Third Circuit has indicated its approval that pervasive illegal conduct

constitutes unfair conduct within the meaning of the catchall provision of the

PUTPCPL.  <u>In re Milbourne</u>, 108 B.R. 522, 534 (Bankr. E.D. Pa. 1989) (citing <u>In re</u>

<u>Smith</u>, 866 F.2d 576, 581-86 (3d. Cir. 1989)).  The Third Circuit's ruling is in

72

agreement with the state court's holding in <u>Nickel</u> that a violation of another law, especially a consumer protection law, constitutes unfair conduct. <u>Id.</u> The Pennsylvania Commonwealth Court has held that the "position adopted by the Bankruptcy Court is that which would be espoused by the Supreme Court." <u>Com. v. Percudani</u>, 825 A.2d 743, 747 (Pa. Commw. Ct. 2003). Therefore, a violation of Pennsylvania antitrust common law and the federal Sherman Act constitutes pervasive illegal conduct and is actionable under the catchall provision as unfair conduct under <u>Nickel</u>, <u>Sperry and Hutchinson</u>, and <u>In re Smith</u>.

### C.   The States Have Sufficiently Pled Unfair or Unconscionable Conduct or Unfair Methods of Competition under their Respective State Laws.

Defendants broadly claim that twenty-one States[37] have not plausibly alleged unfair or unconscionable conduct as required under their state consumer protection laws. (Joint Mem. at 26-27.) Defendants' anemic support for this averment—a string cite of statutes in a footnote and stray blanket statements without elaboration (Joint Mem. at 26, 27 & n.32.)—alone give reason to reject their position. <u>See</u> Local Rule 7(a)(1). In any event, Vermont did not assert a consumer protection claim, and the remaining twenty states have satisfied their pleading requirements under each State's respective consumer protection laws.[38]

---

[37] Defendants identify the following States: Alabama, California, Connecticut, Florida, Hawaii, Indiana, Iowa, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Montana, Nebraska, New Hampshire, New Jersey, North Carolina, South Carolina, Vermont and Washington.

[38] Defendants include in their Section IV.C the conclusory statement that "Plaintiffs fail to allege deceptive conduct, *see supra* Part IV.B.," without explanation. The States, therefore, answer with reference to their response at Part IV.B. If Defendants mean to suggest that these twenty States' consumer protection claims also fail for lack of allegations of deceptive conduct, that is

As an initial matter, the States have sufficiently alleged antitrust claims. Thus, Defendants' argument that the failure to plead antitrust claims dooms the States' consumer protection claims necessarily fails.  (See Joint Mem. at 27.)

Defendants' further suggestion that the States cannot plead consumer protection claims that are based on "Defendants' alleged antitrust violations" is also incorrect. (Id.)  Defendants ignore that many States' consumer protection laws are based on or guided by the Federal Trade Commission Act ("FTC Act"), which prohibits "unfair methods of competition" and "unfair or deceptive acts or practices." 15 U.S.C. § 45(a)(1).  The FTC Act has been applied consistently to encompass price-fixing and other antitrust-type violations.  See, e.g., FTC v. Nat'l Lead Co., 352 U.S. 419, 428–430 (1957); Sun Oil Co. v. FTC, 350 F.2d 624, 627 (7th Cir. 1965) (holding "vertical and horizontal price fixing" violate the FTC Act); Keasbey & Mattison Co. v. FTC, 159 F.2d 940 (6th Cir. 1947) (fixing prices constitutes "unfair method of competition" within the FTC Act).

By alleging conduct that violates antitrust laws, States with so-called "baby FTC Acts," or statutes that prohibit similar kinds of unfair methods of

---

incorrect.  Not only has deceptive conduct been adequately pled, see States' response in Part IV.B, many of these States' consumer protection laws are written in the disjunctive, making "deceptive" conduct distinct from "unfair" conduct – e.g., unfair or deceptive acts or practices. A non-exhaustive list of such state statutes includes Haw. Rev. Stat. § 480-2(a); Iowa Code § 714.16; M.G.L. c. 93A, § 2(a); Mont. Code Ann. § 30-14-103; NH RSA 358-A2; N.C.G.S. § 75-1.1, among others.  The disjunctive language of these acts requires proof of only one, not both of these types of conduct.  See e.g., State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc., 694 N.W. 2d 518, 527 (La. 2005).  As such, without a challenge to the deceptive activity component of these state claims, the Court has no reason to address Defendants' unfair and/or unconscionable challenge.  In any event, Defendants' muddled statement can be set aside given that all States have adequately pled their consumer protection claims.

competition, have also alleged conduct sufficient to state a claim under those

States' consumer protection laws.  This includes California, Connecticut, Florida,

Hawaii, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi,

Montana, Nebraska, New Hampshire, South Carolina and Washington.[39]

