# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT; THE STATE OF
ALASKA; THE STATE OF ARIZONA; THE STATE
OF ARKANSAS; THE STATE OF CALIFORNIA;
THE STATE OF COLORADO; THE STATE OF
DELAWARE; THE DISTRICT OF COLUMBIA;
THE STATE OF FLORIDA; THE STATE OF
HAWAII; THE STATE OF IDAHO; THE STATE OF
ILLINOIS; THE STATE OF INDIANA; THE STATE
OF IOWA; THE STATE OF KANSAS; THE
COMMONWEALTH OF KENTUCKY; THE STATE
OF LOUISIANA; THE STATE OF MAINE; THE
STATE OF MARYLAND; THE
COMMONWEALTH OF MASSACHUSETTS; THE
STATE OF MICHIGAN; THE STATE OF
MINNESOTA; THE STATE OF MISSISSIPPI; THE
STATE OF MISSOURI; THE STATE OF
MONTANA; THE STATE OF NEBRASKA; THE
STATE OF NEVADA; THE STATE OF NEW
HAMPSHIRE; THE STATE OF NEW JERSEY; THE
STATE OF NEW MEXICO; THE STATE OF NEW
YORK; THE STATE OF NORTH CAROLINA; THE
STATE OF NORTH DAKOTA; THE STATE OF
OHIO; THE STATE OF OKLAHOMA; THE STATE
OF OREGON; THE COMMONWEALTH OF
PENNSYLVANIA; THE COMMONWEALTH OF
PUERTO RICO; THE STATE OF RHODE ISLAND;
THE STATE OF SOUTH CAROLINA; THE STATE
OF TENNESSEE; THE STATE OF UTAH; THE
STATE OF VERMONT; THE COMMONWEALTH
OF VIRGINIA; THE STATE OF WASHINGTON;
THE STATE OF WEST VIRGINIA; THE STATE OF
WISCONSIN; and THE STATE OF WYOMING

v.

AUROBINDO PHARMA USA, INC.; ACTAVIS
HOLDCO US, INC.; ACTAVIS PHARMA, INC.;
APOTEX CORP.; ASCEND LABORATORIES,
LLC; CITRON PHARMA, LLC; DR. REDDY'S

No. 3:16-cv-02056 (MPS)

LABORATORIES, INC.; EMCURE
PHARMACEUTICALS, LTD; GLENMARK
PHARMACEUTICALS INC., USA; HERITAGE
PHARMACEUTICALS, INC.; LANNETT
COMPANY, INC.; RAJIV MALIK; MAYNE
PHARMA (USA), INC.; SATISH MEHTA; MYLAN
PHARMACEUTICALS INC.; TEVA
PHARMACEUTICALS USA, INC.; SANDOZ,
INC.; SUN PHARMACEUTICAL INDUSTRIES,
INC.; and ZYDUS PHARMACEUTICALS (USA),
INC.

## **RULING ON INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS**

Six Defendants—Apotex Corp. ("Apotex"), Ascend Laboratories, LLC ("Ascend"),

Glenmark Pharmaceuticals Inc., USA ("Glenmark"), Lannett Company, Inc. ("Lannett"), Mayne

Pharma (USA), Inc. ("Mayne"), and Zydus Pharmaceuticals (USA), Inc. ("Zydus")—have moved

under Fed. R. Civ. P. 12(b)(6) to dismiss claims asserted by the Plaintiffs, the attorneys general of

most of the States and several U.S. territories ("the States"), in this sprawling action alleging price-

fixing, market allocation, and bid rigging in the sale of generic drugs.  ECF Nos. 592, 593, 594,

595, 596, 598, 600.  Prior decisions in this case by another judge make clear that the States have

adequately stated a claim of an overarching conspiracy to fix prices and allocate markets in the

generic pharmaceuticals industry.  As such, the motions to dismiss are denied to the extent they

argue that the States have failed to state a claim that an alleged overarching conspiracy exists.  This

ruling addresses only whether the operative complaint pleads enough facts to make it plausible

that each of the six Defendants here joined the overarching conspiracy or whether, instead, the

conduct of each was limited to a single-drug conspiracy or did not amount to participation in any

conspiracy.  For the reasons set forth below, I find that the States have plausibly alleged that all six

Defendants both conspired with respect to a single drug and joined the overarching conspiracy of

which the single drug arrangement was a part.  The motions to dismiss are thus denied.

2

## I.  Overview

### A.  Procedural Background

This is one of three cases in which the attorneys general of many states and U.S. territories have sued scores of makers of generic drugs for alleged antitrust violations and unfair trade practices.  All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other cases involving similar allegations asserted by private parties in a consolidated proceeding.  ECF No. 9.[1]  This case, which the parties refer to as the "Heritage case," involves allegations that nineteen defendants allocated customers, fixed prices, and rigged bids in the sale of fifteen generic drugs.

In October 2018, the MDL court considered joint and individual motions to dismiss drug-specific complaints filed by private-party plaintiffs (but not the States) alleging schemes to allocate markets and fix prices for various individual drugs.  *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018).  These complaints included allegations against Apotex, Glenmark, Lannett, Mayne, and Zydus, but not Ascend.  *Id.* at 418.  The MDL court found that the private parties "made sufficient allegations of evidence implying a traditional conspiracy to permit their Sherman Act claims to withstand dismissal."  *Id.* at 454.

On February 21, 2019, all Defendants in this case filed in the MDL court a joint motion to dismiss both the States' operative complaint at issue here, and the complaints filed by private parties, all of which asserted the existence of an overarching conspiracy to allocate markets and

---

[1] Unless otherwise indicated, all ECF numbers in this case refer to entries on the docket of this case, not the same case when it was before the MDL court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.

fix prices for multiple drugs—a conspiracy the MDL court described as "extend[ing] beyond the boundaries of any individual drug." *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 524 (E.D. Pa. 2019). On the same day, six individual Defendants—Apotex, Ascend, Glenmark, Lannett, Mayne, and Zydus—filed their own motions to dismiss. All six motions seek to dismiss the overarching conspiracy claim; the motions by Ascend, Glenmark, and Mayne also seek to dismiss individual-drug conspiracy claims.

On August 15, 2019, the MDL court addressed only the joint motion to dismiss and found that the "Plaintiffs make plausible claims that the alleged individual drug conspiracies were connected by common goals, methods, or actors so as to form a broader overarching conspiracy," and as such the complaints "plausibly allege that Defendants engaged in a conspiracy regarding the broader market for generic drugs, and not just the market for any individual drug." *Id.* at 526. The MDL court thus denied the joint motion to dismiss but noted that "[w]hether any individual Defendant has a specific defense to the claims raised against it . . . is a separate question not here resolved." *Id.* at 533.

