## THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| STATE OF CONNECTICUT, et al., | No. 3:16-cv-02056-MPS |
| *Plaintiffs,* | |
| v. | |
| AUROBINDO PHARMA USA, INC., et al., | |
| *Defendants.* | |
| | |
| STATE OF CONNECTICUT, et al., | No. 3:19-cv-00710-MPS |
| *Plaintiffs,* | |
| v. | |
| TEVA PHARMACEUTICALS USA, INC. et al., | |
| *Defendants.* | |
| | |
| STATE OF CONNECTICUT, et al., | No. 3:20-cv-00802-MPS |
| *Plaintiffs,* | |
| v. | |
| SANDOZ, INC., et al., | |
| *Defendants.* | |
| | August 5, 2025 |

## MEMORANDUM OF LAW IN SUPPORT OF THE STATES' MOTION FOR FINAL APPROVAL OF SETTLEMENT WITH APOTEX CORP.

<h1 align="center">TABLE OF CONTENTS</h1>

I. INTRODUCTION ..........................................................................................................1
II. PROCEDURAL BACKGROUND ...............................................................................6
III. SETTLEMENT TERMS ...............................................................................................6
    A. Injunctive Relief.................................................................................................7
    B. Monetary Payment .............................................................................................7
    C. Preliminary Approval ........................................................................................9
    D. Exclusions .........................................................................................................9
    E. Cooperation by Apotex ....................................................................................10
    F. Release and Covenant Not To Sue ...................................................................11
IV. THE STATES' AUTHORITY ......................................................................................11
    A. The States' *Parens Patriae* Authority to Represent Consumers in their States ...........13
    B. Fundamental Differences Between *Parens Patriae* Claims and Rule 23 Claims ........14
V. ARGUMENT ...............................................................................................................14
    A. Standard for Final Approval of *Parens Patriae* Settlement .........................................14
    B. The Settlement Meets the Standard for Final Approval.................................................15
        1. Procedural Analysis Factors Support Final Approval ...........................................15
            i. The States Have Adequately – and Zealously – Represented Consumers..........................................................................................16
            ii. The Settlement Was Negotiated at Arm's Length by Experienced Counsel................................................................................16
            iii. The States Have Obtained a Sufficient Understanding of the Case ...........17
        2. Substantive Analysis Factors Support Final Approval...........................................18
            i. The Settlement Provides Adequate Relief...................................................19
            ii. The Cooperation from Apotex Adds Value to the Settlement ....................21
            iii. The Settlement Is Reasonable Considering the Costs, Risks, and Delay of Trial and Appeal....................................................................21
            iv. The Proposed Method of Distribution Treats Consumers Equitably Relative to Each Other and Based on Claims Asserted and Releases Provided ....................................................................................24
            v. The Monetary Payment to the States is Fair and Reasonable and the Settlement Does Not Contain Any Additional Agreement .........................25
    C. The Notice Plan was Successfully Implemented and Satisfies Due Process...............26
    D. Consumers' Reaction to the Settlement Supports Final Approval ..............................31
VI. THE PLAN OF ALLOCATION AND DISTRIBUTION.................................................32
    1. Allocation of the State Settlement Amount ...........................................................33
    2. The Proposed Consumer Claims and Distribution Process....................................34
    3. Proposed Framework for Allocation Among Consumers.......................................35
    4. Final Distribution Plan is Deferred to a Future Date.............................................39
VII. CONCLUSION..............................................................................................................40

i

# I. INTRODUCTION

On May 12, 2025, the Court issued an Order granting preliminary approval of Plaintiff States[1] (the "States") settlement agreement ("Settlement") with Apotex Corp. ("Apotex"). ECF No. 795 (3:16-cv-02056-MPS), No. 677 (3:19-cv-00710-MPS), and No. 680 (3:20-cv-00802-MPS). That Order (the "Preliminary Approval Order") preliminarily approved the Settlement on the terms set forth in the Settlement, including the proposed allocation of 70% to restitution to Consumers and State Entities, and 30% to payment for the States' costs, the proposed allocation of the 70% restitution amount among Consumers and State Entities, and the proposed framework for the plan of distribution among consumers, appointed an Escrow Agent[2], approved a Notice and Claims Administrator, deferred a final distribution plan, and approved the Notice Plan. In the Preliminary Approval Order, the Court set a July 24, 2025, deadline for Consumers to comment on, object to, or opt out of the Settlement, and ordered the final approval hearing to be held at 10:00 am on August 12, 2025. ECF No. 795 (3:16-cv-02056-MPS), No. 677 (3:19-cv-00710-MPS), and No. 680 (3:20-cv-00802-MPS).[3]

In accordance with the Preliminary Approval Order, the States have carried out the Notice

---

[1] Plaintiff States means Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, U.S. Virgin Islands, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. Plaintiff States include all Plaintiffs in the three related States' action who are releasing their claims against Apotex they could have brought in any of the States' Actions.

[2] Unless otherwise noted, the capitalized terms used in this Memorandum of Law have the same meanings as defined in the Settlement Agreements, submitted as an exhibit to the States Decl..

[3] A separate supplemental agreement was reached between Apotex and the States of Delaware, Georgia, Idaho, Maryland, Mississippi, New Mexico, Pennsylvania, and South Dakota relating to those states' claims for contribution under state law. This supplemental agreement was inadvertently left out of Exhibit 1 to the States' Motion for Preliminary Approval, but is being provided with the States' declaration in this matter.

Plan program authorized by the Court including disseminating notice via publication and digital advertisement, print media advertising, outreach to independent pharmacies, and causing notice to be published on a dedicated website: www.AGGenericDrugs.com. *See* Declaration of Tiffany Janowicz In Support of Plaintiffs' Motion for Final Approval of Settlement With Apotex Corp. on Implementation of The Notice Plan and Administration ("Janowicz Decl.") ¶¶9-17 (filed jointly and in support of this motion). Notice was also publicized through press releases issued by the States[4] and to media outlets through PR Newswire's US1 Newsline in English, Spanish and Chinese, as a nationwide press release across the U.S. reaching approximately 14,500 websites, media outlets, and journalists ("earned media"). *See* Janowicz Decl. ¶¶ 15-16.

As set forth above, the deadline to comment on, object to, or opt out of the Settlement was July 24, 2025. No objections were received and only nine requests for exclusion were made. Janowicz Decl. ¶¶ 26-27, Exhibit F.

The Settlement is a joint settlement with the End-Payer Plaintiffs (the "EPPs") in the related action *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.) (the "MDL"). The States seek final approval of the States' portion of the Settlement as it relates to the States' claims in the States' Actions and for the States' plan to provide notice to Consumers ("Notice Plan"), as described in this motion. The EPPs sought and obtained preliminary approval of the Settlement as it relates to the EPPs' claims in the MDL ("EPP

---

[4] Beginning on March 26, 2025, numerous States Attorneys General issued press releases or social media posts announcing the Settlement and informing potentially eligible Consumers that they may be eligible for compensation, and encouraging Consumers to check the website and register. *See* States Decl. at ¶8; https://attorneygeneral.nd.gov/attorney-general-drew-wrigley-urges-consumers-to-check-eligibility-for-compensation-for-inflated-generic-drug-prices; https://portal.ct.gov/ag/press-releases/2025-press-releases/check-eligibility-for-compensation-for-inflated-generic-drug-prices; https://ag.ny.gov/press-release/2025/attorney-general-james-urges-new-yorkers-claim-compensation-inflated-generic

Settlement") and the notice plan to Corporate Entities.[5] The MDL court preliminarily approved the EPP Settlement and EPP notice plan on May 14, 2025. *See* MDL Doc. No. 3391 and 3392, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724, 2:16-md-02724-CMR, (E.D. Pa. May 14, 2025). The final approval hearing for the EPP Settlement is set for October 3, 2025. *See* MDL Doc. No. 3394.

The Settlement has not been amended or changed in any way since the States sought preliminary approval. The Settlement was reached after extended, arm's length negotiations between experienced counsel for the States and for Apotex. The Settlement resolves the States' claims against Apotex for their participation in an unlawful conspiracy to fix prices and allocate markets for generic pharmaceuticals. *See* Exhibit 1 to States' Declaration in Support of the States' Motion for Final Approval of Settlement with Apotex Corp. ("States Decl."), jointly filed in support of the States' motion. The Settlement resolves and releases all the States' claims against Apotex for conduct alleged in the actions in which Apotex is defendant, *Connecticut et al. v. Aurobindo Pharma USA, Inc.*, *et al.*, 3:16-cv-02056 (the "Action") and *Connecticut et al. v. Teva Pharmaceuticals USA, Inc*., *et al.,* 3:19-cv-00710, and the related action pending in *Connecticut et al. v. Sandoz, Inc*., *et al.,* 3:20-cv-00802 (collectively all three actions are referred to as the "States' Actions"), in exchange for Apotex's payment of $39.1 million (the "Settlement Payment") and injunctive relief. Of the $39.1 million, $27.37 million (70%) shall constitute restitution ("Restitution Account") and shall be held in escrow until, pursuant to an allocation plan approved

---

[5] "Corporate Entities" are defined as corporate (and other business) entities for whom an Attorney General has asserted a claim in the MDL (or any court to which the State Actions have been or may be remanded), whether pursuant to the Attorneys General's parens patriae authority or otherwise, as well as corporate (and other business) entities for which the EPPs are asserting claims (i.e., all corporate and other business entities that are potential members of the EPP Settlement Class).

by the Court, it can be distributed to Consumers[6] and State Entities that are State Releasors, to compensate them for any alleged harm resulting from the alleged Conduct. The remaining $11.73 million (30%) shall be held in an escrow account for use in paying for the expenses, and upon final approval of the Settlement, for costs of litigating the States' claims both collectively and individually, including attorney fees incurred by the States ("Cost Account"). [7]

As a matter of law and policy, the States seek the Court's final approval of the Settlement as it resolves the State claims in the States' Actions and the Notice Plan. As chief legal officers, the attorneys general of the States enforce both state and federal antitrust and consumer protection law. Additionally, they represent their states in their sovereign, proprietary, and *parens patriae* capacities. The States' Actions are enforcement actions brought to advance the public interest and address anticompetitive activity in the generic drug industry that has led to higher prices for Consumers, State Entities, and Corporate Entities. The States plan to gather settlement proceeds for later distribution to Consumers and State Entities, on whose behalf the States assert claims, and are exercising authority to settle and release claims under their *parens patriae* and other state law authority. A minority of State Attorneys General under the law exercised here need court approval of the Settlement of consumer claims and all States are seeking the Court's final approval now that the Notice Plan has been implemented.

