**THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STATE OF CONNECTICUT, et al., | No. 3:16-cv-02056-MPS |
| *Plaintiffs,* | |
| v. | |
| AUROBINDO PHARMA USA, INC., et al., | |
| *Defendants.* | |
| ──────────────────────────── | |
| STATE OF CONNECTICUT, et al., | |
| *Plaintiffs*, | No. 3:19-cv-00710-MPS |
| v. | |
| TEVA PHARMACEUTICALS USA, INC. et al., | |
| *Defendants*. | |
| ──────────────────────────── | |
| STATE OF CONNECTICUT, et al., | |
| *Plaintiffs*, | No. 3:20-cv-00802-MPS |
| v. | |
| SANDOZ, INC., et al., | |
| *Defendants*. | |
| | May 20, 2026 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STATES' MOTION FOR
FINAL APPROVAL OF SETTLEMENTS WITH BAUSCH AND LANNETT AND FOR
ALLOCATION OF SETTLEMENT FUNDS**

i

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................... 1

II.    PROCEDURAL BACKGROUND ............................................................................. 5

III.   SETTLEMENT TERMS ........................................................................................... 5

   A.  Injunctive Relief ................................................................................................ 6

     1.    Bausch Settlement ................................................................................ 6

     2.    Lannett Settlement ............................................................................... 7

   B.  Monetary Relief ................................................................................................ 7

     1.    Bausch Settlement ................................................................................ 7

     2.    Lannett Settlement ............................................................................... 8

   C.  Cooperation ....................................................................................................... 9

     1.    Bausch Settlement ................................................................................ 9

     2.    Lannett Settlement ............................................................................. 10

   D.  Release and Covenant Not to Sue .................................................................. 10

     1.    Bausch Settlement .............................................................................. 10

     2.    Lannett Settlement ............................................................................. 11

   E.  Preliminary and Final Court Approval ........................................................... 11

   F.  Exclusions ....................................................................................................... 12

   G.  Supplemental Agreements .............................................................................. 13

IV.   THE STATES' AUTHORITY ................................................................................ 13

V.    ARGUMENT ......................................................................................................... 17

   A.  Standard for Final Approval of *Parens Patriae* Settlements ............................ 17

   B.  The Settlements Meet the Standard for Final Approval ................................... 17

     1.    Procedural Analysis Factors Support Final Approval. ....................... 18

       i.    The States Have Adequately – and Zealously – Represented Consumers ................. 18

      ii.   The Settlements Were Negotiated at Arm's Length by Experienced Counsel ........... 18

      iii.  The States Have Obtained a Sufficient Understanding of the Case .......................... 20

     2.    Substantive Analysis Factors Support Final Approval. ...................... 21

       i.    The Settlements Provide Adequate Relief. ................................................................. 21

      ii.   The Cooperation from Settling Defendants Adds Value to the Settlements. ............. 23

iii.   The Settlements are Reasonable Considering the Costs, Risks, and Delay of Trial and Appeal. ........................................................................................ 24

iv.   The Monetary Payment to the States is Fair and Reasonable, and the Settlements Do Not Contain Any Additional Agreement that Affects the Fairness of the Settlements. ...................................................................................................... 26

v.   An Allocation and Distribution Plan is not Currently before the Court. .................... 27

C.   The Notice Plan was Successfully Implemented. ............................................................ 27

   1.   Website, E-mail and Toll-Free Telephone ................................................................. 29

   2.   Earned Media and Direct Notice ................................................................................ 29

   3.   Corporate Entities Notice ........................................................................................... 31

D.   Consumers' Reaction to the Settlements Supports Final Approval ................................ 32

   1.   Objection Filed by Consumer Joseph Varga ............................................................. 32

   2.   Few Objections and Exclusions Support Final Approval .......................................... 33

VI.   THE PLAN OF ALLOCATION AND DISTRIBUTION ................................................... 34

A.   Allocation of Settlement Proceeds between the Restitution Accounts and Cost Accounts and Distribution of the Cost Accounts .......................................................... 35

B.   Allocation of Restitution Accounts Between Consumers and State Entities .................... 35

   1.   Heritage Settlement ................................................................................................... 36

   2.   Bausch Settlement ..................................................................................................... 36

   3.   Lannett Settlement ..................................................................................................... 37

C.   Allocation and Distribution of Consumer Restitution ...................................................... 37

D.   Allocation and Distribution to Corporate Entities ........................................................... 39

VII.   CONCLUSION ................................................................................................................... 39

# I.  INTRODUCTION

On February 25, 2026, the Court issued an Order granting preliminary approval of Plaintiff States'[1] (the "States") settlement agreements ("Settlements") with Defendants Bausch Health US, LLC and Bausch Health Americas, Inc. ("Bausch") and Defendant Lannett Company, Inc. ("Lannett"). ECF No. 957 (3:16-cv-02056-MPS), ECF No. 916 (3:19-cv-00710-MPS), and ECF No. 1364 (3:20-cv-00802-MPS). That Order ("Preliminary Approval Order"): (1) preliminarily approved the Settlements on the terms set forth in the Settlements,[2] including the proposed allocation of 70% of the Settlement Funds to restitution to Consumers[3] and State Entities ("Restitution Account"), the proposed allocation of 30% of the Settlement Funds to cover the States' settlement notice and administration costs and litigation costs ("Cost Account"), allocation of Settlement Funds to Corporate Entities, and the proposed allocation of the 70% Restitution Accounts in Heritage, Bausch, and Lannett, between Consumers and State Entities; (2) appointed an Escrow Agent; (3) approved a Notice and Claims Administrator; (4) deferred a final distribution plan; and (5) approved the Notice Plan.  The Preliminary Approval Order set a May 6, 2026, deadline for Consumers and Corporate Entities in Idaho to comment on, object to, or opt out of the Settlements, and set a final approval hearing for 10:00 AM on May 27, 2026.  *Id*.

In accordance with the Preliminary Approval Order, the States have carried out the Notice Plan authorized by the Court including disseminating notice via direct notice to consumers who

---

[1] Plaintiff States means Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, U.S. Virgin Islands, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. Plaintiff States include all Plaintiffs in the three related State actions, who are releasing their claims against Bausch and Lannett that they could have brought in any of the States' Actions.

[2] Unless otherwise noted, the capitalized terms used in this Memorandum of Law have the same meanings as defined in the Settlements, filed as exhibits to the States' declaration. *See infra*.

[3] Unless otherwise noted, the capitalized terms used in this Memorandum of Law have the same meanings as defined in the Settlement Agreements, filed as an exhibit to the States' declaration. *See infra*.

1

registered to receive notice, through earned media, including by nationwide press release, and by causing notice to be published on a dedicated website: www.AGGenericDrugs.com. *See* Declaration of Tiffaney Janowicz In Support of Plaintiffs' Motion for Final Approval of Settlements With Bausch and Lannett on Implementation of the Notice Plan and Administration ("Janowicz Decl.") ¶¶ 8-17 (filed jointly and in support of this motion).

As set forth above, the deadline to comment on, object to, or opt out of the Settlements was May 6, 2026. One objection was received and eleven (11) requests for exclusion were made. Janowicz Decl. ¶¶ 19-20, Exhibit F.; See ECF No. 969 (3:16-cv-02056-MPS), ECF No. 928 (3:19-cv-00710-MPS), and ECF No. 1389 (3:20-cv-00802-MPS).

The States' Settlements with Bausch and Lannett resolve and release all the States' claims against the Settling Defendants based on conduct alleged in *Connecticut et al. v. Aurobindo Pharma USA, Inc.*, *et al.*, 3:16-cv-02056, *Connecticut et al. v. Teva Pharmaceuticals USA, Inc.*, *et al.,* 3:19-cv-00710, and *Connecticut et al. v. Sandoz, Inc.*, *et al.,* 3:20-cv-00802 (collectively referred to as the "States' Actions")[4]. *See* Exhibits 1-2. The Settlements have not been amended or changed in any way since the States sought preliminary approval.

The Settlements were reached after extended, arm's length negotiations between experienced counsel for the States and for Bausch and Lannett. The Settlements resolve the States' claims against Bausch and Lannett for their alleged participation in an unlawful conspiracy to fix prices and allocate markets for generic pharmaceuticals. *See* Exhibits 1 and 2 to States' Declaration in Support of the States' Motion for Final Approval of Settlement with Bausch and Lannett and for Allocation of Settlement Funds ("States' Decl.")(filed jointly and in support of this motion). The Settlements resolve and release all the States' claims against Bausch and Lannett

---

[4] Capitalized terms are defined terms in the Settlements and are used here with the same meaning.

for conduct alleged in the States' Actions, in exchange for Bausch's payment of $4,080,000 and Lannett's payment of $13,770,000 (the "Settlement Payments") and injunctive relief. An amount of $350,000 shall be allocated to restitution to Eligible Corporate Entities (in Idaho and Washington) and 70% of the remaining Settlement Payments (equaling $12,600,000) shall constitute restitution to Consumers and State Entities. Pending an allocation plan approved by the Court, the Settlement Funds allocated to restitution shall be held in escrow until they can be distributed to Consumers,[5] State Entities that are State Releasors, and Eligible Corporate Entities, to compensate them for any alleged harm resulting from the alleged Conduct. The remaining $5,250,000 (30%) shall be held in an escrow account (Cost Account) for use in paying for the expenses of notice and claim administration, and upon final approval of the Settlements, for costs of litigating the States' claims both collectively and individually, including attorney fees incurred by the States.[6]

As a matter of law[7] and policy, the States seek the Court's final approval of the Settlements, as they resolve the States' claims against Settling Defendants in the States' Actions. A minority of state laws obligate the attorney general to provide Consumers with notice of settlements, including an opportunity to opt out of and object to or comment on the Settlements. Only a few state laws require court approval of a settlement of consumer claims after a notice plan is implemented. Nonetheless, all States seek the Court's final approval of the Settlements. As chief legal officers, the attorneys general of the States enforce both state and federal antitrust

---

[5] "Consumers" means Eligible Consumers as defined in the Lannett Settlement and Consumers as defined in the Bausch Settlement.

[6] To the extent that monies in this Cost Account are not used to offset costs of States litigating in the States' Actions, any remaining funds may be used for any other use permitted by state law. *Lannett Settlement* ¶ I.B.; *Bausch Settlement* ¶ I.V.3.

