**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

STATE OF CONNECTICUT, et al.,

*Plaintiffs,*

v.

AUROBINDO PHARMA USA, INC., et al.,

*Defendants.*

No. 3:16-cv-02056-MPS

---

STATE OF CONNECTICUT, et al.,

*Plaintiffs*,

v.

TEVA PHARMACEUTICALS USA, INC. et al.,

*Defendants*.

No. 3:19-cv-00710-MPS

---

STATE OF CONNECTICUT, et al.,

*Plaintiffs*,

v.

SANDOZ, INC., et al.,

*Defendants*.

No. 3:20-cv-00802-MPS

October 8, 2026

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STATES' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ASCEND, CITRON, AND MAYNE**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. PROCEDURAL BACKGROUND ..... 3

III. SETTLEMENT TERMS ..... 4

A. Injunctive Relief ..... 4

1. Mayne ..... 4

2. Ascend ..... 4

3. Citron ..... 5

B. Monetary Relief ..... 6

1. Mayne ..... 6

2. Ascend ..... 6

3. Citron ..... 7

C. Dismissals, Releases, and Preserved Claims ..... 7

1. Mayne ..... 7

2. Ascend ..... 8

3. Citron ..... 8

D. Cooperation ..... 9

1. Mayne ..... 9

2. Ascend ..... 9

3. Citron ..... 9

E. Court Approval, Notice, and Exclusions ..... 9

1. Mayne ..... 9

2. Ascend ..... 10

3. Citron ..... 10

IV. THE STATES' AUTHORITY ..... 10

A. The States' *Parens Patriae* Authority to Represent Eligible Consumers in Their States.. 12

B. Fundamental Differences Between Parens Patriae Claims and Rule 23 Claims ..... 14

V. ARGUMENT ..... 14

A. Standard for Preliminary Approval of *Parens Patriae* Settlements ..... 14

B. The Settlements Meet the Standard for Preliminary Approval ..... 15

1. Procedural Analysis Factors Support Preliminary Approval ..... 17

i. The States Have Adequately – and Zealously – Represented Eligible Consumers .... 17

ii. The Settlements Were Negotiated at Arm's Length by Experienced Counsel ........... 17

iii. The States Have Obtained a Sufficient Understanding of the Case ........................... 19

2. Substantive Analysis Factors Support Preliminary Approval .................................. 20

i. The Settlements Provide Adequate Relief ............................................................... 21

ii. The Cooperation from Settling Defendants Adds Value to the Settlement ................ 22

iii. The Settlements Are Reasonable Considering the Costs, Risks, and Delay of Trial and Appeal ........................................................................................................ 23

iv. The Monetary Payment to the States is Fair and Reasonable and the Settlements Do Not Contain Any Additional Agreement that Affects the Fairness of the Settlement ........................................................................................................ 25

v. An Allocation and Distribution Plan Is Currently Pending Before the Court ............ 26

VI. HUNTINGTON BANK AS ESCROW AGENT ........................................................... 27

VII. THE CONSUMER NOTICE PLAN .......................................................................... 27

VIII. NOTICE TO ELIGIBLE CORPORATE ENTITIES ..................................................... 31

IX. ALLOCATION AND DISTRIBUTION OF SETTLEMENT FUNDS ........................... 32

A. Allocation of Settlement Proceeds between the Restitution Account and Costs Account and Distribution of the Costs Account ........................................................ 33

B. Allocation of Restitution Account Between Eligible Consumers and State Entities ......... 33

C. Allocation and Distribution of Consumer Restitution .................................................... 34

D. Allocation and Distribution to Eligible Corporate Entities .............................................. 35

X. CONCLUSION ........................................................................................................ 35

## I. INTRODUCTION

Plaintiff States[1] (herein "the States" or each "State") have reached settlement agreements ("Settlements") with Defendants Ascend Laboratories, Inc. ("Ascend"), Citron Pharma, LLC ("Citron"), and Mayne Pharma Inc. ("Mayne") (collectively "Settling Defendants") resolving the States' claims against Settling Defendants and Released Parties[2] for their participation in the alleged unlawful conspiracy to fix prices and allocate markets for generic pharmaceuticals. Exhibits 1-3. These Settlements resolve and release all of the States' claims against Settling Defendants based on conduct alleged in *Connecticut et al. v. Aurobindo Pharma USA, Inc.*, *et al.*, 3:16-cv-02056, *Connecticut et al. v. Teva Pharmaceuticals USA, Inc.*, *et al.,* 3:19-cv-00710, and *Connecticut et al. v. Sandoz, Inc.*, *et al.,* 3:20-cv-00802 (collectively referred to as the "States' Actions").

As a matter of law[3] and policy, the States seek the Court's preliminary approval of the Settlements, as they resolve the States' claims against Settling Defendants in the States' Actions, and a notice plan ("Notice Plan") for providing notice to Eligible Consumers, as described in this motion, and to Eligible Corporate Entities in Idaho ("Corporate Entities Notice"). A minority of the States' laws obligate their respective Attorneys General to provide Eligible Consumers with

---

[1]Plaintiff States means Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, U.S. Virgin Islands, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. Plaintiff States include every remaining plaintiff in the States' Actions.

[2] Unless defined in this memorandum, capitalized terms are defined terms in each Settlement and are used here with the same meaning.

[3] *See, e.g., Shepherd Park Citizens Ass'n v. Gen. Cinema Beverages of Washington, D.C.,* 584 A.2d 20 (D.C. 1990); D.C. Code § 28-4507; Idaho Code § 48-108(3); Nev. Rev. Stat. 598.0975(3)(b); ORS 646.775(2), (3), (4), and (5). For citations of the authority pursuant to which each State is acting, see footnote 5, *infra.*

notice of the Settlement, including an opportunity to opt out of and object to or comment on the Settlement. All States are providing those opportunities to Eligible Consumers. Similarly, only a few States' laws require court approval of a settlement of consumer claims after a notice plan is implemented. Nonetheless, all States will seek the Court's final approval after the Notice Plan has been implemented. The States' proposed Notice Plan builds on the notice plans implemented as part of the previously approved settlements with Defendants Heritage Pharmaceuticals Inc., Emcure Pharmaceuticals Ltd., and Satish Mehta ("Heritage Settlement"), ECF Nos. 767 (3:16-cv-02056-MPS), 635 (3:19-cv-00710-MPS), and 602 (3:20-cv-00802-MPS), Defendant Apotex Corp. ("Apotex Settlement"), ECF Nos. 875 (3:16-cv-02056-MPS), 760 (3:19-cv-00710-MPS), and 835 (3:20-cv-00802-MPS), and Defendants Bausch Health US, LLC and Bausch Health Americas, Inc. ("Bausch Settlement"), and Defendant Lannett Company, Inc. ("Lannett Settlement"), ECF Nos. 990 (3:16-cv-02056-MPS), 976 (3:19-cv-00710-MPS), and 1432 (3:20-cv-00802-MPS), as well as the settlement with Defendant Glenmark Pharmaceuticals, Inc., USA, which received preliminary approval on August 6, 2026 (ECF Nos. 1019 (3:16-cv-02056-MPS), 976 (3:19-cv-00710-MPS), and 1484 (3:20-cv-00802-MPS)) and the settlement with Sandoz Inc. and Fougera Pharmaceuticals Inc., which was filed with the Court for preliminary approval on October 1, 2026, ECF Nos. 1038-4 (3:16-cv-02056), 999-4 (3:19-cv-00710), and 1535-4 (3:20-cv-00802). *See* States' Declaration in Support of The States' Motion for Preliminary Approval of Settlements with Ascend, Citron, and Mayne ("States' Decl.") ¶ 20. The details of the States' proposed continued Notice Plan are set forth in the declaration of Tiffaney Janowicz filed herewith.

As requested in previously approved settlements, the States are also seeking preliminary approval of the division and allocation of the Total Settlement Amounts received under the terms

of the Settlements with Mayne and Ascend (referred to as the "Settlement Funds"), allocating approximately 30% to costs and fees (referred to as "Costs Account") and approximately 70% to Eligible Corporate Entities, Eligible Consumers, and State Entities (referred to as "Restitution Accounts"). Furthermore, the States seek approval to distribute and use the balance of the Costs Account, after financing the administration of the Settlements and potential future settlements, to fund continued litigation against the remaining Defendants and for such purposes as are set forth in *Mayne Settlement* ¶ I.E; *Ascend Settlement* ¶ I.F, including attorney fees. Additionally, the States are seeking preliminary approval of a division and allocation of the Restitution Account between Eligible Corporate Entities, Eligible Consumers, and State Entities, and a distribution of the State Entities' share to the States to be divided among the States at their discretion. Lastly, the States request that the Court establish a deadline for opting out of or objecting to the Settlements ("Opt-Out Deadline") and a date for a final approval hearing.

## II. PROCEDURAL BACKGROUND

The States brought three actions against generic drug manufacturers alleging that they conspired to fix prices and allocate markets for many generic drugs in violation of federal antitrust laws and state antitrust and consumer protection laws. *See supra Section I*. In each of the States' Actions, the States also allege an overarching conspiracy for the drugs and anticompetitive acts in that action. Settling Defendants have denied the allegations. The Settlement, if approved, will resolve and release all claims that the States brought or could have brought against Settling Defendants in all three States' Actions.