---

[39] See, e.g., Klein v. Chevron U.S.A., 202 Cal. App. 4th 1342 (2012); Camacho v. Auto Club of S. Cal., 142 Cal. App. 4th 1394, 1403 (2006); Daugherty v. Am. Honda Motor Co., 144 Cal. App. 4th 824, 839 (2006); Roncari Dev. Co. v. GMG Enters., Inc., 45 Conn. Supp. 408, 433-34 (Conn. Super. Ct. 1997) (if a plaintiff adequately pleads a claim under the Connecticut Antitrust Act, it has adequately pled an unfair competition claim under the Connecticut Unfair Trade Practices Act ("CUTPA"); Automatic Cigarette Sales, Inc. v. Wilson, No. CV 960071766, 1997 WL 35809, at *4 (Conn. Super. Ct. 1997) (denying motion to dismiss CUTPA counterclaim where "defendant's allegation that the plaintiffs violated the Connecticut Antitrust Act falls within the penumbra of a statutory concept of unfairness."); Fl. Stat. § 501.204(2); Mack v. Bristol-Myers Squibb Co., 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996) (price-fixing violates Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"); Marco Island Cable, Inc. v. Comcast Cablevision of S., Inc., 2006 WL 1814333, at *6 (M.D. Fla. July 3, 2006) ("Antitrust violations are included within the conduct proscribed by the FDUTPA"); Haw. Rev. Stat. § 480-2(a) and Haw. Rev. Stat. § 480-3 (prohibiting "[u]nfair methods of competition and unfair or deceptive acts or practices" which is "to be construed in accordance with judicial interpretations of similar federal antitrust statutes ...."); Ky. Rev. Stat. Ann. §§ 367.190 & 367.200 (the Kentucky Attorney General may bring an action for injunction and monetary relief under the Kentucky consumer protection statutes for the unfair or deceptive acts or practices taken in conjunction with the antitrust violation); Commonwealth of Ky. v. Marathon Petroleum Co. LP, 191 F. Supp. 3d 694, 705-06 (W.D. Ky. 2016) ("facts support a reasonable inference of unfair conduct for the same reason they support a reasonable inference of federal and Kentucky antitrust violations"); LAC 16:III Chapter 5, § 501; In re New Motor Vehicles Canadian Export Antitrust Litig., 350 F. Supp. 2d at 186-187 (since Maine's Unfair Trade Practices Act encompasses price-fixing violations under Maine's antitrust law, the State of Maine need not allege separate unfair or unconscionable conduct); Ciardi v. Hoffman-La Roche, Ltd., 762 N.E.2d 303, 309 (Mass. 2002) (price-fixing constitutes an unfair method of competition in violation of Massachusetts' Chapter 93A and "conduct which, although not a violation of the letter or spirit of the antitrust laws, [may be] nevertheless either an unfair method of competition, or an unfair or deceptive act or practice."); Moniz v. Bayer Corp., 484 F. Supp. 2d 228, 230 (D. Mass. 2007) (price-fixing is an unfair method of competition under Chapter 93A even where the plaintiff did not have standing to sue under federal antitrust or consumer statutes); Mich. Comp. Laws 445.910(c) (the Michigan Consumer Protection Act

The FTC Act also reaches conduct beyond antitrust violations.  The FTC Act was "designed to supplement and bolster the Sherman Act and the Clayton Act ... to stop in their incipiency acts and practices which, when full blown, would violate those Acts ... as well as to condemn as 'unfair method of competition' existing violations of them."  FTC v. Motion Picture Adver. Serv. Co., 344 U.S. 392, 394-95 (1953) (citation omitted).  Thus, in keeping with the FTC Act and its interpretations, many States' consumer protection laws encompass conduct broader than that proscribed by the Sherman Act.[40]  See id.  Indeed, many States'

_____

authorizes the Attorney General to bring a claim for damages caused by a method, act, or practice that is unfair or deceptive within the meaning of § 5(a)(1) of the FTC Act); Miss. Code § 75-24-5 (prohibiting "unfair methods of competition affecting commerce"); Miss. Code § 75-24-3(c) ("in construing what constitutes unfair or deceptive trade practices the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act…."); Hood v. BASF Corp., No. 56863, 2006 WL 308378, *10 (Miss. Ch. 2006) (an illegal vitamin monopoly was an unfair method of competition affecting commerce); Rohrer v. Knudson, 2009 MT 35, ¶ 31, 349 Mont. 197, 205, 203 P.3d 759, 764 (Mont. 2009) (explaining that Montana consumer protection law follows the FTC Act and holding "as a matter of law that an unfair act or practice is one which offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."); Neb. Rev. Stat. § 59-1602 (prohibiting "[u]nfair methods of competition and unfair or deceptive acts or practices" which under Neb. Rev. Stat. § 59-829 "shall follow the construction given to the federal law by the federal courts");  NH RSA 358-A:2, XIV; NH RSA 358-A:13 (expressly permitting reliance on interpretation and construction of FTC Act for guidance); Milford Lumber Co. v. Rcb Realty, 780 A.2d 1259, 1263 (N.H. 2001) (adopting FTC Act standard for actionable "unfair or deceptive" business conduct in state law); Plowman v. Bagnal, 316 S.C. 283, 450 S.E.2d 36 (1994) ("[i]n section 39-5-20(b), the Legislature specifically instructs state courts to be guided by the decisions of the [FTC and decisions] construing the [FTC] Act);  RCW 19.86.020 (prohibiting unfair methods of competition and deceptive acts);  State v. Black, 100 Wash. 2d 793, 800-01 (1984) (conduct that either (1) threatens incipient violations of the antitrust laws or (2) violates the spirit of the antitrust laws may constitute unfair methods of competition).

[40] State consumer protection laws also, of course, reach other acts, practices and conduct that are "unfair" or "unconscionable."  Thus, while federal

consumer protection laws have been interpreted to encompass instances where, for example, there is an attempt to violate the antitrust laws or the "spirit" of those laws is violated.[41]  The allegations in the Amended Complaint plausibly state a claim under these state laws.

Indeed, the Amended Complaint's allegations, taken as true (including plausible inferences), give rise to actionable unfair or unconscionable business

law may assist in determining whether a particular challenged act or practice is unfair, ultimately state law is controlling because the state courts are the "ultimate arbiters of the meaning and scope of [state] unfair competition law." See, e.g., Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 187 (1999); see also Wisconsin v. Mitchell, 508 U.S. 476, 483 (1993) ("There is no doubt that we are bound by a state court's construction of a state statute.").