In April 2024, with the six individual Defendants' motions to dismiss still pending, the JPMDL remanded the cases brought by the States to this Court, where they were assigned to me. ECF Nos. 345, 353. I now address the six Defendants' "specific defense[s]" to the overarching conspiracy claims raised in the six individual motions to dismiss. I also address Ascend, Glenmark, and Mayne's arguments against the States' individual-drug conspiracy claims.[2]

---

[2] Ascend has also filed a motion to dismiss state-law claims against it, ECF No. 600, that is substantially similar to the motion to dismiss I address here. I deny that motion as well, for the reasons set forth in this ruling. To the extent Ascend genuinely believes there are arguments regarding the state-law claims against it that would survive the analysis in this ruling, Ascend may file a new motion to dismiss the state-law claims within fourteen days.

**B. Allegations**

As noted, the operative complaint in this case, the June 18, 2018, Consolidated Amended Complaint (ECF No. 473 on this Court's docket), alleges collusion in the sale of fifteen generic drugs. ECF No. 473 ¶ 1. Its allegations were summarized by the MDL court in its opinion on Defendants' joint motion to dismiss the overarching conspiracy claims, *In re Generic Pharms. Pricing Antitrust Litig.,* 394 F. Supp. 3d at 514–24, and I adopt that summary by reference.[3] "The claims asserted in the [States'] Overarching Complaint[] [i.e., ECF No. 473] would impose joint and several liability on Defendants not just for their participation in any individual drug conspiracy, but also for their participation in the alleged overarching scheme." *Id.* at 515. Essentially, the complaint describes a series of conspiracies related to individual drugs, and an overarching conspiracy, between makers of generic pharmaceutical products to collude on price, market allocation, and bids for the business of customers.

The following allegations are pertinent to all six Defendants' individual motions to dismiss. As part of the scheme, generic drug makers including the Defendants were expected to "play nice in the sandbox" with their competitors to ensure each competitor received its "fair share" of the market. *See* ECF No. 473 ¶¶ 89–109. The complaint alleges that participants in each of the identified individual-drug agreements followed this "fair share" protocol and were aware that these

---

[3] Although the MDL court's opinion covered complaints by both the States and private-party plaintiffs, the court noted that despite their differences, "each of the Overarching Complaints alleges that Defendants pursued a common goal—to achieve artificially-inflated generic drug prices through the allocation of markets and through price-fixing agreements—and that they did so through a wide-ranging 'fair share' arrangement." *Id.* at 515. As all the "Overarching Complaints" are based on the same set of operative facts, even after remand of this action separate from the others in the MDL, the MDL court's analysis in its opinion denying the joint motion to dismiss encompasses the claims made in the Plaintiff States' operative complaint. The analysis below of the individual motions to dismiss, however, examines only facts alleged in the States' operative complaint. ECF No. 473.

agreements formed a larger whole, impacting how other pharmaceutical competitors set prices and allocated markets across multiple specific-drug markets. *See id.* ¶¶ 89, 92, 105, 107. The agreements were not limited to the market for any individual drug but also encompassed "a more global 'fair share' outcome." *See id.* ¶ 101. While the complaint provides examples by which the companies maintained this "artificial equilibrium," *id.* ¶¶ 99–103, 108–09, it also notes that "[t]here is no precise method for apportioning each participant's 'fair share,'" *id.* ¶ 97. The complaint alleges that the pattern of "fair share" protocol across disparate individual-drug markets "demonstrat[es] the universal understanding and code of conduct agreed to by Defendants" and provided the "industry backdrop" that resulted in an average price increase of 448 percent across the generics industry in 2013 and 2014. *Id.* ¶¶ 105, 110. Factual details relevant to each of the six motions to dismiss at issue are discussed below.

### C. Standard of Review

#### 1. The Law of the Case

In the joint motion to dismiss filed in the MDL court, Defendants argued that the proper test for evaluating whether a set of facts amounts to an overarching conspiracy—as opposed to multiple separate conspiracies—was outlined in *United States v. Kelly*, 892 F.2d 255, 258–59 (3d Cir. 1989), a criminal drug conspiracy case. *See In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 527. The MDL court disagreed, finding that the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), "sets the bar for Plaintiffs' overarching conspiracy allegations, not *Kelly*." 394 F. Supp. 3d at 528. Nonetheless, the MDL court also analyzed the *Kelly* factors and found that "even if *Kelly* were the proper measuring stick for Plaintiffs' Overarching Complaints, their allegations plead an overarching conspiracy." *Id.* I will treat the MDL court's ruling as the law of the case. *See In re Ford Motor Co.*, 591 F.3d 406, 411

(5th Cir. 2009) (on remand from MDL court, "courts should use the law of the case doctrine to determine whether to revisit [the MDL court's] decision"); *In re EDNY Cathode Ray Tube Antitrust Cases*, No. 17-cv-04504, 2017 WL 4351503, at *2 (E.D.N.Y. Sept. 29, 2017) ("The decisions of the CRT MDL Court are law of the case [after remand].  Absent an intervening change of controlling law, new evidence, or the need to correct a clear error, this Court declines to revisit the decisions rendered by the CRT MDL Court." (internal quotation marks omitted)).

In any event, I agree that the *Twombly* pleading standard controls the analysis and that the *Kelly* factors are not part of the plausibility test.  Considerations like the *Kelly* factors may still be pertinent when deciding whether a case presents a single as opposed to multiple conspiracies, and the Second Circuit, in which this Court sits, examines considerations similar to some of the *Kelly* factors when assessing that issue.[4]  To the extent such considerations are relevant to the *Twombly* plausibility analysis here, I discuss them below.

### 2. The *Twombly* Plausibility Standard

In federal court, each complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. 8(a)(2), and if it "fail[s] to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), the court must dismiss it.  In deciding the defendants' motion to dismiss under Rule 12(b)(6), I must determine whether the States have

---

[4] Using the *Kelly* factors, the MDL court considered whether (1) each alleged conspirator was aware of, and committed to, a common goal; (2) the individual conspiracies were interdependent; and (3) there was sufficient overlap among the participants in the individual conspiracies.  *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 527.  The Second Circuit has outlined similar factors useful in determining when a single conspiracy exists, including: the overriding goal of the conspiracy, whether the same core group led the conspiracy, whether the individual schemes shared common participants, whether individual schemes were interdependent, and whether the participants used means and methods common among the individual operations.  *United States v. Berger*, 224 F.3d 107, 114–15 (2d Cir. 2000).  These non-exhaustive factors are similar to the *Kelly* factors.

alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). I must accept as true the complaint's factual allegations, *id.*, and must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss, however. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted).

To state a claim for conspiracy under the Sherman Act, plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. If they cannot allege direct evidence of an agreement, plaintiffs may allege parallel conduct within "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Plaintiffs must reinforce parallel conduct allegations with "plus factors" that provide a basis to infer that a conspiracy existed. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). These factors may include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.*

Courts have found that once the existence of a conspiracy is sufficiently pled, the extent or scope of a conspiracy "is ultimately [a question] of fact, and cannot be resolved [on a motion to dismiss], where the Court tests only the sufficiency of the pleadings." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014); *see also In re*

*Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) (where complaint adequately pled overarching conspiracy, "[q]uestions as to each Defendant's participation in the conspiracy and the conspiracy's scope may be raised later in litigation, but do not merit dismissal at this phase").