The States are also seeking final approval of the division and allocation of the State Settlement Amount between the States (30%), Consumers (45.08%), and State Entities that are

---

[6] "Consumers" defined in the Settlement are natural persons for whom an Attorney General has the power to act, whether pursuant to the Attorney General's *parens patriae* authority or otherwise; as well as natural persons for whom the EPPs are asserting claims (*i.e.*, all natural persons who are potential members of the EPP Settlement Class). For purposes of clarity, the term "Consumers" does not include any State Entity, any county, city, town, or other local entity, or any Corporate Entity. *Settlement ¶ I.F.*

[7] To the extent that monies in this cost account are not used to offset costs of States litigating in the State Actions, any remaining funds may be used for other use permitted by state law. *Settlement ¶ I.DD.3.*

State Releasors (24.92%). Further, the States seek approval to use the remaining balance of the 30% allocated to the Cost Account, after financing the administration of this settlement and potential future settlements, to fund continued litigation against the remaining defendants or such purposes as are set forth in paragraph I.DD.3 of the Settlement, including attorney fees.

A final allocation and distribution plan for the Restitution Account has not yet been developed. Instead, the States are asking the Court to grant final approval of the allocation of 24.92% of the State Settlement Amount to State Entities that are State Releasors and the distribution of these funds to the States to be divided between the settling states based on relative harm and claims asserted in the litigation. Further, the States seek the Court's final approval of a general framework for an allocation and distribution plan for the consumer restitution portion of the State Settlement Amount, equaling the remaining 45.08% of the State Settlement Amount. As part of the Notice Plan, Consumers were provided an opportunity to object to or comment on this proposed framework, or opt out of the settlement, and a few did (opt out). Janowicz Decl. ¶¶26-27

The States (in consultation with the EPPs) are working to develop an efficient and effective consumer distribution plan. In the meantime, the States via their claims administrator have made numerous efforts to inform Consumers of the State Actions, register Consumers, and provide updates on the litigations and settlements. *See infra* V(C). The registration process will assist the States in identifying Consumers eligible for restitution under a future distribution plan. Approval of a final distribution plan for Consumer restitution should, however, be deferred until a later date, after a States' motion, when there are sufficient settlement funds to warrant distribution to Consumers.

## II.     PROCEDURAL BACKGROUND

A large coalition of States brought three actions against generic drug manufacturers alleging that they conspired to fix prices and allocate markets for many generic drugs in violation of federal antitrust laws and state antitrust and consumer protection laws. The actions, collectively referred to as the States' Actions, include: (1) a complaint focused on agreements involving Heritage, filed in December 2016, *Connecticut et al. v. Aurobindo Pharma USA, Inc., et al.*, 3:16-cv-02056 (the "Heritage Action"), which after amendments and consolidation of separate complaints now encompasses 15 drugs; (2) a complaint focused on over 100 different drugs centered on agreements involving Teva Pharmaceuticals, filed in 2019, *Connecticut et al. v. Teva Pharmaceuticals USA, Inc., et al.*, 3:19-cv-00710 ("Teva Action"); and (3) a complaint focused primarily on dermatology products concerning over 80 different drugs, filed in 2020 (the "Dermatology Action"), *Connecticut et al. v. Sandoz, Inc., et al.*, 3:20-cv-00802.  In each of the complaints, the States allege an overarching conspiracy for the drugs and anticompetitive acts in that action.  Although the States have only brought claims against Apotex in the Heritage Action and Teva Action, this Settlement, if granted final approval, will resolve and release all claims that the States brought or could have brought against the Apotex in all three States' Actions.[8]

## III.     SETTLEMENT TERMS

The Settlement contains several different categories of terms and relief, namely: (1)

---

[8] The EPPs have litigated claims against Apotex since 2016. The EPPs have filed 18 individual drug complaints and two multi-drug complaints in the MDL and Apotex is a Defendant in three of EPPs' pending cases. Following the Court's denial of motions to dismiss, the parties engaged in substantial discovery and numerous discovery motions before the Court and the three Special Masters, including one discovery motion that was briefed before the Third Circuit and the United States Supreme Court. EPPs and Defendants have also briefed class certification, twelve *Daubert* motions, and motions for summary judgment in both of the EPP bellwether cases. While the motions in the bellwether cases did not involve Apotex, they involved issues that will apply broadly across the MDL.

Injunctive Relief, (2) Monetary Payment, (3) Preliminary and Final Court Approval, (4) Exclusions, (5) Cooperation by Apotex, and (6) Release and Covenant Not to Sue. A copy of the Settlement with Apotex is attached as Exhibit 1 to the accompanying States' Declaration in Support of the States' Motion For Final Approval of the Settlement with Apotex Corp.

### A. **Injunctive Relief**

The Settlement provides a covenant by Apotex not to engage in any price-fixing, bid-rigging, or market allocation as to any Generic Pharmaceutical Product in violation of Section 1 of the Sherman Act, for seven years after executing the Settlement. *Settlement VII.A.* The States may, upon good cause shown, petition the court for a three-year extension of this covenant. *Id.*

Apotex entered a separate civil settlement agreement with the United States on September 30, 2021, which includes a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the U.S. Department of Health and Human Services. For the duration of the CIA, Apotex covenants to the States that it will substantially maintain its existing compliance program, as set out in the documents shared with the Attorneys General prior to the date of entry of this Agreement. Apotex will provide an annual report to the States as to its compliance program *Settlement ¶ VII.B.* The report shall also confirm that it is in substantial compliance with the terms of the CIA and confirm that no potential antitrust violations have been identified or provide a brief description of any potential antitrust violations disclosed pursuant to Apotex's obligations under the CIA. *Settlement ¶ VII.C.* Apotex agreed to submit to the jurisdiction of this Court for purposes of enforcing the provisions in Section VII of the Settlement.

### B. **Monetary Payment**

The Settlement requires Apotex to make a total cash payment of $39.1 million to the States ("State Settlement Amount"). *Settlement ¶ I.DD, II.A.* Apotex made the payment to the States on

June 10, 2025.  States Decl. ¶ 20. Apotex has no obligation to make any other payments of any kind in connection with the Settlement. *Settlement ¶ II.C.* At least 70% of the State Settlement Amount ("Restitution Account") shall be paid directly into an escrow account ("State Escrow"), pending Final Court Approval of the Settlement.  *Settlement ¶ II.A.*  The Restitution Account shall be allocated among Consumers and the State Entities that are State Releasors as determined by the States, with the EPP Settlement Class Counsel consulting, and as approved by the Court. *Settlement ¶ I.DD.*2. The amount allocated to the State Entities that are State Releasors shall be received by the respective Attorneys General Offices to be allocated for any use permitted under state law at the sole discretion of the States.  *Id.*

The remaining 30% of the State Settlement Amount ("Cost Account") shall also be held in escrow and used to pay for the cost of providing notice and the costs of administration of the Settlement Funds (limited to $500,000), and, upon final approval of the Settlement, for costs of litigating the States' Actions both collectively, or individually, subject to approval of the court. *Settlement ¶¶ II.A-D., I.DD.3, X.A.* To the extent that the Cost Account funds are not used to offset costs of litigating the States' Actions, any remaining funds may be used for any of the following: (1) deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account) for use in accordance with governing laws; (2) deposit into a fund exclusively dedicated to assisting any state to defray the costs of experts, economists and consultants in multistate antitrust investigations and litigations, including healthcare related investigations and litigation; (3) antitrust or consumer protection enforcement, including healthcare-related enforcement, by an individual State or multiple States; or (4) for any other use permitted by state law at the sole discretion of that State's Attorney General. *Settlement ¶¶ II.A., I.DD.3.*

### C. **Preliminary Approval**

As noted, *supra*, on May 12, 2015, this Court preliminarily approved the Settlement – which included the States' proposed Notice Plan – and on May 14, 2025, the EPPs proposed notice plan was preliminarily approved by the court presiding over the MDL in the Eastern District of Pennsylvania. The proposed notices are intended to inform those Consumers and Corporate Entities[9] of their right: (1) to object to the settlement or (2) to file a timely and valid request for exclusion. The States coordinated with the EPPs in providing notice to minimize cost and avoid duplication. *Id*.

### D. **Exclusions**

Subject to court approval, any Consumer or Corporate Entity may seek to be excluded from the Settlement by submitting a valid and timely request for exclusion. *Settlement ¶ IV.A.* The States, State Entities identified on the Settlement's Appendix B, and other State Entities that accept a distribution of settlement proceeds from the Settlement, have no right to seek exclusion. *Id.* Any Consumer or Corporate Entity that submits a valid and timely request for exclusion[10] will not be eligible to receive a distribution of any portion of the settlement amounts and will have no rights with respect to the Settlement. *Id.* Further, subject to court approval, in any written request for exclusion from the Settlement, the Consumer or Corporate Entity seeking exclusion must state his, her, or its full name, address, telephone number and e-mail address and include a statement that they wish to be excluded from the AG Settlement. *Settlement ¶ IV.B.* To the extent legally

---

[9] In order to minimize cost and duplication, Corporate Entities on whose behalf the Attorneys General have asserted claims were covered in the Notice Plan developed and implemented by the EPPs, which plan was submitted for approval in the MDL. *See* Settlement ¶ III.A. The States' Notice Plan will provide notice to all consumers, including consumers on whose behalf the Attorneys General have asserted claims and consumers who are members of the EPP Settlement Class.

[10] A Consumer or Corporate Entity can submit a valid and timely request for exclusion from either the States' Settlement or the EPP Settlement, and if so, will be deemed to have requested exclusion from both. *See* Settlement ¶ *IV.E*

permissible, any Consumer or Corporate Entity that submits a valid and timely request for exclusion from either settlement shall be deemed to have requested exclusion from both the Settlement and the EPP Settlement. *Settlement ¶ IV.E.* Unless otherwise ordered by the Court, a request for exclusion that does not comply with all of the provisions set forth in the applicable notice will be invalid, and any Consumer or Corporate Entity serving such an invalid request shall be bound by this Settlement upon Final Court Approval. *Settlement ¶ IV.F.*

The States and EPPs shall, within ten (10) calendar days of the deadline for submitting a request for exclusion (the "Opt-Out Deadline"), provide Apotex with a list of, and copies of, all requests for exclusion, and shall file with their motions for final approval a list of all persons and entities that timely and validly requested exclusion. *Settlement ¶ IV.G.* Any of the Parties may dispute an exclusion request, in which case they shall, if possible, seek to resolve the disputed exclusion request by agreement within thirty (30) calendar days of the Opt-Out Deadline, and, if necessary, the Parties will seek court approval of any such resolutions. *Id.* If the Parties are unable to resolve any such disputes, the Parties will submit such unresolved disputes to the court for decision. *Id.* Any dispute relating to an exclusion request involving a Consumer or a State Entity should be addressed to this Court, while exclusion requests involving a Corporate Entity or other non-Consumer member of the EPP class will be addressed to the MDL Court.