[7] *See, e.g., Shepherd Park Citizens Ass'n v. Gen. Cinema Beverages of Washington, D.C.,* 584 A.2d 20 (D.C. 1990); D.C. Code § 28-4507); Idaho Code § 48-108(3); Nev. Rev. Stat. 598.0975(3)(b); ORS 646.775(2), (3), (4), and (5). For citations of the authority pursuant to which each State is acting, see footnote 12 *infra*.

and consumer protection law. Additionally, they represent their states in their sovereign, proprietary, and *parens patriae* capacities.  The States' Actions are enforcement actions brought to advance the public interest and address anticompetitive activity in the generic drug industry that has led to higher prices for Consumers, State Entities, and Corporate Entities.[8]  The States are gathering settlement proceeds for later distributions to Consumers and State Entities, on whose behalf the States assert claims, and are exercising authority to settle and release claims under their *parens patriae* and other state law authority. States' Decl. ¶ 11.

The States are seeking final approval of the division and allocation of payments received under the terms of the Settlements (the "Settlement Funds"), allocating 30% to costs and fees (Cost Account) and 70% to Consumers and State Entities (Restitution Account). Further, the States seek final approval to distribute and use the balance of the Cost Account, after financing the administration of the Settlements and potential future settlements, to fund continued litigation against the remaining defendants for such purposes as are set forth in ¶ I.B of the Lannett Settlement and ¶ I.V.3 of the Bausch Settlement, including attorney fees.  This Court has previously approved a 70/30 allocation of Settlement Funds between restitution and costs.  *See* ECF No. 875 (3:16-cv-02056-MPS), No. 760 (3:19-cv-00710-MPS), and No. 835 (3:20-cv-00802-MPS).

Additionally, the States are seeking approval of a division and allocation of the funds allocated to the Restitution Account from the Heritage,[9] Bausch, and Lannett settlements between

---

[8] "Corporate Entities" are defined as corporate (and other business) entities for whom an Attorney General has asserted a claim in the MDL (or any court to which the States' Actions have been or may be remanded), whether pursuant to the Attorneys General's *parens patriae* authority or otherwise, as well as corporate (and other business) entities for which the EPPs are asserting claims (i.e., all corporate and other business entities that are potential members of the EPP Settlement Class).

[9] The Heritage Settlement was approved by the Court on April 1, 2025, ECF No. 767 (3:16-cv-02056-MPS), No. 635 (3:19-cv-00710-MPS), and No. 602 (3:20-cv-00802-MPS). However, the Court's final approval of the Heritage

4

Consumers and State Entities (including Medicaid agencies and non-Medicaid state agencies), and a distribution of the State Entities' share to the States to be divided among the States at their discretion (upon the Court's approval of a final allocation and distribution plan). This Court has previously approved splitting the Restitution Account so that approximate 45% of Settlement Funds are allocated to consumer restitution and 25% of the Settlement Funds are allocated to restitution for State Entities. *Id.*

The States are currently developing a final allocation and distribution plan that reflects and builds on the framework for allocation approved by the Court as part of the final approval of the Apotex Settlement. *See* IV *infra*. The States anticipate submitting their plan for allocation and distribution plan, including a Consumer claims process, for the Court's approval soon.

## II.  PROCEDURAL BACKGROUND

The States' Actions allege that the defendant drug manufacturers conspired to fix prices and allocate markets for many generic drugs in violation of federal antitrust laws and state antitrust and consumer protection laws. *See supra*. In each of the actions, the States also allege an overarching conspiracy that encompasses the drug conspiracies and anticompetitive acts in that action. Even if the States did not bring claims against all Settling Defendants in all three of the States' Actions, the Settlements, if approved, will resolve and release all claims that the States brought or could have brought against Settling Defendants in all three States' Actions.

## III.SETTLEMENT TERMS

The Settlements provide different categories of terms and relief, including (A) Injunctive Relief, (B) Monetary Payment, (C) Cooperation, (D) Release and Covenant Not to Sue, (E) Court

---

Settlement deferred approval of an allocation plan for the Restitution Account, including restitution to State Entities, until a later date and upon a motion made by the States.

Approval, (F) Exclusions, and (G) Supplemental Agreements. *See* Exhibits 1-2.

### A. Injunctive Relief

1. <u>Bausch Settlement</u>

As part of the Bausch Settlement, Bausch covenants that it shall not, for four years from the execution of the agreement, engage in any unlawful price-fixing, bid-rigging, or market allocation as to any Generic Pharmaceutical Product in violation of Section 1 of the Sherman Act. *Bausch Settlement* ¶ VI.A. Bausch will implement and shall continue to maintain for a period of four years, a written "Antitrust Compliance Policy," on which all current Bausch employees responsible for the pricing, sale, bidding, or marketing of generic pharmaceuticals in the United States, including those in a management or employee capacity, will be trained. *Id.* at ¶ VI.B. Each such Bausch employee will also be required to sign an acknowledgment form stating that they have read, and will abide by, the Antitrust Compliance Policy. *Id*. Also, for a period of four years, Bausch will conduct annual antitrust training for all its employees responsible, in a managerial or employee capacity, for the pricing, sale, bidding, or marketing of generic pharmaceuticals in the United States. *Id*. Said training will be conducted by an attorney with experience in antitrust law and with a record kept at each annual training session, including participation, to ensure that all such employees receive such training. *Id*. Bausch will appoint its General Counsel and/or Chief Compliance Officer (or equivalent thereof) to oversee such training and serve as an additional contact, in coordination with Bausch's established corporate policies, for employees to report any conduct that may violate the antitrust laws. *Id*. Bausch shall notify the States within one year following final court approval that Bausch has complied with the provisions of Paragraph VI.B. *Id*. If Bausch breaches Paragraph VI.B, it shall have 21 days to cure such breach, and if it fails to do so, then Bausch's obligations in Paragraph VI.B shall be extended by one additional year. *Id*.

6

### 2. Lannett Settlement

Lannett has agreed to abide by certain injunctive terms during a 10-year period from the execution of the Lannett settlement agreement (the "Enforcement Period"). *Lannett Settlement* ¶ I.G. Lannett covenants that it, along with its current directors, officers, and employees shall not, directly or indirectly, maintain, solicit, suggest, advocate, discuss, or carry out any unlawful agreement with any actual or potential competitor in the generic pharmaceutical industry to: (a) fix prices for generic pharmaceuticals; (b) submit courtesy, cover, or otherwise non-competitive, bids or proposals for the supply, distribution, or sale of generic pharmaceuticals; (c) refrain from bidding on, or submitting proposals for, the supply, distribution, or sale of generic pharmaceuticals; or (d) allocate customers for the sale of generic pharmaceuticals for the Enforcement Period. *Id. at* ¶ X.A. Lannett represents it has implemented, and shall continue to maintain during the Enforcement Period, a written "Antitrust Compliance Manual," on which all current Lannett employees have been trained, including its employees engaged in activities relating to the pricing or sale of generic pharmaceuticals. *Id. at* ¶ X.C. During the Enforcement Period, Lannett (1) will conduct periodic antitrust training sessions for its employees at least once per year, and (2) appoint and maintain a Chief Compliance Officer, who serves to enforce Lannett's Antitrust Compliance Manual and monitor Lannett's employees to ensure that there are no further violations of the antitrust laws. *Id. at* ¶ X.D. Lannett will provide an annual report to the States as to its compliance program. *Id. at* ¶ X.E.

### B. Monetary Relief

### 1. Bausch Settlement

Bausch will pay a total sum of $4,080,000 to the States (the "Bausch Settlement Payment").

*Bausch Settlement* ¶ I.V. An amount of $2,880,000 of the Bausch Settlement Payment shall constitute restitution to Consumers and State Entities that are State Releasors to compensate them for any alleged harm resulting from the conduct alleged in the States' Actions, of which $80,000 shall be considered restitution for Corporate Entities for which the Attorneys General of Idaho and Washington have asserted exclusive claims[10] in the States' Actions. *Id. at* ¶ II.A. The Bausch Settlement allocates the remaining $1,200,000 to the States to be placed in escrow and used to pay the expenses for notice and settlement administration and, upon final approval, to pay for the costs of litigating the States' claims both collectively or individually. *Id. at* ¶ I.V (3), II, IX.

2. Lannett Settlement

Lannett shall pay to the States $13,500,000, plus $270,000 for Eligible Corporate Entities, for a total of $13,770,000 (the "Lannett Settlement Payment"). *Lannett Settlement* ¶ III. The Lannett Settlement Payment shall be paid in equal annual installments over a period of six (6) years (each, an "Annual Payment"). *Id. at* ¶ III.A. The first Annual Payment shall be due thirty (30) days after entry of the Preliminary Approval Order, and each subsequent Annual Payment shall be due on the later of (i) the anniversary of the first payment date or (ii) the anniversary of the date of the Final Approval Order. *Id.* The Annual Payments and the Interest Payments shall be deposited into escrow. *Id. at* ¶ III.B. Seventy percent of the $13,500,000 and 100% of the $270,000 for Eligible Corporate Entities shall be deposited into a Restitution Account (for Eligible Consumers, Eligible Corporate Entities, Medicaid state agencies, and non-Medicaid state agencies), and the remainder shall be deposited into a Cost Account. *Id.* The Restitution Account shall be held in escrow and will only be distributed according to a distribution plan submitted to

---

[10] Under the state laws of Idaho and Washington, only the attorney general can bring antitrust claims for monetary relief on behalf of Corporate Entities that are injured indirectly; thus, such claims are not included in any class action pending in the MDL in Pennsylvania, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).

and approved by the District Court. *Id. at* ¶ III.D.  Upon final Court approval, the funds in the Costs Account may be distributed to the States to pay Settlement Administration Costs and the past and future costs of litigating the States' claims, including attorney fees. *Id.*  In addition to the principal amount, Lannett shall pay interest on the outstanding balance at an annual rate of 8%. *Id.* at ¶ III.C.  "Interest" shall be the amount calculated by multiplying the remaining unpaid balance by 0.08 at the time of each year's Annual Payment *Id.* The Interest so calculated shall be added to the Annual Payment each year. *Id.*

Both Settlements further provide that, to the extent that monies allocated to the Cost Account are not used to offset costs of litigating in the States' Actions, any remaining funds may be used for any of the following: (1) deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account) for use in accordance with the laws governing the account; (2) deposit into a fund exclusively dedicated to assisting any state to defray the costs of experts, economists, and consultants in multistate antitrust investigations and litigations, including healthcare related investigations and litigation; (3) antitrust or consumer protection enforcement, including healthcare-related enforcement, by an individual State or multiple States; or (4) for any other use permitted by state law at the sole discretion of that State's Attorney General. *Bausch Settlement* ¶ I.V (3); *Lannett Settlement* ¶ III.D.