## III. SETTLEMENT TERMS

The Settlements provide different categories of terms and relief, including (A) Injunctive Relief, (B) Monetary Relief, (C) Dismissals, releases, and preserved claims, (D) Cooperation, (E) Court Approval, Notice, and Exclusions. Exhibits 1-3.

### A. Injunctive Relief

1. Mayne

Mayne covenants for a four–year Enforcement Period not to engage in unlawful price–fixing, bid rigging, or market allocation regarding Generic Pharmaceutical Products. Mayne Settlement ¶ XII.A. These covenants include prohibitions on fixing prices, non–competitive bids, refraining from bids, and customer allocation with competitors. Mayne Settlement ¶ XII.A. Mayne has implemented and will maintain an Antitrust Compliance Policy, provide annual antitrust training by qualified counsel to relevant personnel, obtain acknowledgments, maintain attendance records, and require internal reporting of suspected violations; breaches of certain compliance–notice obligations can extend those obligations by one year as the exclusive remedy. Mayne Settlement ¶ XII.B-C.

2. Ascend

Ascend covenants not to engage in unlawful price-fixing, bid-rigging, or market allocation for Generic Pharmaceutical Products during the Enforcement Period. Ascend Settlement ¶ XII.A. Ascend will implement and maintain an Antitrust Compliance Policy, provide annual antitrust training for relevant newly hired personnel, obtain acknowledgments, and certify training completion for current relevant employees within 60 days of the Effective Date. Ascend Settlement ¶ XII.B. Ascend must designate a Compliance Officer who reports to the Board, distributes the Agreement internally, maintains training, investigates credible violations, takes corrective action,

and provides written notice of any actual violation and corrective steps to the Representative States within 30 business days. Ascend Settlement ¶ XII.B-C. Ascend will provide annual certifications of substantial compliance and reports will be kept confidential subject to state law; these covenants are immediately enforceable and included in the court's approval orders. Ascend Settlement ¶ XII.B-C.

3. Citron

Citron has ceased doing business but nonetheless has agreed to prospective injunctive relief for an Enforcement Period starting on the Effective Date and ending December 31, 2033. Citron Settlement ¶ I.I. The Citron Settlement provides for immediate, court-enforceable covenants that prohibit unlawful price-fixing, bid-rigging, and market allocation for Generic Pharmaceutical Products. Citron Settlement ¶ IX.A.1. Citron covenants that it and its current directors, officers, and employees, if any, will not engage in unlawful price-fixing, bid-rigging, or market allocation regarding Generic Pharmaceutical Products during the Enforcement Period, with detailed prohibitions on agreements with competitors. *Id.* The covenants are enforceable by the Court and via a new action by the States. Citron Settlement ¶ IX.A.2. Citron has furthermore agreed to a conditional compliance–program reform if Citron resumes operations. Citron Settlement ¶ IX.B. This program includes the implementation and maintenance of an Antitrust Compliance Policy, annual antitrust training, appointment of a Chief Compliance Officer, internal dissemination of the Citron Settlement, prompt reporting and corrective action on potential violations, and annual compliance reporting to Representative States. Citron Settlement ¶ IX.B.

**B. Monetary Relief**

1. Mayne

Mayne agrees to pay to the States a Total Settlement Amount of $650,000, consisting of $637,255 (Total Settlement Amount less the Eligible Corporate Entities amount) plus $12,745 designated for Eligible Corporate Entities. Mayne Settlement ¶ I.EE., IV. 70% of $446,078.50 (Total Settlement Amount less the Eligible Corporate Entities amount) and the $12,745 designated for Eligible Corporate Entities shall constitute restitution intended to compensate Eligible Consumers, Eligible Corporate Entities, and State Entities for potential overpayments caused by the Conduct. Mayne Settlement ¶ IV. The remaining funds (30% of the Total Settlement Amount less the Eligible Corporate Entities amount) equaling $191,176.50 will be deposited in the Costs Account to compensate the States for attorneys' fees, litigation costs, settlement administration costs, and other state–law–permitted enforcement uses at the sole discretion of each State's Attorney General. Mayne Settlement ¶ IV.

All Settlement Funds will be deposited into an escrow account at Huntington Bank, divided between the Restitution Account and Costs Account, and treated as a Qualified Settlement Fund, and distribution will only take place pursuant to orders by the Court. Mayne Settlement ¶ I.N, IV. Up to $20,000 may be used for notice and administration costs prior to Final Approval. Mayne Settlement ¶ IV, VIII.

2. Ascend

Ascend agrees to pay a Total Settlement Amount of $400,000.00, consisting of $392,157.00 plus $7,843.00 designated for Eligible Corporate Entities. Ascend Settlement ¶ IV. 70% of the $392,157.00 and 100% of the $7,843.00 designated for Eligible Corporate Entities shall be considered restitution and will be deposited into the Restitution Account for later

distribution to Eligible Consumers, Eligible Corporate Entities, and State Entities. Ascend Settlement ¶ IV. The remaining 30% of $392,157.00 (Total Settlement Amount less the Eligible Corporate Entities amount), equaling $117,647.10, is to be deposited into a Costs Account held in Escrow with Huntington Bank. Ascend Settlement ¶ IV. The Attorneys General will only distribute Restitution Account funds pursuant to a Court order and under a court-approved Allocation and Distribution Plan, to compensate Eligible Consumers, Eligible Corporate Entities, and State Entities for alleged harm from the Conduct. Ascend Settlement ¶ I.O, IV. Up to $250,000 from the Costs Account may be used for notice and administration costs during the notice period. Ascend Settlement ¶ IV, IX.

3. Citron

The Citron Settlement does not include any monetary relief, as Citron has ceased business operations and has not operated as a going concern since 2016.

**C. Dismissals, Releases, and Preserved Claims**

1. Mayne

Upon Final Approval, State claims against Mayne are dismissed with prejudice, except claims brought on behalf of Eligible Consumers which are dismissed without prejudice to those consumers' ability to pursue them individually or as a class. Mayne Settlement ¶ I.N, III. State Releasors release all "Released Claims" against Released Parties through the Effective Date arising out of or relating to the alleged Conduct, while expressly reserving specified categories such as tax liabilities, criminal liability, certain Medicaid and consumer protection matters unrelated to the Conduct, product defect, warranty, securities, reverse payment, sham matters, opioid–related claims, unrelated pending litigations, and obligations created by the Mayne Settlement. Mayne Settlement ¶ I.W, IV, VII.

2. Ascend

Upon Final Approval, the Complaints are dismissed with prejudice as to Ascend, except claims brought on behalf of Eligible Consumers, which are dismissed without prejudice to those consumers' ability to pursue them individually or as a class. Ascend Settlement ¶ III. State Releasors release Ascend from all Released Claims arising out of or relating to the alleged price-fixing, bid-rigging, and market allocation Conduct, with specified reservations and exclusions (e.g., criminal liability, unrelated Medicaid liabilities, product defect claims). Ascend Settlement ¶ I.O, I.X, VII.

3. Citron

Upon entry of the Final Approval Order, the Complaint is dismissed with prejudice as to the Released Parties, except Eligible Consumers' claims, which are dismissed without prejudice; the Court retains jurisdiction to enforce the Agreement. Citron Settlement ¶ IV. The States release all civil "Released Claims" against Released Parties through the Effective Date arising out of or relating to the alleged anticompetitive Conduct, including antitrust, consumer protection, civil penalties, and Medicaid/FCA-based claims predicated on the Conduct, excluding claims held by Eligible Consumers. Citron Settlement ¶ I.R. Exclusions preserve specified State rights, including taxes, certain administrative actions, criminal liability, Medicaid claims unrelated to the Conduct, product liability, warranty, unfair/deceptive marketing unrelated to the Conduct, securities, reverse-payment/sham and other non-Conduct competition theories, opioid-related liabilities, other non-MDL litigations, and obligations created by the Citron Settlement. Citron Settlement ¶ V.

**D. Cooperation**

1. Mayne

Mayne agrees to provide reasonable cooperation in the States' ongoing litigation against Other Defendants, including data clarification, authentication/foundation for evidence, identifying knowledgeable persons, attorney proffers, identifying pricing witnesses and documents, facilitating interviews and testimony, and considering additional reasonable requests, subject to privileges and legal prohibitions. Mayne Settlement ¶ XIII.

2. Ascend

Ascend agrees to provide reasonable cooperation to the States against Other Defendants, including helping to understand and authenticate data, identifying knowledgeable personnel, considering additional reasonable assistance requests, and producing up to two witnesses for trial subject to control and limits. Ascend Settlement ¶ XIII.

3. Citron

Citron agrees to provide cooperation relief to aid specified prosecution against Other Defendants, including assistance with data understanding, authentication/foundation for business records, identification of knowledgeable personnel, attorney proffers, identification of pricing information and price increases, and good-faith consideration of additional reasonable requests, all subject to privilege and legal constraints. Citron Settlement ¶ X.

**E. Court Approval, Notice, and Exclusions**

1. Mayne

Eligible Consumers and Eligible Corporate Entities in Idaho will be notified of the Mayne Settlement and may object or request exclusion as approved by the Court. Mayne Settlement ¶ VIII, IX. Those who timely exclude themselves from the Settlement are ineligible for distributions.

*Id.* State Entities identified on Appendix A and State Entities that accept direct distributions are bound and have no exclusion right. Mayne Settlement ¶ VIII, X.