[41] For a non-exhaustive, but illustrative, list of State authority see, e.g., Cel-Tech, 20 Cal. 4th at 180 (an act or practice is "unfair" when it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws"); Roberts Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawaii 225, 255 n.34, 982 P.2d 853, 884 n.34 (1999) ("[C]ompetitive conduct is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and "[t]he word 'unfair' means conduct that (1) threatens an incipient violation of an antitrust law, or (2) violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or (3) otherwise significantly threatens or harms competition.") (internal citations, brackets and quotations omitted); Commonwealth of Ky. v. Marathon Petroleum Co. LP, 191 F. Supp. 3d 694, 706 (W.D. Ky. 2016) ("The Commonwealth's alleged facts support a reasonable inference of unfair conduct for the same reasons that they support a reasonable inference of federal and Kentucky antitrust violations."); Ciardi, 762 N.E.2d at 309 ("conduct which, although not a violation of the letter or spirit of the antitrust laws, [may be] nevertheless either an unfair method of competition, or an unfair or deceptive act or practice" under Massachusetts law); LaChance v. U.S. Smokeless Tobacco Co., 931 A.2d 571, 576-79 (N.H. 2007) (a common nucleus of factual allegations of illegal business conduct may give rise to distinct claims under both New Hampshire antitrust law and consumer protection law); Cheshire v. Coca-Cola Bottling Affiliated, Inc., 758 F. Supp. 1098, 1100 (D.S.C. 1990) ("In South Carolina specifically, "[b]y the express terms of the statute, [SCUTPA] prohibits both unfair or deceptive acts or practices (consumer protection) and anticompetitive conduct (antitrust proscription)."); State v. Black, 100 Wash. 2d at 800 (incipient violations of the antitrust laws—such as attempted price-fixing that does not strictly rise to the level of an agreement—is an unfair method of competition in violation of RCW 19.86.020).

actions and/or unfair methods of competition, regardless of whether that conduct also amounts to an antitrust violation.  The Amended Complaint details the industry known to each defendant pharmaceutical manufacturer, selling generic drugs to a variety of purchasers nationwide (including state government payers -- e.g. for Medicaid, and/or their purchasing agents), all of whom heavily rely on "bargain" generic products to significantly reduce the high cost of health care. (E.g., Am. Compl. ¶¶ 2-4, 28-36, 32-47.)  Each Defendant adopted business practices to artificially inflate and maintain prices and avoid price erosion for commonly used and commonly purchased generic drugs.  (E.g., id. ¶¶ 8-14, 61-63, 75-78, 97-100, 108.)   Each Defendant's public-facing price offerings, including to direct purchasers, implicitly misrepresented that the price offered and charged was a price arrived at through genuine competition.  Some Defendants made additional misrepresentations, such as providing a cover bid to customers that they knew would not be successful and/or providing false or misleading statements to the prospective customer as to why a bid was not submitted. (E.g., id. ¶¶ 11, 61-63, 69-102.)[42]  And each Defendant implemented internal business practices to intentionally obfuscate their illegal conduct.  (E.g., id. ¶¶ 125-33.)

Defendants are hard pressed to identify any applicable public policy that condones schemes to allocate market share and fix prices in an effort to maintain market share and avoid price erosion.  Likewise, Defendants cannot show how

---

[42] These alleged misrepresentations constitute deceptive and/or unfair business conduct or practices, and the allegations of deceptive conduct summarized supra (Section IV.B), also may comprise unfair and/or unconscionable conduct.

their alleged conduct escapes consumer protection law scrutiny as somehow moral, ethical, scrupulous, and not injurious. Defendants engaged in business conduct, made statements, or representations that have the capacity to mislead and exhibited unscrupulous acts in the conduct of commerce. In short, Defendants' actions fall far short of acceptable business conduct in trade or commerce.

Therefore, the States' consumer protection claims, like their antitrust claims, survive Defendants' motion to dismiss. In addition to the arguments above, certain States make the following specific arguments in opposition to Defendants' motion:

*Alabama*: The Alabama Deceptive Trade Practices Act, Code of Alabama 1975, §8-19-5(27) prohibits unconscionable acts. Unconscionable is not defined in the statute, but should be given its plain and ordinary meaning, which is to "show no regard for conscience; affronting the sense of justice, decency or reasonableness." *Unconscionable*, Black's Law Dictionary (10th ed. 2014). Succinctly, Alabama has pled conduct that, if true, would be unconscionable as that term would be defined by state law.

*California*: California alleges several theories of liability under its Unfair Competition Law ("UCL"), Business and Professions Code section 17200, *et seq.*, that do not rely on federal antitrust claims as the predicates. (Am. Compl. ¶ 169.) And, contrary to Defendants' assertion, anticompetitive acts and practices are "independently actionable" under the UCL. <u>Cel-Tech</u>, 20 Cal. 4th at 180-81; <u>Farmers Ins. Exch. v. Superior Court</u>, 2 Cal. 4th 377, 383 (1992); <u>see also Mfrs. Life</u>

**Ins. Co. v. Super. Ct.**, 10 Cal. 4th 257, at 284 n.17 (1995) (remedies available under the UCL are cumulative of other statutory schemes).  Long-established California jurisprudence is also clear that California's laws are broader than and different from the Sherman Act.  The California Supreme Court has repeatedly recognized that California's Cartwright Act and UCL have a different scope, history, and interpretation than that of the Sherman Act, and that both state acts are broader than the Sherman Act.  See **Cel-Tech**, 20 Cal. 4th at 180-81; **In re Cipro Cases I & II**, 61 Cal. 4th 116, 142 (2015); **Aryeh v. Canon Bus. Solutions, Inc.**, 55 Cal. 4th 1185, 1194-95 (Cal. 2013).  The courts have expressly rejected limiting the interpretation of the UCL or any of its prongs within the bounds of the Sherman Act.  **Cel-Tech**, 20 Cal. 4th at 180 (The UCL was "intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive.")

        With respect to the unfairness prong, the allegations in the Amended Complaint are also sufficiently pled and incorporated by reference into California's UCL claim at paragraphs 167 and 169.[43]  In any event, the factual nature of the unfairness claim involves an equitable weighing of all the circumstances that precludes dismissal at this stage.  See, e.g., **Bardin v. DaimlerChrysler Corp.**, 136 Cal. App. 4th 1255, 1271 (2006).