## II. Discussion

In its opinion on the joint motion to dismiss, the MDL court found that the States and the private plaintiffs had satisfied the *Twombly* standard by "plausibly alleg[ing] that Defendants engaged in a conspiracy regarding the broader market for generic drugs, and not just the market for any individual drug," and that "the individual drug conspiracies were connected by common goals, methods, or actors so as to form a broader overarching conspiracy." *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 526. The MDL court found the Plaintiffs' allegations of Defendants' "parallel conduct in the form of price increases across the market for generic drugs" were supported by "plus factors that serve as proxies for direct evidence of an agreement": (1) "the price increases across the market for generic drugs [were] reasonably proximate in time and value"; (2) "the structure of the market for generic drugs motivated Defendants to enter into an antitrust conspiracy and undertake actions against self interest in the form of pricing and bidding decisions that would be irrational in a competitive market for generic drugs"; and (3) "facts implying the existence of a traditional conspiracy: inter-defendant communications, trade association leadership, membership, and meeting attendance, and ongoing state and federal investigations into generic drug pricing." *Id.* at 525 (internal quotations omitted).

Because the MDL court's decision is law of the case (and, in any event, I agree with it), the States have adequately stated a claim under *Twombly* that there was an overarching conspiracy to fix prices and allocate markets in the generic pharmaceuticals industry. As such, the individual

Defendants' motions to dismiss are denied to the extent they argue that the States have failed to state a claim that an alleged overarching conspiracy exists. Left to be answered is whether the operative complaint pleads enough facts to make it plausible that each of the six individual Defendants here joined the overarching conspiracy or whether, instead, its conduct was limited to a single-drug conspiracy or did not amount to participation in any conspiracy. On a motion to dismiss, this issue poses a high bar for the Defendants, because, as I noted above, once the existence of a conspiracy is plausibly alleged, the scope of that conspiracy—including the extent of any single Defendant's participation—is usually treated as a question of fact better resolved at a later stage of the case. *See In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *2; *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *4.

Moreover, the MDL court has already decided that the Defendants have pled an overarching conspiracy, not separate individual drug conspiracies, in part because each arrangement as to an individual drug contributed to the overarching scheme, bore the same characteristics of the overarching scheme, and resulted in price increases that coincided with price increases of other drugs involved in the scheme. This conclusion leaves little—and maybe no—room for an individual defendant plausibly alleged to be a participant in an individual-drug conspiracy to argue that it did not join the overarching scheme, notwithstanding the MDL court's caveat that it was not addressing whether "any individual Defendant has a specific defense to the claims raised against it in the overarching complaints." *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 533.

The Defendants' common arguments that the States fail to link their conduct regarding one drug to an overarching conspiracy are not persuasive. Each of the six Defendants point to the absence of allegations that they competed with Heritage Pharmaceuticals, Inc. ("Heritage") for

10

other drugs or participated in price fixing or market allocation in any way beyond the identified single-drug conspiracy. ECF No. 592 at 1–4, 17–20; No. 593 at 2, 7–9; No. 594 at 21–22; No. 595 at 10; No. 596 at 20–22; No. 598 at 8–9. No such allegation was necessary. A firm can enter into and support a conspiracy to restrain competition in a particular product without actually making or selling that product by, for example, agreeing to refrain from doing so. Here, the States plausibly allege that the Defendants' single-drug agreements, which bore all the characteristics of the broader practices in the industry, contributed to the success of the overarching conspiracy. At the motion to dismiss stage, this is sufficient; more specificity on how any particular individual-drug conspiracy *ultimately* fit in with the overarching conspiracy is not required. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("Specific facts are not necessary; the [complaints] need only give the defendant fair notice of what the claim is and the grounds upon which it rests."); *see In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *2; *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *4. The States also allege sufficient overlap with other alleged conspirators via numerous and sustained contacts. *See, e.g.*, ECF No. 473 ¶¶ 94–95. Whether this overlap was limited to co-conspirators in one single-drug conspiracy is immaterial; the facts alleged are sufficient for me to infer that "each actor was aware of his part in a larger organization where others performed similar roles." *United States v. Berger*, 224 F.3d 107, 115 (2d Cir. 2000).

I now discuss the individual Defendants' motions to dismiss in turn.[5]

---

[5] The parties' briefs also discuss allegations brought by the private-party plaintiffs in the MDL that Defendants Apotex, Glenmark, Lannett, Mayne and Zydus were involved in additional individual-drug conspiracies. As the private-party plaintiffs' complaints are not before me, and the States do not make similar claims, I will not address these allegations.

## A. Apotex

The States allege that an agreement existed between Apotex and co-Defendants Heritage and Teva Pharmaceuticals USA, Inc. ("Teva") to "avoid competition and increase prices on [the generic drug] Leflunomide" and that that agreement was part of an overarching conspiracy to "restrain trade in the generic pharmaceutical industry."  ECF No. 473 ¶¶ 90–92, 385, 390, 566–573.  Apotex's motion does not challenge its alleged involvement in the leflunomide conspiracy; instead, it challenges only the allegations that it joined the overarching conspiracy.  ECF No. 594 at 11.  This makes the question before me quite narrow: In light of the MDL Court's finding that there was an overarching conspiracy in the generic drug industry and Apotex's concession (for purposes of this motion only) that it was part of a single generic drug conspiracy, do the allegations also support a claim that Apotex joined the overarching conspiracy?

### 1. Allegations

The complaint alleges that Heritage, which held a sixty-one percent share of the leflunomide market in April 2014, ECF No. 473 ¶ 381, formed price-fixing agreements with its two "main competitors," Apotex and Teva, *id.* ¶¶ 382, 385.[6]  According to the allegations, after Heritage received word that Teva might leave the market, Apotex's Vice President of Sales communicated with "M.E.," a Senior National Account Manager at Heritage (*id.* ¶ 158) in four phones calls over two days, during which "Heritage and Apotex agreed to avoid competition and increase prices on Leflunomide."  *Id.* ¶¶ 384–85.  The day after these calls, another Heritage

---

[6] The complaint alleges no facts regarding an agreement between Apotex and Teva and does not allege the two companies were in contact in 2014, the time of the alleged conspiratorial conduct regarding leflunomide.  *See* ECF No. 473 ¶ 95.  Rather, it alleges that Heritage "obtained agreements with Teva and Apotex" concerning leflunomide and that these agreements formed an individual-drug conspiracy, which in turn was part of the overarching conspiracy.  *Id.* ¶¶ 568–69, 573.

employee asked M.E. to confirm that he had spoken to competitors "because Heritage needed 'to move forward with the plan asap'"; M.E., who had been tasked with communicating with Apotex about leflunomide, *id.* ¶ 383, responded that he had spoken with competitors and was only waiting on feedback from one company on a different drug. *Id.* ¶ 386. On May 27, 2014, both Heritage and Apotex moved to increase prices on leflunomide. *Id.* ¶ 387. The complaint also alleges that Apotex had seven earlier communications with Teva in 2013, *id.* ¶ 95, but does not specify the content of those communications.