### E.  Cooperation by Apotex

As a condition of the Settlement, Apotex is required to continue providing cooperation to the States, EPPs and their respective counsel, as set forth in Appendix C of the Settlement. *Settlement ¶ VIII.D; Appendix C.* Further, Apotex will use reasonable efforts to provide information necessary to authenticate and admit documents produced by Apotex and will in good faith consider reasonable requests from the States and EPPs for additional assistance that does not

impose an undue burden on Apotex. *Settlement ¶¶ VIII.B and VIII.E.*

## F. <u>Release and Covenant Not To Sue</u>

Upon this Court entering a final approval order, the State Releasors[11] will release, acquit, and forever discharge all Apotex Releasees from all Released Claims,[12] in consideration of Apotex's obligations under the Settlement. *Settlement ¶ VI.A.* The State Releasors expressly waive and fully, finally, and forever settle and resolve, any known or unknown, suspected or unsuspected, contingent or non-contingent claims arising out of the Conduct[13] that they have released or for which they have covenanted not to sue, without regard to the subsequent discovery or existence of such different or additional facts. *Id.* at *¶¶ VI.B* - VI.D. The State Releasors covenant not to sue or otherwise pursue any Apotex Releasees for any Released Claims, whether on their own behalf or, to the fullest extent permitted by law, on behalf of any other natural person or entity, including any State, State Entity, political subdivision, Consumer, or Corporate Entity. *Id.* at *¶ VI.E.*

## IV. THE STATES' AUTHORITY

This Settlement is presented to the Court for final approval by the attorneys general of the States in their sovereign and proprietary capacities and in their capacity as *parens patriae* or similar authority under federal and state laws[14] to bring claims and to obtain important redress for harm

---

[11]*See* Settlement ¶ I.CC.
[12] *See* Settlement ¶ I.X.
[13] *See* Settlement ¶ I.E
[14] *E.g.*, Conn. Gen. Stat. § 35-32(c); Alaska Stat. §§ 45.50.580; 45.50.577(b); Ariz. Rev. Stat. §§ 44-1407, 44-1408(A), 44-1528(A); Cal. Bus. & Prof. Code § 16760; Col. Rev. Stat. § 6-4-111: D.C. Code §§ 28-4507, 28–3909; Del. Code Ann. tit. 6, § 2101, *et seq*.; Del. Code Ann. tit. 29, §§ 2520 and 2522; Fla. Stat. § 542.22(22); Ga. Code Ann. § 10-1-397(b)**;** Idaho Code Ann. § 48-108; 740 Ill. Comp. Stat. 10/7(2); Ind. Code § 24-1-2-5; *Bd. of Comm'rs of Howard Cty. v. Kokomo City Plan Comm'n*, 263 Ind. 282, 295 (1975); *Bd. of Comm'rs of Union City v. McGuinness*, 80 N.E.3d 164, 170 (Ind. 2017); Ind. Code § 24-5-0.5-4(c); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972); Iowa Code § 553.12; Kan. Stat. Ann. § 50-103(a)(8); Ky. Rev. Stat. Ann § 15.020, 367.110 through 367.990, and 518.020; *Com. ex. rel. Conway v.*

caused by Apotex's conduct. State attorneys general are politically accountable representatives of their states and have authority under state law to recover (1) for Consumers and Corporate Entities to the extent permitted by state laws; (2) for public purchasers, including state agencies to the extent permitted by state laws; and (3) for the state, in the form of disgorgement, civil penalties, costs, and fees. As discussed in the States' briefing in support of preliminary approval of the Settlement, the States, based on their authority to bring actions and seek relief for violations of federal law and state antitrust and consumer protection laws as to the facts in their complaints[15],

*Thompson,* 300 S.W.3d 152 (Ky. 2010); *Com. ex rel. Beshear v. ABAC Pest Control Inc.,* 621 S.W.2d 705 (Ky. 1981); *State v. Bordens, Inc.,* 684 So.2d 1024, 1026 (La.Ct.App.1996); *Lund ex rel. Wilbur v. Pratt,* 308 A.2d 554 (Me.1973); Md. Com. Law Code Ann., § 11-209; MGL c. 93A § 4; *State v. Detroit Lumberman's Association,* 1979-2 Trade Cas. (CCH) ¶ 62,990, 1979 WL 18703 (Mich. Cir. Ct. 1979); *Minnesota v. Standard Oil Co.,* 568 F. Supp. 556, 563 (D. Minn. 1983); Miss. Code Ann. §§ 7-5-1; *Clark Oil & Ref Corp. v. Ashcroft,* 639 S.W.2d 594, 596 (Mo. 1982); S*tate ex rel. Olsen v. Public Service Comm'n,* 283 P.2d 594 (Mont. 1955); Neb. Rev. Stat. § 84-212; Nev. Rev. Stat. § 598A.160(1) (1999); Nev. Rev. Stat. 598.0963 (2023); N.H. Rev. Stat. Ann. § 356:4-a; State v. City of Dover, 153 N.H. 181 (N.H. 2006); N.J. Stat. Ann. § 56:9-12.b; N.M. Stat. Ann. § 57-1-3(A), (B) (1979); *New Mexico v. Scott & Fetzer Co.*, 1981-2 Trade Cas. ¶ 64,439, 1981 WL 2167 (D.N.M. 1981); N.Y. Exec. Law § 63(12) and N.Y. Gen. Bus. Law §§ 340-342-a; N.C. Gen. Stat. §§ 75-15, 75-16; *Hyde v. Abbott Labs, Inc.*, 473 S.E.2d 680 (N.C. Ct. App. 1996); *FTC v. Mylan Labs*, 99 F. Supp. 2d 1 (D.D.C. 1999); N. D. Cent. Code §§ 51-08.1-07, -08(2); N. D. Cent. Code § 51-15-07; 4 CMC §§ 5107, 5121(b), 5206(b); Ohio Rev. Code § 109.81; *Ohio v. United Transp. Inc.,* 506 F. Supp. 1278, 1280-81 (S.D. Ohio 1981); 79 O.S. § 205 (A)(1); Or. Rev. Stat. § 646.775(1); 71 Pa. Stat. Ann. § 732-204(c); P.R. Laws Ann. tit. 32, §§ 3341–3344; R.I. Gen. Laws § 6-36-12; S.C. Code Ann. § 39-5-50(b); *State ex rel. Condon v. Hodges*, 349 S.C. 232, 562 S.E. 2d 623 (2002); S.D. Codified Laws § 37-1-23; *State v. Heath*, 806 S.W.2d 535, 537 (Tenn. Ct. App. 1990); Tenn. Code Ann. § 8-6-109; *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812 (6th Cir. 2004); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002); *Connecticut v. Mylan Labs, Inc.*, No. 1:98cv2114, 2001 WL 765466 (D.D.C. Apr. 27, 2001); *Government of Virgin Islands by and through Encarnacion v. Health Quest, LLC,* 2023 WL 7214673, at *4 (Superior Ct. V.I. Oct. 31, 2023) (*citing Mathes v. Century Alumina Co.*, 2008 U.S. Dist. LEXIS 90087, at *29 (D.V.I. 2008)); Utah Code Ann. §§ 76-10-3106(3), 76-10-3108(1), 13-11-17; *Utah Division of Consumer Protection v. Stevens,* 398 F.Supp.3d 1139, 1150 (D. Utah Aug. 19, 2019); Vermont Stat. Ann. 9 V.S.A. § 2458; Va. Code Ann. §§ 59.1-9.15; Rev. Code Wash. § 19.86.080; *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011); W. Va. Code § 47-18-17; Wis. Stat. Ann. §§ 133.16 – 133.17(1); Wy. Stat. §§ 40–12–105, 40–12–106, 40–12–107, 40-12-112 and 40-12-113; *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592 (1982).

[15] *E.g.,* Conn. Gen. Stat. §§ 35-34, 35-38, 42-110o, and 42-110m; Alaska Stat. §§ 45.50.576 - .578, 45.50.501, .531, and .537; Arizona State Uniform Antitrust Act, Ariz. Rev. Stat. §§ 44-1407, 44-1408, 44-1528, and 44-1531; Cal. Bus. & Prof. Code §§ 16750, et seq., 17200, et seq., 17500, et seq., 17206, 17536, 17206.1, 16750, 16754, and 16754.5; Cal. Civil Code § 3345; Colo. Rev. Stat. § 6-4-101, et seq.; D.C. Code §§ 28-4507, 28-4509, and 28–3909; Del. Code Ann. tit. 6 § 2101, et seq.; Del. Code Ann. tit.

are authorized by state law to enter into this Settlement with Apotex to obtain injunctive relief and to recover for the States' Consumers, State Entities, and Corporate Entities, on whose behalf the States assert claims. *See* Memorandum of Law in Support of the States' Motion for Preliminary Approval of Settlement with Apotex Corp., ("States' Memo. Re Preliminary Approval") at 10-14; ECF No. 757 (3:16-cv-02056-MPS), No. 624 (3:19-cv-00710-MPS), and No. 594 (3:20-cv-00802-MPS).