### C. Cooperation

#### 1. Bausch Settlement

Bausch agrees to provide: (a) reasonable efforts to assist the States to understand data produced by Bausch, including consulting with technical personnel to address questions posed by the States' respective data consultants, and to provide any additional information or data reasonably necessary to understand or clarify the data produced by Bausch or otherwise render it

admissible, and to provide additional data as may be reasonably necessary; and (b) reasonable efforts to provide information necessary to authenticate and admit up to 75 documents produced by Bausch, by affidavit, if permitted by the court or, if required by the court, by witness testimony. *Bausch Settlement* ¶ VII.D. Bausch and the States will in good faith consider reasonable requests from each other for additional assistance that does not impose an undue burden. *Id.* at ¶ VII.E.

### 2. Lannett Settlement

Lannett agrees to provide reasonable cooperation to the States in connection with the prosecution of the States' Actions against other defendants. *Lannett Settlement* ¶ VII. Reasonable cooperation includes (A) reasonable efforts to assist the States to understand data produced by Lannett; (B) reasonable efforts to authenticate and lay the foundation to admit documents for use in the Action; (C) identification of persons who are or were working for Lannett who are likely to have relevant information; (D) attorney proffers on Lannett, and current and former employees' knowledge and roles in the conduct alleged in the Action; (E) reasonable efforts to provide access to persons identified in (C) and (G) for interviews; (F) production of witnesses identified in (C) and (G) for testimony at trial; (G) identification of persons who are likely to have relevant information concerning Lannett's pricing information contained in other defendants' documents, and the accuracy of this information, for drugs named in the States' Actions; and (H) identification of price increases implemented during the relevant time period for each drug named in the States' Actions, as to which States allege Lannett entered into a product-specific conspiracy. *Id.*

### D. Release and Covenant Not to Sue

#### 1. Bausch Settlement

In consideration of Bausch's obligations under the settlement, the States agreed to release, acquit, and forever discharge the Bausch Releasees from all Released Claims. *Bausch Settlement*

10

¶ V.A. The States also covenant not to bring, file, or otherwise assert any Released Claim, or to cause or assist to be brought, filed, or otherwise asserted any Released Claim, or to otherwise seek to establish liability for any Released Claim against any Bausch Releasee in any forum whatsoever, whether on their own behalf or on behalf of any other natural person or entity, to the fullest extent permitted by law. *Id.* at ¶ V.E.

2. Lannett Settlement

In consideration of Lannett's obligations under the Lannett Settlement, and as permitted by law, the States have agreed to release the Released Parties in the Lannett Settlement from any and all claims that the States brought or could have brought against them (except on behalf of Local Entities) or any other defendant in the States' Actions relating to the drugs specified based on the conduct alleged, including but not limited to antitrust, consumer protection, fraud or false claims act, "overarching conspiracy," unjust enrichment and disgorgement claims through and including the date of the Release. *Lannett Settlement* ¶IV.A. Each State covenants and agrees that it shall not sue or otherwise seek to establish or impose liability on any of the Released Claims. *Id.* at ¶ IV.B. Released Claims do not include claims unrelated to competition. *Id.* at ¶ IV.C. Lannett's sales of drugs specified in the States' Actions shall, to the extent permitted or authorized by law, remain against other defendants as a potential basis for restitution and other monetary claims and shall be asserted as a part of any joint and several liability claims against other defendants in the States' Actions or against other persons other than the Released Parties. *Id.* at ¶ IV.D.

**E.  Preliminary and Final Court Approval**

The Settlements provide that the States shall file a motion for a Preliminary Approval Order, including their proposed notice and notice plan to inform Consumers, Eligible Corporate Entities in the Lannett Settlement and Corporate Entities in the Bausch Settlement (hereinafter

collectively referred to as "Corporate Entities"), and anyone else for whom notice is required, of their right (i) to object to the Settlements or (ii) to file a timely and valid request for exclusion. *Bausch Settlement* ¶ III.A; *Lannett Settlement* ¶ V, I.N. After preliminary approval and the Court's approval of the allocation plans, notice, and notice plan, the States shall implement their Notice Plan. *Bausch Settlement* ¶ III.C; *Lannett Settlement* ¶ V. Costs for the notice will be paid from the State Escrow but shall be limited to $250,000. *Bausch Settlement* ¶ III.D, IX. Following the conclusion of the Notice Period or as directed by the court, the States shall file a Motion for a Final Approval Order. *Bausch Settlement* ¶ III.E; *Lannett Settlement* ¶ V. As part of the proposed court orders to be submitted to the court with the motion for final approval under the Settlements, the States shall dismiss with prejudice all claims against Bausch and Lannett in the States' Actions. *Lannett Settlement* ¶ I.I., II.B.; *Bausch Settlement* ¶ V.G.

### F. Exclusions

Subject to court approval, any Corporate Entity in Idaho[11] or Consumer may seek to be excluded from the Settlements by submitting a valid and timely request for exclusion. *Bausch Settlement* ¶ IV.A; *Lannett Settlement* ¶ I.N. The States, State Entities identified on Appendix A of the Bausch Settlement, and other State Entities that accept a distribution of settlement proceeds from the Attorneys General's settlement of the States' Actions are bound by the Settlements upon execution and have no right to seek exclusion. *Bausch Settlement* ¶ IV.A. Any Corporate Entity in Idaho or Consumer who submits a valid and timely request for exclusion will not be eligible to receive a distribution of any portion of the Settlement Funds and will not have any rights with respect to the Settlements. *Id*. Bausch or the States may dispute an exclusion request, in which case they shall, if possible, seek to resolve the disputed exclusion request by agreement within thirty

---

[11] Although Washington also asserts an exclusive claim on behalf of Corporate Entities in the States' Actions, Washington law does not provide a right to exclusion from a settlement for Corporate Entities.

(30) calendar days of the Opt-Out Deadline. If necessary, Bausch and the States will seek court approval of any such resolutions. If Bausch and the States are unable to resolve any such disputes, they will submit such unresolved disputes to the court for decision. *Bausch Settlement* ¶ IV.E.

### G.  Supplemental Agreements

The Bausch Settlement includes a Supplemental Agreement between Bausch and the Attorneys General of Delaware, Georgia, Idaho, Maryland, Mississippi, New Mexico, and Pennsylvania regarding potential claims for contribution under state law against Bausch by any alleged co-conspirator(s). *See* Exhibit 1. The Lannett Settlement includes a Confession of Judgment and Stipulated Entry of Judgment. *See* Exhibit 2. In the event of a Default, Lannett irrevocably authorizes any attorney to appear in any court of competent jurisdiction and confess judgment against Lannett in favor of the States, or enter the stipulated entry of judgment, for the full remaining amount due under the Lannett Settlement. *Id*.

### IV. THE STATES' AUTHORITY

The Settlements are presented to the Court for final approval by the States in their sovereign and proprietary capacities and in their capacity as *parens patriae* or similar authority under federal and state laws[12] to bring claims and to obtain important redress for harm caused by

---

[12] *E.g.*, Conn. Gen. Stat. § 35-32(c); Alaska Stat. §§ 45.50.580; 45.50.577(b); Ariz. Rev. Stat. §§ 44-1407, 44-1408(A), 44-1528(A); Cal. Bus. & Prof. Code § 16760; Col. Rev. Stat. § 6-4-111: D.C. Code §§ 28-4507, 28–3909; Del. Code Ann. tit. 6, § 2101, *et seq*.; Del. Code Ann. tit. 29, §§ 2520 and 2522; Fla. Stat. § 542.22(22); Ga. Code Ann. § 10-1-397(b)**;** Idaho Code Ann. § 48-108; 740 Ill. Comp. Stat. 10/7(2); Ind. Code § 24-1-2-5; *Bd. of Comm'rs of Howard Cty. v. Kokomo City Plan Comm'n*, 263 Ind. 282, 295 (1975); *Bd. of Comm'rs of Union City v. McGuinness*, 80 N.E.3d 164, 170 (Ind. 2017); Ind. Code § 24-5-0.5-4(c); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972); Iowa Code § 553.12; Kan. Stat. Ann. § 50-103(a)(8); Ky. Rev. Stat. Ann § 15.020, 367.110 through 367.990, and 518.020; *Com. ex. rel. Conway v. Thompson,* 300 S.W.3d 152 (Ky. 2010); *Com. ex rel. Beshear v. ABAC Pest Control Inc.,* 621 S.W.2d 705 (Ky. 1981); *Lund ex rel. Wilbur v. Pratt*, 308 A.2d 554 (Me.1973); Md. Com. Law Code Ann., § 11-209; MGL c. 93A § 4; *State v. Detroit Lumberman's Association*, 1979-2 Trade Cas. (CCH) ¶ 62,990, 1979 WL 18703 (Mich. Cir. Ct. 1979); *Minnesota v. Standard Oil Co.*, 568 F. Supp. 556, 563 (D. Minn. 1983); Miss. Code Ann. §§ 7-5-1; S*tate ex rel. Olsen v. Public Service Comm'n*, 283 P.2d 594 (Mont. 1955); Neb. Rev. Stat. § 84-212; Nev. Rev. Stat. § 598A.160(1) (1999);  Nev. Rev. Stat.  598.0963 (2023); N.H. Rev. Stat. Ann. § 356:4-a; State v. City of Dover, 153 N.H. 181 (N.H. 2006); N.J. Stat. Ann. § 56:9-12.b; N.M. Stat. Ann. § 57-1-3(A), (B) (1979); *New Mexico v. Scott & Fetzer Co.*, 1981-2 Trade Cas. ¶ 64,439, 1981 WL 2167 (D.N.M. 1981); N.Y. Exec. Law § 63(12) and N.Y. Gen.