2. Ascend

Eligible Consumers in any State and Eligible Corporate Entities in Idaho may seek exclusion from receiving monies by submitting timely, valid opt-out requests under the Court-approved notice plans for the Ascend Settlement. Ascend Settlement ¶ X. Those who timely exclude themselves from the Settlement are ineligible for distributions. *Id.* Attorneys General, States, and State Entities are bound by the Agreement upon execution and have no right to seek exclusion. Ascend Settlement ¶ X.

3. Citron

The States must move for a Preliminary Approval Order within 30 days after the Execution Date and include proposed notice to inform Eligible Corporate Entities in Idaho, and anyone else for whom notice is required or desired, of their right to object or to submit a timely and valid request for exclusion from the Citron Settlement. Citron Settlement ¶ VI.D.

## IV. THE STATES' AUTHORITY

The Settlements are presented to the Court for preliminary approval by the States in their sovereign and proprietary capacities and in their capacity as *parens patriae* or similar authority under federal and state laws[4] to bring claims and to obtain important redress for harm caused by

[4] *E.g.*, Conn. Gen. Stat. § 35-32(c); Alaska Stat. §§ 45.50.580; 45.50.577(b); Ariz. Rev. Stat. §§ 44-1407, 44-1408(A), 44-1528(A); Cal. Bus. & Prof. Code § 16760; Col. Rev. Stat. § 6-4-111: D.C. Code §§ 28-4507, 28–3909; Del. Code Ann. tit. 6, § 2101, *et seq.*; Del. Code Ann. tit. 29, §§ 2520 and 2522; Fla. Stat. § 542.22(22); Ga. Code Ann. § 10-1-397(b)**;** Idaho Code Ann. § 48-108; 740 Ill. Comp. Stat. 10/7(2); Ind. Code § 24-1-2-5; *Bd. of Comm'rs of Howard Cty. v. Kokomo City Plan Comm'n*, 263 Ind. 282, 295 (1975); *Bd. of Comm'rs of Union City v. McGuinness*, 80 N.E.3d 164, 170 (Ind. 2017); Ind. Code § 24-5-0.5-4(c); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972); Iowa Code § 553.12; Kan. Stat. Ann. § 50-103(a)(8); Ky. Rev. Stat. Ann § 15.020, 367.110 through 367.990, and 518.020; *Com. ex. rel. Conway v. Thompson,* 300 S.W.3d 152 (Ky. 2010);

Defendants' conduct. State attorneys general are politically accountable representatives of their states and have authority under state law to recover (1) for consumers and corporate entities to the extent permitted by state laws; (2) for public purchasers, including state agencies to the extent permitted by state laws; and (3) for the state, in the form of disgorgement, civil penalties, costs, and fees.[5] The States, based on their authority to bring actions and seek relief for violations of federal law and state antitrust and consumer protection laws as to the facts in the States' Actions,[6]

---

*Com. ex rel. Beshear v. ABAC Pest Control Inc.,* 621 S.W.2d 705 (Ky. 1981); *State v. Bordens, Inc.*, 684 So.2d 1024, 1026 (La.Ct.App.1996); *Lund ex rel. Wilbur v. Pratt*, 308 A.2d 554 (Me.1973); Md. Com. Law Code Ann., § 11-209; MGL c. 93A § 4; *State v. Detroit Lumberman's Association*, 1979-2 Trade Cas. (CCH) ¶ 62,990, 1979 WL 18703 (Mich. Cir. Ct. 1979); *Minnesota v. Standard Oil Co*., 568 F. Supp. 556, 563 (D. Minn. 1983); Miss. Code Ann. §§ 7-5-1; *Clark Oil & Ref Corp. v. Ashcroft*, 639 S.W.2d 594, 596 (Mo. 1982); S*tate ex rel. Olsen v. Public Service Comm'n*, 283 P.2d 594 (Mont. 1955); Neb. Rev. Stat. § 84-212; Nev. Rev. Stat. § 598A.160(1) (1999); Nev. Rev. Stat. 598.0963 (2023); N.H. Rev. Stat. Ann. § 356:4-a; State v. City of Dover, 153 N.H. 181 (N.H. 2006); N.J. Stat. Ann. § 56:9-12.b; N.M. Stat. Ann. § 57-1-3(A), (B) (1979); *New Mexico v. Scott & Fetzer Co.*, 1981-2 Trade Cas. ¶ 64,439, 1981 WL 2167 (D.N.M. 1981); N.Y. Exec. Law § 63(12) and N.Y. Gen. Bus. Law §§ 340-342-a; N.C. Gen. Stat. §§ 75-15, 75-16; *Hyde v. Abbott Labs, Inc.*, 473 S.E.2d 680 (N.C. Ct. App. 1996); *FTC v. Mylan Labs*, 99 F. Supp. 2d 1 (D.D.C. 1999); N. D. Cent. Code §§ 51-08.1-07, -08(2); N. D. Cent. Code § 51-15-07; 4 CMC §§ 5107, 5121(b), 5206(b); Ohio Rev. Code § 109.81; *Ohio v. United Transp. Inc.,* 506 F. Supp. 1278, 1280-81 (S.D. Ohio 1981); 79 O.S. § 205 (A)(1); Or. Rev. Stat. § 646.775(1); 71 Pa. Stat. Ann. § 732-204(c); P.R. Laws Ann. tit. 32, §§ 3341–3344; R.I. Gen. Laws § 6-36-12; S.C. Code Ann. § 39-5-50(b); *State ex rel. Condon v. Hodges*, 349 S.C. 232, 562 S.E. 2d 623 (2002); S.D. Codified Laws § 37-1-23; *State v. Heath*, 806 S.W.2d 535, 537 (Tenn. Ct. App. 1990); Tenn. Code Ann. § 8-6-109; *In re Cardizem CD Antitrust Litig*., 391 F.3d 812 (6th Cir. 2004); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002); *Connecticut v. Mylan Labs, Inc.*, No. 1:98cv2114, 2001 WL 765466 (D.D.C. Apr. 27, 2001); *Government of Virgin Islands by and through Encarnacion v. Health Quest, LLC,* 2023 WL 7214673, at *4 (Superior Ct. V.I. Oct. 31, 2023) (*citing Mathes v. Century Alumina Co*., 2008 U.S. Dist. LEXIS 90087, at *29 (D.V.I. 2008)); Utah Code Ann. §§ 76-10-3106(3), 76-10-3108(1), 13-11-17; *Utah Division of Consumer Protection v. Stevens,* 398 F. Supp.3d 1139, 1150 (D. Utah Aug. 19, 2019); Vermont Stat. Ann. 9 V.S.A. § 2458; Va. Code Ann. §§ 59.1-9.15; Rev. Code Wash. § 19.86.080; *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011); W. Va. Code § 47-18-17; Wis. Stat. Ann. §§ 133.16 – 133.17(1); Wy. Stat. §§ 40–12–105, 40–12–106, 40–12–107, 40-12-112 and 40-12-113; *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592 (1982).

[5] *See* footnote 7, *infra.*

[6] *E.g.,* Conn. Gen. Stat. §§ 35-34, 35-38, 42-110o, and 42-110m; Alaska Stat. §§ 45.50.576 - .578, 45.50.501, .531, and .537; Arizona State Uniform Antitrust Act, Ariz. Rev. Stat. §§ 44-1407, 44-1408, 44-1528, and 44-1531; Cal. Bus. & Prof. Code §§ 16750, et seq., 17200, et seq., 17500, et

are authorized by state law to enter into the Settlements with Ascend, Citron, and Mayne to obtain injunctive relief and to recover for the States' Eligible Consumers, State Entities, and Eligible Corporate Entities, on whose behalf they assert claims.

### A. The States' *Parens Patriae* Authority to Represent Eligible Consumers in Their States

The States bring claims for monetary relief for Eligible Consumers pursuant to state antitrust and consumer protection laws, which build on the common law doctrine of *parens patriae*. States have long-standing authority to bring *parens patriae* actions. The term *parens patriae* means "parent of the country." *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 600, n.8 (1982) (quoting BLACK'S LAW DICTIONARY 1003 (5th ed. 1979)). The doctrine