---

        [43] Any suggestion that the UCL imposes a heightened pleading burden for claims of deception is wrong.  Under the UCL, it is sufficient that a complaint set forth general allegations describing the offending act or practice.  See, e.g., **On Children's Television, Inc. v. Gen. Foods Corp.**, 35 Cal. 3d 197, 211-14 (1983).  In any event, California's claims also incorporate the more specific allegations at paragraphs 6-14, 42, 48-133, and 137.

*Indiana*:  The Indiana Deceptive Consumer Sales Act ("IDCSA") prohibits unfair, abusive, or deceptive acts, omissions, or practices.  Ind. Code § 24-5-0.5-3(a).  An act, omission or practice includes both implicit and explicit misrepresentations.  Ind. Code § 24-5-0.5-3(a).  The IDCSA prohibits broad categories of deceptive conduct without limiting considerations, such as benefits to competition or reasonability of injury.  To determine whether an act or omission is unfair under the IDCSA, the criteria includes:  (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; or (3) whether it causes substantial injury to consumers (or competitors or other businessmen).  See FTC v. Sperry & Hutchinson Co., 405 U.S. 233 (1972).  Here, Indiana has pled sufficient allegations under this standard.

*Iowa*:  In Iowa, "unfair practice" is defined as "an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefit."  Iowa Code § 714.16(1)(n).   The Iowa Supreme Court has further clarified that a course of conduct contrary to what an ordinary consumer would anticipate contributes to a finding of an unfair practice under Iowa Code § 714.16.  State ex rel. Miller v. Vertrue, Inc., 834 N.W.2d 12, 37 (Ia. 2013).  Here, the Amended Complaint alleges conduct that not only lacks competitive benefit, it is by its very nature anticompetitive.  It is also conduct

contrary to what an ordinary consumer would anticipate, which contributes to a finding of an unfair practice under Iowa law.  Id.  Allegations of price-fixing and market allocation support a claim for unfair practice under Iowa Code § 714.16.

   *Montana*:  Montana has plausibly alleged that Defendants' conduct offends state policy because §103 of Montana's Unfair Trade Practices and Consumer Protection Act ("UTPCPA") prohibits "[u]nfair methods of competition," and § 205 of Montana's antitrust statutes independently prohibits price-fixing, trade restrictions, and anticompetitive behavior.[44]  Mont. Code Ann. § 30-14-103, § 30-14-205.  The Amended Complaint also plausibly alleges sufficient facts that Defendants' conduct was either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  See Rohrer v. Knudson, 203 P.3d 759, 764 n.2 (Mont. 2009).  Indeed, although the forgoing Rohrer consumer protection law factors are disjunctive, viewing the alleged facts in a light most favorable to Montana, the Amended Complaint alleges sufficient facts regarding all of the Rohrer factors.

---

   [44] Montana law does not require allegations or proof of unconscionable conduct.  Mont. Code Ann. § 30-14-103.  Montana law also does not require allegations of deceptive conduct because Montana law prohibits acts or practices if they are either unfair or deceptive: "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."  Id.  (emphasis added).

   Montana notes that Defendants appear to have misconstrued the claims it is asserting.  Defendants' suggestion in footnote 1 of its Joint Memorandum that Montana has not alleged a specific antitrust or price-fixing claim is incorrect.  Montana is asserting both that Defendants' conduct violates Part I of Montana's UTPCPA, Mont. Code Ann. §§ 30-14-101, *et seq.*, and Part II, titled Unfair Trade Practices Generally, Mont. Code Ann. §§ 30-14-201, *et seq.*, specifically including § 205 (prohibiting price-fixing, trade restrictions, and other anticompetitive conduct).  (Am. Compl. ¶¶ 253-55.)

_Nebraska_:  Defendants have engaged in conduct that constitutes both an unfair act or practice and a deceptive act or practice in violation of Neb. Rev. Stat. § 59-1602.  The terms "unfair" and "deceptive" are not defined in the Nebraska Consumer Protection Act, § 59-1601, _et seq._  However, the court in Raad v. Wal–Mart Stores, Inc., 13 F. Supp. 2d 1003 (D. Neb. 1998) defined an unfair practice as one that is immoral, unethical, oppressive, or unscrupulous. The court further defined a deceptive practice as one which possesses the tendency or capacity to mislead or creates the likelihood of deception.  In State ex rel. Stenberg v. Consumer's Choice Foods, Inc., 276 Neb. 481 (2008), the Nebraska Supreme Court expressed a preference for the Raad court's definitions of "unfair" and "deceptive" conduct.  Defendants' misleading statements or representations to prospective customers through the bidding process or any of the Defendants' public-facing statements that falsely attributed price increases to benign factors fall well within the definitions of conduct that courts in Nebraska have deemed "unfair" or "deceptive" under Neb. Rev. Stat. § 59-1602.

_New Hampshire_:  NH RSA 358-A:2 provides an illustrative list of business malfeasance that is within the ambit of "unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within the state." NH RSA 358-A:2.   New Hampshire abides by the "rascality" test to evaluate whether particular allegations sufficiently allege actionable conduct, Turner v. Shared Towers VA, LLC, 107 A.3d 1236, 1248 (N.H. 2014), and also examines factors associated with the FTC Act of whether business conduct is "unfair or deceptive."  Milford Lumber Co. v. Rcb Realty, 780 A.2d 1259, 1263

(N.H. 2001).  See also Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 965 A.2d 1032,

1038-39 (N.H. 2009) (consumer protection claim is not analogous to common law

fraud or deceit, and different elements and standards of proof apply).