### 2. Link to Overarching Conspiracy

The complaint alleges what amounts to direct evidence that Apotex agreed to conspire with Heritage to coordinate the pricing of leflunomide. And although it does not allege direct evidence that would tie Apotex to the overarching conspiracy, it does allege parallel conduct and plus factors that do so. As described earlier in this ruling and in the MDL's Court's ruling, the States allege that participants in each individual-drug "fair share" conspiracy were aware that their conspiracies affected the wider pharmaceutical market, and that the pattern of "fair share" protocol "demonstrat[ed] the universal understanding and code of conduct agreed to." *See id.* ¶¶ 89, 92, 105, 107. The direct evidence about Apotex's agreement regarding leflunomide indicates that that agreement followed the same "fair share" pattern as the overarching conspiracy.

Specifically, the allegation that Apotex and Heritage were both able to implement price increases without the other making a lower bid to compete for customers permits a reasonable inference that the parties had agreed to allocate the market so that each received a "fair share," mimicking the "fair share" protocol characterizing the overall conspiracy. *Id.* ¶ 106; *see also In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525 (finding such decisions "would be irrational in a competitive market for generic drugs"). Further, Apotex's alleged agreement to

raise prices on leflunomide in 2014 was reasonably proximate in time and value to the other price increases in the industry that reflected the overarching conspiracy, ECF No. 473 ¶¶ 11–14, 110–12, 269, 293, 387; the structure of the market motivated Apotex to enter its arrangement regarding leflunomide against its self-interest, when it could have continued to underbid Heritage and compete for its customers—the same structural mechanism driving the overarching conspiracy, *id.* ¶¶ 12, 106, 385, 388; and Apotex communicated regularly with Defendants other than Heritage during this critical period, *id.* ¶¶ 283, 380–90.  These are "plus factors" to accompany parallel conduct that creates "a context that raises a suggestion" that Apotex was aware of and had agreed to be part of the overarching conspiracy.  *See In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525.  The States have thus alleged "enough facts" regarding Apotex's part in the alleged overarching conspiracy "to state a claim to relief that is plausible on its face."  *See Citigroup*, 709 F.3d at 136; *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525.

Apotex's arguments to the contrary are not persuasive.  As described above, a company need not manufacture or sell a particular drug to support a conspiracy to restrain competition in sales of that drug. For these reasons, Apotex's motion to dismiss, ECF No. 594, is denied.

**B.  Ascend**

The States allege that an agreement between Ascend and co-Defendant Heritage regarding the generic drug nimodipine is in itself an unlawful restraint of trade, ECF No. 473 ¶¶ 138, 274, 478, and is also a part of an overarching conspiracy to restrain trade in the wider generic pharmaceutical industry, *id.* ¶¶ 90–92, 148, 483.  Ascend seeks to dismiss the States' claims of both an individual-drug conspiracy involving nimodipine and an overarching conspiracy.  ECF No. 596.

### 1. Allegations

Ascend allegedly communicated and agreed with Heritage to allocate markets to avoid price erosion in April 2014, the same month Ascend received FDA approval to begin producing nimodipine. ECF No. 473 ¶¶ 135, 138. On May 9, 2014, a Heritage employee reported internally that Ascend had "b[ought] in" to a "plan" during an April 22 call between Heritage and Ascend. Under this plan, Heritage would raise its prices, Ascend would enter the market at a high price to avoid erosion, and in exchange Heritage would walk away from certain accounts that Ascend had targeted so Ascend could gain market share at favorable pricing. *Id.* ¶¶ 138–39. Heritage raised its price in June 2014, *id.* ¶ 141, and continued to communicate with Ascend regularly about their nimodipine agreement, *id*. ¶¶ 140–45.[7] Once Ascend entered the market in 2015, it was able to gain market share even though its nimodipine price was higher than Heritage's price. *Id.* ¶¶ 146–47.

### 2. Participation in Individual-Drug Conspiracy

The State's allegations are sufficient to state a claim that Ascend conspired with Heritage to restrain competition in nimodipine sales. On top of the report of an agreement by the Heritage employee, the allegations include Heritage's price increase and promise to "let go" of customers rather than compete based on Ascend's "buy-in" to the "plan." *Id.* ¶ 139. According to the allegations, Heritage implemented its price increase only after confirming that it had secured "buy-in" from Ascend.[8]

---

[7] Excerpts of emails included in the complaint suggest these later communications were about the same subject—the alleged collusive agreement—as those before Heritage's price increase. ECF No. 473 ¶¶ 142 ("Let me know when we can re-connect to continue our discussions from the other day."), 143 ("Wanted to pick up discussions.").

[8] Ascend's theory that Heritage decided to increase its price before Ascend entered the market, and that it merely sought to profit from its final days as the "sole seller," ECF No. 596 at 18–19, do not make the States' allegations implausible. Even if this alternative theory is plausible, so are the

Ascend argues that the nimodipine price increases could not have stemmed from an agreement between Ascend and Heritage because Ascend did not control either pricing or market share. ECF No. 596 at 9, 12–13. It asserts that it never marketed or sold nimodipine, but instead merely served as a "contract manufacturer" for American Health Packaging ("AHP"), a nonparty "which exclusively marketed and sold" the drug, and which the complaint does not mention. *Id.* at 9. Ascend argues that it had already "contacted AHP to license Nimodipine" before communicating with Heritage. *Id.* at 13 & n.8.

Apart from the problem that these facts are not mentioned in the complaint,[9] they do not foreclose the formation of the agreement alleged, which is evidenced by Heritage's alleged statements. Nor do they make such an agreement implausible: The alleged agreement was struck in the same month that Ascend received FDA approval to start production—before Ascend (or AHP) could have begun to sell or market the drug. ECF No. 473 ¶¶ 135, 138. Especially in light of other allegations in the complaint, which describes Heritage as the principal driver of most of the individual drug agreements, it is reasonable to infer that Heritage would not have been willing to increase its price for nimodipine—lest it be underbid by an incoming competitor—without first obtaining the alleged commitment from Ascend. Further, Ascend's argument that there could be no agreement with Heritage because it lacked all control over price or markets (supposedly because it did not actually sell the drug) cannot easily be squared with the allegations that the company continued regular communications about nimodipine after Heritage's price increase.

---

State's allegations. "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012).

[9] Ascend urges the Court to consider exhibits filed with its motion to dismiss that purport to show, among other things, that it "did not sell Nimodipine under its own trade dress." ECF No. 596 at 12–13; *see also id.* at 29–92. I need not decide if I should consider these exhibits at this stage because these documents do not rebut the conspiracy allegations in the complaint.