## A. The States' *Parens Patriae* Authority to Represent Consumers in their States.

The States bring claims for monetary relief for Consumers pursuant to state antitrust and consumer protection laws, which build on the common law doctrine of *parens patriae*. States have long-standing authority to bring *parens patriae* actions. *Id.*

The basis and background of the States' *parens patriae* authority was extensively briefed in the States' preliminary approval papers and supports the States' authority to bring the States'

---

29, §§ 2520 and 2522; Fla. Stat. §§ 501.201, et seq, and 501.204; Idaho Code §§ 48-104, 48-108, and 48-112; 740 ILCS 10/1 et seq.; 10/7(1), 7(2), and 7(4); Ind. Code. §§ 24-1-2-5, 24-1-1-2, and § 24-5-0.5-4; Iowa Code §§ 553.12, 553.13, 714.16; Kan. Stat. Ann. §§ 50-103, 50-108, 50-160, 50-161, and 50-162; Ky. Rev. Stat. Ann. 367.110 et seq.; LSA-R.S. 51:1407, and 51:1408; 10 M.R.S. § 1104, 5 M.R.S. § 209; Md. Com. Law Code Ann. § 11-209; MGL c. 93A, § 4; Mich. Comp. Laws § 445.771, et seq. and § 445.901 et. seq.; Minn. Stat. §§ 325D.43, 325D.45, 325D.49, 325D.56, 325D.57, 325D.58, and 325D.66; Minn. Stat. Ch. 8; Miss. Code Ann. §§ 75-24-1, et seq., and 75-21-1 et seq.; Missouri Rev. Stat. §§ 416.011 et seq., 407.010 et seq., 15 CSR 60-8.010 et seq., 15 CSR 60-9.01 et seq.; Mont. Code Ann. §30-14-111(4), §30-14-131, §30-14-142(2), and § 30-14-222; Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1614, and 84-212; Nev. Rev. Stat. §§ 598.0963, 598.0973, 598.0999, 598A.160, 598A.170, 598A.200 and 598A.250; N.H. RSA 356:4 et seq.; N.H. RSA 358-A:1 et seq.; N.J.S.A. 56:9-1 et seq.; N.J.S.A. 56:8-1 et seq.; N.M. Stat. Ann. §§ 57-1-3, -7, -8; N.M. Stat. Ann. § 57-12-8, -10, -11; N.Y. Gen. Bus. Law §§ 340-342c; N.Y. Executive Law § 63(12); N.C. Gen. Stat. § 75-1 et seq.; N.D.C.C. §§ 51-08.1-01 et seq. and 51-15-01 et seq.; 4 CMC §§ 5101 et. seq.; 4 CMC §§ 5201 et. seq.; Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq.; 79 O.S. § 201 et seq.; 79 O.S. § 205; ORS 646.760, ORS 646.770, ORS 646.775, and ORS 646.780; 73 P.S. §§ 201-4, 201-4.1, and 201-8 (b); 10 P.R. Laws Ann. § 257 et seq.; 32 P.R. Laws Ann. § 3341; R.I. Gen. L. §§ 6-36-1, et. seq.; South Carolina Code of Laws §§ 39-5-50, 39-5-110, 39-5-140, and 1-7-85; S.D. Codified Laws Chapters 37-1 and 37-24; Tenn. Code Ann. §§ 47-25-101 et seq.; 11 V.I.C. § 1507; 12A V.I.C. § 328; Utah Code §§ 76-10-3101 through 76-10-3118; 9 V.S.A. §§ 2458, 2461 and 2465; Virginia Code Section 59.1-9.15; Wash Rev. Code 19.86.080 and 19.86.140; West Virginia Code § 47–18–1 et seq.; Wis. Stat. §§ 133.03, 133.14, 133.16, 133.17, and 133.18; Wyoming Statutes § 40-12-101 et seq.

Actions.  *Id.* at 10-14 (discussing state *parens patriae* authority and legal background).

## B.  Fundamental Differences Between *Parens Patriae* Claims and Rule 23 Claims

*Parens patriae* claims differ from Rule 23 class action claims substantively and procedurally, and *parens patriae* actions are not directly governed by Rule 23 of the Federal Rules of Civil Procedure. *Purdue Pharma L.P. v. Kentucky,* 704 F.3d 208, 217 (2nd Cir. 2013).  While *parens patriae* authority derives from the states' interest as sovereigns, *Georgia*, 324 U.S. at 449, class action representation is developed to more efficiently and effectively manage litigation asserting claims for many businesses or consumers.  *See American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974); States' Memo. Re Preliminary Approval at 14.

This Settlement releases both the *parens patriae* claims by the States and the class action claims by the EPPs.  According to its terms, the Settlement, including the notice plans and the consumer distribution plan, as set by the States in consultation with the EPPs, must be approved by this Court and the MDL court.

## V.  ARGUMENT

Final approval of the Settlement is warranted and appropriate based on the substantive terms of the Settlement, the process by which this Settlement was negotiated, the implemented Notice Plan, and Consumers' Reaction to the Settlement.

## A.  Standard for Final Approval of *Parens Patriae* Settlement

A *parens patriae* settlement will be approved if it is fair, reasonable, and adequate.  *State of N.Y. by Vacco v. Reebok Intern. Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995).  Although States' *parens patriae* actions are distinct from class actions, courts in this circuit and elsewhere generally look to the standards used in approving class action settlements when evaluating what a *parens patriae* settlement delivers. *See Id.; In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. 347, 351

(E.D.N.Y. 2000); *New York v. Salton, Inc.*, 265 F. Supp. 2d 310, 313 (S.D.N.Y. 2003); *New York. v. Nintendo of America, Inc.*, 775 F. Supp. 676, 680 (S.D.N.Y. 1991). In a class action litigation, "Rule 23(e)(2) sets forth the factors that a court must consider when weighing *final* approval." *See In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig..,* 330 F.R.D. 11, 28 (E.D.N.Y 2019).

## B. The Settlement Meets the Standard for Final Approval

The Settlement satisfies the standard for final approval because the Settlement is "fair, adequate, and reasonable, and not a product of collusion." *See* Fed. R. Civ. P. 23(e)(2); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG) (VVP), 2012 WL 3138596, at *4 (E.D.N.Y. Aug. 2, 2012) (citing *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). This evaluation whether to grant final approval requires the court to consider "both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005). Looking to the standard used for approval of class action settlements, final approval requires courts to consider the factors under F. R. Civ. P Rule 23(e)(2), supplemented in the Second Circuit by the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974); *In re GSE Bonds*, 414 F. Supp. 3d  686, 692 (S.D.N.Y. 2019). The States will address both sets of factors.

### 1. Procedural Analysis Factors Support Final Approval

The initial determination of fairness, often called "procedural fairness," focuses on the settlement process itself.  *See e.g. In re GSE Bonds*, 414 F. Supp. 3d at 693; *Ebbert v. Nassau County*, No. CV 05-5445 (AKT), 2011 WL 6826121, at *7 (E.D.N.Y. Dec. 22, 2011); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 238-39 (E.D.N.Y. 2010).  The court must consider two procedural factors under Rule 23; whether (A) the class representatives and class counsel

have adequately represented the class, and (B) the proposal was negotiated at arm's length. Fed. R. Civ. P. 23(e)(2). Because the Settlement was negotiated at arm's length by experienced litigators and is the result of a good-faith and procedurally fair process, the procedural factors support final approval of the Settlement.

i. <u>The States Have Adequately – and Zealously – Represented Consumers</u>

This first procedural factor requiring adequate representation of the class is not directly applicable to a settlement in a *parens* action brought by the States in the public interest. Fed. R. Civ. P. 23(e)(2); *State of New York v. Reebok International, Ltd.,* 96 F.3d 44, 48 (2d Cir. 1996) (noting Attorneys General in *parens* actions are motivated by concern for the public interest). Regardless, the States have vigorously represented the interests of their citizens in this action for more than eight years.[16] States Decl. ¶ 11. The States have engaged in extensive discovery and motion practice, zealous prosecution of this Action, and settlement negotiations to obtain a favorable settlement.[17] *Id.*

ii. <u>The Settlement Was Negotiated at Arm's Length by Experienced Counsel.</u>

The Settlement was "reached through arm's-length negotiations between experienced, capable counsel knowledgeable in complex … litigation'" and enjoys a presumption of fairness. Fed. R. Civ. P. 23(e)(2); *In re GSE Bonds*, 414 F.Supp.3d at 693 (*quoting In re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)); State of *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995). Attorneys representing the parties to the Settlement

---

[16]With the States, the EPPs have vigorously represented the interests of their putative class members, including consumers represented by the EPPs.

[17] Similarly, the EPPs have zealously litigated in the MDL and engaged in settlement negotiations with Apotex to obtain a favorable settlement for putative members of the EPP Settlement Class, including Consumers who are not residents of the States.

are experienced and well-informed. Apotex and EPP's respective counsel have significant expertise in complex antitrust litigation. The Assistant Attorneys General in the offices of the Attorneys General for Connecticut, New York, and Massachusetts who negotiated the Settlement, individually and collectively, also have extensive experience with antitrust investigations and litigation. States Decl. ¶ 13. "The Attorney Generals have extensive experience in complex antitrust cases brought under their *parens patriae* powers." *New York v. Nintendo of Am. Inc.*, 775 F. Supp. at 680. Indeed, this action is part of a long and successful tradition of multistate litigation by state attorneys general.[18]

Courts can place special weight on a settlement being negotiated by government attorneys committed to protecting the public interest. *Wellman v. Dickinson,* 497 F. Supp. 824, 830 (S.D.N.Y. 1980), *aff'd*, 682 F.2d 355 (2d Cir. 1982). The participation of state attorneys general furnishes extra assurance that Consumers' interests are protected. *In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. at 351. The motivating factor in this Action is the enforcement of antitrust laws by the States acting as *parens patriae* for their citizens. *See New York v. Reebok,* 96 F.3d at 48. The States negotiated at arms-length with Defendants for years while actively litigating, and fifty Attorneys General have approved the settlements on behalf of their state, their Consumers, State Entities, and Corporate Entities, for whom they assert claims. States Decl. ¶ 7; Exhibit 1.

   iii.   The States Have Obtained a Sufficient Understanding of the Case

---

[18] *See, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93 (1989); *Hartford Fire Ins. v. California*, 509 U.S. 764 (1993); *In re Panasonic Consumer Elect. Prod.*, 1989-1 Trade Cas. (CCH) ¶ 68, 613 (CCH), 1989 WL 63240, (S.D.N.Y. June 5, 1989); *Colorado v. Airline Tariff Publ's Co.*, 1995-2 Trade Cas. (CCH) ¶ 71,231, 1995 WL 792070 (D.D.C. May 10, 1995); *In re Mid-Atl. Toyota Antitrust Litig., 605* F. Supp. 440 (D.Md.1984); State of *New York v. Reebok International, Ltd.,* 96 F.3d 44 (2d Cir. 1996); *In re Electronic Book Antitrust Litig.,* 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp 706 (D. Minn.1975); *U.S. v. Apple Inc.,* 952 F.Supp.2d 638 (S.D.N.Y 2013); *In re Compact Disk Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197 (D. Me. 2003); *State of New York, et al. v. Cephalon, Inc.*, No. 16-4234 (E.D. Pa. 2016); *State of Wisconsin, et al. v. Indivior Inc., et al.*, 16-cv-5073 (E.D. Pa. 2016).