Settling Defendants' conduct. State attorneys general are politically accountable representatives of their states and have authority under state law to recover (1) for Consumers and Corporate Entities to the extent permitted by state laws; (2) for public purchasers, including state agencies to the extent permitted by state laws; and (3) for the state, in the form of disgorgement, civil penalties, costs, and fees.[13] The States, based on their authority to bring actions and seek relief for violations of federal law and state antitrust and consumer protection laws as to the facts in their complaints,[14] are authorized by state law to enter into the Settlements with Settling Defendants to

Bus. Law §§ 340-342-a; N.C. Gen. Stat. §§ 75-15, 75-16; *Hyde v. Abbott Labs, Inc.*, 473 S.E.2d 680 (N.C. Ct. App. 1996); *FTC v. Mylan Labs*, 99 F. Supp. 2d 1 (D.D.C. 1999); N. D. Cent. Code §§ 51-08.1-07, -08(2); N. D. Cent. Code § 51-15-07; 4 CMC §§ 5107, 5121(b), 5206(b); Ohio Rev. Code § 109.81; *Ohio v. United Transp. Inc.,* 506 F. Supp. 1278, 1280-81 (S.D. Ohio 1981); 79 O.S. § 205 (A)(1); Or. Rev. Stat. § 646.775(1); 71 Pa. Stat. Ann. § 732-204(c); P.R. Laws Ann. tit. 32, §§ 3341–3344; R.I. Gen. Laws § 6-36-12; S.C. Code Ann. § 39-5-50(b); *State ex rel. Condon v. Hodges*, 349 S.C. 232, 562 S.E. 2d 623 (2002); S.D. Codified Laws § 37-1-23; *State v. Heath*, 806 S.W.2d 535, 537 (Tenn. Ct. App. 1990); Tenn. Code Ann. § 8-6-109; *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812 (6th Cir. 2004); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002); *Connecticut v. Mylan Labs, Inc.*, No. 1:98cv2114, 2001 WL 765466 (D.D.C. Apr. 27, 2001); *Government of Virgin Islands by and through Encarnacion v. Health Quest, LLC,* 2023 WL 7214673, at *4 (Superior Ct. V.I. Oct. 31, 2023) (*citing Mathes v. Century Alumina Co*., 2008 U.S. Dist. LEXIS 90087, at *29 (D.V.I. 2008)); Utah Code Ann. §§ 76-10-3106(3), 76-10-3108(1), 13-11-17; *Utah Division of Consumer Protection v. Stevens,* 398 F.Supp.3d 1139, 1150 (D. Utah Aug. 19, 2019); Vermont Stat. Ann. 9 V.S.A. § 2458; Va. Code Ann. §§ 59.1-9.15; Rev. Code Wash. § 19.86.080; *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011); W. Va. Code § 47-18-17; Wis. Stat. Ann. §§ 133.16 – 133.17(1); Wy. Stat. §§ 40–12–105, 40–12–106, 40–12–107, 40-12-112 and 40-12-113; *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592 (1982).

[13] *See* footnote 14, *infra.*

[14] *E.g.,* Conn. Gen. Stat. §§ 35-34, 35-38, 42-110o, and 42-110m; Alaska Stat. §§ 45.50.576-.578, 45.50.501, .531, and .537; Arizona State Uniform Antitrust Act, Ariz. Rev. Stat. §§ 44-1407, 44-1408, 44-1528, and 44-1531; Cal. Bus. & Prof. Code §§ 16750, et seq., 17200, et seq., 17500, et seq., 17206, 17536, 17206.1, 16750, 16754, and 16754.5; Cal. Civil Code § 3345; Colo. Rev. Stat. § 6-4-101, et seq.; D.C. Code §§ 28-4507 and 28-4509; Del. Code Ann. tit. 6 § 2101, et seq.; Del. Code Ann. tit. 29, §§ 2520 and 2522; Fla. Stat. §§ 501.201, et seq, and 501.204; Idaho Code §§ 48-104, 48-108, and 48-112; 740 ILCS 10/1 et seq.; 10/7(1), 7(2), and 7(4); Ind. Code. §§ 24-1-2-5, 24-1-1-2, and § 24-5-0.5-4; Iowa Code §§ 553.12, 553.13, 714.16; Kan. Stat. Ann. §§ 50-103, 50-108, 50-160, 50-161, and 50-162; Ky. Rev. Stat. Ann. 367.110 et seq.; 10 M.R.S. § 1104, 5 M.R.S. § 209; Md. Com. Law Code Ann. § 11-209; MGL c. 93A, § 4; Mich. Comp. Laws § 445.771, et seq. and § 445.901 et. seq.; Minn. Stat. §§ 325D.43, 325D.45, 325D.49, 325D.56, 325D.57, 325D.58, and 325D.66; Minn. Stat. Ch. 8; Miss. Code Ann. §§ 75-24-1, et seq., and 75-21-1 et seq.; Mont. Code Ann. §30-14-111(4), §30-14-131, §30-14-142(2), and § 30-14-222; Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1614, and 84-212; Nev. Rev. Stat. §§ 598.0963, 598.0973, 598.0999, 598A.160, 598A.170, 598A.200 and 598A.250; N.H. RSA 356:4 et seq.; N.H. RSA 358-A:1 et seq.; N.J.S.A. 56:9-1 et seq.; N.J.S.A. 56:8-1 et seq.; N.M. Stat. Ann. §§ 57-1-3, -7, -8; N.M. Stat. Ann. § 57-12-8, -10, -11; N.Y. Gen. Bus. Law §§ 340-342c; N.Y. Executive Law § 63(12); N.C. Gen. Stat. § 75-1 et seq.; N.D.C.C. §§ 51-08.1-01 et seq. and 51-15-01 et seq.; 4 CMC §§ 5101 et. seq.; 4 CMC §§ 5201 et. seq.; Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq.; 79 O.S. § 201 et seq.; 79 O.S. § 205; ORS 646.760, ORS 646.770, ORS 646.775, and ORS 646.780; 73 P.S. §§ 201-4, 201-4.1, and 201-8 (b); 10 P.R. Laws Ann. §§ 257 et seq.; 32 P.R. Laws Ann. § 3341; R.I. Gen. L. §§ 6-36-1, et. seq.; South Carolina Code of Laws §§ 39-5-50, 39-5-110, 39-5-140, and 1-7-85; S.D. Codified Laws Chapters 37-1 and 37-24; Tenn. Code Ann. §§ 47-25-101 et seq.; 11 V.I.C. § 1507; 12A V.I.C. § 328; Utah Code §§

14

obtain injunctive relief and to recover for the States' Consumers, State Entities, and Corporate Entities, on whose behalf they assert claims.

A. **The States' *Parens Patriae* Authority to Represent Consumers in their States.**

The States bring claims for monetary relief for Consumers pursuant to state antitrust and consumer protection laws, which build on the common law doctrine of *parens patriae*. States have long-standing authority to bring *parens patriae* actions. The term *parens patriae* means "parent of the country." *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 600, n.8 (1982) (quoting BLACK'S LAW DICTIONARY 1003 (5th ed. 1979)). The doctrine originated under the English common law, which recognized the King as the guardian of "'all charitable uses in the kingdom.'" *Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 257 (1972) (quoting 3 William Blackstone, Commentaries, 47-48 (1794)). In *Hawaii v. Standard Oil Co*., the court affirmed "the right of a State to sue as parens patriae to prevent or repair harm to its 'quasi-sovereign' interests." 405 U.S. at 258. The *parens patriae* doctrine has evolved to encompass a wide range of actions to protect the health and safety of a state's citizens. *See, e.g., Georgia v. Tennessee Copper Co.,* 206 U.S. 230 (1907) (interstate air pollution); *Kansas v. Colorado,* 185 U.S. 125 (1902) (water diversion); *Louisiana v. Texas,* 176 U.S. 1 (1899) (communicable disease).

State authority to bring a *parens patriae* action for federal antitrust law violations was first recognized by the U.S. Supreme Court in *Georgia v. Pennsylvania Railroad Co.,* 324 U.S. 439 (1945). Since *Georgia,* federal courts have routinely recognized the right of state attorneys general to bring *parens patriae* actions to redress consumer deception and antitrust violations.[15]

---

76-10-3101 through 76-10-3118; 9 V.S.A. §§ 2458, 2461 and 2465; Virginia Code Section 59.1-9.15; Wash Rev. Code 19.86.080 and 19.86.140; West Virginia Code § 47–18–1 et seq.; Wis. Stat. §§ 133.03, 133.14, 133.16, 133.17, and 133.18; Wyoming Statutes § 40-12-101 et seq.

[15] *See e.g. In re Electronic Book Antitrust Litig.,* 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014) (conspiracy to raise eBook prices); *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995), *aff'd,* 96 F.3d 44 (2d Cir. 1996) (conspiracy to fix, raise, maintain, or stabilize retail prices of shoes); *In re Mid-Atl. Toyota Antitrust Litig.*, 541 F.

The States have, and have used, *parens patriae* authority to recover monetary damages for consumers for antitrust violations. *E.g.,* 15 U.S.C. § 15c; *In re Electronic Book Antitrust Litig.,* 14 F. Supp. 3d 525, 531 (S.D.N.Y. 2014). States have built on federal *parens patriae* authority with state law, including the provisions exercised here. Those state laws are sometimes constitutional, statutory, including both competition-specific statutes and general statutes that apply to competition issues, common law, and case law.[16] States are enforcing those laws here to fill gaps in federal law and otherwise strive to further the public interest.

### B.  Fundamental Differences Between *Parens Patriae* Claims and Rule 23 Claims

*Parens patriae* claims differ from Rule 23 class action claims substantively and procedurally, and *parens patriae* actions are not directly governed by Rule 23 of the Federal Rules of Civil Procedure. *Purdue Pharma L.P. v. Kentucky,* 704 F.3d 208, 217 (2nd Cir. 2013).  While *parens patriae* authority derives from the states' interest as sovereigns, *Georgia*, 324 U.S. at 449, class action representation is developed to more efficiently and effectively manage private litigation asserting claims for many businesses or consumers. *See American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974).  Because of its sovereign nature and political accountability, *parens patriae* authority is exercised as soon as a state attorney general files an action.  In contrast, representation by class counsel under Rule 23 requires court appointment and class certification, even in the settlement context.  Fed. R. Civ. P. 23.  Additionally, a class action requires the ascertainability of class members.  Fed. R. Civ. P 23(b)(3).

---

Supp. 62 (D. Md. 1981) (alleged conspiracy to fix artificially high price for "polyglycoat" finish applied to certain automobiles); *California v. Infineon Technologies AG,* 531 F.Supp.2d 1124 (N.D. Cal 2007) (alleged horizontal price-fixing conspiracy in market for dynamic random access memory (DRAM)).
[16] *See* footnotes 12 and 14, *supra.*

## V.    ARGUMENT

Final approval of the Settlements is warranted and appropriate based on the substantive terms of the Settlements and the process by which the Settlements were negotiated.

### A.  Standard for Final Approval of *Parens Patriae* Settlements

A *parens patriae* settlement will be approved if it is fair, reasonable, and adequate. *State of N.Y. by Vacco v. Rebook Intern. Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995). Although States' *parens patriae* actions are distinct from class actions, courts in this circuit and elsewhere generally look to the standards used in approving class action settlements when evaluating what a *parens patriae* settlement delivers. *See Id.; In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y. 2000); *New York v. Salton, Inc.*, 265 F. Supp. 2d 310, 313 (S.D.N.Y. 2003); *New York. v. Nintendo of America, Inc.*, 775 F. Supp. 676, 680 (S.D.N.Y. 1991). In a class action litigation, "Rule 23(e)(2) sets forth the factors that a court must consider when weighing *final* approval." *See In re Payment Card.,* 330 F.R.D. at 28.