seq., 17206, 17536, 17206.1, 16750, 16754, and 16754.5; Cal. Civil Code § 3345; Colo. Rev. Stat. § 6-4-101, et seq.; D.C. Code §§ 28-4507 and 28-4509; Del. Code Ann.tit. 6 § 2101, et seq.; Del. Code Ann. tit. 29, §§ 2520 and 2522; Fla. Stat. §§ 501.201, et seq, and 501.204; Idaho Code §§ 48-104, 48-108, and 48-112; 740 ILCS 10/1 et seq.; 10/7(1), 7(2), and 7(4); Ind. Code. §§ 24-1-2-5, 24-1-1-2, and § 24-5-0.5-4; Iowa Code §§ 553.12, 553.13, 714.16; Kan. Stat. Ann. §§ 50-103, 50-108, 50-160, 50-161, and 50-162; Ky. Rev. Stat. Ann. 367.110 et seq.; LSA-R.S. 51:1407, and 51:1408; 10 M.R.S. § 1104, 5 M.R.S. § 209; Md. Com. Law Code Ann. § 11-209; MGL c. 93A, § 4; Mich. Comp. Laws § 445.771, et seq. and § 445.901 et. seq.; Minn. Stat. §§ 325D.43, 325D.45, 325D.49, 325D.56, 325D.57, 325D.58, and 325D.66; Minn. Stat. Ch. 8; Miss. Code Ann. §§ 75-24-1, et seq., and 75-21-1 et seq.; Missouri Rev. Stat. §§ 416.011 et seq., 407.010 et seq., 15 CSR 60-8.010 et seq., 15 CSR 60-9.01 et seq.; Mont. Code Ann. §30-14-111(4), §30-14-131, §30-14-142(2), and § 30-14-222; Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1614, and 84-212; Nev. Rev. Stat. §§ 598.0963, 598.0973, 598.0999, 598A.160, 598A.170, 598A.200 and 598A.250; N.H. RSA 356:4 et seq.; N.H. RSA 358-A:1 et seq.; N.J.S.A. 56:9-1 et seq.; N.J.S.A. 56:8-1 et seq.; N.M. Stat. Ann. §§ 57-1-3, -7, -8; N.M. Stat. Ann. § 57-12-8, -10, -11; N.Y. Gen. Bus. Law §§ 340-342c; N.Y. Executive Law § 63(12); N.C. Gen. Stat. § 75-1 et seq.; N.D.C.C. §§ 51-08.1-01 et seq. and 51-15-01 et seq.; 4 CMC §§ 5101 et. seq.; 4 CMC §§ 5201 et. seq.; Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq.; 79 O.S. § 201 et seq.; 79 O.S. § 205; ORS 646.760, ORS 646.770, ORS 646.775, and ORS 646.780; 73 P.S. §§ 201-4, 201-4.1, and 201-8 (b); 10 P.R. Laws Ann. §§ 257 et seq.; 32 P.R. Laws Ann. § 3341; R.I. Gen. L. §§ 6-36-1, et. seq.; South Carolina Code of Laws §§ 39-5-50, 39-5-110, 39-5-140, and 1-7-85; S.D. Codified Laws Chapters 37-1 and 37-24; Tenn. Code Ann. §§ 47-25-101 et seq.; 11 V.I.C. § 1507; 12A V.I.C. § 328; Utah Code §§ 76-10-3101 through 76-10-3118; 9 V.S.A. §§ 2458, 2461 and 2465; Virginia Code Section 59.1-9.15; Wash Rev. Code 19.86.080 and 19.86.140; West Virginia Code § 47–18–1 et seq.; Wis. Stat. §§ 133.03, 133.14, 133.16, 133.17, and 133.18; Wyoming Statutes § 40-12-101 et seq.

originated under the English common law, which recognized the King as the guardian of "'all charitable uses in the kingdom.'" *Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 257 (1972) (quoting 3 William Blackstone, Commentaries, 47-48 (1794)). In *Hawaii v. Standard Oil Co*., the court affirmed "the right of a State to sue as parens patriae to prevent or repair harm to its 'quasi-sovereign' interests." 405 U.S. at 258. The *parens patriae* doctrine has evolved to encompass a wide range of actions to protect the health and safety of a state's citizens. *See, e.g., Georgia v. Tennessee Copper Co.,* 206 U.S. 230 (1907) (interstate air pollution); *Kansas v. Colorado,* 185 U.S. 125 (1902) (water diversion); *Louisiana v. Texas,* 176 U.S. 1 (1899) (communicable disease).

State authority to bring a *parens patriae* action for federal antitrust law violations was first recognized by the U.S. Supreme Court in *Georgia v. Pennsylvania Railroad Co.,* 324 U.S. 439 (1945). Since *Georgia,* federal courts have routinely recognized the right of state attorneys general to bring *parens patriae* actions to redress consumer deception and antitrust violations.[7] The States have, and have used, *parens patriae* authority to recover monetary damages for consumers for antitrust violations. *E.g.,* 15 U.S.C. § 15c; *In re Electronic Book Antitrust Litig.,* 14 F. Supp. 3d 525, 531 (S.D.N.Y. 2014). States have built on federal *parens patriae* authority with state law, including the provisions exercised here. Those state laws are sometimes constitutional, statutory (including both competition specific statutes and general statutes that

[7] *See, e.g. In re Electronic Book Antitrust Litig.,* 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014) (conspiracy to raise eBook prices); *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995), *aff'd,* 96 F.3d 44 (2d Cir. 1996) (conspiracy to fix, raise, maintain, or stabilize retail prices of shoes); *In re Mid-Atl. Toyota Antitrust Litig*., 541 F. Supp. 62 (D. Md. 1981) (alleged conspiracy to fix artificially high price for "polyglycoat" finish applied to certain automobiles); *California v. Infineon Technologies AG,* 531 F. Supp. 2d 1124 (N.D. Cal 2007) (alleged horizontal price-fixing conspiracy in market for dynamic random access memory (DRAM)).

apply to competition issues), common law, and case law.[8] The States are enforcing those laws here to fill gaps in federal law and otherwise strive to further the public interest.

### B. Fundamental Differences Between Parens Patriae Claims and Rule 23 Claims

*Parens patriae* claims differ from Rule 23 class action claims substantively and procedurally, and *parens patriae* actions are not directly governed by Rule 23 of the Federal Rules of Civil Procedure. *Purdue Pharma L.P. v. Kentucky,* 704 F.3d 208, 217 (2d Cir. 2013). While *parens patriae* authority derives from the states' interests as sovereigns, *Georgia*, 324 U.S. at 449, class action representation is developed to more efficiently and effectively manage private litigation asserting claims for many businesses or consumers. *See American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974). Because of its sovereign nature and political accountability, *parens patriae* authority is exercised as soon as a state attorney general files an action. In contrast, representation by class counsel under Rule 23 requires court appointment and class certification, even in the settlement context. Fed. R. Civ. P. 23. Additionally, a class action requires the ascertainability of class members. Fed. R. Civ. P. 23(b)(3).

## V. ARGUMENT

Preliminary approval of the Settlements is warranted and appropriate based on the substantive terms of the Settlements and the process by which the Settlements were negotiated.

### A. Standard for Preliminary Approval of *Parens Patriae* Settlements

*Parens patriae* settlements will be approved if they are fair, reasonable, and adequate. *State of N.Y. by Vacco v. Reebok Intern. Ltd*., 903 F. Supp. 532, 535 (S.D.N.Y. 1995). Although states' *parens patriae* actions are distinct from class actions, courts in this circuit and elsewhere generally look to the standards used in approving class action settlements when evaluating what

[8] *See* footnotes 5 and 7 *supra.*

a *parens patriae* settlement delivers. *See Id.; In re Toys 'R' Us Antitrust Litig*., 191 F.R.D. 347, 351 (E.D.N.Y. 2000); *New York v. Salton, Inc.*, 265 F. Supp. 2d 310, 313 (S.D.N.Y. 2003); *New York v. Nintendo of Am. Inc.*, 775 F. Supp. 676, 680 (S.D.N.Y. 1991). The *parens patriae* settlement approval process generally applies a two-step approach: (1) preliminary approval and (2) final approval. *See In re GSE Bonds Antitrust Litigation*, 414 F. Supp. 3d 686, 691-92 (S.D.N.Y 2019); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.,* 330 F.R.D. 11, 28 (E.D.N.Y. 2019).

The preliminary approval process is governed by a "likelihood standard," requiring the Court to assess whether the parties have shown that "the court ***will likely*** be able to grant final approval…." *In re Payment Card*, 330 F.R.D. at 28 n.21 (emphasis in original). Preliminary approval of a settlement "is at most a determination that there is what might be termed 'probable cause' to submit the proposal to … [consumers] and hold a full-scale hearing as to its fairness." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010) (citing *In re Traffic Executive Association–Eastern Railroads,* 627 F.2d 631, 634 (2d Cir.1980)). "Because Rule 23(e)(2) sets forth the factors that a court must consider when weighing *final* approval, it follows that courts must assess at the preliminary approval stage whether the parties have shown that the court will *likely* find that the factors weigh in favor of final settlement approval." *In re Payment Card,* 330 F.R.D. at 28.

**B. The Settlements Meet the Standard for Preliminary Approval**

The Settlements satisfy the standard for preliminary approval because the Court w*ill likely* be able to grant final approval of the Settlement. *See supra, e.g.*, *In re Toys 'R' Us Antitrust Litig*., 191 F.R.D. at 351; *New York v. Salton, Inc.*, 265 F. Supp. 2d at 313; *State of New York v. Reebok Intern. Ltd*., 903 F. Supp at 535; *New York. v. Nintendo of Am. Inc.*, 775 F. Supp. at 680.

Final approval of a class action settlement requires courts to consider whether:

A. the class representatives and class counsel have adequately represented the class;
B. the proposal was negotiated at arm's length;
C. the relief provided for the class is adequate, taking into account:
    i. the costs, risks, and delay of trial and appeal;
    ii. the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required;
    iii. *the terms of any proposed award of attorney fees*, including timing of payment; and
    iv. any agreement required to be identified under Rule 23(e)(3); and
D. the proposal treats class members equitably relative to each other.