As described earlier, the allegations of each Defendant's business

malfeasance—involving widely used generic drugs that are commonly purchased

by state governments, nationwide purchasing agents and retailers, and

consumers – are sufficient to plead an actionable consumer protection claim,

beyond the state antitrust law claim.  See LaChance, 931 A.2d at 576-79. [45]

New Jersey: Defendants not only incorrectly argue that New Jersey failed

to plead conduct that is "unconscionable" under the New Jersey Consumer

Fraud Act, N.J. Stat. Ann. 56:8-1, et seq. ("NJCFA"), but also fail to address New

Jersey's additional claims that Defendants made misleading statements and

knowing omission of material facts.  (See Am. Compl. ¶ 271.)

It is a violation of the NJCFA to engage in "any unconscionable commercial

practice … misrepresentation, or the knowing[] concealment suppression, or

omission of any material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the sale or advertisement of any

merchandise." N.J. Stat. Ann. 56:8-2 (emphasis added).  "The [NJCFA] is

intended to protect consumers 'by eliminating sharp practices and dealings in the

---

[45]  New Hampshire also points to the Massachusetts decision in Ciardi, 762 N.E.2d at 309, 314, given the state court's general reliance on Massachusetts law for guidance in interpreting and applying NH RSA 358-A, et seq., see Milford Lumber Co., 780 A.2d at 1262, and its specific reliance on the Ciardi decision in related analysis, see LaChance, 931 A.2d at 578-79.

Of note, New Hampshire has since enacted so-called Illinois Brick repealer legislation, effective January 1, 2008.  See N.H. RSA 356:11.

marketing of merchandise.'"  Lemelledo v. Beneficial Mgmt. Corp. of Am., 696 A.2d 546, 550 (N.J. 1997) (citations omitted).  The NJCFA affords the Attorney General "the broadest kind of power to act in the interest of the consumer public."  Id. at 461 (citation omitted).

While New Jersey alleges that Defendants participated in an unlawful anticompetitive scheme to fix the pricing of generic drugs in violation of the NJATA, such conduct does not form the basis of the Attorney General's NJCFA claim.  Rather, it is Defendants' unconscionable commercial practices that flowed from the unlawful scheme, including Defendants' charging New Jersey consumers and state entities "exorbitant prices" for the generic drugs, as well as Defendants' misleading statements and knowing omission of material facts concerning the reason for price increases that form the basis of the Attorney General's NJCFA claims.[46]

First, it is well-established that "exorbitant pricing" is an unconscionable commercial practice under the NJCFA.  See Skeer v. EMK Motors, Inc., 455 A.2d 508, 513 (N.J. Super. Ct. App. Div. 1982); Kugler v. Romain, 279 A.2d 640, 652 (N.J. 1971).

Defendants' conduct in connection with the marketing and sale of the generic drugs is distinct from the alleged collusion and price-fixing in violation of the NJATA, and New Jersey case law has acknowledged such distinction in

---

[46] Conduct that is violative of the NJCFA can constitute more than one type of violation.  Miller v. Am. Family Publishers, 663 A.2d 643, 652 n.8 (N.J. Super. Ct. Ch. Div. 1995).

finding violations of the NJATA and NJCFA in the same action.  See <u>Kugler v.</u> <u>Koscot Interplanetary, Inc.</u>, 293 A.2d 682, 684 (N.J. Super. Ct. Ch. Div. 1972).

Second, although Defendants do not expressly seek dismissal of New Jersey's NJCFA claims based upon Defendants' misleading statements and knowing omission of material facts, New Jersey has appropriately pled such violations, as discussed above.  (<u>See</u> <u>also</u> Am. Compl. ¶ 271.)

Finally, New Jersey has pled its NJCFA claims with appropriate particularity.  <u>Leon v. Rite Aid Corp.</u>, 774 A.2d 674, 680 (App. Div. 2001) (given liberal interpretation in favor of consumers, the "generous and hospitable" approach of [motion to dismiss] analysis *takes on an even greater significance"* with NJCFA claims) (emphasis added); <u>see also</u> <u>State, Dep't of Treasury, Div. of</u> <u>Inv. ex rel. McCormac v. Qwest Commc'ns Intern., Inc.</u>, 904 A.2d 775, 780 (N.J. App. Div. 2006) (requiring an "indulgent" reading of the complaint under N.J. Court Rule 4:5-8, an analog to Rule 9(b)).   The States' detailed and particularized allegations at ¶¶1- 140 of the Amended Complaint plainly put the Defendants on notice as to New Jersey's NJCFA claims in accordance with Rule 9(b).  <u>See</u> <u>Seville Indus. Mach. Corp. v. Southmost Mach. Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984) ("It is certainly true that allegations of 'date, place or time' fulfill [the functions of particularity], . . . nothing in [Rule 9(b)] requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud").

<u>*North Carolina*</u>:  North Carolina's claims under N.C.G.S. § 75-1.1 are not simply bootstrapped antitrust allegations.  That provision "sanctions, as part of

its broad remedial purpose of promoting ethical business dealings, commercial 'unfairness' and 'deception' beyond traditional antitrust concepts." L.C. Williams Oil Co. v. Exxon Corp., 625 F. Supp. 477, 481 (M.D.N.C. 1985) (citations omitted). To prevail on a § 75-1.1 claim, North Carolina must show that a defendant engaged in an unfair or deceptive act or practice, or an unfair method of competition in or affecting commerce; unlike many federal antitrust statutes, the State need not show that competition has been injured. See Am. Rockwool, Inc. v. Owens-Corning Fiberglass Corp., 640 F. Supp. 1411, 1426-27 (E.D.N.C. 1986).

Contrary to Defendants' implications, § 75-1.1 is written in the disjunctive—it renders unlawful acts or practices that are "unfair _or_ deceptive" (emphasis added). Defendants argue that North Carolina has not sufficiently alleged unfair conduct, but apparently recognize that the State's allegations of deceptive acts are adequate. As such, the State has adequately pled a § 75-1.1 claim. Even if allegations of unfair conduct were also necessary, the Amended Complaint's allegations to this effect, as articulated above, are more than sufficient.