The States have plausibly alleged that Ascend and Heritage conspired to restrain competition in sales of nimodipine.[10]

### 3. Link to Overarching Conspiracy

As suggested earlier, once it is established that there was an agreement with respect to an individual drug, it is a short step to link that agreement to the overarching conspiracy already found (on the pleadings) by the MDL Court. And so Ascend's arguments to dismiss the States' overarching conspiracy claims also fall short. The factual allegations already recited are consistent with the broader "fair share" protocol. The States allege that Heritage increased prices after confirming "buy-in" from Ascend in exchange for letting some customers go to Ascend, *id.* ¶ 138–39, and that the tablets Ascend manufactured entered the market at a higher price than Heritage's, a time when one would expect a lower price. *Id.* ¶¶ 136, 147. As already suggested, this echoes the behavior attributed to the overarching conspiracy and fits a pattern of Heritage's reaching out and nailing down commitments from its competitors across multiple drugs. While there is no express allegation that Ascend was aware of Heritage's conduct with respect to other drugs, there are enough facts to make it plausible that it was: according to the complaint, the Ascend employee who ultimately struck the deal on Nimodipine had a previous relationship with the Heritage employee who was not only on the other end of the Nimodipine deal but was also involved in many other individual drug agreements described in the complaint. *Id.* ¶¶ 137, 157, 172, 215, 234–35, 260, 271–274, 290. Further, the Nimodipine deal was allegedly reached in a Heritage-Ascend phone call lasting only "19 minutes," *id.* ¶ 138, which hardly suggests that Ascend was

---

[10] Because I find that the amount of pricing control retained by Ascend is a fact issue, I also reject Ascend's arguments that the States have failed to allege an antitrust injury. ECF No. 596 at 20. The complaint plausibly alleges anticompetitive conduct by Ascend resulting in harm to competition in the nimodipine market.

unfamiliar with the collusive practices allegedly prevailing in the industry as a whole. All this is sufficient to make the short step from individual-drug agreement to participation in the overarching conspiracy.

For these reasons, Ascend's motion to dismiss, ECF No. 596, is denied. Because the sealed version of Ascend's memorandum of law only redacts quotes and information from the complaint, which is not sealed, the Clerk is directed to unseal ECF No. 597.

### C. Glenmark

The States allege that an agreement between Glenmark and co-Defendants Heritage, Aurobindo Pharma USA, Inc. ("Aurobindo"), Citron Pharma, LLC ("Citron"), and Sandoz, Inc. ("Sandoz"), regarding the generic drug fosinopril-hydrochlorothiazide ("Fosi-HCTZ") is in itself an unlawful restraint of trade, ECF No. 473 ¶¶ 306–27, and is also a part of an overarching conspiracy to restrain trade in the wider generic pharmaceutical industry, *id.* ¶¶ 90–92, 328, 541. Glenmark seeks to dismiss claims of both an individual-drug conspiracy involving Fosi-HCTZ and an overarching conspiracy. ECF No. 595.

#### 1. Allegations

The complaint alleges the following: In May 2014, Heritage was planning a price increase for Fosi-HCTZ, of which it had 47 percent of the market, ECF No. 473 ¶¶ 307, 310. Its employees reached out to counterparts at Fosi-HCTZ competitors, including Glenmark, in May 2014, and Glenmark also spoke with Aurobindo. *Id.* ¶ 309. Heritage's subsequent communications regarding "price increase strategies" with Aurobindo and Sandoz then "sparked a flurry of communications" from an Aurobindo employee in June 2014, including "five [] phone calls and multiple text messages" with a counterpart at Glenmark. *Id.* ¶¶ 311–16. Heritage, Aurobindo, and Sandoz (but not Glenmark) then met at a trade conference to discuss Fosi-HCTZ pricing, after which Heritage

reported finding "similar like minding on the pricing strategies we discussed." *Id.* ¶¶ 287, 311. A week later, another Glenmark employee also called a different contact at Aurobindo. *Id.* ¶ 316. After Heritage announced that it was raising its price on Fosi-HCTZ, Glenmark and Aurobindo spoke twice the next day. *Id.* ¶ 324. Communications between Glenmark and Heritage then resumed the following month, *id.* ¶ 322, as Heritage increased its price to eighteen customers, *id.* ¶ 325. On July 9, 2014, Citron "confirmed internally that Heritage had increased" its price for Fosi-HCTZ, and that it would try to follow suit. *Id.* ¶ 325. On July 14, 2014, Glenmark communicated twice with Citron—one day before Citron increased its Fosi-HCTZ price. *Id.* ¶ 326. Although the complaint alleges that Sandoz also increased its price, *id.* ¶¶ 325–27, and that "Aurobindo was on board with the price increase strategy," *id.* ¶ 313, no such allegations are made about Glenmark.

### 2. Participation in Individual-Drug Conspiracy

Despite the States' allegations of numerous and sustained communications with other companies during the relevant time period, Glenmark contends that the States failed to tie any of its calls and text messages with competitors to any of the conspiratorial conduct. *See* ECF No. 595 at 16. The complaint expressly alleges that Heritage confirmed Fosi-HCTZ agreements with Aurobindo and Sandoz, ECF No. 473 ¶¶ 287, 311, 313, but it does not make that allegation about Glenmark.

Even so, viewing the complaint as a whole, I find that the States have plausibly presented enough facts to support "a context that raises a suggestion of a preceding agreement" between Fosi-HCTZ sellers—including Glenmark—to fix prices. *Twombly*, 550 U.S. at 557. The States allege that as part of its plan to increase prices for Fosi-HCTZ, Heritage communicated with Glenmark and other sellers of that drug, and that those communications spurred Glenmark and the

other firms to communicate with each other.  ECF No. 473 ¶¶ 309, 324.  Although the Complaint does not describe the content of these calls, their close proximity to Heritage's planned price increase and the Heritage-Aurobindo agreement permits a reasonable inference that the calls were related to Fosi-HCTZ pricing.  The same can be inferred from Glenmark's calls with Citron, which came only a day before Citron raised its price of Fosi-HCTZ to match Heritage.  *Id.* ¶ 326.

Amid these discussions, Heritage, Citron, and Sandoz implemented substantial price increases beginning in July 2014 that continued at least until 2015.  *Id.* ¶¶ 325–27.  When this allegation is combined with the allegations of frequent communications, including with Glenmark, around the time of the price increases, the allegation that these companies were able to maintain these high prices throughout this period despite Glenmark's presence in the market permits a reasonable inference that Glenmark had agreed not to underbid them or otherwise pursue their customers—contrary to its own commercial interest and consistent with the "fair share" protocol described in the complaint.  *Id.* ¶ 106; *see also In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525 (finding such decisions "would be irrational in a competitive market for generic drugs").  The absence of an allegation that Glenmark raised its own Fosi-HCTZ prices does not make it implausible that it agreed to cooperate with its competitors' plans to raise their prices, especially given the alleged context of a cooperative ethos in the industry.

Further supporting this inference is the multi-pronged, crisscrossing character of the Fosi-HCTZ competitors' agreements, a feature unlike those in the alleged individual-drug conspiracies involving Apotex and Ascend, described above.  In those cases, the States allege that Heritage formed *separate* agreements with its competitors—with Teva and Apotex for leflunomide, and with Ascend and Sun Pharmaceutical Industries for nimodipine—and that these separate agreements formed an individual-drug conspiracy.  Here, the States allege that the competitors

were in regular communication with each other and formed *one* agreement between all parties. Glenmark spoke not only with Heritage, but also with Aurobindo and Citron.