The States were well informed about the issues in this matter and the strengths and weaknesses of the States' Actions when they negotiated the Settlement with Apotex. States Decl. ¶¶ 11-14. The third *Grinnell* factor requires the court to consider the stage of the proceedings and amount of discovery completed. *In re GSE Bonds*, 414 F. Supp. 3d at 699. "The relevant inquiry 'is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement.'" *Id. (quoting In re AOL Time Warner, Inc.*, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006)). The State of Connecticut has been investigating some claims since July 2014, and most States have been litigating some of the claims in the States' Actions since December 2016. The lengthy and extensive litigation has provided an excellent foundation to understand the facts and legal issues, as did this Court's and the MDL Court's opinions and orders. The States understand what Consumers, State Entities, Corporate Entities, and members of the EPP Settlement Class have overpaid for generic pharmaceuticals manufactured by Apotex and the other Defendants, and the challenged conduct's price effects on generic pharmaceuticals, based on data provided by state Medicaid agencies, third parties, and Defendants in the MDL and expert analysis and reports. The States' investigation and litigation work over the past eight years, including expert discovery, has allowed them to obtain an excellent understanding of the case. States Decl. ¶ 11.

2. Substantive Analysis Factors Support Final Approval

The second set of factors focuses on the substantive terms of the Settlement and the relief that the settlement is expected to provide. *See In re Payment Card,* 330 F.R.D. at 29 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment) ("Paragraphs (C) and (D) constitute the 'substantive' analysis factors and examine '[t]he relief that the settlement is expected to provide …'"). When evaluating whether to approve a settlement, the court must consider whether: (C) the

relief provided is adequate, and (D) the proposal treats eligible consumers equitably relative to each other. Fed. R. Civ. P. 23(e)(2). This inquiry overlaps significantly with several *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C)(i). *In re GSE Bonds,* 414 F. Supp. 3d at 693 (*citing In re Payment Card*, 330 F.R.D. at 36). The substantive factors weigh in favor of final approval because the Settlement provides substantial and guaranteed recovery for Consumers, State Entities, and Corporate Entities, which recovery is fair, reasonable, and adequate given the litigation risks. States Decl. ¶ 26.

Rule 23(e)(2)(C) requires the court to examine whether the "relief … is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Further, *Grinnell* factor eight, "the range of reasonableness of the settlement in light of the best possible recovery," and factor nine, "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation," are often considered together, *In re GSE Bonds*, 414 F. Supp. 3d at 696 (*quoting In re Payment Card*, 330 F.R.D. at 47-48).

i. The Settlement Provides Adequate Relief

The Settlement provides adequate relief through monetary relief that represents a significant percentage of possible recovery, considering case complexity and litigation risk, in addition to valuable injunctive relief and cooperation. When assessing the adequacy of a settlement, courts may need to forecast the likely range of possible recoveries and the likelihood of success in obtaining such results. *In re GSE Bonds*, 414 F. Supp. 3d at 693 (*citing In re Payment Card,* 330 F.R.D. at 36). The court's task is to weigh the settlement figure against the amount of likely recovery. *Reebok,* 96 F.3d at 49. Courts have held that "[t]he proper measure of damages

in a suit concerning a price-fixing conspiracy is 'the difference between the prices actually paid and the prices that would have been paid absent the conspiracy.'" *In re Electronic Books Antitrust Litig.*, 2014 WL 1282293 at *16 (S.D.N.Y., March 28, 2014) (quoting *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1077 (2d Cir.1988)).  Further, monetary relief in antitrust cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565, 101 S. Ct. 1923, 68 L.Ed.2d 442 (1981) (quoting *Bigelow v. RKO Pictures, Inc.,* 327 U.S. 251, 264 (1946)).

Based on information and data the States have obtained through investigation and discovery, and analysis provided by the States' experts, the States estimate that the total amount of overcharge associated with sales by Apotex during the period at issue in the litigation is approximately $202 million. The amounts of overcharges passed through to Consumers and State Entities is disputed, but the States' expert in the Dermatology Action has indicated the cumulative passthrough of overcharges is estimated at 50% ,, which would be $101 million. States Decl. ¶ 9. Given that, the $39.1 million settlement amount to the States is a significant percentage considering the case complexity and litigation risk and, therefore, reasonable, adequate, and within the range of possible approval.  *See e.g., In re GSE Bonds*, 414 F. Supp. 3d at 697 (13-17% of the best possible recovery considered reasonable); *In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, 2006 WL 3247396, at *6 (S.D.N.Y. Nov. 8, 2006) (settlement "representing roughly 10-15% of the credit transaction fees collected by Defendants"). In addition to the monetary relief, the Settlement also provides valuable relief through Apotex's commitment to maintain its existing compliance program and provide an annual report to the States as to its compliance program.  *See* Settlement ¶ VII.B.

ii. <u>The Cooperation from Apotex Adds Value to the Settlement</u>

Apotex's agreement to provide cooperation to the States in the ongoing litigation against other Defendants adds value to the Settlement. *See In re GSE Bonds*, 414 F. Supp. 3d at 697. Successful litigation against Apotex's co-defendants will increase the likelihood of further recovery and additional value to the States, the Consumers, State Entities, and Corporate Entities on whose behalf the States assert claims, and for EPP Settlement Class members. Related to this is the seventh *Grinnell* factor, defendants' ability to withstand a greater judgment. Even if it is determined that Apotex could withstand a greater judgment, "courts have noted that a defendant's cooperation 'tends to offset the fact that they would be able to withstand a larger judgment.'" *In re GSE Bonds*, 414 F. Supp. 3d at 694 (*quoting In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008)). Therefore, Apotex's covenant of continued cooperation in this litigation supports final approval. *See e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396 at *9 (E.D.N.Y. Sept. 25, 2009) ("the agreement to cooperate with the plaintiffs … adds significant value"); *In re GSE Bonds*, 2019 WL 6842332 at *4 (S.D.N.Y Dec. 16, 2019) ("this cooperation … nonetheless provides some additional value to the GS settlement"); *In re Packaged Ice Antitrust Litig.*, 2010 WL 3070161 at *6 (E.D. Mich. Aug 2, 2010) (where "there is the potential for a significant benefit … in the form of cooperation on the part of the settling Defendant, this Court is reluctant to refuse to consider the very preliminary approval that will trigger that cooperation").

iii. <u>The Settlement Is Reasonable Considering the Costs, Risks, and Delay of Trial and Appeal.</u>

When evaluating the adequacy of the Settlement, the Court should analyze the comparison between the settlement amount and the full estimated damages in light of all the risks of litigation, which determine the likelihood of recovery. As the risks of litigation increase, the range of

reasonableness correspondingly decreases. *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 336 (D.N.J. 2002). This analysis overlaps significantly with *Grinnell* factors 1, 4, 5, and 6, which include: the complexity, expense, and likely duration of the litigation (factor 1); the risks of establishing liability (factor 4); the risks of establishing damages (factor 5); and the risks of maintaining the class action through the trial (factor 6). *Grinnell*, 495 F.2d at 463.

A settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution. *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y.1972). The Settlement's substantial and guaranteed recovery for Consumers is fair, reasonable, and adequate given the litigation risks inherent in any litigation and more particularly in a complex antitrust case such as this matter. In addition to analyzing purchases of Apotex's generic pharmaceuticals at issue, the States have gathered information needed to adequately assess their risks of litigation in this matter.

The States have done significant investigation and litigation work to support their belief in their claims, but litigation always include risks. Antitrust cases "'are complicated, lengthy, and bitterly fought,'… as well as costly." *In re GSE Bonds,* 414 F.Supp.3d at 697 (quoting *Wal-Mart Stores, Inc., v. Visa U.S.A., Inc*., 396 F.3d 96, 118 (2d Cir. 2005)); *See also In re Vitamin C Antitrust Litig*, No. 06-MD-1738 (BMC), 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012). This litigation, which, in addition to federal law claims, also includes state law claims for forty-two different states,[19] is no exception, particularly given the number of parties, drugs, and alleged

---

[19] The States bring claims under the laws of Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin. *See* Consolidated Amended Complaint. The EPPs bring claims under the laws of every state except Indiana and Ohio.

conspiracies and the fact that the litigation against Apotex has been ongoing for more than eight years. *See In re GSE Bonds*, 414 F.Supp.3d at 693. This Action will involve multiple trials, which will be lengthy and complex because of the nationwide scope of the alleged activities, and it has already required lengthy and expensive discovery, which is still ongoing. *See New York v. Reebok,* 903 F. Supp. at 536. "Courts favor settlement when litigation is likely to be complex, expensive, or drawn out." *In re GSE Bonds*, 414 F.Supp.3d at 693.

Litigating the claims and defenses in this case would necessarily entail some risk with respect to establishing liability and proving damages or other relief sought. "[A]s to liability, establishing the existence and extent of a conspiracy will necessarily be a complex task, and many of the hurdles that plaintiffs have overcome at the pleading stage will raise substantially more difficult issues at the proof stage." *In re LIBOR-Based Fin. Instruments Antitrust Litig*., 327 F.R.D. 483, 494 (S.D.N.Y. 2018) ("*LIBOR*")*.* Further, litigation also includes risk that the fact finder would find that the injury caused by the anticompetitive conduct is less than alleged. Proving violations of antitrust laws is no mean feat, and even if that feat is accomplished, proving remedies and damages is just as difficult. *See Id.* at 494 (plaintiffs' damages models would "unquestionably be challenged and perhaps subject to further *Daubert* motions"); *In re GSE Bonds*, 414 F. Supp. 3d at 697 (even if they prove liability, plaintiffs will still face the difficulties inherent in proving damages).

At trial, proof of damages, disgorgement, restitution, and civil penalties would likely be a complex task involving a "battle of the experts." *In re Nasdaq Mkt.-Makers Antitrust Litig*., 187 F.R.D. 465, 476 (S.D.N.Y. 1998); *See Chatelain* v. *Prudential–Bache Secs., Inc.,* 805 F. Supp. 209, 213 (S.D.N.Y. 1992) (complex issue of establishing damages would require battle of the experts). "As the Second Circuit has noted, 'the history of antitrust litigation is replete with cases

in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.'" *In re GSE Bonds*, 414 F. Supp. 3d at 694 (*quoting Wal-Mart Stores,* 396 F.3d at 118 (citation omitted)); *See also ZF Meritor et al. v Eaton Corporation*, 800 F.Supp.2d 633 (D. Del. August 4, 2011) (exclusion of expert report made plaintiffs unable to prove monetary damages despite jury verdict finding antitrust violations).