### B.  The Settlements Meet the Standard for Final Approval.

The Settlements satisfy the standard for final approval because the Settlements are "fair, adequate, and reasonable, and not a product of collusion." *See* Fed. R. Civ. P. 23(e)(2); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG) (VVP), 2012 WL 3138596, at *4 (E.D.N.Y. Aug. 2, 2012) (citing *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). This evaluation whether to grant final approval requires the court to consider "both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005). Looking to the standard used for approval of class action settlements, final approval requires courts to consider the factors under Fed. R. Civ. P. Rule 23(e)(2), supplemented in the Second Circuit by the factors set forth in *City of Detroit v.*

*Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974); *In re GSE Bonds*, 414 F. Supp. 3d at 692. The States will address both sets of factors.

    1. <u>Procedural Analysis Factors Support Final Approval.</u>

The initial determination of fairness, often called "procedural fairness," focuses on the settlement process itself. Fed. R. Civ. P. 23(e)(2). *See e.g. In re GSE Bonds*, 414 F. Supp. 3d at 693; *Ebbert v. Nassau County*, No. CV 05-5445 (AKT), 2011 WL 6826121, at *7 (E.D.N.Y. Dec. 22, 2011); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 238-39 (E.D.N.Y. 2010). Because the Settlements were negotiated at arm's length by experienced litigators and are the result of a good-faith and procedurally fair process, the procedural factors support final approval of the Settlements.

    i. <u>The States Have Adequately – and Zealously – Represented Consumers.</u>

This first procedural factor requiring adequate representation of the class is not directly applicable to a settlement in a *parens* action brought by the States in the public interest. *See e.g. State of New York v. Reebok International, Ltd.,* 96 F.3d 44,48 (2d Cir. 1996) (noting Attorneys General in *parens* actions are motivated by concern for the public interest). Nonetheless, the States have vigorously represented the interests of their citizens in this action for more than nine years. States' Decl. ¶ 12. The States have engaged in extensive discovery and motion practice, zealous prosecution of the States' Actions, and settlement negotiations to obtain favorable settlements. *Id.* The States represent forty-eight U.S. jurisdictions whose interests are aligned in enforcing federal and state laws and vigorously pursuing remedies for their states, their Consumers, State Entities, and Corporate Entities. *Id.* at ¶ 10.

    ii. <u>The Settlements Were Negotiated at Arm's Length by Experienced Counsel.</u>

The Settlements were "reached through arm's-length negotiations between experienced,

capable counsel knowledgeable in complex … litigation" and "'enjoy[] a presumption of fairness.'" *In re GSE Bonds*, 414 F.Supp.3d at 693 (*quoting In re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)); State of *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. at 535. Attorneys representing the parties to the Settlements are experienced and well-informed. Settling Defendants' respective counsels have significant expertise in complex antitrust litigation. The Assistant Attorneys General in the offices of the Attorneys General for Connecticut, New York, California, and Kansas who negotiated the Settlements, individually and collectively, also have extensive experience with antitrust investigations and litigation. States' Decl. ¶ 14. "The Attorney Generals have extensive experience in complex antitrust cases brought under their *parens patriae* powers." *N.Y. v. Nintendo of Am. Inc.*, 775 F. Supp. at 680.  Indeed, this action is part of a long and successful tradition of multistate litigation by State Attorneys General.[17]

Courts can place special weight on a settlement being negotiated by government attorneys committed to protecting the public interest. *Wellman v. Dickinson,* 497 F. Supp. 824, 830 (S.D.N.Y. 1980), *aff'd*, 682 F.2d 355 (2d Cir. 1982). The participation of State Attorneys General furnishes extra assurance that consumers' interests are protected. *In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. at 351. The motivating factor in the States' Actions is the enforcement of antitrust laws by the States acting as *parens patriae* for their citizens. *See New York v. Reebok,* 96 F.3d at 48. The States negotiated at arm's-length with Defendants while actively litigating,

---

[17] *See, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93 (1989); *Hartford Fire Ins. v. California*, 509 U.S. 764 (1993); *In re Panasonic Consumer Elect. Prod.*, 1989-1 Trade Cas. (CCH) ¶ 68, 613 (CCH), 1989 WL 63240, (S.D.N.Y. June 5, 1989); *Colorado v. Airline Tariff Publ's Co.*, 1995-2 Trade Cas. (CCH) ¶ 71,231, 1995 WL 792070 (D.D.C.May 10, 1995); *In re Mid-Atl. Toyota Antitrust Litig., 605* F. Supp. 440 (D.Md.1984); *New York v. Reebok International, Ltd.,* 96 F.3d 44 (2d Cir. 1996); *In re Electronic Book Antitrust Litig.,* 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp 706 (D. Minn.1975); *U.S. v. Apple Inc.,* 952 F.Supp.2d 638 (S.D.N.Y 2013); *In re Compact Disk Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197 (D. Me. 2003); *New York, et al. v. Cephalon, Inc.*, No. 16-4234 (E.D. Pa. 2016); *Wisconsin, et al. v. Indivior Inc., et al.*, 16-cv-5073 (E.D. Pa. 2016); *Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD (N.D. Cal.)

and forty-eight (48) Attorneys General have approved the Settlements on behalf of their states, their Consumers, State Entities, and Corporate Entities, for whom they assert claims. States' Decl. ¶ 10; Exhibit 1 and 2.

### iii.   The States Have Obtained a Sufficient Understanding of the Case.

The States were well informed about the issues in this matter and the strengths and weaknesses of the States' Actions when they negotiated the Settlements with Settling Defendants. States Decl. ¶¶ 12-14. The third *Grinnell* factor requires the court to consider the stage of the proceedings and amount of discovery completed.  *In re GSE Bonds*, 414 F. Supp. 3d at 699. "The relevant inquiry 'is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement.'" *Id.* (*quoting In re AOL Time Warner, Inc.*, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006)). The State of Connecticut has been investigating some claims since July 2014, and most States have been litigating some of the claims in the States' Actions since December 2016. The lengthy and extensive litigation has provided an excellent foundation to understand the facts and legal issues, as did this Court's and the MDL Court's opinions and orders.  The States understand what Consumers, State Entities, and Corporate Entities have overpaid for generic pharmaceuticals manufactured by Settling Defendants and the other defendants ("Drugs at Issue"), and the challenged conduct's price effects on generic pharmaceuticals, based on data provided by state Medicaid agencies, third parties, other defendants in the States' Actions and the MDL, and expert analysis and reports. The States' investigation and litigation work over the past twelve years, including expert discovery and recent summary judgment briefings, has allowed them to obtain an excellent understanding of the case. States Decl. ¶ 12. In summary, because the Settlements were the product of arm's-length

20

negotiations between informed and experienced counsel and were reached after a lengthy investigation and litigation, the procedural factors weigh in favor of final approval.

### 2. Substantive Analysis Factors Support Final Approval.

The second set of Rule 23(e) factors focuses on the substantive terms of the Settlements and the relief that the Settlements are expected to provide. Fed. R. Civ. P. 23(e)(2); *In re Payment Card,* 330 F.R.D. at 29. This inquiry overlaps significantly with several *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C). *In re GSE Bonds,* 414 F. Supp. 3d at 693 (*citing In re Payment Card*, 330 F.R.D. at 36). The substantive factors weigh in favor of final approval because the Settlements provide substantial and guaranteed recovery for Consumers, State Entities, and Corporate Entities, which recovery is fair, reasonable, and adequate given the litigation risks. States Decl. ¶¶ 15, 31.

Rule 23(e)(2)(C) requires the court to examine whether the "relief … is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Further, *Grinnell* factors eight, "the range of reasonableness of the settlement in light of the best possible recovery," and nine, "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation," are often considered together, *In re GSE Bonds*, 414 F. Supp. 3d at 696 (*quoting In re Payment Card*, 330 F.R.D. at 47-48).

### i. The Settlements Provide Adequate Relief.

When assessing the adequacy of a settlement, courts may need to forecast the likely range of possible recoveries and the likelihood of success in obtaining such results. *In re GSE Bonds*, 414 F. Supp. 3d at 693 (citing *In re Payment Card,* 330 F.R.D. at 36). The court's task is to weigh

the settlement figure against the amount of likely recovery. *New York v. Reebok,* 96 F.3d at 49.  Courts have held that "[t]he proper measure of damages in a suit concerning a price-fixing conspiracy is 'the difference between the prices actually paid and the prices that would have been paid absent the conspiracy.'" *In re Electronic Books Antitrust Litigation*, 2014 WL 1282293 at *16 (S.D.N.Y., March 28, 2014) (quoting *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1077 (2d Cir.1988)).  Further, monetary relief in antitrust cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565, 101 S. Ct. 1923, 68 L.Ed.2d 442 (1981) (quoting *Bigelow v. RKO Pictures, Inc.,* 327 U.S. 251, 264 (1946)).

Based on information and data the States have obtained through investigation and discovery, and analysis provided by the States' experts in the Dermatology Action, the States estimate that the total amount of overcharge associated with sales by Bausch ranges from $29.9 million to -$28.6 million.[18] The States' damages expert Hal Singer determined Bausch caused between $9.8 million and $4.8 million in single damages.[19] Given that the $4.08 million settlement amount to the States is a significant percentage considering the case complexity and litigation risk, it is, therefore, reasonable and adequate.  *See e.g., In re GSE Bonds*, 414 F. Supp. 3d at 697 (13-17% of the best possible recovery considered reasonable); *In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, 2006 WL 3247396, at *6 (S.D.N.Y. Nov. 8, 2006) (settlement "representing roughly 10-15% of the credit transaction fees collected by Defendants").

Based on similar information provided by the States' experts in the Dermatology Action relating to Lannett, the States estimate that the total amount of overcharge associated with sales by

---

[18] Reply Report of Frederick Warren-Boulton, Ph.D. (August 26, 2024), Table 21, page 141
[19] Reply Report of Hal J. Singer, Ph.D. (August 26, 2024) Appendix 7, table 3, page 114

22

Lannett ranges between $68.3 million and $79.4 million[20] and that the single damages caused by Lannett ranges between $9.1 million and $10.3 million.[21] Therefore, the States maintain that the $13.77 million Lannett settlement is reasonable, adequate, and within the range of approval. *Id.*

In addition to monetary relief, the Settlements provide valuable relief through Settling Defendants' commitment to business reform, including establishing or maintaining a compliance program and training, and providing reporting to the States as to its compliance program. *See Bauch Settlement* ¶ V; Lannett Settlement ¶ X.

ii. The Cooperation from Settling Defendants Adds Value to the Settlements.