F. R. Civ. P. 23(e)(2). "Paragraphs (A) and (B) constitute the 'procedural' analysis factors and examine 'the conduct of the litigation and of the negotiations leading up to the proposed settlement.'" *In re Payment Card,* 330 F.R.D. at 29 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment). "Paragraphs (C) and (D) constitute the 'substantive' analysis factors and examine '[t]he relief that the settlement is expected to provide ….'" *Id.* In the Second Circuit, the Rule 23(e)(2) factors are supplemented by the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), when determining whether the Court will likely find that a settlement is fair, reasonable, and adequate, thus warranting preliminary approval. *Id.*; *In re GSE Bonds*, 414 F. Supp. 3d at 692. *Grinnell* sets forth nine factors that are referred to as the *Grinnell* factors:

(1) the complexity, expense, and likely duration of the litigation;
(2) the reaction of the class to the settlement;
(3) the stage of the proceedings and the amount of discovery completed;
(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6) the risks of maintaining the class action through the trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and,
(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d at 463 (citations omitted). The States will address both sets of factors.

1. Procedural Analysis Factors Support Preliminary Approval

The initial determination of fairness, often called "procedural fairness," focuses on the settlement process itself. Fed. R. Civ. P. 23(e)(2). *See, e.g. In re GSE Bonds*, 414 F. Supp. 3d at 693; *Ebbert v. Nassau County*, No. CV 05-5445 (AKT), 2011 WL 6826121, at *7 (E.D.N.Y. Dec. 22, 2011); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 238-39 (E.D.N.Y. 2010). Because the Settlements were negotiated at arm's length by experienced litigators and is the result of a good-faith and procedurally fair process, the procedural factors support preliminary approval of the Settlement.

i. The States Have Adequately – and Zealously – Represented Eligible Consumers

This first procedural factor requiring adequate representation of the class is not directly applicable to a settlement in a *parens* action brought by the States in the public interest. *See, e.g. State of New York v. Reebok International, Ltd.,* 96 F.3d 44, 48 (2d Cir. 1996) (noting Attorneys General in *parens* actions are motivated by concern for the public interest). Nonetheless, the States have vigorously represented the interests of their citizens in the States' Actions for more than nine years. States' Decl. ¶ 10. The States have engaged in extensive discovery and motion practice, zealous prosecution of the States' Actions, and settlement negotiations to obtain a favorable settlement. *Id.* The States represent forty-eight U.S. jurisdictions whose interests are aligned in enforcing federal and state laws and vigorously pursuing remedies for their states, their Eligible Consumers, State Entities, and Corporate Entities. *Id.* ¶ 9.

ii. The Settlements Were Negotiated at Arm's Length by Experienced Counsel

The Settlements were "reached through arm's-length negotiations between experienced, capable counsel knowledgeable in complex … litigation" and "'enjoys a presumption of

fairness.'" *In re GSE Bonds*, 414 F. Supp.3d at 693 (*quoting In re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)); State of *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. at 535. Attorneys representing the parties to the Settlements are experienced and well-informed. Settling Defendants' respective counsel have significant expertise in complex antitrust litigation. The Assistant Attorneys General who negotiated the Settlement, individually and collectively, also have extensive experience with antitrust investigations and litigation. States' Decl. ¶ 12. "The Attorneys General have extensive experience in complex antitrust cases brought under their *parens patriae* powers." *New York v. Nintendo of Am. Inc.*, 775 F. Supp. at 680. Indeed, this action is part of a long and successful tradition of multistate litigation by State Attorneys General.[9]

Courts can place special weight on a settlement being negotiated by government attorneys committed to protecting the public interest. *Wellman v. Dickinson,* 497 F. Supp. 824, 830 (S.D.N.Y. 1980), *aff'd*, 682 F.2d 355 (2d Cir. 1982). The participation of the States' Attorneys General in the negotiation of the Settlement furnishes extra assurance that Eligible Consumers' interests are protected. *In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. at 351. The motivating factor in the States' Actions is the enforcement of antitrust laws by the States acting as *parens patriae*

---

[9] *See, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93 (1989); *Hartford Fire Ins. v. California*, 509 U.S. 764 (1993); *In re Panasonic Consumer Elect. Prod.*, 1989-1 Trade Cas. (CCH) ¶ 68, 613 (CCH), 1989 WL 63240, (S.D.N.Y. June 5, 1989); *Colorado v. Airline Tariff Publ's Co.*, 1995-2 Trade Cas. (CCH) ¶ 71,231, 1995 WL 792070 (D.D.C. May 10, 1995); *In re Mid-Atl. Toyota Antitrust Litig., 605* F. Supp. 440 (D.Md.1984); State of *New York v. Reebok International, Ltd.,* 96 F.3d 44 (2d Cir. 1996); *In re Electronic Book Antitrust Litig.,* 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp 706 (D. Minn.1975); *U.S. v. Apple Inc.,* 952 F. Supp.2d 638 (S.D.N.Y 2013); *In re Compact Disk Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197 (D. Me. 2003); *State of New York, et al. v. Cephalon, Inc.*, No. 16-4234 (E.D. Pa. 2016); *State of Wisconsin, et al. v. Indivior Inc., et al.*, 16-cv-5073 (E.D. Pa. 2016); *See also*, *State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD (N.D. Cal.).

for their citizens. *See New York v. Reebok,* 96 F.3d at 48. The States negotiated at arm's length with Defendants while actively litigating, and the States' forty-eight (48) Attorneys General have approved the Settlements on behalf of their states, their Eligible Consumers, State Entities, and Eligible Corporate Entities, for whom they assert claims. States' Decl. ¶¶ 8, 12; Exhibits 1-3.

iii. The States Have Obtained a Sufficient Understanding of the Case

The States were well informed about the issues in this matter and the strengths and weaknesses of the States' Actions when they negotiated the Settlements with Ascend, Citron, and Mayne. States' Decl. ¶¶ 10-13. The third *Grinnell* factor requires the Court to consider the stage of the proceedings and amount of discovery completed. *In re GSE Bonds*, 414 F. Supp. 3d at 699. "The relevant inquiry 'is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement.'" *Id.* (*quoting In re AOL Time Warner, Inc.*, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006)). The State of Connecticut has been investigating some claims since July 2014, and most States have been litigating some of the claims in the States' Actions since December 2016. The lengthy and extensive litigation has provided an excellent foundation to understand the facts and legal issues, as have this Court's and the MDL Court's opinions and orders. The States understand what Eligible Consumers, State Entities, and Corporate Entities have overpaid for the Drugs at Issue manufactured by Settling Defendants and the Other Defendants as a result of the conduct alleged in the States Actions, based on data provided by state Medicaid agencies, third parties, Other Defendants in the States' Actions and other defendants in the MDL, and expert analysis and reports. The States' investigation and litigation work over the past ten years, including expert discovery and recent summary judgment briefings, has allowed them to obtain an excellent understanding of the case. States' Decl. ¶ 10.

In summary, because the Settlements were the product of arm's length negotiations between informed and experienced counsel and were reached after a lengthy investigation and litigation, the procedural factors weigh in favor of preliminary approval.

2. <u>Substantive Analysis Factors Support Preliminary Approval</u>

The second set of Rule 23(e) factors focuses on the substantive terms of the Settlements and the relief that the Settlements are expected to provide. Fed. R. Civ. P. 23(e)(2); *In re Payment Card,* 330 F.R.D. at 29. This inquiry overlaps significantly with several *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C). *In re GSE Bonds,* 414 F. Supp. 3d at 693 (citing *In re Payment Card*, 330 F.R.D. at 36). The substantive factors weigh in favor of preliminary approval because the Settlements provide substantial and guaranteed recovery for Eligible Consumers, State Entities, and Eligible Corporate Entities, which recovery is fair, reasonable, and adequate given the litigation risks. States' Decl. ¶ 28.

Rule 23(e)(2)(C) requires the Court to examine whether the "relief … is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Furthermore, *Grinnell* factors eight ("the range of reasonableness of the settlement in light of the best possible recovery)," and nine ("the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation") are often considered together. *In re GSE Bonds*, 414 F. Supp. 3d at 696 (*quoting In re Payment Card*, 330 F.R.D. at 47-48).

i. The Settlements Provide Adequate Relief

When assessing the adequacy of a settlement, courts may need to forecast the likely range of possible recoveries and the likelihood of success in obtaining such results. *In re GSE Bonds*, 414 F. Supp. 3d at 693 (citing *In re Payment Card,* 330 F.R.D. at 36). The Court's task is to weigh the settlement figure against the amount of likely recovery. *New York v. Reebok,* 96 F.3d at 49. Courts have held that "[t]he proper measure of damages in a suit concerning a price-fixing conspiracy is 'the difference between the prices actually paid and the prices that would have been paid absent the conspiracy.'" *In re Electronic Books Antitrust Litigation*, 2014 WL 1282293 at *16 (S.D.N.Y., March 28, 2014) (quoting *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1077 (2d Cir.1988)). Furthermore, monetary relief in antitrust cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565, 101 S. Ct. 1923, 68 L.Ed.2d 442 (1981) (quoting *Bigelow v. RKO Pictures, Inc.,* 327 U.S. 251, 264 (1946)).