_South Carolina_: The South Carolina Unfair Trade Practices Act, S.C. Code § 39-5-10, _et seq._ ("SCUTPA"), prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20. Defendants claim that South Carolina did not articulate a claim for unfair or unconscionable conduct.[47] The Amended Complaint is replete

---

[47] South Carolina courts have explained that an unfair trade practice is "offensive to public policy or which is immoral, unethical, or oppressive." State ex rel. Wilson v. Ortho-McNeil-Janssen Pharma., Inc., 777 S.E.2d 176, 188 (S.C. 2015) (quoting deBondt v. Carlton Motorcars, Inc., 536 S.E.2d 399, 407 (S.C. App. 2000)).

with allegations that the Defendants colluded to raise and maintain artificially high prices for their generic drugs, which is unquestionably offensive to public policy, immoral, unethical, and oppressive, and hence, unfair.  (See Am. Compl. ¶¶ 7-8; 11-14; 67; 103.)[48]  In South Carolina specifically, "[b]y the express terms of the statute, [SCUTPA] prohibits both unfair or deceptive acts or practices (consumer protection) and anticompetitive conduct (antitrust proscription)." Cheshire v. Coca-Cola Bottling Affiliated, Inc., 758 F. Supp. 1098, 1100 (D.S.C. 1990) (emphasis added).  Thus, the Attorney General of South Carolina can hold the Defendants accountable for both antitrust violations and consumer protection claims under the same statutory framework.

    For these reasons, the States' consumer protection claims survive in tandem with their antitrust claims, and also under broader definitions of unfair or unconscionable conduct.

    **D.    Indiana, Maine, and Michigan Possess Statutory Authority to Challenge the Conduct Alleged in the Amended Complaint under their State Consumer Protection Laws.**

    Defendants argue that the consumer protection claims of "Indiana, Maine, and Michigan should be dismissed because those state statutes do not prohibit the antitrust conduct Plaintiffs allege." (Joint Mem. at 28.)  This argument mischaracterizes what conduct is covered by each of these three States' consumer protection statutes.  As discussed below, Indiana, Maine, and Michigan

---

    [48] Defendants did not seek dismissal of South Carolina's claims for failure to allege deceptive conduct.  So long as South Carolina alleges Defendants' conduct has a "tendency to deceive," which it does, South Carolina need not plead that Defendants' conduct was unfair.  See Janssen, 777 S.E.2d at 188. Defendants' conduct was unfair, and South Carolina has so pled.

each have a statutory basis to challenge the conduct alleged in the Amended Complaint under their state consumer protection laws.

_Indiana_:  The Indiana Deceptive Consumer Sales Act ("IDCSA") broadly prohibits a supplier from committing any unfair, abusive, or deceptive acts, omissions, or practices in connection with a consumer transaction.  Ind. Code § 24-5-0.5-3(a).  This prohibition includes both implicit and explicit misrepresentations.  Ind. Code § 24-5-0.5-3(a).  Although Indiana Code § 24-5-0.5-3 details certain prohibited practices by a supplier, this list is not an exhaustive recitation of all acts that are potentially unlawful under the statute.  Ind. Code § 24-5-0.5-3(b) ("Without limiting the scope of subsection (a), the following acts . . . are deceptive acts").  Further, Defendants' reliance on Berghausen v. Microsoft, 765 N.E.2d 592 (Ind. Ct. App. 2002), is misplaced.  In Berghausen, the court rejected Plaintiff's "implicit representations" argument because prior interpretations of the IDCSA required an express misrepresentation to violate the statute.  Ind. Code § 24-5-0.5-3(a) (2013).  However, the Indiana legislature expanded the law in 2014 to include implicit misrepresentations and omissions.  See Ind. Code. § 24-5-0.5-3(a) (2014).

_Maine_:  The prohibitions of the FTCA encompass and include those set forth in Section 1 of the Sherman Act, such as price-fixing.  FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 454 (1986).  Since Maine's UTPA is interpreted consistent with the FTCA, such a violation of the FTCA may also constitute a violation under Maine's UTPA.  See, e.g., In re New Motor Vehicles Canadian Export Antitrust Litig., 350 F. Supp. 2d at 186-187 ("allegations of a conspiracy to keep Canadian

vehicles out of the United States, if true, could constitute a violation of Maine's Unfair Trade Practices Act"). Defendants' reliance on federal district court cases outside both this Circuit and Maine's First Circuit for the proposition that Maine's UTPA does not apply to price-fixing allegations (Joint Mem. at 29), is inapposite. Not only are those cases not binding on this court, their overbroad application of a state court holding in <u>Tungate v. MacLean-Stevens Studios, Inc.</u>, 714 A.2d 792 (Me. 1998), that conduct leading to higher prices was not deceptive within the meaning of Maine's UTPA, was explicitly rejected by the federal district court in the District of Maine. <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 350 F. Supp. 2d at 187 n.40 ("The relevant provision in this case is not the prohibition on 'unfair or deceptive acts,' but rather the ban on 'unfair methods of competition,' which was not implicated in <u>Tungate</u>. <u>Tungate</u>'s standards for establishing deception are therefore not pertinent.").

*Michigan*: Contrary to Defendants' assertions, Defendants' conduct may be the subject of a claim brought under the Michigan Consumer Protection Act by the Michigan Attorney General. In particular, the Michigan Consumer Protection Act specifically authorizes the Attorney General to bring a claim for damages caused by a method, act, or practice that is unfair or deceptive within the meaning of Sec. 5(a)(1) of the FTC Act. <u>See</u> Mich Comp Laws 445.910(c). And, the Second Circuit has recognized that Section 5 of the FTC Act encompasses alleged violations of the Sherman Act and the Clayton Act. <u>U.S. v St. Regis Paper Co.</u>, 285 F.2d 607 (2d Cir. 1960) ("[A]ny violation of the Sherman and Clayton Acts [is] also a violation of § 5 of the Federal Trade Commission Act."). Therefore,

Defendants' argument, premised on the notion that Michigan's claim under the Michigan Consumer Protection Act is invalid because it does not fall within the enumerated list in MCL 445.903, is incorrect.  The Michigan Attorney General may bring this claim under a separate provision of the act, MCL 445.910(c), which incorporates the claims at issue in this case.