Though sparse, the allegations against Glenmark are enough to support an inference that it joined the Fosi-HCTZ agreement. As the MDL court noted in its opinion denying motions to dismiss private party complaints regarding individual conspiracies, "Plaintiffs are not obliged to have the same quality or quantity of allegations as to one defendant as unto another. [T]here is no requirement that allegations pertaining to one defendant mirror those against other defendants in terms of specific conduct or 'quantity' of alleged 'bad acts.'" *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d at 450 (citations and internal quotation marks omitted).

I therefore deny Glenmark's motion to dismiss claims of an individual-drug conspiracy regarding Fosi-HCTZ.

### 3. Link to Overarching Conspiracy

As already discussed, it is now just a short step between my conclusion, on the basis of the pleadings only, that Glenmark participated in the individual conspiracy, and the MDL Court's earlier conclusion, again based on the complaint alone, that there existed an overarching conspiracy. It just remains to be seen whether there are sufficient allegations in the complaint to tie the two together. There are. As the MDL court found, the States have stated a plausible claim that all "fair share" agreements—including those concerning Fosi-HCTZ—impacted how other pharmaceutical companies set prices and allocated markets across multiple specific-drug markets. *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525–26. The alleged agreement between the Fosi-HCTZ competitors is plausible, is consistent with the "fair share" protocol, and easily fits within the alleged overarching conspiracy. ECF No. 473 ¶¶ 89–109.

Specifically, the States allege that Heritage had nearly half the market for Fosi-HCTZ in 2014, and that when Heritage increased its price to eighteen customers by as much as 200 percent, none of its four competitors, including Glenmark, moved to undercut its prices or attempted to gain market share. *Id.* ¶¶ 307, 319, 325. Instead, at least two competitors "played nice in the sandbox" and increased their own prices to match Heritage. This conduct is consistent with the "fair share" protocol that the States allege was rampant in the industry at that time. *Id.* ¶¶ 90–92, 106.

The States plausibly allege that (1) the Fosi-HCTZ agreement in which Glenmark joined was reasonably proximate in time and value to other such agreements in the industry, *id.* ¶¶ 11–14, 110–12, 269, 293, 325–27; (2) the structure of the pharmaceutical market as a whole provided motivation for Glenmark to enter this overarching agreement against its self-interest, *id.* ¶¶ 99–101, 104–107, 325–27; and (3) that it communicated at length with other defendants, *id.* ¶¶ 95, 309, 316, 322, 324, 326. As the MDL court found, these are "plus factors" to accompany parallel conduct that creates "a context that raises a suggestion of a preceding agreement." *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525–26. The States have thus alleged "enough facts" regarding Glenmark's part in the alleged overarching conspiracy "to state a claim to relief that is plausible on its face." *See Citigroup*, 709 F.3d at 136; *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525.

For these reasons, Glenmark's motion to dismiss, ECF No. 595, is denied.

### D. Lannett

The States allege that an agreement between Lannett and co-Defendants Heritage, Par Pharmaceutical Companies, Inc. ("Par"),[11] and Mylan Pharmaceuticals Inc. ("Mylan"), regarding

---

[11] Par filed a Notice of Bankruptcy Discharge on July 8, 2024. ECF No. 559. Absent objection, I

the generic drug doxycycline monohydrate ("Doxy Mono") is part of the overarching conspiracy to restrain trade in the wider generic pharmaceutical industry.  ECF No. 473 ¶¶ 246–267, 525. Lannett's motion does not challenge its alleged involvement in an individual-drug conspiracy; instead, it challenges the allegations that it joined an overarching conspiracy.  ECF No. 593 at 5.

### 1. Allegations

The States allege the following: As Heritage looked to increase its Doxy Mono price by as much as four times, it first reached out to Lannett and spoke "through numerous phone conversations, text messages, and in-person meetings," over several months starting in March 2013.  ECF No. 473 ¶¶ 248–50, 252–54.  An internal Lannett email sent on March 25, 2013, reflected Lannett's awareness of Heritage's intent to increase the price for Doxy Mono, and stated "[w]e are waiting to find out when and why."  *Id.* ¶ 252.  Other communications between the two companies included a conference in May 2013 during which the Lannett representative exchanged text messages with a Heritage counterpart that mentioned Doxy Mono.  *Id.* ¶ 255.  At another conference the following month, the same representatives "exchanged numerous calls and text messages."  *Id.* ¶ 256.  Lannett increased its Doxy Mono price a week later.  *Id.* ¶ 257.  Two Lannett employees also communicated with Par on the day before and the day of Lannett's price increase, and the other Doxy Mono sellers—Heritage and Mylan—were also communicating around this time.  *Id.* ¶ 258.  As Heritage prepared to increase its price, a "flurry of communications between the four competitors" followed in August 2013, including a text message exchange between Lannett and Heritage expressly referring to price increases and an internal email in which a Par vice president noted that "we will follow" Heritage's increase.  *Id.* ¶¶ 259–262.

---

dismissed all claims against Par on August 15, 2024.  ECF No. 604.  As I did not consider the merits of the allegations against Par, its dismissal has no impact on the present analysis.

### 2.   Link to Overarching Conspiracy

The States allege that participants in each individual-drug "fair share" conspiracy were aware that their conspiracies affected the wider pharmaceutical market, *see id.* ¶¶ 89, 92, 107, and that the pattern of "fair share" protocol "demonstrat[ed] the universal understanding and code of conduct agreed to," *id.* ¶ 105.   The factual allegations already recited are consistent with the broader "fair share" protocol.   Specifically, the allegations that Lannett and Heritage were both able to implement price increases without the other—or the other Doxy Mono competitors— entering a lower bid to compete for customers permits a reasonable inference that the parties had agreed to allocate the market so that each received a "fair share," mimicking the "fair share" protocol characterizing the overall conspiracy.   *Id.* ¶ 106; *see also In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525 (finding such decisions "would be irrational in a competitive market for generic drugs").

Moreover, the States allege that while Lannett was communicating with Heritage and Mylan about Doxy Mono in 2013, Heritage and Mylan were simultaneously communicating with each other to fix prices and allocate the market according to the "fair share" protocol for another version of doxycycline.   ECF No. 473 ¶¶ 182–95.   In that agreement, the States allege, "the President of Mylan[] told the CEO of Heritage that Mylan would 'play fair' as Heritage entered the Doxy DR market and agreed that Mylan would give up two large accounts to Heritage."   *Id.* ¶ 103.   The temporal proximity of these Doxy DR talks to Lannett's Doxy Mono communications with these same competitors, *see id.* ¶¶ 183–84 (alleging outreach by Heritage to Mylan regarding Doxy DR in May 2013), 255 (alleging communication between Heritage and Lannett regarding Doxy Mono in May 2013), makes it plausible that Lannett was aware that the "fair share" scheme

was affecting the markets for drugs beyond Doxy Mono and that its Doxy Mono agreement with Heritage and Mylan followed the same pattern, furthering the overarching "fair share" conspiracy.