This litigation has been ongoing for more than eight years, and considering the risks, costs, and delay involved in an antitrust case of this magnitude, the opportunity for guaranteed relief weighs heavily in favor of approving the Settlement. *See In re GSE Bonds*, 414 F. Supp. 3d at 694 (court should balance immediacy and certainty of recovery against the continued risk of litigation). Recognizing the cooperation that Apotex has agreed to provide, an early settlement discount, the risks of litigation, and the time value of money, the States believe that the $39.1 million Settlement is fair, reasonable and adequate.

iv. The Proposed Method of Distribution treats Consumers Equitably Relative to Each other and Based on Claims Asserted and Releases Provided.

The States propose to hold Consumer restitution funds in the State Escrow designated for later distribution to Consumers and to submit a complete allocation and distribution plan to the Court for approval at a future date. *See Settlement ¶ XI.B.* A plan of allocation is not required for the Court to grant approval of the Settlement. *E.g., In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2015 WL 9952596, at *3 (S.D.N.Y. Dec. 15, 2015) (order stating that counsel shall submit for the Court's approval a proposed Plan of Distribution of the Settlement Funds at a later date). However, the States have proposed a framework and general principles for the plan for distribution to Consumers as further described in Paragraph *V.D*, *infra*. Consumers were provided an opportunity to object to or comment on this proposed framework, or opt out of the settlement,

as part of the Notice Plan. Janowicz Decl. ¶¶ 5, 9, 27, 32. The proposed distribution plan structure includes a plan for allocation that treats Consumers equitably relatively to each other and based on the strength of claims asserted and released on their behalf. *See* Paragraph V.D, *infra*. The States' proposed plan regarding distribution to Consumers, *infra,* is fair to Consumers as a whole, taking into consideration the strength of releases and claims based on available evidence, and meets the desired goal that a distribution plan must be fair and adequate. *See In re GSE Bonds*, 414 F. Supp.3d 686, 694 (S.D.N.Y. 2019).

v. <u>The Monetary Payment to the States is Fair and Reasonable and the Settlement Does Not Contain Any Additional Agreement.</u>

The Court must also consider the terms of any proposed award of attorney's fees, including timing of payment, and any agreement required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C). The States have not entered into any related agreements requiring disclosure. The Settlement provides that 30% of the State Settlement Amount be placed in escrow for use in paying for the expenses of the Notice Plan and administration, and upon final approval of this Settlement, for costs of litigating the States' claims both collectively and individually, including to reimburse the States for attorney's fees. *Settlement ¶ I.DD.3.* Further, to the extent that the funds in the Cost Account are not needed to offset costs of States litigating in the State Actions, any remaining funds may be used by the States as set forth in the Settlement's paragraph I.DD.3. *See III.B, supra.* The Cost Account represents statutorily authorized recovery and enforcement remedies, including the costs and expenses of settlement administration, the costs, expenses and attorneys' fees incurred by the States in investigating and litigating the States' Actions, and such other monetary recovery or remedies the States may be entitled to pursuant to state law. This payment to the state is fair and reasonable under the circumstances.

In summary, the factors set forth in Rule 23(e)(2), together with the *Grinnell* factors,

demonstrate that the Settlement is fair, reasonable, and adequate, under the circumstances of this case, and that final approval of the Settlement is warranted.

**C.   The Notice Plan was Successfully Implemented and Satisfies Due Process.**

To assist with the creation and implementation of a Notice Plan, the States retained Rust Consulting, Inc. ("Rust"), a nationally recognized notice and administration company specializing in the design and implementation of notice and administration programs of all sizes and types in class action settlements and similar matters.  Janowicz Decl. ¶¶ 1-4; States Decl.¶ 16.  Rust has extensive experience in state and federal class and *parens patriae* actions. Janowicz Decl. ¶¶1-4[20]

The Notice Plan approved by the Court and implemented by Rust achieved each of the planned objectives.   Janowicz Decl.¶ 7. The Notice Plan reached at least 78% of potential Consumers using a methodology that is consistent with many nationwide court-approved class action notice plans and within the guidelines established by the Federal Judicial Center. Janowicz Decl.¶ 28.  Moreover, it is likely that the Notice Plan resulted in a higher percentage of potential Consumers who received notice of the Settlement when considering the additional efforts taken by Rust that were not included in the calculated reach percentage (*e.g.* website, earned media, outreach communications).  *Id.*

The cornerstone of the Notice Plan, and States' notice efforts generally, were the Court-approved Notices: the Short Form notice and Long Form notice.  These were drafted to clearly and succinctly explained the nature of the States' Actions, including the Apotex Settlement, the

---

[20] *See e.g. In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002); *In re Metropolitan life Ins. Co. Sales Practices Litig.*, 1999 WL 33957871 (W.D. Pa. Dec. 28, 1999); *In re Electronic Book Antitrust Litig.,* 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014). Rust was also approved by this Court as the Notice and Claims Administrator for the Heritage Settlement. ECF No. 675 (3:16-cv-02056-MPS), No. 465 (3:20-cv-00802-MPS), and No. 502 (3:20-cv-00802-MPS).

applicable deadlines, and Consumers' rights to comment on, object to, or opt out of the Settlement. The notices were designed to get Consumers' attention by including an informative headline and eye-catching graphic. The notices were clear, concise, and written in plain, easily understood language. Janowicz Decl. ¶¶ 5-6, 30; Exhibits G and H.  While the Short Form was kept simple to encourage readership and comprehension, the Long Form provided substantial information about the States' Actions and the Settlement, including background, the Drugs at Issue, what options Consumers had relating to the Settlement, and providing specific instruction Consumers needed to follow to properly exercise their rights.  *Id.* at ¶¶ 31-32.  The Short Form and Long Form notices are both available on the website in several languages (English, Spanish, Chinese, Arabic, French, Russian and Vietnamese).  *See infra.*

The Court-approved Notice Plan was designed to provide Consumers with opportunities to learn about the Settlement and act upon their rights; and to ensure that Consumers will be exposed to, see, review, and understand the Notices. Janowicz Decl. ¶¶ 5-6.  The Notice Plan has six components: a website, direct notice to those who previously registered for updates, digital advertising of the settlement, print media in the form of an ad published in *AARP Bulletin*, "earned media" through strategic distribution of press releases, and outreach to thousands of independent drugstores.  *Id.* at ¶ 8; *see also* Janowicz Prelim. Approval Decl. at ¶¶ 7-29.

**Website, E-mail and Toll-Free Telephone**

On October 30, 2024, Rust established a website at www.AGGenericDrugs.com to enable Consumers to obtain and download information about the States' Actions and register to receive updates.  Janowicz Decl.¶ 9.  The website is currently viewable in English, Spanish, Chinese, Arabic, French, Russian and Vietnamese and includes the Short Form Notice and Long Form Notice (both in English, Spanish, Chinese, Arabic, French, Russian and Vietnamese),  the list of

drugs involved, answers to frequently asked questions (including how to object and opt-out), the Settlement Agreement, and other court documents from the States' Actions. *Id.*. In addition to providing information, the website also has a form allowing Consumers to register to obtain future information about how to file a claim seeking payment (if eligible) and a form for Consumers seeking to be excluded from the Settlement. *Id.* As of July 24, 2025, the website has had 484,446 unique visits. Janowicz Decl. ¶ 21.

On the same day the website was launched, Rust also established a toll-free phone number (1-866-290-0182) to allow Consumers to call and request that notice be mailed to them, or alternatively, to listen to answers to frequently asked questions and/or leave a voice mail. *Id.* at ¶¶ 9, 22. Telephone support is provided in English, Spanish and Chinese. Rust has returned calls from persons leaving voicemails with questions. As of July 24, 2025, Rust received 1,402 calls, including 408 voicemails, to the toll-free number. *Id.* at ¶¶ 9, 22.

Further, Rust established a mailing address (AG Generic Drug Litigation, c/o Rust Consulting – 8769, PO Box 2599, Faribault, MN 55021-9599) and a dedicated e-mail inbox (info@agdrugsettlement.com), to receive registration forms, exclusions, objections, letters and other communications regarding the Settlement. *Id.* at ¶¶ -23.

As of July 24, 2025, Rust has received 97,330 Registration Forms from the website and emails, although these have not yet been fully reviewed to remove duplicative or suspicious forms. Janowicz Decl.¶ 25.

### Digital and Print Advertising

A paid media program was implemented using digital and social media, using banner and social media advertising. Janowicz Decl. ¶ 12. When clicking on the advertisement, Consumers were taken directly to the Settlement website where they could read details about the Settlement

and review the comprehensive list of included drugs. Janowicz Decl. ¶ 14. Between May 20, 2025 and July 23, 2025, approximately 102 million viewable impressions were delivered through Meta Platforms, specifically its social media platforms Facebook and Instagram, and on Nextdoor, and banner ads via demand-side platforms (DSPs) which placed ads across sites and apps based on selected targeting. Janowicz Decl. ¶ 15. Ads appeared in English, Spanish, Chinese, Arabic, French, Russian, and Vietnamese. *Id.* Targeted digital advertising focused on delivery to various audiences, including purchasers of generic prescription drugs and those whose interests match pharmacies or medical conditions such as dermatitis, among others. *Id.* Further, Between May 20, 2025 and July 23, 2025, registered sponsored keywords and phrases in English, Spanish, and Chinese (*e.g.*, generic prescription drug settlement and AG generic drug settlement) were implemented with all major search engines, including Google AdWords, Bing (Microsoft Advertising), and their search partners. Janowicz Decl. ¶ 16. A copy of the digital ads used are provided in Exhibit A and Exhibit B of the Janowicz Declaration.

To better reach older segments of the target audience who may be more likely to read print material, Rust published the Summary Notice in the July/August issue of *AARP Bulletin,* which has a circulation of 21.5 million and readership of 30 million. Decl. Janowicz ¶ 17.[21] The publication was available for purchase online beginning July 10, 2025, and was delivered to subscribers between July 7, 2025 and July 19, 2025. *Id.;* Exhibit C..