Further value is added to the Settlements through Settling Defendants' agreement to provide cooperation to the States in the ongoing litigation against other defendants. *See In re GSE Bonds*, 414 F. Supp. 3d at 697. Successful litigation against Settling Defendants' co-defendants will increase the likelihood of further recovery and additional value to the States, Consumers, State Entities, and Corporate Entities on whose behalf the States assert claims. Related to this is the seventh *Grinnell* factor, defendants' ability to withstand a greater judgment. Even if it is determined that Settling Defendants could withstand a greater judgment, "courts have noted that a defendant's cooperation 'tends to offset the fact that they would be able to withstand a larger judgment.'" *In re GSE Bonds*, 414 F. Supp. 3d at 694 (*quoting In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008)).

Settling Defendants' covenant of continued cooperation in this litigation provides considerable value, which supports final approval. *See e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396 at *9 (E.D.N.Y. Sept. 25, 2009) ("the agreement to cooperate with the plaintiffs … adds significant value"); *In re GSE Bonds*, 2019 WL 6842332 at *4

---

[20] Reply Report of Frederick Warren-Boulton, Ph.D. (August 26, 2024), Table 21, page 141
[21] Reply Report of Hal J. Singer, Ph.D. (August 26, 2024) Appendix 7, table 3, page 114

(S.D.N.Y Dec. 16, 2019) ("this cooperation … nonetheless provides some additional value to the GS settlement"); *In re Packaged Ice Antitrust Litig.*, 2010 WL 3070161 at *6 (E.D. Mich. Aug 2, 2010) (where "there is the potential for a significant benefit … in the form of cooperation on the part of the settling Defendant, this Court is reluctant to refuse to consider the very preliminary approval that will trigger that cooperation").

        iii.   <u>The Settlements are Reasonable Considering the Costs, Risks, and Delay of Trial and Appeal.</u>

When evaluating the adequacy of the Settlements, the Court should analyze the comparison between the settlement amounts and the full estimated damages in light of the risks of litigation, which determine the likelihood of recovery. As the risks of litigation increase, the range of reasonableness correspondingly decreases. *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 336 (D.N.J. 2002). This analysis overlaps significantly with *Grinnell* factors 1, 4, 5, and 6, which include: the complexity, expense, and likely duration of the litigation (factor 1); the risks of establishing liability (factor 4); the risks of establishing damages (factor 5); and the risks of maintaining the class action through the trial (factor 6). *Grinnell*, 495 F.2d at 463.

A settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution. *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y.1972). The Settlements' substantial and guaranteed recovery for the States and its Consumers and State Entities is fair, reasonable, and adequate given the litigation risks inherent in any litigation and more particularly in complex antitrust cases like these matters. In addition to analyzing purchases made of Settling Defendants' Drugs at Issue and the damage analysis contained in expert reports submitted in the States' Actions, the States have gathered information necessary to adequately assess their risks of litigation in these matters.

The States have done significant investigation and litigation work to support their belief

24

in their claims, but litigation always includes risks.  Antitrust cases "'are complicated, lengthy, and bitterly fought,'… as well as costly." *In re GSE Bonds,* 414 F.Supp.3d at 697 (quoting *Wal-Mart Stores, Inc., v. Visa U.S.A., Inc*., 396 F.3d 96, 118 (2d Cir. 2005)); *See also In re Vitamin C Antitrust Litig*, No. 06-MD-1738 (BMC), 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012). This litigation, which, in addition to federal law claims, also includes state law claims for forty-one different states,[22] is no exception, particularly given the number of parties, drugs, and alleged conspiracies and the fact that the litigation against Settling Defendants has been ongoing for nine years. *See In re GSE Bonds*, 414 F.Supp.3d at 693.  The States' Actions will involve multiple lengthy and complex trials because of the nationwide scope of the alleged activities, and it has already required lengthy and expensive discovery. *See New York v. Reebok,* 903 F. Supp. at 536. "Courts favor settlement when litigation is likely to be complex, expensive, or drawn out." *In re GSE Bonds*, 414 F.Supp.3d at 693.

Litigating the claims and defenses in this case would necessarily entail some risk with respect to establishing liability and proving damages or other relief sought. "[A]s to liability, establishing the existence and extent of a conspiracy will necessarily be a complex task, and many of the hurdles that plaintiffs have overcome at the pleading stage will raise substantially more difficult issues at the proof stage." *In re LIBOR-Based Fin. Instruments Antitrust Litig*., 327 F.R.D. 483, 494 (S.D.N.Y. 2018) ("*LIBOR*"). Proving violations of antitrust laws is no mean feat, and even if that feat is accomplished, proving remedies and damages is just as difficult. *See LIBOR*, 327 F.R.D. at 494 (plaintiffs' damages models would "unquestionably be challenged and

---

[22] The States bring claims under the laws of Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.

perhaps subject to further *Daubert* motions"); *In re GSE Bonds*, 414 F. Supp. 3d at 697 (even if they prove liability, plaintiffs will still face the difficulties inherent in proving damages). At trial, proof of damages, disgorgement, restitution, and civil penalties would likely be a complex task involving a "battle of the experts." *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998); *See Chatelain* v. *Prudential–Bache Secs., Inc.,* 805 F. Supp. 209, 213 (S.D.N.Y. 1992) (complex issue of establishing damages would require battle of the experts).

This litigation has been ongoing for more than nine years, and considering the risks, costs, and delay involved in an antitrust case of this magnitude, the opportunity for guaranteed relief weighs heavily in favor of approving the Settlements. *See In re GSE Bonds*, 414 F. Supp. 3d at 694 (court should balance immediacy and certainty of recovery against the continued risk of litigation). Recognizing the cooperation that Settling Defendants have agreed to provide, the risks of litigation, and the time value of money, the States believe that the $13.77 million Lannett Settlement and $4.08 million Bausch Settlement are both fair, reasonable and adequate.

      iv.   <u>The Monetary Payment to the States is Fair and Reasonable, and the Settlements Do Not Contain Any Additional Agreement that Affects the Fairness of the Settlements.</u>

The Court must also consider the terms of any proposed award of attorney fees, including timing of payment and any agreement required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C). The Settlements provides that 30% of the Settlement Payments (not including the payment to Corporate Entities), which equals $4,050,000 of the Lannett Settlement and $1,200,000 of the Bausch Settlement, be placed in a Cost Account for use in paying for the expenses of the Notice Plan and administration, and upon final approval of the settlement, for costs of litigating the States' claims both collectively, or individually, including to reimburse the States for attorney fees. *Lannett Settlement ¶ I.B; Bausch Settlement ¶ I.V.3.* Further, to the extent

26

that the funds in the Cost Accounts are not needed to offset costs of States litigating in the State Actions, any remaining funds may be used by the States as set forth *supra* in III.B. The Cost Accounts represent statutorily authorized recovery and enforcement remedies, including the costs and expenses of settlement administration, the costs, expenses, and attorney fees incurred by the States in investigating and litigating the States' Actions, and other monetary recovery or remedies the States may be entitled to pursuant to state law.[23] This payment to the States is fair and reasonable considering that the States are engaged in continuing, lengthy, and complex litigation. The States have not entered into any related agreements that affect the fairness of the Settlements. The Settlements also include supplemental agreements as set forth in III.G. *supra.*

> v.    An Allocation and Distribution Plan is not Currently before the Court.

The States have not yet proposed and submit to the Court a plan for allocation and distribution of restitution among Consumers. The States are requesting that the proposed allocation and distribution plan be deferred until an allocation and distribution plan has been finalized by the States and presented to the Court for approval. An allocation and distribution plan is not required for the Court to grant final approval of the Settlements. *See* III.G. *supra.*

In summary, the factors set forth in Rule 23(e)(2), together with the *Grinnell* factors, demonstrate that the Settlements are fair, reasonable, and adequate, under the circumstances of this case, and that final approval of the Settlements is warranted.

## C. The Notice Plan was Successfully Implemented.

The Notice Plan approved by the Court was implemented by Rust and achieved each of the planned objectives. Janowicz Decl. ¶ 7. To assist with the creation and implementation of a Notice Plan, the States retained Rust, a nationally recognized notice and administration company

---

[23] See footnote 14, s*upra.*

27

specializing in the design and implementation of notice and administration programs of all sizes and types in class action settlements and similar matters.[24] Janowicz Decl. ¶¶1-4; States Decl. ¶18.

The cornerstone of the Notice Plan and States' notice efforts generally were the court-approved Notices: the Short Form notice and Long Form notice.  These notices clearly and succinctly explain the nature of the States' Actions, the Bausch and Lannett Settlements, the applicable deadlines, and Consumers' rights to comment on, object to, or opt out of the Settlements. The notices were written in plain, easily understood language. *Id* at ¶¶5-6, 22.  While the Short Form was kept simple to encourage readership and comprehension, the Long Form provided substantial information about the States' Actions and the Settlements, including background, the Drugs at Issue, what options Consumers had relating to the Settlements, and providing specific instructions Consumers needed to follow to properly exercise their rights.  *Id.* at ¶¶23-24; Exhibits B-C. Both form notices are available on the designated website in English, Spanish, French, traditional Chinese, simplified Chinese, Arabic, and Vietnamese.  *Id.*

The Court-approved Notice Plan was designed to provide Consumers with opportunities to learn about the Settlements and act upon their rights; and to ensure that Consumers will be exposed to, see, review, and understand the Notices. Janowicz Decl. ¶¶5-6.  The Notice Plan builds on the notice provided in previous settlements in the States' Actions and has three components: a website, direct notice to those who previously registered for updates, and "earned media" through strategic distribution of press releases.  *Id*. at ¶ 8; *see also* Janowicz Prelim. Approval Decl. at ¶¶ 7-17.

---

[24] *See e.g. In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002); *In re Metropolitan life Ins. Co. Sales Practices Litig.*, 1999 WL 33957871 (W.D. Pa. Dec. 28, 1999); *In re Electronic Book Antitrust Litig.,* 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014). Rust was also approved by this Court as the Notice and Claims Administrator for the Heritage Settlement. ECF No. 675 (3:16-cv-02056-MPS), No. 465 (3:20-cv-00802-MPS), and No. 502 (3:20-cv-00802-MPS).