Based on information and data the States have obtained through investigation and discovery, and analysis provided by the States' experts in the Dermatology Action (*Connecticut et al. v. Sandoz, Inc., et al.*, 3:20-cv-00802), the States estimate that any overcharges attributable to Mayne's anticompetitive conduct are minimal, that overcharges attributable to Citron's anticompetitive conduct related to the two drug-specific conspiracies brought against Citron is less than $2 million, and that overcharges attributable to Ascend for its role in the single drug conspiracy is no more than $500,000. States' Decl. ¶¶ 14-16. In light of Citron's defunct status, the Citron Settlement does not provide monetary relief and provides injunctive terms only. States' Decl. ¶ 15. Given that the Settlement Funds are significant considering the case complexity and litigation risk, they are, therefore, reasonable, adequate, and within the range of possible approval

for purposes of the preliminary approval analysis. *See, e.g., In re GSE Bonds*, 414 F. Supp. 3d at 697; *In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, 2006 WL 3247396, at *6 (S.D.N.Y. Nov. 8, 2006).

In addition to monetary relief, the Settlements provide valuable relief through Settling Defendants' commitments, including maintaining a compliance program, a Chief Compliance Officer, antitrust training, and providing reporting of potential violations to the States. *See* Mayne Settlement ¶ XII; Ascend Settlement ¶ XII; Citron Settlement ¶ IX.

ii. <u>The Cooperation from Settling Defendants Adds Value to the Settlement</u>

Further value is added to the Settlements through Settling Defendants' agreement to provide cooperation to the States in the ongoing litigation against Other Defendants. *See In re GSE Bonds*, 414 F. Supp. 3d at 697. Successful litigation against Other Defendants will increase the likelihood of further recovery and additional value to the States, Eligible Consumers, State Entities, and Eligible Corporate Entities on whose behalf the States assert claims. Related to this is the seventh *Grinnell* factor, defendants' ability to withstand a greater judgment. Even if it is determined that Settling Defendants could withstand a greater judgment, "courts have noted that a defendant's cooperation 'tends to offset the fact that they would be able to withstand a larger judgment.'" *In re GSE Bonds*, 414 F. Supp. 3d at 694 (*quoting In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008)).

Settling Defendants' covenant to reasonably cooperate in this litigation confers substantial value that supports preliminary approval. *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396 at *9 (E.D.N.Y. Sept. 25, 2009) ("the agreement to cooperate with the plaintiffs … adds significant value"); *In re GSE Bonds*, 2019 WL 6842332 at *4 (S.D.N.Y Dec. 16, 2019) ("this cooperation … nonetheless provides some additional value to the GS settlement"); *In re Packaged Ice Antitrust Litig.*, 2010 WL 3070161 at *6 (E.D. Mich. Aug 2,

2010) (where "there is the potential for a significant benefit … in the form of cooperation on the part of the settling Defendant, this Court is reluctant to refuse to consider the very preliminary approval that will trigger that cooperation"). By committing to provide reasonable cooperation to assist the States in litigating their claims against the Other Defendants in the States' Actions, Settling Defendants provide meaningful added value to the States and the Settlements. *See* Mayne Settlement ¶ XIII; Ascend Settlement ¶ XIII; Citron Settlement ¶ X.

iii. The Settlements Are Reasonable Considering the Costs, Risks, and Delay of Trial and Appeal

When evaluating the adequacy of the Settlement, the Court should compare the Settlement Funds and the full estimated damages in light of the risks of litigation, which determine the likelihood of recovery. As the risks of litigation increase, the range of reasonableness correspondingly decreases. *In re Cendant Corp. Derivative Action Litig*., 232 F. Supp. 2d 327, 336 (D.N.J. 2002). This analysis overlaps significantly with *Grinnell* factors 1, 4, 5, and 6, which include: the complexity, expense, and likely duration of the litigation (factor 1); the risks of establishing liability (factor 4); the risks of establishing damages (factor 5); and the risks of maintaining the class action through the trial (factor 6). *Grinnell*, 495 F.2d at 463.

A settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution. *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y.1972). The Settlement's substantial and guaranteed recovery for the States, Eligible Consumers, and State Entities is fair, reasonable, and adequate given the risks inherent in any litigation and more particularly in a complex antitrust case such as this matter. In addition to analyzing purchases of Settling Defendants' Drugs at Issue and the damages analysis contained in expert reports submitted in the States' Actions, the States have gathered information necessary to adequately assess their risks of litigation in this matter.

The States have done significant investigation and litigation work to support their belief in their claims, but litigation always includes risks. Antitrust cases "'are complicated, lengthy, and bitterly fought,'… as well as costly." *In re GSE Bonds,* 414 F. Supp.3d at 697 (quoting *Wal-Mart Stores, Inc., v. Visa U.S.A., Inc*., 396 F.3d 96, 118 (2d Cir. 2005)); *See also In re Vitamin C Antitrust Litig*, No. 06-MD-1738 (BMC), 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012). This litigation, which, in addition to federal law claims, also includes state law claims for forty-one different states,[10] is no exception, particularly given the number of parties, drugs, and alleged conspiracies and the fact that the litigation against Settling Defendants has been ongoing for nine years. *See In re GSE Bonds*, 414 F. Supp.3d at 693. The States' Actions will involve multiple trials, which will be lengthy and complex because of the nationwide scope of the alleged activities, and it has already required lengthy and expensive discovery. *See New York v. Reebok,* 903 F. Supp. at 536. "Courts favor settlement when litigation is likely to be complex, expensive, or drawn out." *In re GSE Bonds*, 414 F. Supp.3d at 693.

Litigating the claims and defenses in this case would necessarily entail some risk with respect to establishing liability and proving damages or other relief sought. "[A]s to liability, establishing the existence and extent of a conspiracy will necessarily be a complex task, and many of the hurdles that plaintiffs have overcome at the pleading stage will raise substantially more difficult issues at the proof stage." *In re LIBOR-Based Fin. Instruments Antitrust Litig*., 327 F.R.D. 483, 494 (S.D.N.Y. 2018) ("*LIBOR*"). Proving violations of antitrust laws is no mean feat,

---

[10] The States bring claims under the laws of Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.

and even if that feat is accomplished, proving remedies and damages is just as difficult. *See LIBOR*, 327 F.R.D. at 494 (plaintiffs' damages models would "unquestionably be challenged and perhaps subject to further *Daubert* motions"); *In re GSE Bonds*, 414 F. Supp. 3d at 697 (even if they prove liability, plaintiffs will still face the difficulties inherent in proving damages). At trial, proof of damages, disgorgement, restitution, and civil penalties would likely be a complex task involving a "battle of the experts." *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998); *See Chatelain* v. *Prudential–Bache Secs., Inc.,* 805 F. Supp. 209, 213 (S.D.N.Y. 1992) (complex issue of establishing damages would require battle of the experts).

This litigation has been ongoing for more than nine years, and considering the risks, costs, and delays involved in an antitrust case of this magnitude, the opportunity for guaranteed relief weighs heavily in favor of approving the Settlement. *See In re GSE Bonds*, 414 F. Supp. 3d at 694 ("a court 'should balance … immediacy and certainty of recovery against the continuing risk of litigation'"). Recognizing the cooperation that Settling Defendants have agreed to provide, the increased likelihood of settlements with Other Defendants, the risks of litigation, and the time value of money, the States believe that the Settlements with Settling Defendants are fair, reasonable, and adequate.

iv. <u>The Monetary Payment to the States is Fair and Reasonable and the Settlements Do Not Contain Any Additional Agreement that Affects the Fairness of the Settlement</u>

The Court must also consider the terms of any proposed award of attorney fees, including timing of payment, and any agreement required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C). The Ascend and Mayne Settlements provide that 30% of the Settlement Funds, which equals $ 117,647.10 (Ascend) and $ 191,176.50 (Mayne) will be placed in a Costs Account for use in paying for the expenses of the Notice Plan and administration, and upon final approval of the settlement, for costs of litigating the States' claims both collectively or individually,

including to reimburse the States for attorney fees. Mayne Settlement ¶ I.E; Ascend Settlement ¶ I.F. Furthermore, to the extent that the funds in the Costs Account are not needed to offset costs of States litigating in the State Actions, any remaining funds may be used by the States as set forth in Mayne Settlement ¶ I.E; and Ascend Settlement ¶ I.F. The Costs Account represents statutorily authorized recovery and enforcement remedies, including the States' costs and expenses of settlement administration, the costs, expenses, and attorney fees incurred by the States in investigating and litigating the States' Actions, and other monetary recovery or remedies the States may be entitled to pursuant to state law.[11] This payment to the States is fair and reasonable under the circumstances. The States have not entered into any related agreements that affect the fairness of the Settlement.

v. <u>An Allocation and Distribution Plan Is Currently Pending Before the Court</u>

The States submitted Plaintiff States' Motion for Preliminary Approval of an Allocation and Distribution Plan for Consumer Restitution Funds ("Allocation and Distribution Plan") on August 3, 2026, and the Court granted preliminary approval of the Allocation and Distribution Plan on September 8, 2026. ECF Nos. 1014, 1034 (3:16-cv-02056-MPS), 971, 992 (3:19-cv-00710-MPS), and 1472, 1510 (3:20-cv-00802-MPS). The States are requesting that the share of the Settlement Funds allocated to Consumer Restitution Funds be placed in Escrow and allocated and distributed in accordance with the States' Allocation and Distribution Plan and as further approved by the Court. As set forth in the Plaintiff States' Motion for Preliminary Approval of an Allocation and Distribution Plan for Consumer Restitution Funds, the States believe the proposed Allocation and Distribution Plan is fair, adequate, and reasonable under the circumstances.