> **E.    New Hampshire Has Sufficiently Alleged Intrastate Nexus and North Carolina Is Not Required to Plead Substantial Effects.**

New Hampshire has sufficiently alleged intrastate nexus under its state consumer protection statute.  North Carolina law does not have the pleading requirement ascribed to it by Defendants and, even if it did, the allegations in the Amended Complaint are sufficient to satisfy it.[49]

*New Hampshire*:  New Hampshire's consumer protection claim incorporates factual allegations that allow a plausible inference of a sufficient intrastate nexus.  See NH RSA 358-A:2.  Contrary to Defendants' assertions, there is a split of authority among some federal district courts as to the quantum of intrastate nexus required under the New Hampshire consumer protection act.[50] For example, the New Jersey district court in In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig., refused to grant defendants' motion to dismiss New Hampshire's consumer protection act claim because "courts interpreting [the act] . . . disagree as to whether a nationwide scheme in which the plaintiffs pay a higher price in the state is sufficient to satisfy the statute's requirement."

---

[49] Defendants again raise the Dormant Commerce Clause, in a footnote, with regard to state consumer protection claims.  The States address this footnote in Section of III.D.2, supra.

[50] Notably, the New Hampshire state courts have yet to rule on this issue.

No. 12-169, 2013 WL 5503308, at **21-22 (D.N.J. Oct. 2, 2013).  The New Jersey court rejected the plea for dismissal because the defendants failed to contend with contrary authority.  The same result is warranted here.

The better view of the broadly protective New Hampshire law is represented by district court decisions denying motions to dismiss where the complaints included allegations of an anticompetitive scheme that resulted in consumers receiving and paying higher prices for goods in the state of New Hampshire.  See, e.g., In re DDAVP Indirect Purchaser Antitrust Litig. v. Ferring Pharms. Inc., 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012) (denying motion to dismiss New Hampshire consumer protection claim where "Plaintiffs located in New Hampshire had to pay higher prices for DDAVP because of Defendants' alleged deception."); In re Chocolate Confectionary Antitrust Litig., 749 F.Supp.2d 224, 234–35 (M.D. Pa. 2010) (denying motion to dismiss New Hampshire consumer protection claim where "complaint avers that defendants colluded to fix the price of chocolate products that were then introduced into the New Hampshire market [and] [t]his behavior encompasses conduct that was part of trade or commerce that, at the very least, had indirect effects on the New Hampshire market and its residents."); Environamics Corp. v. Ferguson Enters., No. Civ. 00-579-JD, 2001 WL 1134727, at *4 (D.N.H. Sept. 24, 2001) (denying motion to dismiss New Hampshire consumer protection claim where allegations showed that "the deceptive act of misrepresenting the condition of the pump occurred in New Hampshire when Environamics received the pump and its allegedly false documentation.").

92

Here, New Hampshire's consumer protection claim alleges, among other things, that Defendants' illegal pricing of Doxy DR and Glyburide in the generic drug market "substantially affect[ed] the people of New Hampshire and ha[d] various impacts within the Plaintiff State."  (Am. Compl. ¶¶ 265-66.)  Defendants' alleged business malfeasance marketed and introduced generic products with artificially high pricing into the New Hampshire market, where they were received and purchased by state government entities, commercial entities, and end-user patients.  As with Defendants' attack on New Hampshire's antitrust claim, the defendants' premature effort to eviscerate discovery for the consumer protection claim should be rejected.  See Cardigan Mt. Sch. v. NH Ins. Co., 787 F.3d 82, 89 (1st Cir. 2015); Metts v. Murphy, 363 F.3d 8, 10, 12 (1st Cir. 2004).

North Carolina:  Defendants argue that claims under N.C.G.S. § 75-1.1 require allegations of a substantial in-state effect.  All of the cases Defendants rely on for this proposition concern out-of-state plaintiffs seeking to hold parties in North Carolina liable when the wrongful conduct and/or injuries were not even sustained in the State.  See Merck & Co. Inc. v. Lyon, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996) (no allegation that injury occurred in the state); In re Refrigerant Compressors Antitrust Litig., No. 2:09-md-02042, 2013 WL 1431756, at *19 (E.D. Mich. Apr. 9, 2013) (defendants did not market or sell their product in the state); In re Cast Iron Soil Pipe & Fittings Antitrust Litig., No. 1:14-md-2508, 2015 WL 5166014, at *33 (E.D. Tenn. June 24, 2015) (out-of-state plaintiffs did not allege injury in the state).  Such a fact pattern is inapplicable here.

93

Other courts have found that § 75-1.1 does not have a "substantial effects" requirement.  See In re Lidoderm Antitrust Litig., 103 F. Supp. 3d 1155, 1173-74 (N.D. Cal. 2015); In re Packaged Seafood Prods. Antitrust Litig., No. 15-md-2670, 2017 WL 1010329, --- F. Supp. 3d --- , at **25-26 (S.D. Cal. Mar. 14, 2017).  Indeed, § 75-1.1 protects North Carolina consumers victimized by unfair or deceptive conduct and can be applied to "concerted multi-state conduct resulting in injury to North Carolina residents." American Rockwool, Inc. v. Owens-Corning Fiberglass Corp., 640 F. Supp. 1411, 1427-28 (E.D.N.C. 1986).

Even assuming, *arguendo*, that substantial in-state effects must be alleged, the Amended Complaint is rife with allegations concerning the impact Defendants' anticompetitive conduct had on the prices of generic drugs in North Carolina. (See Am. Compl. ¶¶ 5, 8, 14, 18, 64-65, 102, 134-35, 137-38.)