The alleged Doxy Mono conspiracy follows the same pattern of conduct, involves the same players, and took place at a time proximate to the overarching conspiracy, raising the suggestion that its alleged participants, including Lannett, were aware of and had agreed to be part of the overarching conspiracy. There are "enough facts" regarding Lannett's part in the alleged overarching conspiracy "to state a claim to relief that is plausible on its face." *See Citigroup*, 709 F.3d at 136; *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525. Although Lannett argues that the complaint does not makes any specific allegations regarding it beyond the scope of its involvement with Doxy Mono, ECF No. 593 at 7–8, as described above, a company need not manufacture or sell a particular drug to support a conspiracy to restrain competition in sales of that drug.[12]

For these reasons, Lannett's motion to dismiss, ECF No. 593, is denied.

### E.  Mayne

The States allege that an agreement between Mayne and co-Defendant Heritage regarding the generic drug doxycycline hyclate delayed-release ("Doxy DR") is in itself an unlawful restraint of trade, ECF No. 473 ¶¶ 211–41, and is also a part of an overarching conspiracy to restrain trade in the wider generic pharmaceutical industry, *id.* ¶ 242.[13] Mayne seeks to dismiss the States' claims

---

[12] Lannett made a similar argument in a motion to dismiss private-party plaintiffs' complaints in a parallel action before the MDL court. *See* ECF No. 666-3 at 9 (reproducing *In re Generic Pharms. Pricing Antitrust Litig.,* No. 16-md-2724, 2023 WL 2244685, at *5 (E.D. Pa. Feb. 27, 2023)). The MDL court denied the motion, and subsequently denied a motion to certify the denial for interlocutory appeal, finding that Lannett's argument that it "manufactured only one of the drugs in question . . . does not negate the allegations that it agreed to the 'fair-share' scheme to allocate customers among manufacturers." *See* ECF No. 666-4 at 6 (reproducing *In re Generic Pharms. Pricing Antitrust Litig.*, No. 2:20-cv-03539-CMR, ECF No. 267 at 6 (E.D. Pa. July 10, 2023)).

[13] The States separately allege an individual-drug conspiracy between Heritage and Mylan

of both an individual-drug conspiracy involving Doxy DR and an overarching conspiracy.  ECF No. 592.

### 1. Allegations

The States allege the following: Before Mayne entered the market, the only sellers of Doxy DR were Heritage and Mylan.  ECF No. 473 ¶ 181.  In 2013, Mylan allowed Heritage to take two of its large Doxy DR customers, and Heritage refrained from competing with Mylan for other customers, pursuant to an agreement between the two companies to fix prices and allocate the market between them.  *Id.* ¶¶ 182–210.

As Mayne prepared to enter the market, "Mayne approached Heritage to discuss its plans." *Id.* ¶ 218.  Following this initial communication, "Mayne's initial strategy was to avoid bidding on Heritage customers and to instead target Mylan, which at the time had roughly 60% of the Doxy DR market." *Id.* ¶ 219.  Mayne's Executive Vice President of Generic Products wrote in a February 21, 2014 email that "Mylan has given up several large customers to Heritage and they are not giving any more.  We need to go after business at Heritage also." *Id.*  When Mayne placed a bid for the business of a Mylan customer, Heritage declined to enter its own bid for the customer, despite having adequate supply to do so, to avoid upsetting its agreement with Mylan.  *Id.* ¶¶ 212–14.

Mayne, while looking for "one [l]arge account," struggled for months to gain any market share.  *Id.* ¶¶ 220, 224, 226.  Upon underbidding Heritage's price for one "large pharmacy customer," a Mayne employee told Heritage that, given Mayne's struggles to break into the market, she "had to go to" the customer.  *Id.* ¶ 223.  Although Heritage countered Mayne's price to retain

---

regarding Doxy DR, ECF No. 473 ¶¶ 180–217, but the complaint does not raise a claim of an individual-drug conspiracy between Mayne and Mylan.

that account, *id.* ¶ 223, when Mayne next underbid Heritage's price for another customer, Heritage did not counter Mayne's bid amid a concern that "[Mayne] will keep going after accounts," *id.* ¶ 227. Then, when Mayne pursued two larger Heritage accounts, McKesson One Stop and Econdisc, the competitors discussed a deal in which Heritage would give up its Econdisc account if Mayne "would agree not to price Doxy DR aggressively, and if Mayne would also agree to withdraw its offer to McKesson." *Id.* ¶ 230. After further discussions, a "formal offer" followed on November 25, 2014: "If you retract McK[esson] we will give up Econ[disc]." *Id.* ¶ 234. Mayne then attempted to rescind its McKesson bid, *id.* ¶ 235, and Heritage fulfilled its end of the agreement by "walking" from Econdisc, *id.* ¶ 238. The alleged Mayne-Heritage agreement was still in place over a year later, when Heritage opted not to bid for a pharmacy chain that was "shopping for a better price." *Id.* ¶ 240. Heritage's representative confirmed that Heritage would not bid in a text to a counterpart at Mayne, who responded, "Thank you." *Id.*

### 2. Participation in Individual-Drug Conspiracy

The State's allegations are sufficient to state a claim that Mayne conspired with Heritage to restrain competition in Doxy DR sales. The complaint outlines the terms of a collusive agreement between Mayne and Heritage. The States allege that Heritage sent Mayne a "formal offer" to divide customers in November 2014, *id.* ¶ 234, following several months of communications between the two competitors about their market activities, including discussions about targeting specific customers, *id.* ¶¶ 218–26. Following the November 2014 discussion, Heritage's representative reported internally that after further conversation, Mayne's counterpart "was going to try to rescind" a bid to McKesson, a Heritage customer. *Id.* ¶ 235. Further, Heritage followed through on its side of the agreement by "walking" away from Econdisc. *Id.* ¶ 238. These facts permit the reasonable inference that Mayne agreed to Heritage's "formal offer" to allocate

customers.  Whether Mayne ultimately withdrew its McKesson bid is immaterial to whether a prior agreement to do so was formed.

This conclusion is supported by the other allegations that plausibly show that Mayne was inclined to join Heritage in an agreement to control Doxy DR prices and allocate the market.  First, the parties had ongoing and continuous communication throughout the period, when Mayne was struggling to obtain market share, and while Heritage already had an agreement with Mylan. Second, after an initial call with Heritage, Mayne's strategy first included avoiding bidding on Heritage's customers.  *Id.* ¶ 219.  Third, more than a year after the McKesson offer, Heritage *continued* to avoid competing with Mayne—and then confirmed as much to Mayne, whose employee responded, "Thank you."  *Id.* ¶ 240.  That Heritage would have continued to forgo competition with Mayne in the absence of a reciprocal agreement is not plausible, especially in light of its agreement with Mylan.  I therefore deny Mayne's motion to dismiss claims of an individual-drug conspiracy with Heritage.

### 3.  Link to Overarching Conspiracy

As described earlier, once it is established that there was an agreement with respect to an individual drug, it is a short step to link that agreement to the overarching conspiracy already found (on the pleadings) by the MDL Court.  As the MDL court found, the States have stated a plausible claim that all "fair share" agreements—including those concerning Doxy DR—impacted how other pharmaceutical companies set prices and allocated markets across multiple specific-drug markets.  *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525–26.  The factual allegations already recited are consistent with the broader "fair share" protocol.