**Earned Media, Direct Notice and Outreach**

The Notice Plan also included an "earned media" program to supplement the paid media programs.. The earned media program consisted mostly of redistributing State press release(s)

---

[21] Due to the timing of the bi-monthly publications, *AARP Bulletin* was used instead of *AARP The Magazine*, which was identified in the States' preliminary approval papers for the Apotex Settlement. *See*, States' Memo. Re Preliminary Approval at 29. Both publications reach a similar audience and have similar circulations and readerships. Janowicz Decl. ¶ 17

through various media outlets (and in a few different languages) with the expectation that it would lead to the press release being posted in various different locations and thus potentially viewed by more and diverse groups of Consumers. Decl. Janowicz ¶¶ 18-19; States Decl. ¶ 8. Specifically, on June 9, 2025, Rust announced the preliminary approval of the settlement on PR Newswire's National US1 Newsline and Multicultural Markets, which included translated distributions in Spanish, simplified Chinese and traditional Chinese. Janowicz Decl. ¶ 18. The English press release generated 630 postings of the full text of the press release in the form of radio and television announcements, newspaper and online stories, with the potential audience of 145.1 million. *Id*. The Spanish press release generated 51 postings with the potential audience of 4.1 million, and the Chinese press releases generated a total of 9 postings with the potential audience of 7.1 million. Consequently, information about the Settlement appeared in numerous media outlets, such as *Daily Gazette* (New York) and KTLA (Los Angeles), and the Associated Press. *Id.* at ¶¶ 18-19.

On May 30, 2025, Rust sent the Short Form Notice via email to Consumers who previously registered to receive updates concerning the case status. Janowicz Decl. ¶ 11. Additionally, Rust mailed the Short Form Notice to registrants who previously registered to receive updates but did not provide an email address with their registration. *Id*. In all, Rust sent 90,926 notices by email and 34 notices by mail to registrants. *Id.*

The Notice Plan also included outreach to independent pharmacies. Janowicz Decl. ¶ 20. On June 25, 2025, Rust caused 17,511 emails to be sent to independent drug stores across the country. *Id.* The email included a letter drafted by the States and a link to the Summary Notice. The letter asked the pharmacies to post, email or otherwise share the Summary Notice with customers who may have purchased one or more of the drugs at issue. *Id*. On July 10, 2025, Rust sent a similar letter with a copy of the Summary Notice to the same list via mail. *Id*.; Exhibits D

and E.

The Notice Plan, as implemented by Rust, constituted the best notice practicable under the circumstances and provided Consumers with information reasonably necessary to evaluate their options. *See* Fed. R. Civ. P. 23(e)(1)(B); *In re GSE Bonds*, 414 F. Supp. 3d at 702 (the Court is required to "direct to class members the best notice that is practicable under the circumstance[s]"). The Court-approved Notice Plan was designed to satisfy due process; provide Consumers opportunities to learn about the Settlement and act upon their rights; and ensure Customers will be exposed to, see, review, and understand the Notices. Janowicz Decl. ¶ 5. The Notice Plan also included Notices that were noticeable, clear, concise, and written in plain, easily understood language. Janowicz Decl. ¶ 6.

The Notice Plan, as implemented, meets the requirements of Rules 23 and due process. There are no rigid rules for determining whether a settlement notice satisfies constitutional requirements. *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F.Supp.2d 179, 191 (S.D.N.Y. 2012), *aff'd sub nom* 731 F.3d 241 (2d Cir. 2013). "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 727 (2d Cir. 2023) (citing, *Wal-Mart Stores*, 396 F.3d at 113–14). "[N]otice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Id.* at 114 (citation and internal quotation marks omitted).

**D.  Consumers' Reaction to the Settlement Supports Final Approval**

The Settlement was well received by Consumers, as shown by the absence of objections and the limited number of exclusion requests – especially in comparison to the large number of

registrations. Janowicz Decl. ¶ 25-26; State Decl. ¶ 19. As of July 24, 2025, Rust has received only nine requests for exclusions. Janowicz Decl. ¶ 26. Copies of the exclusion requests are attached as Exhibit F to the Janowicz Declaration. The lack of any objections and limited exclusions supports a finding that the Settlement is fair. *See Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 362 n.4 (S.D.N.Y. 2002) (stating that "the lack of objections may well evidence the fairness of the Settlement"). These indicia of support and lack of significant opposition to the Settlement is an important factor weighing in favor of final approval. *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (settlement approved where 0.26% of the class requested exclusion from the settlement and .06% of class members objected); *see also City of Pontiac Gen. Emps' Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 279 (S.D.N.Y. 2013) (Rakoff, J.) (noting that "not a single class member objected to the settlement"); *In re Am. Bank Note Holographies, Inc*., 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) ("the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy"). The absence of objections and the small number of exclusions by consumers supports final approval.

## VI. THE PLAN OF ALLOCATION AND DISTRIBUTION

The States are seeking final approval of (1) the proposed framework for allocation of the settlement funds between Consumers and State Entities that are State Releasors, and (2) the proposed framework of a consumer distribution plan.

The States maintain that the proposed framework of the distribution plan and the allocation of the restitution funds between Consumers and State Entities that are State Releasors is fair and reasonable under the circumstances. The standard for judicial approval of a settlement agreement, that requires a finding that the settlement is fair, adequate and reasonable "applies with as much

force to the review of the allocation agreement as it does to the review of the overall settlement between plaintiffs and defendants." *In re Chicken Antitrust Litig.,* 669 F.2d 228, 238 (5th Cir. 1982); *see also In re Citric Acid Antitrust Litig.*, 145 F. Supp, 2d 1152, 1154 (N.D.Cal.2001) (Approving a plan for the allocation of a class settlement fund is governed by the same legal standards that apply to approving the settlement terms: the distribution plan must be "fair, reasonable and adequate"). Approval of a plan of distribution is within the discretion of the Court. *In re Chicken,* 669 F.2d at 238*; West Virginia v. Chas. Pfizer & Co., Inc.,* 440 F.2d 1079, 1085 (2d Cir. 1971); *White v. National Football League,* 822 F. Supp. 1389, 1417 (D. Minn. 1993). A plan of allocation may be approved so long as it has a "reasonable, rational basis." *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-3400 (CM) (PED), 2010 WL 4537550, at *21 (S.D.N.Y. Nov. 8, 2010); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497 (S.D.N.Y. 2009). However, "a plan of allocation need not be perfect." *In re GSE Bonds, 414 F. Supp.3d at 694 (quoting In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05-CV-10240, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007)).

### 1. Allocation of the State Settlement Amount

The Settlement provides that 70% of the $39.1 million State Settlement Amount is allocated to restitution to Consumers and State Entities that are State Releasors, to compensate them for any alleged harm resulting from the alleged Conduct. *Settlement I.DD, II.A.* The States propose that 45.08% of the State Settlement Amount (or 64.4% of the restitution amount) equaling $17,624,403.04 be allocated and distributed to Consumers and 24.92% of the State Settlement Amount (or 35.6% of the restitution amount) equaling $9,745,596.96 be allocated as restitution to State Entities, to be divided between the settling states based on relative harm and claims asserted in the litigation, and distributed to each State for such use permitted under state law at the sole

discretion of each State Attorney General. *See Settlement* DD(2) ("The State Settlement Amount shall be allocated among the State Entities that are State Releasors as determined by the Attorneys General"). States Decl. ¶ 21. The States propose that the distribution to States of funds allocated as restitution to State Entities that are State Releasors will be made promptly upon the Court's final approval of the Settlement.

## 2. The Proposed Consumer Claims and Distribution Process

To receive a portion of the Settlement, a Consumer will be required to submit a claim and release form. The States do not intend to require proof of purchase beyond a verified statement of purchase from a Consumer. *Id.* However, the States reserve the option of requiring proof or auditing any large claims submitted. *Id.* The States do not intend to block any claims as being too small to be paid, but rather, propose to determine and set a minimum payment amount to be paid to a Consumer filing a valid claim ("Minimum Payment") so that all valid claims would receive at least a minimum amount. *Id.; See In re Nasdaq Mkt.-Makers Antitrust Litig., No. 94 CIV. 3996 RWS, 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000)* (approving $25 minimum payment as a reasonable means of compensating class members with relatively small claims); *In re Initial Pub. Offering Sec. Litig., 671 F. Supp. 2d 467, 497-98 (S.D.N.Y. 2009)* (approving $10 minimum payment no matter how small the claim). The States believe that the use of a Minimum Payment is important to encourage Consumers to participate in the claims process.

The States propose that the Minimum Payment amount be determined after additional settlements have been reached and it is appropriate and efficient to do a distribution to Consumers, to ensure that a reasonable portion of the Settlement funds are allocated towards claimants receiving the Minimum Payment, while still preserving enough funds for Consumers with larger documented claims. The use of a Minimum Payment allows Consumers to meaningfully

participate in the Settlement by submitting valid claims and is designed to avoid a situation in which the cost of issuing a payment exceeds the amount of the payment. *Id.* A Minimum Payment amount also allows smaller claims to be processed more efficiently and with less inquiries and challenges on claims. Efficiency, ease of administration and conservation of public and private resources are highly relevant to the reasonableness of a settlement. *In re PaineWebber Ltd. Partnership Litig.,* 171 F.R.D. 104, 135, (S.D.N.Y. 1997). The "goal of any distribution method is to get as much of the available damages remedy to [Consumers] … as possible and in as simple and expedient a manner as possible." *LIBOR,* 327 F.R.D. at 496 (quoting 4 William B. Rubenstein, *Newberg on Class Actions* § 12:15 (5th ed.)(Westlaw 2018). In the event that a minimum payment is impracticable, the States reserve the possibility of pro rata reductions or other options, in which event the States will first seek and obtain approval from the Court.

The States believe this plan for distribution represents a reasonable method of ensuring equitable and timely distribution of the restitution funds, and to as many affected Consumers as possible, without burdening the process in a way that will unduly waste funds. *See In re GSE Bonds,* 414 F. Supp.3d at 694; *See also LIBOR,* 327 F.R.D. at 496 (quoting *In re Credit Default Swaps Antitrust Litig.*, 13-md-2476 (DLC), 2016 WL 2731524 *9 (S.D.N.Y. April 26, 2016) ("A principal goal of a plan of distribution must be the equitable and timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund").