### 1. Website, E-mail and Toll-Free Telephone

On October 30, 2024, Rust established a website at www.AGGenericDrugs.com to enable Consumers to obtain and download information about the States' Actions and Settlements and register to receive updates. Janowicz Decl.¶ 9. The website is currently viewable in English and Spanish and includes the Short Form Notice, the Long Form Notice, the list of drugs involved, answers to frequently asked questions (including how to object), the Settlement Agreements, and other court documents from the States' Actions. *Id.* In addition to providing information, the website also has a form allowing Consumers to register to obtain future information about how to file a claim seeking payment (if eligible) and a form for Consumers seeking to be excluded from the Settlement. *Id.* As of May 14, 2026, the website has registered a total of 1,026,839 unique visits with 112,286 of those unique visits taking place between Feb 2, 2026, and May 14, 2026. *Id* at ¶ 14. Rust also established a toll-free phone number (1-866-290-0182) to allow Consumers to call and request that notice be mailed to them, or alternatively, to listen to answers to frequently asked questions and/or leave a voice mail. *Id.* at ¶¶ 14-17. Telephone support is provided in English, Spanish and Chinese. Rust has returned calls from persons leaving voicemails with questions. Since February 2, 2026, there have been 354 calls and 126 voicemails to the toll-free number. *Id.* at ¶ 15. Further, Rust established a mailing address and a dedicated e-mail inbox, to receive registration forms, exclusions, objections, letters and other communications regarding the Settlements. *Id.* at ¶¶ 16-17. As of May 14, 2026, Rust had received 253,831 total Registration Forms from the website and emails, although these have not yet been fully reviewed to remove duplicative or suspicious forms. Janowicz Decl. ¶ 18.

### 2. Earned Media and Direct Notice

The Notice Plan also included an "earned media" program. This earned media program

consisted of State press releases which were also distributed through various media outlets (and in a few different languages) with the expectation that the press releases would be posted in various locations and  viewed by more and diverse groups of Consumers.  Decl. Janowicz ¶¶ 12-13; States Decl. ¶21.  Specifically, on  March 17, 2026, Rust announced the preliminary approval of the Settlements on PR Newswire's National US1 Newsline and Multicultural Markets, which included translated distributions in Spanish, simplified Chinese and traditional Chinese.  Janowicz Decl. ¶13. The press release used wording from the summary notice, which highlighted the Settlement details, provided information concerning rights and options for potential Consumers, and featured the toll-free telephone number and website address.  *Id.*

Starting February 2, 2026, Rust sent the Short Form Notice via email to Consumers who previously registered to receive updates concerning the case status.  Janowicz  Decl. ¶11. Additionally, Rust mailed the Short Form Notice to registrants who previously registered to receive updates but did not provide an email address with their registration.  *Id*.  Since February 2, 2026, Rust has sent 220,207 notices by email and 131 notices by mail to registrants. In all since October 30, 2024, Rust sent 311,132 notices by email and 165 notices by mail to registrants. *Id.*

The Notice Plan, as implemented by Rust, constituted the best notice reasonable or practicable under the circumstances and provided Consumers with information reasonably necessary to evaluate their options. *See* Fed. R. Civ. P. 23(e)(1)(B); *In re GSE Bonds*, 414 F. Supp. 3d at 702 (the Court is required to "direct to class members the best notice that is practicable under the circumstance[s]"). The Court-approved Notice Plan was designed to satisfy due process; provide Consumers opportunities to learn about the Settlements and act upon their rights; and ensure Customers will be exposed to, see, review, and understand the Notices. Janowicz Decl.  ¶5.

The implemented Notice Plan meets the requirements of Rule 23 and due process. There

30

are no rigid rules for determining whether a settlement notice satisfies constitutional requirements. *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F.Supp.2d 179, 191 (S.D.N.Y. 2012), *aff'd sub nom* 731 F.3d 241 (2d Cir. 2013).  "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 727 (2d Cir. 2023) (citing, *Wal-Mart Stores*, 396 F.3d at 113–14).  "[N]otice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Id.* at 114 (citation and internal quotation marks omitted). The States maintain that the implemented Notice Plan was reasonable under the circumstances of this case and considering the notice efforts undertaken by the States for previous settlements in this litigation.

3. Corporate Entities Notice

The Notice Plan for Corporate Entities in Idaho and Washington, as approved by the Court, was implemented and achieved each of the planned objectives.  Janowicz Decl. ¶ 25-26.  Under the terms of the Settlements, the attorneys general of Idaho and Washington are settling and releasing claims on behalf of Corporate Entities on whose behalf those attorneys general have exclusive claims. Under Idaho and Washington state law, only the attorney general may bring antitrust claims for monetary relief on behalf of persons (which includes Corporate Entities) who are injured indirectly. *See* Idaho Code §§ 48-108(2), 48-113(1); Wash. Rev. Code 19.86.080. The Settlements provide that the States shall give notice to Corporate Entities in Idaho of the Settlements and their right to exclude themselves from the States' Actions and the Settlements. *See* Idaho Code § 48-108(2)(b), (2)(c), (3). Although Washington also asserts an exclusive claim on behalf of Corporate Entities in the States' Actions, Washington law does not provide a right to exclusion from a settlement for Corporate Entities. *See* Wash. Rev. Code 19.86.080. While

Washington law does not require notice, Washington did give notice to Corporate Entities in Washington through a press release issued by the Washington Attorney General.[25]  The Idaho Attorney General provided notice to Corporate Entities in Idaho through a press release issued by the Idaho Attorney General.[26] Considering that Corporate Entities in Idaho that are injured indirectly do not have a private right of action for their indirect injuries, notice through a press release constitutes sufficient notice. Further, Rust established a subpage on the website www.AGGenericDrugs.com at https://www.aggenericdrugs.com/English/CorporateEntities where Corporate Entities in Idaho and Washington can obtain information about the Settlements and register to obtain additional and future information about the litigation and a future claim process. Janowicz Decl. at ¶ 25. Finally, the website provided Corporate Entities in Idaho an opportunity to exclude themselves from the Settlements. *Id*.

### D.  <u>Consumers' Reaction to the Settlements Supports Final Approval</u>

The Settlements were well received by Consumers, as shown by the single objection and the limited number of exclusion requests – especially in comparison to the large number of registrations. Janowicz Decl. ¶ 19-20; State Decl. ¶ 22.  As of May 1, 2026, Rust had received only eleven (11) requests for exclusion. Janowicz Decl. ¶ 19.  Copies of the exclusion requests are attached as Exhibit A.  One objection was filed with the Court by a consumer.  See ECF No. 969 (3:16-cv-02056-MPS), No. 928 (3:19-cv-00710-MPS), and No. 1389 (3:20-cv-00802-MPS).

### 1.  <u>Objection Filed by Consumer Joseph Varga</u>

Mr. Varga is an Indiana resident who purchased generic prescription drugs at retail between May 1, 2009 and December 31, 2019. *Id*. First, Mr. Varga objects to the allocation of 30% to cost,

---

[25]https://www.atg.wa.gov/news/news-releases/ag-brown-announces-1785-million-settlements-ongoing-drug-price-fixing-conspiracy
[26]https://www.ag.idaho.gov/newsroom/attorney-general-labrador-announces-17-85-million-in-settlements-in-ongoing-generic-drug-price-fixing-conspiracy-cases/

arguing that percentage is excessive.  However, the 30% cost allocation is not purely fee reimbursements for the Attorneys General. The Cost Account will also cover the administrative costs, including any costs associated with future claims processes, claims administration, and distribution of funds to Consumers.  No part of the funds allocated to Consumer restitution will be used to pay for the claims process and administration.  Further, this case has been litigated for close to ten years, and it is a complicated case that has required significant resources and time, including the costs of experts.  The allocation of 30% of the Settlements Funds to the Cost Account is necessary for the States to be able to pay their bills and finance the litigation in this matter. Second, Mr. Varga objects to burdens in the claims process, including any requirements that consumers must provide documentation for purchases. He proposes an attestation-based process— which is, in fact, what the States proposed in the framework approved with the Apotex settlement. *See* ECF No. 875 (3:16-cv-02056-MPS), ECF No. 760 (3:19-cv-00710-MPS), and ECF No. 835 (3:20-cv-00802-MPS). The States do not intend to require documentation, except in instances where the Claim Administrator finds it necessary to  verify unusual or very large claims. The States proposed allocation and distribution plan will address this issue when filed. Third, Mr. Varga objects to unclaimed funds being redirected to *cy pres* distribution, which is an issue that is not currently before the Court.  The States do not intend to address unclaimed funds until the end of the claim process in the States' Actions, during which they intend to maximize direct payments. Moreover, *cy pres* distribution may not even be an option for many of the States.

2.    Few Objections and Exclusions Support Final Approval

Mr. Varga's objection is the sole objection filed by a consumer.  And, as of May 14, 2026, there have been no exclusions and objections made by Corporate Entities.  Janowicz Decl. at ¶ 26. The small number of objections and limited exclusions supports a finding that the Settlements are

33

fair. *See Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 362 n.4 (S.D.N.Y. 2002) (stating that "the lack of objections may well evidence the fairness of the Settlement"). These indicia of support and lack of significant opposition to the Settlements is an important factor weighing in favor of final approval. *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (settlement approved where 0.26% of the class requested exclusion from the settlement and .06% of class members objected); *see also City of Pontiac Gen. Emps' Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 279 (S.D.N.Y. 2013) (Rakoff, J.) (noting that "not a single class member objected to the settlement"); *In re Am. Bank Note Holographies, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) ("the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy"). The absence of objections and the small number of exclusions by consumers supports final approval.

## VI. THE PLAN OF ALLOCATION AND DISTRIBUTION

The States are seeking final approval of the allocation and distribution of parts of the Settlement Funds received in the States' Actions, including approval of (A) allocation of Settlement Funds between restitution and costs and the distribution to the States of funds allocated to costs, (B) allocation of restitution funds between Consumers and State Entities and the distribution to the States of funds allocated to State Entities, (C) a deferral of a plan of allocation and distribution of consumer restitution funds among Consumers, and (D) a deferral of the allocation and distribution of Corporate Entities Restitution. The approval of a plan of distribution is within the discretion of the Court. *In re Chicken Antitrust Litig.,* 669 F.2d 228, 238 (5th Cir. 1982)*; West Virginia v. Chas. Pfizer & Co., Inc.,* 440 F.2d 1079, 1085 (2d Cir. 1971); *White v. National Football League,* 822 F. Supp. 1389, 1417 (D. Minn. 1993). The standard for judicial approval of a settlement agreement, which requires a finding that the settlement is fair, adequate

and reasonable, "applies with as much force to the review of the allocation agreement as it does to the review of the overall settlement between plaintiffs and defendants." *In re Chicken,* 669 F.2d at 238; *see also In re Citric Acid Antitrust Litig.*, 145 F. Supp, 2d 1152, 1154 (N.D.Cal.2001) (approving a plan for the allocation of a class settlement fund is governed by the same legal standards that apply to approving the settlement terms: the distribution plan must be "fair, reasonable and adequate").