[11] *See* footnote 7, s*upra.*

In summary, the factors set forth in Rule 23(e)(2), together with the *Grinnell* factors, demonstrate that the Settlements are fair, reasonable, and adequate, under the circumstances of this case, and that preliminary approval of the Settlements is warranted.

## VI. HUNTINGTON BANK AS ESCROW AGENT

Pursuant to the Settlements, Ascend will pay $400,000 and Mayne will pay $650,000 (the "Settlement Funds") to the States. Mayne Settlement ¶ IV; Ascend Settlement ¶ IV. Settling Defendants' payments will be deposited directly into escrow with Huntington Bank and will accrue interest. States' Decl. ¶ 17. The States shall hold the payments in escrow pending final Court approval of a distribution. Mayne Settlement ¶ I.E, I.N, I.Z, IV, V; Ascend Settlement ¶ I.F, I.O, I.AA, IV, V. Subject to Court approval, a state escrow (a "State Escrow") will be established at the Huntington National Bank ("Huntington Bank" and "Escrow Agent") pursuant to an Escrow Agreement dated September 12, 2024 (the "Escrow Agreement"). *Id.* Huntington Bank is well qualified to serve as the Escrow Agent, already serving in this role in previous settlements in the States' Actions and having regularly served in that role in many other *parens patriae* or class action settlements. States' Decl. ¶ 18. Therefore, the States request that the Court appoint Huntington Bank to serve as Escrow Agent for the purpose of administering the State Escrow holding the Settlement Funds.

## VII. THE CONSUMER NOTICE PLAN

The States seek the Court's approval of the proposed Notice Plan set forth in the declaration of Tiffaney Janowicz filed herewith. There are no rigid rules for determining whether a settlement notice satisfies constitutional requirements. *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp.2d 179, 191 (S.D.N.Y. 2012), *aff'd sub nom. Charron*, 731 F.3d 241 (2d Cir. 2013). "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the

Federal Rules is measured by reasonableness." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 727 (2d Cir. 2023) (citing, *Wal-Mart Stores*, 396 F.3d at 113–14). "[N]otice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores*, 396 F.3d at 114 (citation and internal quotation marks omitted).

To ensure compliance with notice requirements under the Settlement, as well as state and federal laws, the States have retained Rust Consulting, Inc. ("Rust"), a nationally recognized notice and administration company specializing in the design and implementation of notice and administration programs of all sizes and types in class action settlements and similar matters. *See* Declaration of Tiffaney Janowicz ("Janowicz Decl.") ¶¶ 2-4 and Exhibit A. Rust has extensive experience in state and federal class and *parens patriae* actions. *Id.*

Relying on the noticing efforts undertaken by the States for the previous settlements in the States' Actions with Heritage, Apotex, Bausch, Lannett, and Glenmark which provided notice about the previous settlements, the litigation, and all the defendants and Drugs at Issue, the States propose to take the following actions to effectuate notice to Eligible Consumers:

First, on October 30, 2024, Rust established a website at www.AGGenericDrugs.com. The website informs Eligible Consumers about the litigation and Settlement, including basic information about Eligible Consumers' rights and options concerning the Settlement, shares helpful documents, and lists "FAQs" to several expected questions Eligible Consumers are likely to have. Janowicz Decl. ¶ 10*;* Exhibit E. The website also includes a toll-free telephone number and email address where Eligible Consumers can seek additional information. Janowicz Decl. ¶ 10. The home page on the website will be modified to include overviews of the Settlements along with the Eligible Consumers' options and relevant deadlines (when available). Janowicz Decl. ¶ 11.

Separate links for documents relating to the Settlements will be added to the website's documents page. *Id.* All documents will be organized by settlement with the settlement name in the link to minimize consumer confusion. *Id.* The website also makes clear that Eligible Consumers need only register *once* to receive future information about the States' litigation(s) and receive a claim form when available. *Id.*

The States have drafted a clear, one-page notice ("Short Form Notice"), that informs Eligible Consumers of the Settlements and the litigation, helps Eligible Consumers determine whether they may be eligible to participate under the Settlement, provides a means by which Eligible Consumers can register to obtain additional information about the litigation and claims process, and explains the manner and effect of opting out or objecting to the Settlement. Janowicz Decl. ¶ 10; Exhibit D. The States will also provide a much longer and more detailed notice ("Long Form Notice"), available on the website and mailed to Eligible Consumers upon request. Janowicz Decl. ¶ 10; Exhibit C. The Long Form Notice will include additional information about the Settlement. *Id.* The website also has a form allowing Eligible Consumers to register to obtain future information about how to file a claim seeking payment (if eligible), and a form for Eligible Consumers seeking to be excluded from the Settlement. *Id. See also* AGGenericDrugs.com

Second, from the time the first settlement in the States' Actions was announced, Rust has been collecting registrations through the settlement website, by telephone, and by mail. Janowicz Decl. ¶ 12. When possible, Rust will send direct notice to registered Eligible Consumers by emailing the Short Form Notice to Eligible Consumers who registered to receive updates concerning the case status. *Id.* For those Eligible Consumers who did not provide an email address with their registration, Rust will mail the Long Form Notice. *Id.* A note will accompany both types

of notices to let Eligible Consumers know that the notice is being sent as a result of their registration, and they do not need to register again to receive future updates. *Id.*

Third, an earned media program will be implemented that includes press releases issued by the States that provide opportunities for Eligible Consumers to receive information on the Settlements through traditional media, such as television, radio and newspapers, as well as digital advertising. Janowicz Decl. ¶ 13. Additionally, the language of the Short Form Notice will be distributed through PR Newswire's US1 Newsline as a nationwide press release across the U.S. reaching approximately 14,500 websites, media outlets, and journalists. *Id.* The distribution includes a SocialBoost widget enabling seamless sharing to major platforms (X/Twitter, Facebook, Instagram, LinkedIn, and WhatsApp). Each button shares an optimized preview including the content link, an image, headline, and suggested social post copy. *Id.*

The objective of the proposed Notice Plan is to provide reasonable notice to Eligible Consumers who purchased one of the generic drugs specified in the States' Actions; provide Eligible Consumers with opportunities to learn about the Settlements and act upon their rights; and ensure that Eligible Consumers will be exposed to, see, review, and understand the notices. Janowicz Decl. ¶¶ 6-7. The Notice Plan builds on notice efforts undertaken by the States for previous settlements in this litigation. Janowicz Decl. ¶ 8. The Notice Plan will "fairly, accurately, and neutrally describe the claims and parties in the litigation, the terms of the proposed settlement, and the identity of persons entitled to participate in it," as well as apprising affected Eligible Consumers of their options regarding the proposed Settlement. *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (*citing*, *Foe v. Cuomo*, 700 F. Supp. 107, 113 (E.D.N.Y. 1988), *aff'd,* 892 F.2d 196 (2d Cir. 1989)); *Wal-Mart Stores*, 396 F.3d at 114. The States believe the Notice Plan provides reasonable notice to Eligible Consumers under the circumstances. The States

propose that notice shall begin within seven (7) days of preliminary approval and provide a deadline of seventy-seven (77) days from the date of the order of preliminary approval for Eligible Consumers to opt out of, comment on, or object to the Settlement. The States request that this Court approve the Notice Plan, and order that notice commence within seven (7) days after the entry of the Preliminary Approval order.

## VIII. NOTICE TO ELIGIBLE CORPORATE ENTITIES

Under the terms of the Settlement, the attorneys general of Idaho and Washington are settling and releasing claims on behalf of corporate (and other business) entities for which the Attorneys General of Idaho and Washington have asserted an exclusive claim in the Action, whether pursuant to the Attorneys General *parens patriae* authority or otherwise ("Eligible Corporate Entities"). Under Idaho and Washington state law, only the attorney general may bring antitrust claims for monetary relief on behalf of persons (which includes Eligible Corporate Entities) who are injured indirectly. *See* Idaho Code §§ 48-108(2), 48-113(1); Wash. Rev. Code 19.86.080. The Settlements provide that the States shall provide notice to Eligible Corporate Entities of their rights to comment on or to exclude themselves from the States' Actions and the Settlement.[12] *See* Mayne Settlement ¶ VIII, IX.; Ascend Settlement ¶ X; Citron Settlement ¶ VI.D. The States propose to give notice to Eligible Corporate Entities in Idaho through a press release issued by the Idaho Attorney General. States' Decl. ¶ 26. Considering that Eligible Corporate Entities in Idaho that are injured indirectly do not have a private right of action for their indirect

[12] *See* Idaho Code § 48-108(2)(b), (2)(c), (3). Although Washington also asserts an exclusive claim on behalf of Eligible Corporate Entities in the States' Actions, Washington law does not provide a right to exclusion from a settlement for Eligible Corporate Entities. See Wash. Rev. Code 19.86.080. While Washington law does not require notice, Washington will still give notice to Eligible Corporate Entities in Washington through a press release issued by the Washington Attorney General.

injuries, notice through a press release constitutes sufficient notice. Furthermore, Rust will establish a subpage on the website www.AGGenericDrugs.com at https://www.aggenericdrugs.com/English/CorporateEntities where Eligible Corporate Entities in Idaho and Washington can obtain information about the Settlements and register to obtain additional and future information about the litigation and a future claims process. Janowicz Decl. ¶ 18. Finally, the website will provide Eligible Corporate Entities in Idaho an opportunity to exclude themselves from the Settlement. *Id.*