F.    Vermont Does Not Assert a State Consumer Protection Law Claim.

Defendants contend that Vermont's consumer protection law requires an allegation that Defendants sell directly to consumers.  This argument is irrelevant because Vermont is suing only for the violation of its state antitrust law.  In Vermont, claims for violation of the antitrust law ("unfair methods of competition in commerce") and traditional consumer protection claims ("unfair or deceptive acts or practices in commerce") arise from the same statutory provision. 9 V.S.A. § 2453.  (See Am. Compl. ¶ 305.)  In the event that Defendants' argument is aimed at Vermont's antitrust claim, they are incorrect: indirect purchaser claims are permitted. 9 V.S.A. § 2465(b); Elkins v. Microsoft, 817 A.2d 9, 12-13 (Vt. 2002) (no privity requirement under Vermont law).

G.   **Indirect Purchasers Have Standing under Florida and Louisiana Consumer Protection Laws.**

The States need not address arguments raised against Connecticut, Indiana, Montana, and New Jersey that their claims on behalf of indirect purchasers under their consumer protection statutes fail because none of these states has pled such a claim.  Florida and Louisiana, however, have asserted such claims and have standing to pursue them for the reasons discussed below.

*Florida*:  It is well-settled law that indirect purchasers have standing to maintain an action under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  The highest Florida court to consider the issue determined that indirect purchasers have standing under FDUTPA.  Mack v. Bristol-Myers Squibb Co., 673 So. 2d 100, 101 (Fla. Dist. Ct. App. 1996).  According to Mack, the rule of law in Florida, a "fair reading of [FDUTPA] reveals no intention by the legislature to limit suits for price-fixing to direct purchasers only." Id. at 105.  Federal courts applying Mack have found it controlling and have consistently held that indirect purchasers have standing under FDUTPA.[51]

---

[51] See In re Aggrenox Antitrust Litig., 2016 WL 4204478, at *8 (D. Conn. Aug. 9, 2016) (finding Mack as controlling on this issue and upholding indirect purchaser claims under FDUPTA); In re TFT-LCD (Flat Panel) Antitrust Litig., 2014 WL 4652145, at *2 (N.D. Cal. Sept. 18, 2014) ("The FDUTPA is Florida's indirect purchaser statute."); California v. Infineon Techs. AG, 2008 WL 4225459, at *1 (N.D. Cal. Sept. 11, 2008) ("Mack is controlling, and in accordance with that holding, indirect purchaser standing under FDUTPA is permissible …."); In re Vitamins Antitrust Litig., No. Misc. 99-197 (TFH), 2000 WL 1475705, at *15 (D.D.C. May 9, 2000) ("Florida courts have interpreted [FDUTPA] to allow claims by both direct and indirect purchasers.").  Defendants misapply In re Dig. Music Antitrust Litig.  As to Florida, the court dismissed only unjust enrichment claims.  812 F. Supp. 2d at 420.  This has no bearing here on Florida's unfair method of competition claim under FDUTPA.

95

_**Louisiana**_:   Louisiana's Unfair Trade Practices Act ("LUTPA") is interpreted to include anticompetitive and restraint of trade types of claims.  (<u>See</u> <u>infra</u>, Sec. IV.C.)  LUTPA confers standing on "any person" who suffers a loss as a result of another person's use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. In <u>Cheramie</u> <u>Servs., Inc. v. Shell Deepwater Prod. Inc.</u>, 35 So.3d 1053 (La. Apr. 23, 2010), the Louisiana Supreme Court addressed the definition of "any person" under LUTPA and found it unrestricted in any manner.  Under LUTPA, "any person" means precisely that—_any_ person, be they a direct purchaser, or indirect.  If the injury can be shown, standing is conferred.  <u>Id.</u> at 1057.

## CONCLUSION

For the foregoing reasons, and those in States' Joint Consolidated Memorandum in Opposition to the Motions to Dismiss the Amended Complaint by Defendants Mylan Pharmaceuticals Inc., Mayne Pharma Inc., Aurobindo Pharma USA, Inc. and Teva Pharmaceuticals USA Inc., filed simultaneously with this

Opposition, the States respectfully request that Defendants' Motions to Dismiss the Amended Complaint be denied in their entirety.

DATED:  May 22, 2017

PLAINTIFF
STATE OF CONNECTICUT
GEORGE JEPSEN
ATTORNEY GENERAL

PLAINTIFF
COMMONWEALTH OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

BY:  /s/ W. Joseph Nielsen
   W. Joseph Nielsen
   Federal Bar No. ct20415
   Laura J. Martella
   Federal Bar No. ct27380
   Assistant Attorneys General
   55 Elm Street, P.O. Box 120
   Hartford, CT  06141-0120
   Tel: (860) 808-5040
   Fax: (860) 808-5033
   Joseph.Nielsen@ct.gov
   Laura.Martella@ct.gov

BY:  /s/ William T. Matlack
   William T. Matlack (MA BBO No. 552109)
   Assistant Attorney General
   Chief, Antitrust Division
   Carol E. Head (MA BBO No. 652170)
   Matthew M. Lyons (MA BBO No. 657685)
   Michael MacKenzie (MA BBO No. 683305)
   Assistant Attorneys General
   Antitrust Division
   One Ashburton Place
   Boston, MA 02108
   Tel: (617) 727-2200
   Fax: (617) 722-0184 (fax)
   William.Matlack@state.ma.us
   Carol.Head@state.ma.us
   Matthew.Lyons@state.ma.us
   Michael.Mackenzie@state.ma.us

*Attorneys for Plaintiff States*

## CERTIFICATION

I hereby certify that on May 22, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


 /s/ W. Joseph Nielsen
W. Joseph Nielsen
Assistant Attorney General

98