Mayne's alleged behavior with regard to Doxy DR closely tracks the manner in which all the generic drug makers allegedly behaved in the overarching "fair share" conspiracy.  Even before

Mayne entered the Doxy DR market in February 2014, Mayne's Director of National Accounts took the initiative to reach out to a counterpart at Heritage, which the States allege was involved in all of the individual-drug conspiracies involved in the complaint.  ECF No. 473 ¶ 218.  This suggests that Mayne was aware of and would follow the industry-wide practice of discussing and trying to resolve "fair share" issues with competitors.  *Id.* ¶ 97.  And Mayne's and Heritage's communications over the ensuing months, even before they reached a specific agreement to allocate McKesson and Econdisc, likewise suggest a practiced understanding of the way the game was allegedly played, with Mayne's representative at times giving notice to her longtime friend in the industry, A.S. of Heritage, of which customers Mayne would target, and Heritage at times apologizing for "protect[ing]" its business when Mayne inquired about specific agreements.  *Id.* ¶ 226.  Even if those exchanges do not provide direct evidence of an agreement being reached as to Doxy DR, their allegedly familiar, cooperative nature and tone are emblematic of the overarching conspiracy, which the States characterize as "playing nice in the sandbox."  From this context, I find it plausible that these discussions included discussions of participating in the "fair share" protocol, and that Mayne was already aware that establishing agreements with existing Doxy DR sellers would aid it in gaining market share.

Although Mayne argues that the complaint does not makes any specific allegations regarding it beyond the scope of its involvement with Doxy DR, ECF No. 592 at 18–20, as described above, a company need not manufacture or sell a particular drug to support a conspiracy to restrain competition in sales of that drug.

For these reasons, Mayne's motion to dismiss, ECF No. 592, is denied.

### F. Zydus

The States allege that an agreement between Zydus and co-Defendants Heritage and Teva regarding the generic drug acetazolamide is part of an overarching conspiracy to restrain trade in the wider generic pharmaceutical industry. ECF No. 473 ¶¶ 295–305. Zydus's motion does not challenge its alleged involvement in an individual-drug conspiracy; instead, it challenges the allegations that it was involved in an overarching conspiracy. ECF No. 598 at 11.

#### 1. Allegations

The States allege the following: In April 2014, Heritage and Teva held seventy-eight percent of the acetazolamide market, with Zydus their only other competitor. ECF No. 473 ¶ 296. On April 15, 2014, Heritage and Teva representatives agreed during a seventeen-minute phone call to raise prices of various drugs, including acetazolamide. *Id.* ¶ 297. Under the agreement, if Heritage increased its price, "Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts." *Id.* The next day, the same Teva representative spoke with Zydus's Senior Director of National Accounts for twenty minutes, and "close communication" between them and other employees at the two companies, including Zydus's Vice President of Sales, followed "frequently over the next several months." *Id.* ¶ 298. Zydus's Vice President of Sales also communicated with Heritage in April 2014. *Id.* ¶ 299. By May 7, the Heritage representative confirmed internally that Heritage "had already obtained 'buy in from all to go up' on Acetazolamide pricing . . . and expressed an intention to raise prices within the next week." *Id.* ¶ 300. Heritage began raising its acetazolamide price by seventy-five percent in June 2014. *Id.* ¶¶ 303–04. The complaint does not allege whether Teva or Zydus also raised their prices, but it notes that "[du]ring this time period Heritage avoided bidding on any potential customers to which Zydus was already supplying Acetazolamide, in order to

maintain market share among the competitors." *Id.* ¶ 301.  In all, the States allege that Zydus had

86 phone or text communications with Heritage from August to October 2013, and 638 such

communications with Teva from July 2013 to July 2014.  *Id.* ¶¶ 94–95.

### 2.  Link to Overarching Conspiracy

The States allege that participants in each individual-drug "fair share" conspiracy were

aware that their conspiracies affected the wider pharmaceutical market, *see id.* ¶¶ 89, 92, 107, and

that the pattern of "fair share" protocol "demonstrat[ed] the universal understanding and code of

conduct agreed to," *id.* ¶ 105.  The factual allegations already recited are consistent with the

broader "fair share" protocol.

Specifically, the allegation that Heritage was able to implement a large price increase

without its competitors entering a lower bid to compete for customers permits the reasonable

inference that Heritage, Teva, and Zydus had all agreed to allocate the market—contrary to their

own commercial interest and consistent with the "fair share" protocol described in the complaint.

*See id.* ¶¶ 106, 297, 300 (noting Heritage had "buy in *from all* to go up" (emphasis added)); *see

also In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525 (finding such decisions

"would be irrational in a competitive market for generic drugs").  Supporting this inference is

Heritage's decision not to compete for Zydus's customers in the period before the price increase.

ECF No. 473 ¶ 301.  Standing alone, Heritage's decision to raise its price and avoid competing

with Zydus would not require agreement from Zydus (or Teva) on an overarching conspiracy.  But

the complaint provides sufficient "plus factors" accompanying parallel conduct from which to infer

that all three competitors were aware that the "fair share" scheme was affecting the markets for

drugs beyond acetazolamide, and that the acetazolamide agreement followed the same pattern and

furthered the overarching "fair scheme" conspiracy.

Most telling among these "plus factors" is the frequency of communications between Zydus and Teva over the relevant time period.  *Id.* ¶ 95 (documenting 638 "phone/text communications" from July 2013 through July 2014).  This entails "a high level of interfirm communications"—at a time proximate to the other alleged individual "fair share" conspiracies involving Zydus's competitors—which is consistent with the inference that Zydus's conspiratorial conduct stretched beyond acetazolamide into an overarching conspiracy.

The "plus factors" create "a context that raises a suggestion of a preceding agreement." *See Citigroup*, 709 F.3d at 136; *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525.  The alleged acetazolamide conspiracy follows the same pattern of conduct and involves the same players as the overarching conspiracy and took place at a time proximate to the overarching conspiracy.  Accepting all pleaded facts as true, the States have plausibly alleged under *Twombly* that Zydus was part of the overarching conspiracy.

Although Zydus argues that the complaint does not makes any specific allegations regarding it beyond the scope of its involvement with acetazolamide, ECF No. 598 at 8–9, as described above, a company need not manufacture or sell a particular drug to support a conspiracy to restrain competition in sales of that drug.

For these reasons, Zydus's motion to dismiss, ECF No. 598, is denied.

### III. Conclusion

I find that the States' complaint pleads enough factual matter to plausibly allege that each of the six Defendants here joined both an individual-drug conspiracy and the overarching conspiracy.  On a motion to dismiss, however, I must accept the allegations in a complaint as true; whether the States can prove any of the allegations discussed here remains to be seen.

For the foregoing reasons, the individual defendants' motions to dismiss, ECF Nos. 592, 593, 594, 595, 596, 598 and 600, are denied.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J

Hartford, Connecticut
February 7, 2025