### 3. Proposed Framework for Allocation Among Consumers

The States propose the following framework for allocation among Consumers. The Settlement provides that the "State Settlement Amount shall be allocated … among Consumers ***as determined by*** the Attorneys General with the EPP Settlement Class Counsel consulting … and approved by the court." *Settlement* ¶ DD(2)(emphasis added). The States propose to treat

Consumers equitably relatively to each other and based on representation in the litigation, strength of claims asserted, and releases provided for consumer claims. A Consumer shall be entitled to receive payments in proportion to their spend on generic pharmaceuticals at issue (i.e. "pro-rata")[22] with one exception; Consumers residing in a non-settling state on whose behalf only EPPs are settling claims, namely Alabama, Arkansas, Hawaii, and Texas, shall receive less, likely only the minimum payment, because they are giving less by providing a release only for class action claims and not *parens patriae* claims brought by the state. *Id.*

A plan of distribution "'must be fair and adequate,'" but "it 'need only have a reasonable, rational basis, particularly if recommended by experienced and competent … counsel." *In re GSE Bonds*, 414 F. Supp.3d at 694 (*citing In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005)). There is no rule that a settlement must benefit all Consumers equally if the allocation is rationally based on legitimate considerations. *In re MetLife Demutualization Litig., 689 F.Supp.2d 297, 344 (E.D.N.Y 2010; In re PaineWebber Ltd. Partnership Litig.,* 171 F.R.D. at 129; *In re Agent Orange Prod. Liab. Litig*., 611 F. Supp. 1396, 1411 (E.D.N.Y. 1985); *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1148 (11th Cir.1983); *See also In re Blue Cross Blue Shield Antitrust Litig*, MDL 2406, 85 F.4th 1070, 1094 (11th Cir. 2023) ("Although the settlement agreement's allocation is facially unequal, it is not facially unfair"); *In re Payment Card Interchange Fee and Merc. Disc. Antitrust Litig.*, 2024 WL 3236614 *36 (E.D.N.Y, June 28, 2024) ("Inequitable treatment can arise where differently situated class members are treated equally by a settlement").

---

[22] A pro rata plan for allocation has been used in many antitrust cases. *See e.g. In re Vitamins Antitrust Litig.,* 2000 WL 1737867, at *6 (D.D.C.Mar.31, 2000); *In re Lloyds' Am. Trust Fund Litig.,* 2002 WL 31663577, at *19 (S.D.N.Y.Nov.26, 2002); *In re Paine Webber Inc. Ltd. Partnerships Litig.,* 117 F.3d 721 (2d Cir.1997).

The States' proposal to treat Consumers in non-settling states differently than Consumers residing in the States, is fair and reasonable for several reasons. First, the States *parens patriae* and other claims on behalf of their citizens are different than class action claims. The claims brought on behalf of Consumers in non-settling states consist of the EPPs' private cause of action class action claims for Consumers residing in those states. Compared to the States' *parens patriae* claims and other state claims, the EPP claims carry more uncertainty and litigation risk. For example, the class action claims are reliant on the ability to certify a class, *see* F. R. Civ. P. 23. Treating Consumers differently because of the strength of claims asserted on their behalf and risk of non-recovery is not uncommon nor unfair. *See e.g. In re Remicade Antitrust Litig.*, No. CV 17-4326-KSM, 2023 WL 1850502 (E.D. Pa. Feb. 8, 2023) (Members of Selected States treated differently from members in other states because of those states' laws); *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010) (varied relief among class members with differing claims in class settlements is not unusual); *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1146 (8th Cir.1999) ("[A]lmost every settlement will involve different awards for various class members.").

Numerous courts have approved distribution plans that allocate the settlement proceeds according to the relative strengths and weaknesses of the various claims. Se*e e.g. In re Warner Communications Sec. Lit.* 618 F. Supp. 735, 745 (S.D.N.Y. 1985), affd., 198 F.2d 35 (2d Cir. 1986)(the proposed method of allocation recognizes the potential for recovery varies among class members); *In re MetLife Demutualization Litig.,* 689 F.Supp.2d 297, 344 (E.D.N.Y 2010) ("Relative strength and value of different categories of claims may be considered"); *Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir. 1982)(not unfair for settlement's distribution formula to reflect value of claim). "[W]hen real and cognizable differences exist between the 'likelihood of ultimate success' for different plaintiffs, 'it is appropriate to weigh 'distribution of the settlement

... in favor of plaintiffs whose claims comprise the set' that was more likely to succeed." *In re PaineWebber Ltd. Partnership Litig.,* 171 F.R.D. at 133 (quoting *In re Agent Orange Prod. Liab. Litig.,* 611 F. Supp. at 1411; *see Becher v. Long Island Lighting Co,* 64 F. Supp 174, 181-182 (E.D.N.Y 1999) (approving allocating settlement funds among three different groups of class members based on the strengths of their claims and relative risk of non-recovery). For clarification, the States' allocation plan does not take into account the existence of *Illinois Brick* repealers[23] because "[i]t is purely speculative that claimants from indirect purchaser states could anticipate a greater recovery than claimants from other states; all claimants sought damages through consumer protection statutes, some of which also provide for punitive or treble damages." *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231 (D. Del. 2002), aff'd, 391 F.3d 516 (3d Cir. 2004).

Second, the scope of the release is less for Consumers residing in non-settling states. Settling defendants pay for releases. The release of claims provided for Consumers residing in non-settling states is less than for Consumers residing in the settling States, as *parens patriae* and other state claims are not being released for Consumers in non-settling states to the same extent that they are by the States' Consumers. An important part of a global settlement is "that Defendants achieve 'total peace.'" *In re Remeron End-Payor Antitrust Litig.,* No. CIV. 02-2007 FSH, 2005 WL 2230314 (D.N.J. Sept. 13, 2005) (quoting *In re Chicken Antitrust Litig.,* 669 F.2d 228, 238 (5th Cir.1982). It is reasonable and fair that the States' Consumers be compensated differently because of total peace provided to Defendants from the States.

Third, the States are carrying the labor and cost of the claims process and distribution to Consumers, from which the EPP proposed consumer class benefits. Therefore, it is fair and

---

[23] Since the U.S. Supreme Court's decision in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746-47 (1977)), holding that "indirect" purchasers do not have antitrust standing to sue for damages under federal antitrust law, most states have enacted so-called *Illinois Brick* repealer statutes, or developed case law, that expressly allow downstream purchasers to bring claims under the respective state antitrust laws.

reasonable that the States be entitled to compensate Consumers residing within the States differently than Consumers residing in other states that have not participated in or contributed to the States' Actions.

"As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *In re PaineWebber Ltd. Partnership Litig.,* 171 F.R.D. at 133. The States' proposed plan of consumer allocation and distribution has a reasonable and rational basis and is recommended by fifty state attorneys general, making it both fair and adequate under the circumstances of the States' Action. *See In re GSE Bonds,* 414 F. Supp.3d at 694.

The Settlement provides a significant recovery that can reimburse a large number of Consumers for a share of their damages. The proposed framework for allocation and distribution is calculated to bring relief to as many Consumers as possible by employing a method that will equitably distribute the benefits to affected Consumers. The proposed framework was noticed to Consumers in the Long Form Notice, allowing Consumers to object to or comment on the proposed framework, as well as an opportunity to opt out of the Settlement. States Decl. ¶ 22; Exhibit H. No comments or objections were received. Decl. Janowicz ¶ 27. The States maintain the proposed framework for a distribution plan is fair and reasonable under the circumstances and, therefore, asks the Court to grant final approval the proposed framework for a distribution and allocation plan.[24]

### 4. Final Distribution Plan is Deferred to a Future Date.

According to the terms of the Settlement, any distribution to Consumers will be made pursuant to a future Court-approved distribution plan, after this Settlement Final Court Approval,

---

[24] EPPs will request that the MDL court find that this proposed framework is fair, reasonable and adequate.

and at a time to be determined by the States. *Settlement ¶ XI.B.* Approval of a settlement does not depend on approval of a distribution plan. *See e.g. In re Chicken Antitrust Litigation,* 560 F.Supp. 957, 959 (N.D.Ga.1980), *aff'd,* 669 F.2d 228 (5th Cir.1982); *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871 (1971). The States ask that a complete distribution plan, and any deadlines related thereto, be deferred and presented to the Court for approval at a future date when there is enough consumer funds accumulated to make a distribution practicable and sensible. States Decl. ¶ 23. At an appropriate time, the States will file a motion for approval of an allocation and distribution plan for the Court's approval, building on the proposed framework, if approved.

## VII. CONCLUSION

For the foregoing reasons, the States respectfully request that the Court grant final approval of the Settlement, including a 70/30 percentage split and allocation of the State Settlement Amount between restitution and cost escrow, a 45.08/24.94 percentage split and allocation of the State Settlement Amount between Consumers and State Entities who are State Releasors, grant final approval of the proposed framework for a plan of distribution and allocation to Consumers, and defer the approval of a final distribution plan until a later date and upon a motion made by the States indicating that a distribution to consumers is appropriate and efficient.

Respectfully submitted this 5th day of August, 2025.

STATE OF NEW YORK
LETITIA JAMES
Attorney General

/s/ *Saami Zain*
Saami Zain (phv208329)
Robert L. Hubbard
Federal Bar No. Ct.30195
Assistant Attorneys General
28 Liberty Street
New York, NY 10005
Tel: (212) 416-6360
Fax: (212) 416-6015
Saami.Zain@ag.ny.gov
Robert.Hubbard@ag.ny.gov

*Attorneys for the State of New York*

STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

/s/ *Allison C. Frisbee*[25]
Allison C. Frisbee
Federal Bar No. Ct30779
Kyle J. Ainsworth
Federal Bar No. Ct31785
Cara L. Moody
Federal Bar No. Ct31924
Assistant Attorneys General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5030
Fax: (860) 808-5391
Allison.Frisbee@ct.gov
Kyle.Ainsworth@ct.gov
Cara.Moody@ct.gov
*Attorneys for the State of Connecticut*

STATE OF NORTH DAKOTA
Drew H. Wrigley
Attorney General

/s/ *Elin S. Alm*
Elin S. Alm
Bar number phv207896
Assistant Attorney General
Director, Consumer Protection & Antitrust
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Tel: (701) 328-5570
Fax: (701) 328-5568
ealm@nd.gov

*Attorney for the State of North Dakota*

---

[25] Counsel for Plaintiff State of Connecticut represents the consent of all Plaintiffs in the above captioned case pursuant to Section XI.D. of the Electronic Filing Policies and Procedures.