### A. Allocation of Settlement Proceeds between the Restitution Accounts and Cost Accounts and Distribution of the Cost Accounts

The Settlements provide that, after subtracting the amount allocated to Corporate Entities, 70% of the Settlement Funds shall be allocated and held in the State Escrow for later distribution to victims of the anticompetitive acts alleged by the States, namely Consumers and State Entities, including Medicaid state agencies, and other state agencies whose claims are being released by the States (Restitution Account). *Lannett Settlement* ¶ I.R; *Bausch Settlement* ¶ I.V. Further, 30% of the Settlement Funds (after subtracting the amount allocated to Corporate Entities) shall be held in escrow and used to pay for settlement notices and administration costs and, upon final approval of the Settlement Agreements, for costs of litigating the States' claims, including attorney fees (Cost Accounts). *Lannett Settlement* ¶ I.B.; *Bausch Settlement* ¶ I.V.3. The Cost Account will receive 30% of the Settlement Funds which equals $4,050,000 ($ 4,876,200 inclusive of interests) of the Lannett Settlement Payment and $1,200,000 of the Bausch Settlement Payment. The States request that the Court grant final approval of the proposed 70/30 percentage allocation of Settlement Funds between the Restitution Accounts and Cost Accounts and request final approval for the Cost Accounts to be distributed to the States upon final approval of the Settlements.

### B. Allocation of Restitution Accounts Between Consumers and State Entities

The Court's final approval of the Apotex Settlement in the States' Actions approved an

35

allocation of the Settlement Funds in the Restitution Account (70% of the Settlement Funds) between Consumers in the amount of $17,624,403.04 and State Entities in the amount of $9,745,596.96. ECF No. 875 (3:16-cv-02056-MPS), No. 760 (3:19-cv-00710-MPS), and No. 835 (3:20-cv-00802-MPS). This approved allocation results in approximately 45% of the Settlement Funds being allocated to Consumers and approximately 25% of the Settlement Funds being allocated to State Entities. The States are seeking final approval of the same allocation percentage between Consumers and State Entities in the Lannett and Bausch Settlements and, also, for the Restitution Account held in escrow from the Heritage Settlement.

### 1. Heritage Settlement

This Court issued an Order granting final approval of the Heritage Settlement on April 1, 2025, ECF No. 767 (3:16-cv-02056-MPS), No. 635 (3:19-cv-00710-MPS), and No. 602 (3:20-cv-00802-MPS). In accordance with the Court's order for final approval of the settlement with Heritage, $6 million of the $10 million settlement is held in the State Escrow (Restitution Account) for later distribution to eligible consumers, state Medicaid agencies, and non-Medicaid state agencies (State Entities). *Id.* The States seek final approval to split the Restitution Account so that $3,833,997.54 is allocated to Consumers ("Heritage Consumer Fund") and $2,166,002.46 is allocated to State Entities.

### 2. Bausch Settlement

The settlement with Bausch provides that $2,880,000 of the $4,080,000 Settlement Funds shall be used for restitution. From the $2,880,000, $80,000 is allocated to Corporate Entities for whom Idaho and Washington assert exclusive claims. The settlement allocates $2,800,000 as restitution to Consumers and State Entities (Restitution Account). The States seek final approval to split the Restitution Account so that $1,803,007.56 is allocated to Consumers ("Bausch

Consumer Fund") and $996,992.44 is allocated to State Entities.

3. Lannett Settlement

The Lannett Settlement provides that $9,720,000 of the $13,770,000 ($16,254,000 inclusive of interest) Settlement Funds shall be used for restitution. $270,000 is allocated to Corporate Entities for whom Idaho and Washington assert exclusive claims. The settlement allocates $9,540,000 ($11,375,419.47 inclusive of interest) as restitution to Consumers and State Entities (Restitution Account).  The States seek final approval to split the Restitution Account so that $6,085,800 ($7,343,525.35 inclusive of interest) is allocated to Consumers ("Lannett Consumer Fund") and $3,364,200 ($4,031,894.12 inclusive of interest) is allocated to State Entities.

Based on information and data obtained through discovery, as well as the analysis provided by the States' experts or consultants concerning the estimated expenditures on the Drugs at Issue, the States assert that the proposed allocation among Consumers and State Entities is equitable and just and reasonably reflects the estimated harm incurred.   The States maintain that this allocation between Consumers and State Entities meets the standard for final approval.  Further, the States request approval to distribute to the States all Settlement Funds allocated to State Entities, upon final approval of the Settlements and the future allocation and distribution plan for consumer restitution, so that the State Entity funds may be further allocated and distributed by the States among themselves at the States' discretion and pursuant to a collective agreement among the States.

**C. Allocation and Distribution of Consumer Restitution**

Upon final approval of the proposed allocation of the Settlement Funds as set forth above, a total of $29,347,208.14 of the Settlement Funds from the Apotex, Heritage, Bausch, and Lannett

37

settlements ("Consumer Restitution Funds") will be allocated to consumer restitution and held in escrow subject to further allocation and distribution to Consumers pursuant to a Court approved allocation and distribution plan for consumer restitution.  According to the terms of the Settlement, any distribution to Consumers will be made pursuant to a future Court-approved distribution plan, after the Settlements Final Court Approval, and at a time to be determined by the States. *Bausch Settlement* ¶ II.A, *Lannett Settlement* ¶ III.D. Approval of a settlement does not depend on approval of a distribution plan. *See e.g. In re Chicken Antitrust Litigation,* 560 F.Supp. 957, 959 (N.D.Ga.1980), *aff'd,* 669 F.2d 228 (5th Cir.1982); *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871 (1971).

The Court's final approval of the Apotex settlement approved a framework for allocation among Eligible Consumers under the Apotex Settlement.  *See* ECF No. 875 (3:16-cv-02056-MPS), No. 760 (3:19-cv-00710-MPS), and No. 835 (3:20-cv-00802-MPS). The Apotex Notice Plan disseminated notice of this proposed allocation framework to Eligible Consumers.  The States, working with the Notice and Claims Administrator, are developing an allocation and distribution plan that reflects and builds on the framework for allocation approved by the Court as part of the final approval of  the Apotex Settlement. At an appropriate time, the States will file a motion for approval of an allocation and distribution plan for the Court's approval, building on the Apotex framework. At that time, further notice and opportunity to opt out or object will be provided to consumers, as indicated by the Court's Preliminary Approval Order. ECF No. 957 (3:16-cv-02056-MPS), No. 916 (3:19-cv-00710-MPS), and No. 1364 (3:20-cv-00802-MPS). Payments to Eligible Consumers will be conditioned on the submission of a valid and timely claim once a claim process is approved, noticed, and opened. The States request final approval of the Settlements while deferring approval of an allocation and distribution plan for consumer restitution.

### D. Allocation and Distribution to Corporate Entities

The Settlements designate $350,000 ($80,000 from Bausch and $270,000 from Lannett) as restitution for Corporate Entities ("Corporate Entities Restitution") for which the Attorneys General of Idaho and Washington have asserted exclusive claims in the States' Actions. *Bausch Settlement* ¶ I.V; *Lannett Settlement* ¶ III. The States are requesting final approval of this allocation of restitution to Corporate Entities and an order that further allocation and distribution of Corporate Entities' Restitution be deferred until a later appropriate date when it can be part of a plan relating to additional settlements as well.

## VII. CONCLUSION

For the foregoing reasons, the States respectfully request that the Court

1) Grant final approval of the Settlements with Defendants Bausch and Lannett;

2) Dismiss the litigation against Defendants Bausch and Lannett Releasees only, with prejudice and except as provided for in the Settlement;

3) Find that the notice given to Consumers and Corporate Entities in Idaho constitutes due, adequate, and sufficient notice and meets the requirements of due process and the Federal Rules of Civil Procedure;

4) Grant final approval of the allocation of funds between the Restitution Accounts and Cost Accounts;

5) Grant final approval of a distribution to the States of all funds allocated to the Costs Accounts to be allocated among the states at the States' discretion;

6) Grant final approval of the allocation of the Restitution Accounts between Consumers and State Entities in the Heritage, Lannett, and Bausch Settlements;

7) Grant final approval that a distribution to the States of all funds allocated to State Entities

39

may take place upon the Court's final approval of a plan of allocation;

8) Grant final approval that all funds allocated to Consumer restitution be held in escrow and that an allocation and distribution plan be deferred until a future appropriate time, upon motion by the States;

9) Grant final approval of the Settlements' allocation of Settlement Funds to Corporate Entities in Idaho and Washington;

10) Grant final approval that funds allocated to Corporate Entities restitution be held in escrow and that distribution be deferred until a future appropriate time, upon motion by the States;

11) Retain exclusive jurisdiction over the Settlements, including the administration and consummation of the Settlements; and

12) Direct consummation of the Settlements pursuant to its terms and that the Final Approval Order as to the Bausch and Lannett Releasees shall be final and immediately appealable

Respectfully submitted this 20th day of May, 2026.


STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL

*/s/ Saami Zain*
Saami Zain
Bar No. phv208392
Robert L. Hubbard
Fed Bar No. ct30195
Assistant Attorneys General
Antitrust Bureau
28 Liberty Street, 20th Floor
New York, NY  10005
Tel:  (212) 416-8267
Robert.Hubbard@ag.ny.gov
Saami.Zain@ag.ny.gov

*Attorneys for the State of New York*


STATE OF NORTH DAKOTA
DREW H. WRIGLEY
ATTORNEY GENERAL

*/s/ Elin S. Alm*
Assistant Attorney General
Elin S. Alm
Bar number phv207896
Director, Consumer Protection & Antitrust Division
Office of the Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND  58504
Telephone (701) 328-5570
Facsimile (701) 328-5568
ealm@nd.gov

*Attorney for the State of North Dakota*

STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

*/s/ Cara Moody*[27]
Cara Moody
Federal Bar No. ct31924
Assistant Attorney General
Nicole Demers
Deputy Associate Attorney General
Federal Bar No. ct27223
Connecticut Office of the Attorney General
165 Capitol Ave.
Hartford, CT 06106
Tel: (860) 808-5030
Fax: (860) 808-5391
Cara.Moody@ct.gov
Nicole.Demers@ct.gov

*Counsel for the State of Connecticut*

---

[27] Counsel for Plaintiff State of Connecticut represents the consent of all Plaintiffs litigating against Sandoz in the above-captioned case pursuant to Section XI.D. of the Electronic Filing Policies and Procedures.