## IX. ALLOCATION AND DISTRIBUTION OF SETTLEMENT FUNDS

The States seek preliminary approval of the allocation and distribution of parts of the Settlement Funds received in the States' Actions, including approval of (A) allocation of Settlement Funds between restitution and costs and the distribution to the States of funds allocated to costs, (B) allocation of restitution funds between Eligible Consumers and State Entities and the distribution to the States of funds allocated to State Entities, (C) allocation of Consumer Restitution Funds according to the Allocation and Distribution Plan preliminarily approved by the Court on September 8, 2026; and (D) a deferral of the allocation and distribution of the funds allocated to Eligible Corporate Entities. The approval of a plan of distribution is within the discretion of the Court. *In re Chicken Antitrust Litig.,* 669 F.2d 228, 238 (5th Cir. 1982)*; West Virginia v. Chas. Pfizer & Co., Inc.,* 440 F.2d 1079, 1085 (2d Cir. 1971); *White v. National Football League,* 822 F. Supp. 1389, 1417 (D. Minn. 1993). The standard for judicial approval of a settlement agreement, that requires a finding that the settlement is fair, adequate and reasonable, "applies with as much force to the review of the allocation agreement as it does to the review of the overall settlement between plaintiffs and defendants." *In re Chicken,* 669 F.2d at 238; *see also In re Citric Acid Antitrust Litig.*, 145 F. Supp, 2d 1152, 1154 (N.D.Cal.2001) (approving a plan for the allocation

of a class settlement fund is governed by the same legal standards that apply to approving the settlement terms: the distribution plan must be "fair, reasonable and adequate").

### A. Allocation of Settlement Proceeds between the Restitution Account and Costs Account and Distribution of the Costs Account

The Settlements provide that 70% of the Settlement Funds shall be allocated and held in the State Escrow for later distribution to victims of the anticompetitive acts alleged by the States, namely Eligible Corporate Entities, Eligible Consumers and State Entities ("Restitution Account"). Mayne Settlement ¶ IV; Ascend Settlement ¶ IV. Furthermore, 30% of the Settlement Funds shall be held in escrow and used to pay for settlement notice and administration costs and, upon final approval of the Settlement Agreements, for costs of litigating the States' claims, including attorney fees ("Costs Account"). Mayne Settlement ¶ IV; Ascend Settlement ¶ IV. The States request that the Court grant preliminary approval of the proposed 70/30 percentage allocation of Settlement Funds between the Restitution Account and Costs Account and request approval for the Costs Account to be distributed to the States upon final approval of the Settlement.

### B. Allocation of Restitution Account Between Eligible Consumers and State Entities

The Settlements provide that 70% of the $400,000 Settlement Funds from Ascend and the $650,000 Settlement Funds from Mayne, which equals $741,176.40 ($282,352.90 from Ascend and $458,823.50 from Mayne) are allocated to restitution for Eligible Corporate Entities, Eligible Consumers and State Entities that are State Releasors (referred to as the "Restitution Account"), to compensate them for any alleged harm resulting from the alleged Conduct. Mayne Settlement ¶ IV; Ascend Settlement ¶ IV. Of the Restitution Amount, $12,745.00 (Mayne) and $7,843.00 (Ascend) is allocated to Eligible Corporate Entities and $446,078.50 (Ascend) and $274,509.90 (Mayne) is allocated to State Entities and Eligible Consumers. Mayne Settlement ¶ IV; Ascend Settlement ¶ IV.

As with previous settlements, the States propose to split this share of the Restitution Account so that $288,004.42 from Mayne and $177,233.78 from Ascend (which is approximately 44% of the Settlement Funds) is allocated to Eligible Consumers ("Consumer Restitution Funds") and $158,074.08 and $97,276.12 (which is approximately 24% of the Settlement Funds) is allocated to State Entities. The States request that the Settlement Funds allocated to State Entities be distributed to the States upon final approval of the Settlements and the final approval of an Allocation and Distribution Plan, for the States to allocate among themselves per their agreement and at their discretion.

The States maintain that this allocation between Eligible Consumers and State Entities, which is based on numbers provided by experts relating to estimated spend, is fair, reasonable, and warrants preliminary approval. Further, the States request preliminary approval to distribute to the States the share of the Settlement Funds allocated to State Entities, upon final approval of the Settlement, to be further allocated and distributed by the States among themselves at the States' discretion and pursuant to a collective agreement among the States.

**C. Allocation and Distribution of Consumer Restitution**

Based on the foregoing, the States propose that the share of the Settlement Funds allocated to Consumer Restitution Funds be further allocated among Eligible Consumers and distributed pursuant to an allocation and distribution plan for consumer restitution in the States' Actions that was submitted to the Court with a motion for preliminary approval on August 3, 2026. ECF Nos. 1014 (3:16-cv-02056-MPS), 971 (3:19-cv-00710-MPS), and 1472 (3:20-cv-00802-MPS) ("Allocation and Distribution Plan"). The Court granted preliminary approval of the Allocation and Distribution Plan on September 8, 2026. ECF Nos. 1014, 1034 (3:16-cv-02056-MPS), 971, 992 (3:19-cv-00710-MPS), and 1472, 1510 (3:20-cv-00802-MPS). The States request that the

allocation and distribution of Consumer Restitution Funds from the Settlements be included in the Allocation and Distribution Plan, as further ordered by the Court.

**D. Allocation and Distribution to Eligible Corporate Entities**

The Ascend and Mayne Settlements designate $12,745.00 and $7,843.00 as restitution for Eligible Corporate Entities ("Corporate Entity Payments") for which the Attorneys General of Idaho and Washington have asserted an exclusive claim in the States' Actions. Mayne Settlement ¶ I.EE., IV; Ascend Settlement ¶ IV. The States are requesting that further allocation and distribution of the Corporate Entity Payments be deferred until a later appropriate date when it can be part of a plan relating to previous and subsequent settlements as well, possibly until the end of the litigation in the States' Actions.

## X. CONCLUSION

For the foregoing reasons, the States respectfully request that the Court (1) find that the Settlements were negotiated at arm's length, are fair, reasonable, and adequate, and were entered into in good faith; (2) preliminarily approve the Settlements with Defendants Ascend, Citron, and Mayne; (3) appoint Huntington Bank as the Escrow Agent; (4) stay the litigation against Settling Defendants until the Court decides whether to grant final approval of the Settlements; (5) appoint Rust Consulting as the Notice and Claims Administrator; (6) approve the Notice Plan for providing notice to Eligible Consumers; (7) approve the plan for notice to Corporate Entities; (8) preliminarily approve the allocation of funds between the Restitution Account and Costs Account; (9) preliminarily approve a distribution to the States of all funds allocated to the Costs Account; (10) preliminarily approve the allocation of the Restitution Account between Eligible Corporate Entities, Eligible Consumers, and State Entities; (11) preliminarily approve a distribution to the States of all funds allocated to State Entities; (12) preliminarily approve that all funds allocated to

Consumer Restitution Funds be held in escrow, and subject to a future allocation and distribution plan, be deferred until a future appropriate time, upon motion as ordered by the Court as part of the States' Allocation and Distribution Plan; (13) preliminarily approve the Settlements' allocation of Corporate Entity Payments to Eligible Corporate Entities; (14) preliminarily approve that the share of the Settlement Funds allocated to Eligible Corporate Entities be held in the State Escrow and that the distribution be deferred until a future appropriate time; (15) setting an objection deadline for the Settlement, (16) setting an opt out deadline for the Settlement; (17) ordering that the allocation and distribution of Consumer Restitution Funds be addressed through the States' motion for approval of the Plaintiff States' Allocation and Distribution Plan filed August 3, 2026, and preliminarily approved September 8, 2026, and any subsequent orders entered by the Court thereon; and (18) setting a date and time for a final approval hearing.

Date: October 8, 2026.

STATE OF NORTH DAKOTA
DREW H. WRIGLEY
Attorney General

*/s/ Elin S. Alm*
Elin S. Alm
Bar number phv207896
Assistant Attorney General
Director, Consumer Protection
& Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone (701) 328-5570
ealm@nd.gov

*Attorney for the State of North Dakota*

STATE OF NEW YORK
LETITIA JAMES
Attorney General

*/s/ Saami Zain*
Saami Zain
Bar No. phv208392

Robert L. Hubbard
Federal Bar No. Ct30195

Assistant Attorneys General
Antitrust Bureau
Office of the Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
Tel: (212) 416-8267
Robert.Hubbard@ag.ny.gov
Saami.Zain@ag.ny.gov

*Attorneys for the State of New York*

STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

By: *<u>/s/ Amy Taylor</u>* [13]
Amy Taylor
Pro Hac Bar No.: PHV209197
Assistant Attorneys General

Nicole Demers
Federal Bar No. ct27223
Deputy Associate Attorney General

Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5030
Fax: (860) 808-5391
Amy.Taylor@ct.gov
Nicole.Demers@ct.gov

*Attorneys for the State of Connecticut*

[13] Counsel for Plaintiff State of Connecticut represents the consent of all Plaintiffs in the above-captioned case pursuant to Section XI.D. of the Electronic Filing Policies and Procedures.